## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

## BALTIMORE DIVISION

| | |
|---|---|
| **STACEY BAILEY, individually and on behalf of all others similarly situated,**<br>3400 Lakewind Way<br>Alpharetta, GA 30005<br><br>*And*<br><br>**ERIC CURRY, individually and on behalf of all others similarly situated,**<br>2844 Abaco Lane<br>Jacksonville Beach, FL 32250<br><br>**Plaintiffs,**<br><br>v.<br><br>**THE NFL PLAYER DISABILITY & SURVIVOR BENEFIT PLAN;**<br>200 St. Paul Street, Suite 2420<br>Baltimore, Maryland 21202<br><br>*And*<br><br>**THE DISABILITY BOARD OF THE NFL PLAYER DISABILITY & SURVIVOR BENEFIT PLAN;**<br>200 St. Paul Street, Suite 2420<br>Baltimore, Maryland 21202<br><br>*And*<br><br>**THE DISABILITY INITIAL CLAIMS COMMITTEE OF THE NFL PLAYER DISABILITY & SURVIVOR BENEFIT PLAN**<br>200 St. Paul Street, Suite 2420<br>Baltimore, Maryland 21202<br><br>*And* | Case No. _____<br><br><br>**CLASS ACTION**<br><br>**JURY TRIAL DEMANDED AS TO ALL CLAIMS SO TRIABLE** |

**THE BERT BELL/PETE ROZELLE NFL
PLAYER RETIREMENT PLAN;**
200 St. Paul Street, Suite 2420
Baltimore, Maryland 21202

*And*

**THE RETIREMENT BOARD OF THE
BERT BELL/PETE ROZELLE NFL
PLAYER RETIREMENT PLAN;**
200 St. Paul Street, Suite 2420
Baltimore, Maryland 21202

*And*

**THE DISABILITY INTIAL CLAIMS
COMMITTEE OF THE BERT
BELL/PETE ROZELLE NFL PLAYER
RETIREMENT PLAN**
200 St. Paul Street, Suite 2420
Baltimore, Maryland 21202

*And*

**THE 88 PLAN;**
200 St. Paul Street, Suite 2420
Baltimore, Maryland 21202

*And*

**THE 88 BOARD**
200 St. Paul Street, Suite 2420
Baltimore, Maryland 21202

                    **Defendants.**

## CLASS ACTION COMPLAINT

1.      Plaintiffs Stacey Bailey and Eric Curry, on behalf of themselves and on behalf of

all similarly situated participants, their beneficiaries, and Estates, pursuant to the Employee

Retirement Income Security Act of 1974, as amended, 29 U.S.C. §1001 *et seq*.  ("ERISA") and 42

U.S.C. §1981 bring this action against Defendants. Those Defendants are as follows:

2.      The NFL Player Disability & Survivor Benefit Plan, (the "Disability Plan") (previously known as the Neurocognitive and Death Benefit Plan, The NFL Player Disability & Neurocognitive Benefit Plan, and The NFL Player Supplemental Disability Plan).

3.      The Disability Board of The NFL Player Disability & Survivor Benefit Plan (the "Disability Board") which is the Disability Plan's named fiduciary performing certain Plan Administrator functions.

4.      The Disability Initial Claims Committee of The NFL Player Disability & Survivor Benefit Plan (The "Disability Plan Initial Claims Committee"), which serves as a fiduciary under the Plan and performs certain Plan Administrator functions.

5.      The Bert Bell/Pete Rozelle NFL Player Retirement Plan (the "Bell/Rozelle NFL Plan").

6.      The Retirement Board of The Bert Bell/Pete Rozelle NFL Player Retirement Plan which is the named Plan Administrator and fiduciary under the Plan.

7.      The 88 Plan.

8.      The 88 Board which is the 88 Plan's named Plan Administrator and fiduciary.

9.      The Disability Plan, The Disability Plan Board, The Disability Plan Initial Claims Committee, The Bert Bell/Pete Rozelle NFL Player Retirement Plan, The Retirement Board of the Bert Bell/Pete Rozelle NFL Player Retirement, The 88 Plan, and The 88 Board are collectively referred to herein as "Defendants."

10.     The Disability Plan, the Bell/Rozelle NFL Plan, and the 88 Plan are collectively referred to herein as "the Plans."

11.     Plaintiffs Stacey Bailey and Eric Curry, on behalf of themselves and on behalf of all similarly situated participants, their beneficiaries, and Estates, are seeking redress for violations

of plan terms and governing regulations, and breaches of fiduciary duty, the denial of statutorily mandated full and fair review of benefits denials, discrimination and other violations, based upon personal knowledge as to themselves and their own acts, and as to all other matters upon information and belief, based upon investigation of counsel.

## NATURE OF THE ACTION

12.     Plaintiffs and absent Class members are participants in the Plans and bring this action under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §1001, *et seq.* ("ERISA"), against the Defendants to enforce their rights under the terms of the Plans, to clarify their rights under the terms of the Plans, to enjoin acts and practices that violate the terms of the Plans or ERISA, and to obtain other appropriate equitable relief.  Plaintiffs also bring this action under 42 U.S.C. §1981 to address certain discriminatory conduct as set out herein.

## JURISDICTION AND VENUE

13.     Jurisdiction is appropriate under 28 U.S.C. §1331 in that 42 U.S.C. §1981 and 29 U.S.C. §1132 confer jurisdiction upon the district courts of the United States where, as here, Plaintiffs' claims relate to an "employee welfare benefit plan" and/or "employee pension plan" as those terms are defined within 29 U.S.C. §1001, *et. seq*. and where the questions related to Plaintiffs' claims for relief under 42 U.S.C. §1981 occurred within this district.

14.     Venue is appropriate in that a substantial part of the events or omissions giving rise to the Plaintiffs' claims occurred within this district.

15.     Venue is also proper in this District and Division pursuant to 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391 because Defendants maintain business activity in and are in this district and the Plans in question are administered and reside within or may be found in Baltimore, Maryland.

## PARTIES

16.     Plaintiffs are Plan "Participants," as defined by 29 U.S.C. §1002(7) and the terms of the Plans.

17.     Stacey Bailey is an African American former professional football player who played for the Atlanta Falcons in the 1982 through 1990 NFL seasons.  Mr. Bailey resides in Alpharetta, Georgia.

18.     As a person who was employed under a contract by a member club of the NFL, Mr. Bailey is a Participant in the Plans.

19.     Mr. Bailey applied for benefits under the Plans.

20.     Although he suffers from serious impairments in multiple domains and is entitled to benefits for a moderate impairment, he was improperly diagnosed only with a mild impairment and as a result receives far less than he is entitled to receive under the Plans because of the conduct set out herein.

21.     Eric Curry is an African American former professional football player who played for the Tampa Bay Buccaneers and Jacksonville Jaguars in the 1993 through 1999 NFL seasons. Mr. Curry resides in Jacksonville Beach, Florida.

22.     As a person who was employed under a contract by a member club of the NFL, Mr. Curry is a Participant in the Plans.

23.     Mr. Curry applied for benefits under the Plans.

24.     Although he suffers from serious impairments in multiple domains and is entitled to benefits for a moderate impairment, he was improperly diagnosed only with a mild impairment and as a result receives far less than he is entitled to receive under the Plans because of the conduct set out herein.

25.     The Bert Bell/Pete Rozelle NFL Player Retirement Plan is a pension plan and/or an employee welfare benefit plan as defined by ERISA.

26.     The Retirement Board of the Bert Bell/Pete Rozelle NFL Player Retirement Plan is the named Plan Administrator and a fiduciary of the Bell/Rozelle NFL Plan.

27.     The NFL Player Disability & Survivor Benefit Plan is an employee welfare benefit plan as defined by ERISA.

28.     The Disability Board of the NFL Player Disability & Survivor Benefit Plan is the named Plan administrator and a fiduciary of the Disability Plan.

29.     The Disability Initial Claims Committee of the NFL Player Disability & Survivor Benefit Plan is a named claims administrator and a fiduciary of the Disability Plan.

30.     The 88 Plan is a pension plan and/or an employee welfare benefit plan as defined by ERISA.

31.     The 88 Board of the 88 Plan is the named Plan administrator and a fiduciary of the 88 Plan.

## FACTUAL ALLEGATIONS

I.     **Introduction to Race Norming and its Impact on Plan Participants**

32.     This case concerns the assumption that certain human beings (e.g., African Americans) are inherently less intelligent due to their race and the tangible, detrimental impacts that this assumption has on participants in these Plans both presently due to a bias being used in the administration of the Plans and on participants in the Plans when they ultimately seek benefits under the Plans.

33.     Defendants have deprived and continue to deprive participants of equal treatment under the Plans and ultimately the biased treatment results in unfair assessment of the participants'

rights and entitlements to benefits under the Plans by permitting the use of race-based adjustments to the participants' neurocognitive assessments.

34.     This conduct creates a separate system within the Plans for assessing entitlement of benefits based on race.

35.     The Plans include entitlement to certain benefits for participants with certain neurocognitive impairments.

36.     When participants in the Plans apply for benefits because of a neurocognitive impairment, they are subjected to a battery of cognitive tests to diagnose the level of their impairment.

37.     Then, a participant's individual score is compared to a baseline score to determine if the Participant is suffering from neurocognitive decline.

38.     The difference between those two scores is referred to as a cognitive deficit or decline and the significance of that deficit directly impacts participants' entitlement to benefits.

39.     The baseline score used by the Plans is adjusted based on the race of the Plan participant.

40.     Because the baseline is adjusted based on race, certain participants (e.g., Caucasians) are assumed to have a higher baseline score that is used in assessing their cognitive decline.

41.     The ultimate result from this biased methodology (in a case with two equally situated claimants whose only difference is race) would be a larger cognitive deficit assessment for the Caucasian participant and a smaller cognitive deficit assessment for the African American participant.

42.    This methodology of adjusting the baseline score based on race is called "race norming."

43.    The various committees, boards, physicians, and fiduciaries who determine a participant's entitlement to benefits under the Plans have been and are using a race-norming methodology.

44.    The cumulative effect of these actions is that certain participants (e.g., African Americans) must show a greater impairment than other participants to qualify for the same Plan benefits.

45.    Plaintiffs Stacey Bailey and Eric Curry are victims of this discriminatory practice as well as other members of the Classes defined herein.

46.    Stacey Bailey is a participant under these Plans and has a serious neurocognitive impairment that has resulted in memory loss, language difficulty, and an inability to perform many day-to-day tasks.

47.    Eric Curry is a participant under these Plans and suffers from neurocognitive impairment that has resulted in memory loss, language difficulty, and an inability to perform many day-to-day tasks.

48.    Because Plaintiffs are African American, when they applied for disability benefits, multiple scores from their cognitive test battery were adjusted using the Plans' race norming methodology.

49.    As a result, the cognitive decline measurements from the tests appear smaller than they would have been had Plaintiffs been provided the same treatment under the Plans as certain Caucasian participants.

50.     As a result of this race norming in the administration of the Plans, Plaintiffs have been discriminated against and ultimately receive less benefits because of the presumption the Plans utilize that their skin color impacts measurements of cognitive decline.

51.     Plaintiffs are not the only victims of this practice.  Other participants in the Plans seeking to enforce their rights under these Plans have been treated in the same way. As such, Class members have likewise been discriminated against and ultimately receive less benefits because of the presumption the Plans utilize that their skin color impacts measurements of cognitive decline.

52.     These Plans have recently come under fire for fiduciary breaches involving a pattern of systematic bias against participants with that bias being motivated by financial considerations to limit the payment of benefits to the very participants whom the Plans were designed to help, as one court put it, as "compensation for investing themselves in the sport."

53.     As described by one district court, "[t]he curtain has been pulled back as to the inner workings of [the Board]. And what lies behind it is far from pretty with respect to how it handles disability benefit claims sought by former players[.]" *Cloud v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, No. 3:20-CV-1277-S, 2022 WL 2237451, at *1, *130-32 (N.D. Tex. June 21, 2022) appeal pending, No. 22-10710 (oral arguments heard on Sept. 7, 2023).

54.     The Plans provide disability and related benefits to eligible NFL Players, including Plaintiffs and Class members.

55.     The Plans are multi-employer plans as defined in 29 U.S.C. §1002(37).

56.     Race norming is the practice of adjusting scores on cognitive tests to compare a test subject's result with the results of a "reference population" purportedly of the same race as the test subject.

57.     For example, a race-normed test result compares African American test subjects' scores to an African American reference population and White test subjects' scores to a White reference population.

58.     "Raw scores" reflecting a test subject's actual performance on tests are converted to "T-scores" that reflect the comparison to the relevant reference population.

59.     A T-score reflects the distance of a test subject's score relative to the reference population's mean.

60.     A T-score of 50 indicates that a test subject's score is the mean score of the reference population, and each ten points away from a T-score of 50 indicates a standard deviation from the mean.

61.     Thus, a score of 40 indicates a score one standard deviation below the reference population's mean score; a score of 60 indicates a score one standard deviation above the mean; a score of 30 indicates a score two standard deviations below the mean; and so on.

62.     In general, T-scores need not be based on a comparison to a race-based reference population.

63.     For example, some tests are scored using T-scores that compare a test subject to an age-based reference population.

64.     Race norming, however, involves the use of race-based reference populations to generate T-scores.

65.     T-scores and other comparative measures (such as a test score's percentile in relation to a reference population) are key elements of neurocognitive diagnoses.

66.     For example, the DSM-5 notes that "[f]or mild NCD [neurocognitive disorder], performance typically lies in the 1-2 standard deviation range (between the 3rd and 16th percentiles)."

67.     The DSM-5 also explains that "[f]or major NCD [neuro-cognitive disorder], performance is typically 2 or more standard deviations below appropriate norms (3rd percentile or below)."

68.     Thus, the reference population that is used to determine a test subject's score in relation to the mean score can have a significant impact on the diagnosis that the test subject receives because of his or her test results.

69.     The Heaton norms are one commonly used race-norming tool.

70.     The Heaton norms' African American reference population has lower mean scores than the White reference population.

71.     Because the reference population mean score against which African American test subjects' scores are compared is lower than the mean score against which White test subjects' scores are compared, the same raw score for an African American person results in a higher T-score than it would for a White person.

72.     Although the Heaton norms include only African American and White reference populations, it is common to use the African American reference population to adjust the test results of non-White test subjects other than African American people.

73.     The higher a persons' T-score (or other comparative score) on a cognitive test, the less likely it is that the person will be diagnosed with a neurocognitive impairment.

74.     Thus, using the Heaton norms to adjust the scores of African American test subjects assumes that African American people have lower neurocognitive functioning than White people

to begin with, and that African American people with low scores on cognitive tests are closer to where they are expected to be based on their race.

75.    Applying the Heaton norms to adjust test scores based on race ignores the individual characteristics of a test subject and simply treats them as a member of an undifferentiated group based on their race.

76.    Race norming also ignores the underlying socioeconomic factors that may result in racial disparities in performance on cognitive tests, instead, using race as a broad proxy despite the heterogeneity of those populations.

77.    A recent position statement of the American Academy of Clinical Neuropsychology ("AACN") explained that the term "race" as used in the field "lacks a clear definition" and ignores the wide variability that exists within racial groups.

78.    There are also technical problems with the use of race norming.

79.    The AACN has noted that "sampling of racial minority populations in the U.S. has been limited and inconsistent when creating neuropsychology test norms" resulting in potential "diagnostic error, as well as stigmatization of minority populations based on supposed disparities in neuropsychological ability."

80.    The false negative rate of the Heaton norms, or of race norming methodologies in general, is unknown.[1]

81.    And the use of race norming by the administrators of the Plan (as discussed in further detail below) ignores that the Plan entitles participants to benefits under the Plans (such as the Mild and Moderate Neurocognitive Benefit) based solely on their own neurocognitive

---

[1] Philip G. Gasquoine, *Race-Norming of Neuropsychological Tests*, 19 Neuropsychology Rev. 250, 254-55 (2009).

functioning, not their neurocognitive functioning as compared to a race-based reference population.

82.     Given the significant ethical and technical issues with the use of race norming, groups representing mainstream medical views have disavowed the practice.

83.     For example, the AACN "supports the elimination of race as a variable in demographically based normative test interpretation."

84.     Approximately eight cognitive tests (some of which include subtests) are used to determine whether (and the degree to which) an applicant is impaired in the DSM-5 domains of cognitive functioning.

85.     On information and belief, the battery of tests that is used to diagnose neurocognitive impairments is specified in the Plans training documents, and the same battery is applied to all such participants in these Plans who apply for benefits.

86.     Different race norming tools, based on normative data for White, African American, Hispanic, and Asian reference populations, are used to adjust scores on the WAIS-IV and WMS-IV tests.

87.     Defendants are aware of race norming and its detrimental impact on African American players because of the concussion-related litigation in *In re National Football League Players' Concussion Injury Litigation*, No. 2:12-md-02323-AB (E.D. Pa.), and related cases[2] (collectively, the "Concussion Litigation").

88.     In 2020, two former NFL players sued the NFL and NFL Properties, LLC, alleging that the defendants had insisted on using the Heaton norms to adjust applicants' scores on the tests

---

[2] *See, e.g.*, *Henry v. National Football League*, No. 2:20-cv-04165-AB (E.D. Pa.).

used to diagnose players' injuries and thus entitlement to Concussion Litigation benefits, and moved to modify the settlement agreement to disallow race norming.

89.    That practice of race norming in the Concussion Litigation settlement award decisions resulted in African American players receiving less benefits under the settlement agreement than similarly situated White players.

90.    In 2021, the NFL agreed to end the practice of race norming in the administration of the Concussion Litigation settlement.[3]

91.    Defendants nonetheless continued to use race norming in administering the Plans.

92.    Because of Defendants' practice of race norming, Plaintiffs and all Class members have been denied the full benefits owed to them under the Plans because of their race.

## II.    Plaintiffs and Their Neurocognitive Disabilities

### a.    Plaintiff Stacey Bailey

93.    Stacey Bailey is an African American former professional football player.

94.    After playing college football at San Jose State University, Mr. Bailey was selected in the 1982 NFL draft by the Atlanta Falcons.

95.    He played wide receiver for the Falcons from 1982 through 1990 and, following an injury, was released by the Falcons in September 1990.

96.    In recent years, Mr. Bailey has experienced serious neurocognitive impairments that have prevented him from working and living a normal life.

97.    For example, Mr. Bailey has been unable to manage the landscaping business he started after his NFL career ended, primarily handing it over to his children, because of his

---

[3] This Class Action Settlement modification's purpose was to "immediately eliminate the consideration of race, including Race Norming, from the Settlement Program." It did not address consideration of race or the use of race-norming under the Plans.

neurocognitive impairments, and he can no longer participate in many household tasks or in household decision-making.

98.    Mr. Bailey defers many decisions to his wife and has stopped socializing and speaking publicly at football-related events.

99.    Both Mr. Bailey's language and memory are seriously impaired.

100.    His impairments therefore fall into multiple DSM-5 domains.

101.    For example, Mr. Bailey has had difficulty remembering the names of his grandchildren, and he often has trouble finding words.  He also suffers from headaches, a depressed mood, and anxiety.

102.    Mr. Bailey's impairments require the use of compensatory strategies and accommodations to allow him to perform routine activities of daily living and to engage in any for-profit occupation.

103.    Mr. Bailey's condition is so severe that in October 2020 he was diagnosed with Alzheimer's disease, based on symptoms he has experienced going at least as far back as September 2016.

104.    Those symptoms should qualify him for Moderate Neurocognitive Benefits under the Plan.

105.    Mr. Bailey is a beneficiary of the Concussion Litigation settlement.

106.    The administrator of that settlement accepted Mr. Bailey's Alzheimer's diagnosis, and awarded Mr. Bailey supplemental benefits, in addition to the benefits for a Level 2 impairment that he had previously received.

107.    A Level 2 impairment diagnosis under the Concussion Litigation settlement is akin to moderate dementia, the equivalent of the diagnosis required for Moderate Neurocognitive Benefits under the Plans.

108.    Those diagnoses required showings of impairments in multiple domains and of functional decline.

109.    Those same showings should make Mr. Bailey eligible for, among others, Disability Plan benefits.

110.    Mr. Bailey applied for a benefit from the Disability Plan on June 16, 2020, and was examined by two Plan Physicians, a neurologist and neuropsychologist, on February 8 and 9, 2021, respectively.

111.    Among other tests, the Boston Naming Test was administered to Mr. Bailey.

112.    The report of the neurologist indicates that Mr. Bailey scored an "abnormally low score" on the Montreal Cognitive Assessment (a screening test for detecting cognitive impairment), despite acknowledging that Mr. Bailey "put forth full effort in taking the test."

113.    That Plan Physician acknowledged multiple "worrisome" signs, including "unequivocal frontal release signs often seen in individuals who have or are likely to develop dementia in the future ..."

114.    With respect to the memory domain, the report of Mr. Bailey's neuropsychological examination (the "Neuropsychological Report") notes that Mr. Bailey fell "within the impaired range of ability range of ability (<1st percentile)" and that "[t]here is evidence of objective impairment on tests of memory functioning."

115.    Given Mr. Bailey's extremely low functioning in this domain ("<1st percentile") Mr. Bailey was diagnosed at least with a mild-moderate objective impairment in the memory domain.

116.    Under the Disability Plan, a Participant is entitled to Moderate Neurocognitive Benefits "if he has a mild-moderate objective impairment in two or more domains of neurocognitive functioning."

117.    Because of Mr. Bailey's mild-moderate objective impairment in the memory domain, Mr. Bailey would need a mild-moderate objective impairment in only one more domain to qualify for Moderate Neurocognitive Benefits.

118.    Mr. Bailey should have been diagnosed with at least a mild-moderate objective impairment in the language domain but was not because of the impact of race norming.

119.    In the language domain, Mr. Bailey's Boston Naming Test score was race-normed using the Heaton norms to a T-score of 32 (less than two standard deviations from the mean for the African American reference population).

120.    On information and belief, that score is above the cutoff between mild and mild-moderate objective impairments, and therefore is associated only with a mild objective impairment.

121.    If Mr. Bailey were White, he would have had a T-score of 25, which is more than two standard deviations from the mean for the White reference population and is associated with a mild-moderate objective impairment.

122.    Information from Mr. Bailey's Neuropsychological Report supports this conclusion.

123.    For example, the Neuropsychological Report includes the following passage:

## ASSESSMENT PROCEDURES:

During the current neuropsychological assessment, test interpretation is based on normative data contained in individual test manuals including the Advanced Clinical Solutions, WAIS-WMS-IV and the co-normed database published by Heaton, Miller, Taylor and Grant (2004). Performance descriptors used are Standard Scores or T Scores and in some cases Z scores (CVLT-II), which are described in the table below.



| | | | | | | |
|---|---|---|---|---|---|---|
| Standard Score | 55 | 70 | 85 | 100 | 115 | 130 | 145 |
| T-Score | 20 | 30 | 40 | 50 | 60 | 70 | 80 |
| Z Score. | -3.0. | -2.0 | -1.0 | 0.0 | 1.0 | 2.0 | 3.0 |
| Percentile | <1st | 2nd | 16th | 50th | 84th | 98th | >99th |

Descriptive levels that coincide with the above bell curve are consistent with the American Academy of Clinical Neuropsychology (AACN) guidelines (Guilmette, Sweet & colleagues, 2020) and are as follows:

| Standard Score | T-Score | Z Score | Percentile | Descriptive Range |
|---|---|---|---|---|
| >130 | >70 | >+2.0 | >98 | Exceptionally high |
| 120–129 | 63-69 | +1.33-1.99 | 91–97 | Above average score |
| 110–119 | 57-62 | +0.67-1.32 | 75–90 | High average score |
| 90–109 | 43-56 | -0.67-0.66 | 25–74 | Average score |
| 80–89 | 37-42 | -0.66-1.33 | 9–24 | Low average score |
| 70–79 | 30-36 | -1.32 -2.00 | 2–8 | Below average score |
| <70 | <30 | <-2.00 | <2 | Exceptionally low |

124.    Both charts from this portion of the Neuropsychological Report confirm the significance of scoring above or below a T-score of 30.

125.    The table at the bottom, for example, notes that T-scores in the range of 30-36 are merely "[b]elow average," while T-scores below 30 are "[e]xceptionally low."

126.    This corresponds to the line between "mild NCD" and "major NCD" specified in the DSM-5 and suggests that this same criterion is used to distinguish between "mild objective impairment" and "mild-moderate objective impairment" in the Neurocognitive Benefits application process.

127.    The significant difference between Mr. Bailey's "African American" T-score and the "White" T-score associated with the same raw score—a difference of nearly a full standard

deviation from the mean—strongly suggests that a White Participant with Mr. Bailey's same raw score on the Boston Naming Test would have been diagnosed with at least a mild-moderate objective impairment in the language domain.

128.    Thus, had Mr. Bailey been White, his cognitive test scores would have resulted in a diagnosis of mild-moderate objective impairment in the language domain, and he would have qualified for Moderate Neurocognitive Benefits.

129.    As a result of the use of race norming on his Boston Naming Test results, Mr. Bailey did not have a diagnosis of "mild-moderate objective impairment in **two or more domains** of neurocognitive functioning" as required to qualify for Moderate Neurocognitive Benefits.

130.    The Neuropsychological Report confirms that Mr. Bailey's test results were interpreted "based on normative data contained in individual test manuals including ... the co-normed database published by Heaton, Miller, Taylor and Grant (2004)" (i.e., the Heaton norms).

131.    It also indicates that "average intellectual functioning was used to derive multivariate base rate expectations for performance ..."

132.    There would have been no way for Mr. Bailey, or any reasonable person in his situation, however, to understand this language to mean that his test results were adjusted based on his race.

133.    Participants have only discovered the application of race norming to their neuropsychological test results because the information was publicly disclosed and, for all intents and purposes, acknowledged by the NFL in the Concussion Litigation.

134.    Because the Heaton norms were applied to lower Mr. Bailey's Boston Naming Test score relative to White Participants, the two Plan Physicians who examined Mr. Bailey filled out

a "Joint Physician Report Form" indicating that Mr. Bailey only qualifies for Mild Neurocognitive Benefits.

135.    In a letter dated March 2, 2021, the Disability Plan Initial Claims Committee informed Mr. Bailey that he qualified only for Mild Neurocognitive Benefits, and that he would receive a monthly benefit of $3,000, instead of the $5,000 he would have received had he qualified for Moderate Neurocognitive Benefits.

136.    It did so despite Mr. Bailey's prior Alzheimer's diagnosis.

137.    Mr. Bailey also later learned that his WAIS-IV and WMS-IV test results were adjusted using race norming.

138.    After examining Mr. Bailey, a Plan Physician created a document entitled "Demographically Adjusted Score Report."

139.    The Score Report notes that the results contained within it include "[d]emographic corrections based on age, education, sex, and four categories of race/ethnicity (White, African American, Hispanic Asian)."

140.    The document indicates that Mr. Bailey's scores on various WAIS-IV and WMS-IV subtests were converted into T-scores.

141.    Notably, the T-scores from the Demographically Adjusted Score Report were not initially provided to Mr. Bailey and did not appear in the Neuropsychological Report in which his race-normed Boston Naming Test results appeared.

142.    This document was only provided to Mr. Bailey after he specifically requested it.

143.    In addition to the monetary damages incurred because of the determination that he suffered from a lesser deficit than he truly does, Mr. Bailey has also suffered pain and humiliation

through the knowledge that he was racially discriminated against by those responsible for administering the Plan under which he is supposed to be treated as an equal to White Participants.

**b. Plaintiff Eric Curry**

144.    Eric Curry is an African American former professional football player.

145.    After playing college football at the University of Alabama, Mr. Curry was selected in the 1993 NFL draft by the Tampa Bay Buccaneers.

146.    He played Defensive End for the Falcons from Tampa Bay Buccaneers through 1997, then he played from the Green Bay Packers in 1998, then he finished his career with the Jacksonville Jaguars in 1999.

147.    In recent years, Mr. Curry has experienced serious neurocognitive impairments that have prevented him from working and living a normal life.

148.    He can no longer participate in many household tasks or in household decision-making.

149.    Mr. Curry demonstrated cognitive deficits in cognitive processing speed, executive functioning, immediate and delayed memory, and motor speed domains.

150.    His impairments therefore fall into multiple DSM-5 domains.

151.    Mr. Curry has a documented history of functional decline due to neurological impairment.

152.    Prior to his most recent application, Mr. Curry was a beneficiary of the Disability Plan benefits due to neurological conditions until later when his benefits were revoked and denied by the Board of the Disability Plan.

153.    Mr. Curry was a beneficiary of the Concussion Litigation settlement.

154. The Administrator of that settlement awarded Mr. Curry benefits for a Level 1.5 impairment in or around January 2021.

155. A Level 1.5 impairment diagnosis under the Concussion Litigation settlement is akin to dementia, the equivalent of the diagnosis required for Moderate Neurocognitive Benefits under the Disability Plan.

156. Those diagnoses required showings of impairments in multiple domains and of functional decline through a clinical dementia rating score level of 1.0 (mild dementia) in categories of community affairs, personal care, and homes & hobbies.

157. Those same showings and symptoms should make Mr. Curry eligible for Moderate Neurocognitive Benefits under the Disability Plan.

158. On or around July 27, 2021, the Disability Plan Initial Claims Committee informed Mr. Curry that he qualified only for Mild Neurocognitive Benefits, and that he would receive a monthly benefit of $3,000, instead of the $5,000 he would have received had he qualified for Moderate Neurocognitive Benefits.

159. It did so despite his previous disability awards and his Level 1.5 impairment award under the Concussion Litigation Settlement.

160. Subsequently, Mr. Curry appealed the decision and demonstrated cognitive impairment in multiple domains with evaluations with the Plan physicians.

161. Mr. Curry provided historical information of documented functional decline.

162. Despite Mr. Curry's performance consistent with his past cognitive testing results of impairment in multiple domains and pages of functional decline documented by multiple doctors, the Plan physicians concluded Mr. Curry only qualified for mild impairment based on one single observation of Mr. Curry talking on the phone.

163.    Moreover, the Plan physicians improperly considered Mr. Curry's "demographic background," including his race, when estimating his premorbid IQ.

164.    Mr. Curry also later learned that his WAIS-IV and WMS-IV test results were adjusted using race norming.

165.    After examining Mr. Curry, a Plan Physician created a document entitled "Demographically Adjusted Score Report."

166.    The Score Report notes that the results contained within it include "[d]emographic corrections based on age, education, sex, and four categories of race/ethnicity (White, African American, Hispanic Asian)."

167.    The document indicates that Mr. Curry's scores on various WAIS-IV and WMS-IV subtests were converted into T-scores.

168.    Notably, the T-scores from the Demographically Adjusted Score Report were not initially provided to Mr. Curry and did not appear in the Neuropsychological Report in which his race-normed Boston Naming Test results appeared.

169.    This document was only provided to Mr. Curry after he specifically requested it.

170.    In addition to the monetary damages incurred because of the determination that he suffered from a lesser deficit than he truly does, Mr. Curry has also suffered pain and humiliation through the knowledge that he was racially discriminated against by those responsible for administering the Plan under which he is supposed to be treated as an equal to White participants.

## CLASS ALLEGATIONS

171.    Because the process of race-norming and use of methodologies that include race-norming when converting raw scores to T-scores is mandated by the Plan, the impacts felt by Plaintiffs Bailey and Curry are felt by all members of the Plan.

172.    As a result of the differential and discriminatory practices employed by the Defendants, the Plans have violated their terms and ERISA.

173.    Plaintiffs bring this action as a class action, individually and on behalf of all other similarly situated participants, their beneficiaries, and Estates, pursuant to the provisions of Rule 23(a), (b)(1), (b)(2), (b)(3), and (c)(4) of the Federal Rules of Civil Procedure.

174.    The Class is defined as follows:

> All Participants in The NFL Player Disability & Survivor Benefit Plan, The Bert Bell/Pete Rozelle NFL Player Retirement Plan, and the 88 Plan.

175.    The §1981 Subclass is defined as follows:

> All Non-White Participants in The NFL Player Disability and Survivor Benefit Plan, The Bert Bell/Pete Rozelle NFL Player Retirement Plan, and the 88 Plan.

176.    Excluded from the Class are Defendants and their officers and directors, governmental entities, Plaintiffs' counsel, and the members of the judiciary and their staff to whom this case is assigned and their immediate families.  Plaintiffs reserve the right to revise the Class definition, as appropriate, during this litigation.

177.    This action has been brought and may properly be maintained on behalf of the class proposed herein under Rule 23 of the Federal Rules of Civil Procedure.

178.    **Numerosity.** The members of the Class are so numerous and geographically dispersed that individual joinder of all class members would be impracticable.  These Plans reported the participants as follows for the corresponding years: The Disability Plan in 2021 reported 20,997 participants; the Bell/Rozelle NFL Plan in 2021 reported 14,963 participants; and the 88 Plan in 2021 reported 12,628 participants in those Plan's respective filings with the Department of Labor. The exact number of Class members as of the date of filing is currently unknown to Plaintiffs but may be readily identified and ascertained from the books and records

maintained by Defendants.  Moreover, given the multiemployer nature of these Plans, the members of the Class are so numerous and so geographically dispersed across the country that joinder of all Class members is impracticable.

179.   **Commonality and Predominance.** There are questions of law or fact common to all members of the Class concerning exclusively Defendants' discriminatory actions and entail consideration of Plan Terms and ERISA provisions uniformly applicable to all Class members. Resolution of these questions will not require individual inquiry into the actions or circumstances of individual participants and can be answered with evidence common to all Class.  This action involves common questions of law and fact, which predominate over any questions affecting individual Class members and which can be answered using evidence common to the Class, including, without limitation: whether Participants of the Plans are subject to the discriminatory practice of race-norming by Defendants; whether such conduct also constitutes a breach of fiduciary duty under ERISA and a violation of Plan terms; whether such conduct violates 42 U.S.C. § 1981; and whether class members are entitled to injunctive relief and/or other equitable relief as may deemed appropriate.

180.   **Typicality.**  Plaintiffs' claims are typical of the other Class members' claims because Plaintiffs, like each of the other Class members, are subject to ongoing discrimination in the administration of these Plans, were and remain subject to the Plans' use of race-norming; have their rights and entitlements to benefits impacted by race norming and some may also have received or will receive less in benefits than they would have been entitled to had their cognitive test results not been subjected to race-norming.  Plaintiffs and the other Class members suffered damages to their rights under these Plans as a direct and proximate result of these same wrongful

practices by Defendants.  Plaintiffs' claims arise from the same practices and course of conduct that give rise to the other Class members' claims.

181.    **Adequacy.**  Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other members of the Class that they seek to represent. Plaintiffs will fairly and adequately protect the interests of the absent members of the Class. Because their claims are typical of those of absent members of the Class, Plaintiffs have every incentive to vigorously pursue those claims on behalf of absent Class members, and their interests coincide with, and are not antagonistic to, those of the Class. Rather, Plaintiffs share the same interest as Class members in putting an end to Defendants' conduct. Also, Plaintiffs have retained counsel competent and experienced in complex class action litigation and intend to prosecute this action vigorously.  As such, Plaintiffs and their counsel will fairly and adequately protect the Class members' interests.

182.    The requirements of Fed. R. Civ. P. 23(b)(1), (b)(2), (b)(3), and (c)(4) are satisfied in that, as set forth above, prosecution of separate actions by individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for Defendants. Adjudications with respect to individual members of the Class would as a practical matter be dispositive of the interests of the other members not parties to the adjudications and would substantially impair or impede their ability to protect their interests. All Class members would benefit from the injunctive relief requested herein. Additionally, Defendants have acted and/or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief appropriate with respect to the Class as a whole. Additionally, because of the Defendants uniform conduct, that the questions of law and fact which are common to all Class

members predominate over any questions affecting only individual members and a class action is the superior method over other available methods for fairly and efficiently adjudicating the controversy.

183.    Class action treatment is superior to any other available means for the fair and efficient adjudication of the controversy alleged herein, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims, so it would be impracticable for Class members to individually seek redress for Defendants' wrongful conduct. Additionally, individualized litigation creates a danger for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

## COUNT I
### Declaratory Judgment and Injunctive Relief

184.    Plaintiffs and the Class members repeat and re-allege the foregoing paragraphs as if fully set forth herein.

185.    Nothing in the Plans allows disparate treatment of Plan participants based on race.

186.    The creation of racial preference among Plan participants violates the fiduciary duty to act in the exclusive interest of participants and the fiduciary duty not to create preferences and arbitrarily discriminate among participants in an ERISA plan.

187.    The Defendants breached their fiduciary duty by creating improper preferences among Plan participants such that Plaintiffs and the other Class members are denied the same benefits under the Plans as certain other Caucasian participants.

188.    As a result, Plaintiffs seek declaratory and injunctive relief consisting of an order prohibiting the Defendants from using race norming in their ongoing administration of the Plans.

189.    Plaintiffs further seek injunctive relief ordering Defendants to examine all Class members who applied for, are presently receiving, or have previously received benefits under the Plans that were subjected to race norming and reexamine those claims' decisions to remove any vestige of that bias and follow the Plans' terms in providing benefits resultant from that removal.

**COUNT II**
**ERISA §502(a), 29 U.S.C. §1132(a)**

190.    Plaintiffs and the Class members repeat and re-allege the foregoing paragraphs as if fully set forth herein.

191.    Plaintiffs and the other Class members are participants in the Plans who have their claims denied or who have been paid lesser benefits than the full benefits owed to them under the Plans because of their race.

192.    By way of example, in the claims of the named Plaintiffs, Mr. Bailey and Mr. Curry have mild-moderate objective impairment in two or more domains of neurocognitive functioning which reflect acquired brain dysfunction and which may require use of compensatory strategies and/or accommodations to independently perform complex activities of routine daily living or to engage in any occupation for remuneration or profit. As a result, Mr. Bailey and Mr. Curry are entitled to at least moderate impairment Neurocognitive Benefits under the Disability Plan, but despite properly exhausting the administrative appeals process, were only granted Mild Neurocognitive Benefits because of the discriminatory application of race-norming to their cognitive test results.

193.    The other Class members likewise were either denied the full benefits to which they are entitled or had their claims denied in their entirety because of the discriminatory application of race-norming to their cognitive test results.

194.    Plaintiffs and the other Class members have been damaged by these actions, including by being denied benefits they would have received if not for the discrimination against them based on their race.

195.    Defendants have violated ERISA by these actions and further denied Plaintiffs and absent Class members full and fair review of adverse benefits determinations.

196.    ERISA implementing regulations provide that "[i]n the case of a plan providing disability benefits, the plan must ensure that all claims and appeals for disability benefits are adjudicated in a manner designed to ensure the independence and impartiality of the persons involved in making the decision. Accordingly, decisions regarding hiring, compensation, termination, promotion, or other similar matters with respect to any individual (such as a claims adjudicator or medical or vocational expert) must not be made based upon the likelihood that the individual will support the denial of benefits." 29 C.F.R. §2560.503-1(b)(7). These Plans have failed to follow these requirements by hiring experts and physicians and third-party administrators who, in their assessment of Class members claims, discriminated against Class members using race norming.

197.    Plaintiffs and Class members have either exhausted all available administrative remedies under the terms of the Plans or, alternatively, they are deemed to have exhausted administrative remedies because Defendants failed to afford Plan participants a full and fair review process, because attempting to receive a fair review would be futile under these circumstances, and the Plans lack procedures in place that would be adequate to provide a full and fair review in light

of the discriminatory conduct described herein. In the further alternative, exhaustion of administrative remedies is not required here because Plaintiffs assert claims for breaches of fiduciary duty and assert statutory violations of ERISA and violations of regulations promulgated thereunder, separate from violations of Plan terms.

198.    Given the continuing nature of Defendants' breaches of their statutory and regulatory obligations and of their fiduciary duties, the limitations periods applicable to Plaintiffs' and Class members' claims have not begun to run. Alternatively, as recounted above, because Defendants have for decades actively concealed their misconduct, including through repeated misrepresentations to Plaintiffs and Class members, all applicable statutes of limitations affecting Plaintiffs' and Class members' claims have been tolled. Finally, in addition to the reasons set out above, given the nature of the disability claims impacted by the  Defendants' conduct, any limitations period on the Plaintiffs and Class members' claims should be tolled due to cognitive disability.

### COUNT III
**42 U.S.C. §1981**
**(On Behalf of Subclass Only)**

199.    Plaintiffs and the Class members repeat and re-allege the foregoing paragraphs as if fully set forth herein.

200.    Using race norming to adjust cognitive test scores in the manner discussed above can only be based on the racist assumption found in the Heaton norms that African American and other Non-White participants are inherently less intelligent than White participants, and therefore that a Subclass participant cannot be considered impaired—and therefore should not qualify for the same benefits—unless his raw score is much lower than a White participant's.

201.    Defendants' pattern and practice is demonstrated by the required usage of race-norming in converting raw scores to T-scores and is demonstrated by the Plaintiffs' own experiences; the same race-norming methodologies are likewise applied to every other African American and Non-White Plan participant.

202.    Plaintiffs and the other Subclass members have thus been denied "the same right in every State and territory to make and enforce contracts, . . . as is enjoyed by white citizens" in violation of 42 U.S.C. §1981.

203.    The Plaintiffs and other Subclass members had a right to have their raw scores assessed without respect to the mean score of the Non-White reference population. By causing the Plan to be administered in the manner alleged herein, the Defendants have also denied Plaintiffs and the other Subclass members "the same right in every state and territory ... to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens." 42 U.S.C. §1981.

204.    Plaintiffs and the other Subclass members have been damaged by Defendants' use of intentional race discrimination in the determination of the benefits to which Plan participants are entitled.  Plaintiffs and the other Subclass members have lost benefits they would have received if not for the discrimination against them based on their race and have suffered pain and humiliation because of Defendants' discriminatory actions.

## REQUEST FOR RELIEF

WHEREFORE, Mr. Bailey and Mr. Curry, individually and on behalf of the other Class members, respectfully request that judgment be entered against Defendants, and that the Court grant the following relief:

a.   Certify the Class under the Federal Rules of Civil Procedure;

b.   That Plaintiffs be appointed as the representatives of the Class;

c.  That counsel for Plaintiffs be appointed as counsel for the Class;

d.  Declare the Plans' use of race norming to violate the Plans terms;

e.  Declare the Plans' use of race norming to violate ERISA;

f.  Declare that Defendants breached their fiduciary duties under ERISA;

g.  Enjoin Defendants from continuing the discriminatory practices alleged in this Complaint;

h.  Pursuant to the injunctive remedy requiring Defendants to reconsider any claims which were impacted by the discrimination described herein and provide the relief required by the Plan terms to any resultant award of benefits with said reconsideration to be supervised by Class counsel;

i.  Enjoin the Defendants from reducing benefits payable to Plaintiffs and Class members due to their participation in this lawsuit;

j.  Award Plaintiffs and the other members of the Class the costs incurred in this lawsuit and reasonable attorneys' fees;

k.  Award the Plaintiffs and the Class members pre-judgment and post-judgment interest at the maximum rate allowed by law for any benefits that were withheld because of the use of race norming;

l.  Awarding compensatory and punitive damages; and

m.  Awarding the Class such other relief, general or special, at law or in equity, which the Court may deem just, proper, and equitable.


DATED: September 29, 2023

Respectfully submitted,

By: */s/ Christopher T. Nace*

Christopher T. Nace
**PAULSON AND NACE, PLLC**
1025 Thomas Jefferson Street, NW, Suite 810
Washington, D.C. 20007
ctnace@paulsonandnace.com

W. Daniel "Dee" Miles, III (*pro hac vice pending*)
Leon H. Hampton, Jr. (*pro hac vice pending*)
Rebecca Gilliland (*pro hac vice pending*)
Paul W. Evans (*pro hac vice pending*)
**BEASLEY, ALLEN, CROW, METHVIN,**
**PORTIS & MILES, P.C.**
218 Commerce Street
Montgomery, AL 36104
Telephone: 334-269-2343
Facsimile: 334-954-7555
Dee.Miles@BeasleyAllen.com
Leon.Hampton@BeasleyAllen.com
Rebecca.Gilliland@BeasleyAllen.com
Paul.Evans@BeasleyAllen.com
(Signed by Christopher T. Nace with the permission
of W. Daniel "Dee" Miles, III, Leon H. Hampton,
Jr., Rebecca Gilliland and Paul W. Evans)

Thomas O. Sinclair (*pro hac vice pending*)
**SINCLAIR LAW FIRM, LLC**
2140 11th Ave S
Suite 212
Birmingham, Alabama 35205
Telephone: 205-868-0818
Facsimile: 205-868-0894
tsinclair@sinclairlawfirm.com
(Signed by Christopher T. Nace with the permission
of Thomas O. Sinclair)

Vicki Trammell Cuthbert (*pro hac vice pending*)
**THE CUTHBERT FIRM, LLC**
540-Powder Springs Street
Suite c-15
Marietta, GA 30064

33

Telephone: 470-317-7717
Fax:  866-990-9743
Vicki@cuthbertfirm.com
(Signed by Christopher T. Nace with the permission
of Vicki Trammell Cuthbert)

***Attorneys for Plaintiffs***