**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**BALTIMORE DIVISION**

**STACEY BAILEY, et al.,**

**Plaintiffs,**

v.

**THE NFL PLAYER DISABILITY & SURVIVOR BENEFIT PLAN, *et al.***

**Defendants.**

Case No. 1:23-cv-02661-JRR

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF ATTORNEYS' FEES, EXPENSES, AND SERVICE AWARDS**

## TABLE OF CONTENTS

**INTRODUCTION**......1

**BACKGROUND FACTS**......2

**I. The Claims and Alleged Harm to the Class**......2

**II. The Litigation and Negotiations**......4

**III. The Relief Achieved by Plaintiffs and Counsel**......5

**IV. Summary of the Settlement**......5

**LEGAL STANDARD**......6

**ARGUMENT**......10

**I. CLASS COUNSEL ARE ENTITLED TO AND SHOULD BE AWARDED ATTORNEYS' FEES AND COSTS**......10

**A. Class Counsel Are Entitled to An Award of Fees And Costs Under ERISA**......10

**1. The degree of the opposing party's culpability or bad faith**......11

**2. The ability of the opposing party to satisfy an award of fees**......11

**3. Whether an award of fees against the opposing party would deter others from acting under similar circumstances**......12

**4. Whether the party requesting fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA**......12

**5. The relative merits of the parties' positions**......13

**B. The Fourth Circuit's *Johnson* Factors All Support the Fee Requested, Here, By Class Counsel**......13

**1. Time and Labor**......13

**2. Novelty and Difficulty**......15

**3. Skill Required**......17

**4. Preclusion of Other Employment** ....................18

**5. And 6. Customary Fee and Contingency** ....................18

**7. And 8. Results Obtained** ....................19

**9. Experience and Ability** ....................20

**10. Undesirability of the Case** ....................20

**11. And 12. Relationship and Awards in Similar Cases** ....................21

**C. Section 1988 Provides an Additional Basis for Awarding Lodestar** ....................21

**D. .The Hourly Rates Are Reasonable** ....................21

**E. The Hours Expended Are Reasonable** ....................25

**F. The Court Should Award Basic Lodestar Now for Hours to Date and Reserve Jurisdiction to Consider Future Hours and any Enhancement Upon Completion of the Rescoring Protocol** ....................25

**G. Class Counsels' Expenses Are Reasonable and Should Be Approved** ....................27

**II. CLASS REPRESENTATIVE SERVICE AWARDS ARE WARRANTED, HERE** ....................28

**A. The Class Representatives Merit a Service Award** ....................29

**B. The Requested Service Awards Are Reasonable** ....................29

**CONCLUSION** ....................30

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Barber v. Kimbrell's Inc.*,
577 F.2d 216 (4th Cir. 1978) .......... 8

*Berry v. Schulman*,
807 F.3d 600 (4th Cir. 2015) .......... 28

*Birks v. Small Cmty. Specialists*, L.L.C.,
No. 8:23-CV-00837-BAH, 2024 WL 5344437 (D. Md. Dec. 10, 2024) .......... 28

*Blanchard v. Bergeron*,
489 U.S. 87 (1989) .......... 8

*Blum v. Stenson*,
465 U.S. 886 (1984) .......... 9

*Boxell v. Plan for Grp. Ins. of Verizon Commc'ns, Inc.*,
No. 1:13-CV-089 JD, 2015 WL 4464147 (N.D. Ind. July 21, 2015) .......... 22

*Ciarciello v. Bioventus Inc.*,
760 F. Supp. 3d 377 (M.D.N.C. 2024) .......... 22

*Cook v. Niedert*,
142 F.3d 1004 (7th Cir. 1998) .......... 28

*De Paredes v. Zen Nails Studio LLC*,
134 F.4th 750 (4th Cir. 2025) .......... 23

*Decohen v. Abbasi*, LLC,
299 F.R.D. 469 (D. Md. 2014) .......... 28

*Feinberg v. T. Rowe Price Grp., Inc.*,
610 F. Supp. 3d 758 (D. Md. 2022) .......... Passim

*Fox v. Vice*,
563 U.S. 826 (2011) .......... 10

*Galeener v. Source Refrigeration & HVAC, Inc.*,
2015 WL 12977077 (N.D. Cal. Aug. 21, 2015) .......... 30

*Goodlaxson v. Mayor & City Council of Baltimore*,
776 F. Supp. 3d 311 (D. Md. 2025) .......... Passim

*Hardt v. Reliance Standard Life Ins. Co.*,
560 U.S. 242 (2010) .......... 7

*Hensley v. Eckerhart*,
461 U.S. 424 (1983) .......... Passim

*In re Heritage Bond Litig.*,
2005 WL 1594389 (C.D. Cal. June 10, 2005) .......... 18

*In re High-Tech Emp. Antitrust Litig.*,
2015 WL 5158730 (N.D. Cal. Sep. 2, 2015) .......... 30

*In re Microstrategy, Inc.*,
172 F. Supp. 2d 778 (E.D. Va. 2001) .......... 22

*Jeffboat, LLC v. Director, Office of Workers' Compensation Programs*,
553 F.3d 487 (7th Cir.2009) .......... 22

*Johnson v. Georgia Highway Express, Inc.*,
488 F.2d 714 (5th Cir. 1974) .......... 8, 24

*Kelly v. Johns Hopkins Univ.*,
No. 1:16-CV-2835-GLR, 2020 WL 434473 (D. Md. Jan. 28, 2020) .......... 18, 22

*Ketchum v. Moses*,
17 P.3d 735 (Cal. 2001) .......... 19

*Kruger v. Novant Health, Inc.*,
No. 1:14CV208, 2016 WL 6769066 (M.D.N.C. Sept. 29, 2016) .......... 23

*Lou v. Am. Honda Motor Co.*,
2025 WL 1359067 (N.D. Cal. May 9, 2025) .......... 24

*Martin v. Cavalier Hotel Corp.*,
48 F.3d 1343 (4th Cir. 1995) .......... 7

*McAdams v. Robinson*,
26 F.4th 149 (4th Cir. 2022) .......... 7, 9, 27, 28

*Moreno v. City of Sacramento*,
534 F.3d 1106 (9th Cir. 2008) .......... 10

*Newman v. Piggie Park Enterprises*,
390 U.S. 400 (1968) .......... 21

*Newport News Shipbuilding & Dry Dock Co. v. Holiday*,
591 F.3d 219 (4th Cir. 2009) .......... 23

*Pennsylvania v. Delaware Valley Citizens' Counsel for Clean Air,* ("*Delaware Valley I*"),
478 U.S. 546 (1986) ............................................................ 9

*Perdue v. Kenny A. ex rel. Winn*,
559 U.S. 542 (2010) ............................................................ 9, 21

*Phillips v. Triad Guaranty Inc.*,
2016 WL 2636289 ............................................................ 22

*Pickett v. Sheridan Health Care Ctr.*,
664 F.3d 632 (7th Cir.2011) ............................................................ 22

*Quesinberry v. Life Ins. Co. of N. Am.*,
987 F.2d 1017 (4th Cir. 1993) ............................................................ 7, 11

*Robinson v. Equifax Info. Servs., LLC*,
560 F.3d 235 (4th Cir. 2009) ............................................................ 10

*Ruckelshaus v. Sierra Club*,
463 U.S. 680 (1983) ............................................................ 7

*Rum Creek Coal Sales, Inc. v. Caperton*,
31 F.3d 169 (4th Cir. 1994) ............................................................ Passim

*Sims v. BB&T Corp.*,
Civ. No. 1:15-732, 2019 WL 1993519 (M.D.N.C. May 6, 2019) ............................................................ 23

*Vogel v. Harbor Plaza Ctr., LLC*,
893 F.3d 1152 (9th Cir. 2018) ............................................................ 23

*Zakikhani v. Hyundai Motor Co.*,
2023 WL 4544774 (C.D. Cal. May 5, 2023) ............................................................ 24

**Statutes**

28 U.S.C. § 1920 ............................................................ 27
29 U.S.C. § 1132(g)(1) ............................................................ 7, 27
42 U.S.C. § 1981 ............................................................ Passim
42 U.S.C. § 1988 ............................................................ 8, 9, 21

**Rules**

Fed. R. Civ. P. 23(h) ............................................................ 6, 7, 10, 27
Rule 23 ............................................................ 14

**Other Authorities**

H.R.Rep. No. 94–1558, p. 1 ........................................................................................... 21
S.Rep. No. 94–1011 ........................................................................................................ 21

## INTRODUCTION

This case is not an ordinary ERISA benefits dispute. For over a decade, non-white NFL players with neurocognitive deficits who applied for benefits under their ERISA benefit Plans[1] were evaluated using methodologies that adjusted their raw cognitive scores based on race. The racially discriminatory adjustments assumed White players have higher pre-disability cognitive abilities making it harder, for non-white claimants to demonstrate the cognitive impairment required for disability benefits. The challenged practice implicated both ERISA's commands governing plan administration and 42 U.S.C. § 1981's guarantee of equal contractual rights. The resolution crafted by Plaintiffs and their counsel, after years of negotiations and thousands of hours of work, corrects Defendants' reliance on and use of physician recommendations including the facially discriminatory racial adjustments in making disability determinations under the Plans.

Absent this lawsuit, the Plans would have continued without ever curing the known and long-standing use of race. Although Plaintiffs allege and maintain that the Plans knew of the use and impact of racially biased adjustments on neurocognitive testing for far longer, the record in this case establishes a critical and undisputed fact: in June of 2021 the Plans admitted to knowing the use of and impact of these racial adjustments on existing claims.[2] The Plans were aware that race-based demographic adjustments had been applied to Plan participants' neuropsychological tests, that those adjustments reduced the likelihood that a non-white player's claims could qualify for benefits, and directed the Plan's so-called "Neutral Physicians" to stop using race as a factor for new claims filed after that date. The Plans took no action with respect to the harm already done

---

[1] The NFL Player Disability & Survivor Benefit Plan, The Bert Bell/Pete Rozelle NFL Player Retirement Plan, and The 88 Plan. (collectively, the "Plans").

[2] The June 2021 letter appears to have been prompted by the filing of the *Henry v. National Football League* complaint on August 25, 2020 (E.D. Pa. 20-cv-04165-AB), but the Plans took no action, formally, until June of 2021. Notably, the Plans did not amend the Plans to prohibit the conduct, which would have triggered notice to all plan participants of the conduct and given all existing claimants notice that their ongoing claims may have been impacted.

and continuing to be done every single month in underpaying existing non-white participants' claims. Not one prior test was rescored. Not one prior benefit determination was reconsidered. Not one affected Plan participant was identified or notified. That remained true until September 29, 2023, when Plaintiffs filed this lawsuit. Plaintiffs Stacey Bailey and Eric Curry filed this putative class action on September 29, 2023, asserting claims under 42 U.S.C. § 1981 and the Employee Retirement Income Security Act of 1974 ("ERISA") to stop ongoing, correct past and deter future discrimination, and obtain retroactive relief.

Defendants engaged in preliminary settlement discussions shortly after the Complaint was filed, but those early discussions did not produce a quick resolution. The comprehensive settlement ultimately achieved required nearly three years of negotiation, seven in-person mediation sessions, each occurring over the course of multiple days, dozens of online meetings and phone calls, and sustained advocacy by Class Counsel to bring to conclusion. Class Counsel now respectfully request the Court award attorneys' fees, costs, and expenses consistent with the time, skill, complexity, and risk invested in this litigation, and service awards to the Class Representatives who bore personal risk to force a change the Plans chose not to undertake on their own.

## BACKGROUND FACTS

### I. The Claims and Alleged Harm to the Class

The Plans in this litigation are employee welfare benefit plans under ERISA, established pursuant to successive collective bargaining agreements between the NFL Management Council and the NFL Players Association. (Compl. ¶¶ 25, 27, 30.) The Bert Bell/Pete Rozelle NFL Player Retirement Plan, which traces its origins to the first NFL players' pension plan established in 1962, provides retirement, disability, and related benefits to eligible former players. The NFL Player Disability & Survivor Benefit Plan provides disability benefits to eligible participants, including

Line-of-Duty benefits, Neurocognitive benefits at the Mild and Moderate levels, and Total and Permanent disability benefits. The 88 Plan provides additional benefits for former players with dementia-related conditions. Each Plan is jointly administered by a Board composed of representatives designated by the NFL Management Council and the NFLPA, and each Board serves as the named Plan administrator and fiduciary under ERISA. (Compl. ¶¶ 26, 28, 31.)

Having both previously applied for disability benefits based upon neurocognitive deficits, Plaintiffs Stacey Bailey and Eric Curry filed this class action on behalf of themselves and all non-white participants in the Plans. (Compl. ¶¶ 1, 10, 174-75.) The Complaint alleged that Defendants were aware of the impact and permitted the evaluation of participants' neurocognitive test results using race-based demographic adjustments, known as "race norming," that assumed a lower cognitive baseline for non-white participants than for white participants. (Compl. ¶¶ 32-92.) Because entitlement to benefits under the Plans depends on demonstrating a sufficient deficit between a participant's assumed pre-disability baseline and current cognitive functioning, a lower baseline means a non-white participant must score lower on the tests to register the same degree of impairment as a white participant with the same current test scores. (Compl. ¶¶ 32-92.) The Complaint alleged that Defendants were aware of race norming's harmful effects yet continued to permit the ongoing impact from the practice in administering the Plans. (Compl. ¶¶ 32-92.)

The Complaint asserted three counts on behalf of the class: (1) a claim for declaratory and injunctive relief under ERISA, alleging that race norming violated the Plans' terms and Defendants' fiduciary duties by creating race-based preferences among participants; (2) a claim under ERISA § 502(a) for recovery of benefits wrongfully denied or reduced through the application of race norming; and (3) a claim under 42 U.S.C. § 1981, alleging that Defendants' race-based adjustment practices denied non-white participants the same right to make and enforce contracts as is enjoyed

by white participants. (Compl. ¶¶ 184-204.) As relief, Plaintiffs sought a permanent injunction prohibiting the use of race norming in adjustment of claims for benefits, an order requiring Defendants to reexamine all affected class member claims and provide any resulting benefits retroactively, and an award of pre- and post-judgment interest on withheld benefits. (Compl., Request for Relief ¶¶ d-k.) Plaintiffs have achieved this goal with complete success.[3]

## II. The Litigation and Negotiations

Shortly after the Complaint was filed, the parties jointly filed a motion for a 90-day stay and asking for the appointment of Interim Class Counsel on December 4, 2023, which the Court granted the next day. (Dkt. Nos. 30 and 31.) Defendants denied all wrongdoing, asserted race-based adjustments were made by individual physicians exercising independent clinical judgment, raised statute of limitations defenses, asserted the case could not be certified as a class, and contended individual claims lacked merit. These were genuine disputes, not pro forma positions.

Because of the stay so the parties could explore resolution, formal discovery did not occur, but the parties agreed to pursue confirmatory discovery in the context of settlement. Class Counsel invested substantial time and resources in developing the factual record and knowledge base necessary to meaningfully evaluate the strengths and risks of the Class's claims and Defendants' positions. Defendants produced thousands of pages of plan documents, amendments, and participant-level data covering the years-long class period. Class Counsel, working with their expert Dr. Malcolm Spica, Ph.D., ABPP, analyzed that data, evaluated the scope of the race-based adjustment practices, and developed the scientific and legal framework for the class's position on

[3] In the Request for Relief in the Complaint, a-c has been preliminarily approved; d-f are substantive findings not required in Class Settlement context, but because of the relief achieved are still, essentially, in Plaintiffs favor; g-i and k are part of the relief achieved; Plaintiffs seek j-k through this filing; though not described as such, l is part of the relief that flows from performance of the injunction; and m is a catch-all request for relief. (Compl. ¶¶ 31-32) Plaintiffs have, therefore, achieved all of the relief sought in the Complaint.

rescoring. Formal settlement negotiations were conducted through seven in-person multi-day mediation sessions and numerous telephonic conferences, under the guidance of the Honorable Gerald E. Rosen (Ret.), a former United States District Judge with extensive mediation experience. After more than 18 months of negotiations, a Term Sheet was executed on July 11, 2025. Negotiations continued after the execution of the Term Sheet for nearly another year until the final Settlement Agreement and Joint Motion were finalized and filed on May 29, 2026. (Dkt. No. 82.)

## III. The Relief Achieved by Plaintiffs and Counsel

Comparing the request for relief in the Complaint and the terms of the Settlement, Plaintiffs achieved more than the relief sought. The Settlement delivers both retroactive and forward-looking relief. The retroactive relief goes beyond the Plans' limitation on damages and, arguably, beyond ERISA's limitations, rectifying roughly 14 years of discrimination. The Rescoring Protocol is a systematic, expert-driven process through which all eligible class members' prior tests are rescored using race-neutral methods, with the results reviewed by multiple experts. Forward-looking relief is twofold: the conduct is to be prohibited by Court Order (as opposed to a letter that can be revoked or altered at any time) and every member of the Class found to be entitled to a change in benefits, will receive that change in benefits going forward for as long as they are eligible under the Plans. Finally, impacted participants shall receive a 6% per annum interest on any retroactive payments determined to be owed to a Class Member. With Final Approval, the only relief remaining in the Complaint is the subject of this Motion: attorneys' fees and costs, and Class Representative service awards which shall not financially impact members of the Class.

## IV. Summary of the Settlement

Under the Settlement, the Defendants agreed to the below relief. This undertaking is largely expert-driven at the Defendants' expense but includes Class Counsel's oversight.

| SUMMARY OF SETTLEMENT BENEFITS | |
|---|---|
| **Prohibition on Race-Based Adjustments** | Defendants are permanently prohibited from using race-based demographic adjustments in the administration of neuropsychological tests for any Plan participant. This prohibition is court-enforceable and applies to all future benefit determinations under the Plans. *Settlement Agreement § VI. A.* |
| **Rescoring Protocol** | All eligible class members' prior neuropsychological tests, dating back to January 1, 2012, will be rescored using race-neutral methodology under a Rescoring Protocol designed by the parties with the advice of experts. Results are reviewed by Plaintiffs' Expert, Defendants', and—where the two experts do not agree—neutral third expert. *Settlement Agreement § VI. B.* |
| **Retroactive Benefit Reconsideration** | Any class member whose rescored test demonstrates entitlement to a higher level or new benefits will receive the full retroactive benefits from two months prior to the rescored application. *Settlement Agreement § VI. C.* |
| **Interest on Retroactive Benefits** | Qualifying class members will receive six percent (6%) per annum interest on all retroactive benefit payments, calculated from the date benefits would have originally been paid through the date of actual payment. *Settlement Agreement § VI. C. 3.* |
| **Waiver of Limitations Defenses** | Defendants have agreed not to assert any statute of limitations defense or damages-limitation provision against qualifying class members with respect to retroactive benefit claims arising under the Settlement. *See Joint Motion for Entry of an Order Preliminarily Approving Class Settlement, Conditionally Certifying the Proposed Class for Settlement Purposes Only, and Scheduling a Final Fairness Hearing, at 25.* |
| **No Reduction of Existing Awards** | No class member's current benefit award will be reduced as a result of the rescoring process, regardless of outcome. *Settlement Agreement § VI. B. 10.* |
| **Attorneys' Fees and Service Awards Paid Separately** | All attorneys' fees, costs, expenses, and service awards are paid by Defendants separate from and in addition to any benefits payable to Settlement Class Members. No class member's recovery is reduced by any fee or service award. *Settlement Agreement § VIII.E.* |

## LEGAL STANDARD

Section 502 (g)(1) of ERISA, Fed. R. Civ. P. 23(h), and, because this litigation is vindication of federal civil rights protections under §1981, § 1988 all support awarding attorneys' fees and costs in this case. ERISA § 502(g)(1) provides that "the court in its discretion may allow

a reasonable attorney's fee and costs of the action to either party." 29 U.S.C. § 1132(g)(1). To obtain a fee award under § 502(g)(1), a party need not be a "prevailing party" in the traditional sense, but the party must have achieved "some degree of success on the merits." *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 255 (2010). The standard is not satisfied "by achieving 'trivial success on the merits' or a 'purely procedural victor[y],' but does satisfy it if the court can fairly call the outcome of the litigation some success on the merits without conducting a 'lengthy inquir[y] into the question whether a particular party's success was "substantial" or occurred on a "central issue."'" *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 255 (2010) (quoting *Ruckelshaus v. Sierra Club,* 463 U.S. 680, 688 (1983)). A court-approved class action settlement is success on the merits under § 502(g)(1). *See Martin v. Cavalier Hotel Corp.*, 48 F.3d 1343, 1359 (4th Cir. 1995). In evaluating whether to exercise its discretion to award fees under ERISA, courts in the Fourth Circuit consider five factors: (1) the degree of the opposing party's culpability or bad faith; (2) the ability of the opposing party to satisfy an award of fees; (3) whether an award of fees against the opposing party would deter others from acting under similar circumstances; (4) whether the party requesting fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA; and (5) the relative merits of the parties' positions. *Quesinberry v. Life Ins. Co. of N. Am.*, 987 F.2d 1017, 1029 (4th Cir. 1993) (en banc).

Rule 23(h) also authorizes an award of "reasonable attorney's fees and nontaxable costs" in a certified class action. Fed. R. Civ. P. 23(h). Under *Hensley v. Eckerhart*, 461 U.S. 424 (1983), the lodestar, reasonable hours multiplied by a reasonable hourly rate, establishes the fee to which prevailing counsel is entitled. The lodestar may be adjusted upward based on the circumstances of the case, including through a multiplier or, where the litigation has generated quantifiable economic relief for the class, through a percentage-of-recovery award. *See McAdams v. Robinson*,

26 F.4th 149, 161 (4th Cir. 2022); *Rum Creek Coal Sales, Inc. v. Caperton*, 31 F.3d 169, 175 (4th Cir. 1994). Courts in this district also consider the factors set forth in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974), as adopted by the Fourth Circuit, *see Barber v. Kimbrell's Inc*., 577 F.2d 216 (4th Cir. 1978), to assess whether lodestar reflects a reasonable fee. The U. S. Supreme Court supports the use of the *Johnson* factors as relevant for adjusting the lodestar but "no one factor is a substitute for multiplying reasonable billing rates by a reasonable estimation of the number of hours expended in the litigation." *Blanchard v. Bergeron*, 489 U.S. 87, 94 (1989). In other words, the analysis starts with straight lodestar. *See id.*

Those factors adopted from *Johnson* include: (1) time and labor required; (2) novelty and difficulty of the questions presented; (3) skill required to perform the legal service properly; (4) preclusion of employment by the attorney due to acceptance of the case; (5) customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) amount involved and results obtained; (9) experience, reputation, and ability of the attorneys; (10) undesirability of the case; (11) nature and length of the professional relationship with the client; and (12) awards in similar cases. Where, as here, the relief obtained is primarily injunctive and structural, the *Johnson* factors are applied with particular attention to the results achieved. *See, e.g., Feinberg v. T. Rowe Price Grp., Inc*., 610 F. Supp. 3d 758, 772 (D. Md. 2022); *Goodlaxson v. Mayor & City Council of Baltimore*, 776 F. Supp. 3d 311, 325 (D. Md. 2025). *Hensley* directs that the most critical factor is the degree of success obtained. 461 U.S. at 436.

Finally, because this litigation enforced federal civil-rights protections through §1981, the Court should award attorneys' fees and costs. *Hensley*, 461 U.S. at 429-30. "Congress enacted 42 U.S.C. § 1988 in order to ensure that federal rights are adequately enforced. Section 1988 provides that a prevailing party in certain civil rights actions may recover 'a reasonable attorney's fee as

part of the costs.'" *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 550 (2010); *see Hensley*, 461 U.S. at 429-30. Like other federal fee shifting statutes, § 1988 does not provide a bright-line rule but utilizes lodestar as start and allows for enhancement in rare and exceptional circumstances. *Perdue*, 559 U.S. at 552 (quoting *Pennsylvania v. Delaware Valley Citizens' Counsel for Clean Air,* ("*Delaware Valley I*") 478 U.S. 546, 565 (1986), *Blum v. Stenson,* 465 U.S. 886, 897 (1984), *Hensley*, 461 U.S. at 435. Under § 1988, "a 'reasonable' fee is a fee that is sufficient to induce a capable attorney to undertake the representation of a meritorious civil rights case." *Perdue*, 559 U.S. at 552; *See Delaware Valley I,* 478 U.S. at 565; *Blum,* 465 U.S. at 897. And, absent "special circumstances" showing that "such an award [would be] unjust," a fee should ordinarily be awarded. *Hensley*, 461 U.S. at 429 (internal citations and quotations omitted).

In this petition, Class Counsel requests an award at final approval of their full lodestar as the minimum amount to which they are entitled as a matter of law under ERISA § 502(g)(1), *Hensley*, *Johnson*, and § 1988 based on the work performed and the results achieved. Class Counsel further request the Court reserve jurisdiction to consider a supplemental fee petition following substantial completion of the Rescoring Protocol, at which time Class Counsel will report on the economic value of relief delivered to the Class and will seek an additional award, whether in the form of a lodestar multiplier or a percentage of the recovery delivered to the class, commensurate with that value. *See McAdams*, 26 F.4th at 162 (affirming court's broad equitable discretion in structuring fee awards in class actions); *Hensley*, 461 U.S. at 437 (courts must exercise equitable judgment in light of the circumstances of each case). This two-step process ensures Class Counsels' compensation for ongoing supervision of the implementation of the injunctive remedy and, as a result, Class Counsels' proposal would likewise permit the Court to

review the true value of the retroactive portion rather than decide and award an enhancement based on speculative projections of future, potential benefits if forced into a present petition.

In assessing the reasonableness of hours, the Supreme Court has cautioned that fee determinations "should not result in a second major litigation" and that "[t]rial courts need not, and indeed should not, become green-eyeshade accountants." *Fox v. Vice*, 563 U.S. 826, 838 (2011). "The essential goal in shifting fees . . . is to do rough justice, not to achieve auditing perfection." *Id.* This Court should evaluate the time invested by Class Counsel with that standard in mind and with appropriate deference to the professional judgment of counsel who prevailed. Courts have repeatedly recognized that, when reviewing successful counsel's staffing decisions, they "should defer to the winning lawyer's professional judgment," "after all, [counsel] won, and might not have, had [they] been more of a slacker." *Moreno v. City of Sacramento*, 534 F.3d 1106, 1112 (9th Cir. 2008); *see also Robinson v. Equifax Info. Servs., LLC*, 560 F.3d 235, 243-44 (4th Cir. 2009).

## ARGUMENT

### I. CLASS COUNSEL ARE ENTITLED TO AND SHOULD BE AWARDED ATTORNEYS' FEES AND COSTS

"In a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h); *see also Hensley*, 461 U. S. at 433. If this Court grants final approval, Class Counsel are entitled to an award of attorney's fees and costs. *Id.* *Hensley* not only permits Counsel to receive their lodestar, here, but more explicitly states "[w]here a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee. Normally this will encompass all hours reasonably expended on the litigation, and indeed in some cases of exceptional success an enhanced award may be justified." 461 U.S. at 435. As in this case, "[t]he result is what matters." *Id.*

#### A. Class Counsel Are Entitled to An Award of Fees And Costs Under ERISA

The Fourth Circuit recognizes that "the foremost principle which guides [a Court's] review of attorneys' fees awards under ERISA is the discretion the statute grants to the district court." *Quesinberry v. Life Ins. Co. of N. Am.*, 987 F.2d 1017, 1029 (4th Cir. 1993). That discretion dictates there is no hard-and-fast rule on how or when to award fees. But, despite overruling the implication that an award of fees is always merited, the five factors described in *Reinking v. Philadelphia American Life Insurance Co.*, are "general guidelines to be used in determining whether to grant a request for attorneys' fees." *Id.*

**1. The degree of the opposing party's culpability or bad faith.** As noted above, the Plans admitted racial discrimination was impacting claims by letter in June of 2021. Despite knowing of the racial discrimination, the Plans took no action to correct the past conduct instead directing it to stop in new claims only. These actions, or, more correctly, lack of action despite full knowledge, was certainly not in good faith and demonstrates the culpability of the Plans.

**2. The ability of the opposing party to satisfy an award of fees.** There is no question that Defendants have the financial ability to satisfy an award of attorneys' fees and costs. As one example, the NFL Player Disability & Survivor Benefit Plan is funded by the thirty-two NFL clubs, whose combined revenues exceeded $23 billion in 2024. According to IRS Form 990 filings publicly available through ProPublica's Nonprofit Explorer, the Plan reported revenues of approximately $350 million in fiscal year 2025, with the Bert Bell/Pete Rozelle NFL Player Retirement Plan separately reporting approximately $4 billion in assets and having paid over $135 million in benefits in 2024 alone. Each of the thirty-two NFL clubs contributes to Plan funding pursuant to the terms of the applicable collective bargaining agreements. The fee and cost award sought here, paid by Defendants separately from and in addition to any benefits payable to class

members, represents a small fraction of the Plans' annual revenues and a negligible fraction of the NFL's overall financial resources. This factor weighs decisively in favor of a fee award.

**3. Whether an award of fees against the opposing party would deter others from acting under similar circumstances.** The conduct at issue in this litigation was not the isolated act of a single bad actor. It was a known, racially discriminatory, systematic practice embedded in the adjustments applied to neurocognitive testing for more than a decade to a defined class of plan participants. Upon information and belief, the Plans at issue in this litigation are not the only ones responsible for benefit determinations that used and continue to use race-based adjustments. A fee award in this matter sends a clear signal to ERISA plan fiduciaries: where a plan's benefit determination practices discriminate on the basis of race, the discovery of that discrimination and its prospective correction do not discharge the fiduciary's obligation to the participants already harmed. Deterrence of future inaction in the face of known harm is as important as deterrence of the initial wrong. Without a meaningful fee award, other fiduciaries have little incentive to undertake voluntary retroactive remediation, absent litigation. Thus, an award of fees here advances ERISA's remedial purpose of protecting plan participants and beneficiaries and deters future fiduciaries from choosing prospective compliance over retroactive accountability.

**4. Whether the party requesting fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA.** This matter satisfies both factors, though only one is needed. First, the relief in this case is a class-wide injunctive remedy that provides relief to all participants. While not every participant has been financially impacted by the wrongful use of race in adjusting their neuropsychological tests, the discriminatory use of race by the Plan fiduciaries, is a violation of trust that this remedy seeks to cure. Second, this litigation resolves any lingering doubt about the overlap of racial

discrimination laws and ERISA. Both § 1981 and ERISA act in concert to prevent the treatment of a group of participants differently from another.

**5. The relative merits of the parties' positions.** The Settlement itself is the most compelling evidence on this point. Defendants are large institutional fiduciaries represented throughout this litigation by one of the country's preeminent ERISA defense firms. They had every incentive and resource to contest this case through class certification, summary judgment, and trial. But faced with justifying a discriminatory practice or the failure to cure the known impact, they chose instead to negotiate a comprehensive class-wide settlement that provides every element of relief sought by the Complaint. Defendants did not settle because Plaintiffs' case lacked merit.

Plaintiffs have satisfied the *Quesinberry* factors and should be awarded their attorneys' fees and costs.

### B. The Fourth Circuit's *Johnson* Factors All Support the Fee Requested, Here, By Class Counsel.

**1. Time and Labor.** As set forth in the supporting Declarations, Class Counsel have devoted substantial time to this matter over years of litigation, negotiation, and confirmatory discovery. Ex. A, Declaration of W. Daniel "Dee" Miles, ("WDM Decl."), ¶¶ 4-5, 16-29, Ex. B, Declaration of Thomas O. Sinclair ("TOS Decl."), ¶¶ 95-113, and Ex. C, Declaration of Christopher T. Nace ("Nace Decl."), ¶¶ 4-9. The work encompassed legal research across novel ERISA and §1981 issues, analysis of neuropsychological data, expert coordination, and extended arm's-length negotiations.

The scope of that investment is placed in context by examining what it took to get the Settlement Agreement and Preliminary Approval papers filed with this Court. Following the execution of the Term Sheet on July 11, 2025, the product of years of arm's-length negotiation on the overall structure and scope of the relief, it took nearly another year to translate that rough

agreement in principle into an enforceable Settlement Agreement and supporting court filings. Class Counsel collectively devoted hundreds of hours to that post-Term Sheet drafting and negotiation alone. Over that period, counsel exchanged nearly forty drafts of the Settlement Agreement, conducted multiple negotiation sessions (some of which included experts), and at least ten drafts of the Memorandum of Law. Together, these documents address a 14-year class period, a complex expert-driven rescoring methodology, eligibility criteria and exclusions requiring individualized analysis of three separate ERISA governed, Taft-Hartley benefit and pension plans (with multiple revisions over the course of nearly 15 years), benefit calculation protocols, a neutral physician oversight structure, and the full range of Rule 23 certification and approval requirements. Each draft required review, analysis, negotiation, and revision by counsel on both sides.

A comparison of the parties' respective litigation teams further illustrates the reasonableness of the time Class Counsel has invested. On the defense side, Groom Law Group, one of the country's preeminent ERISA advising and defense firms, fielded a team of three attorneys throughout the negotiations and drafting process: Edward J. Meehan, Mark C. Nielsen, and Jovana Vujovic, but, though they did not formally appear, the team included Michael Junk and Alvaro Anillo through every phase. Additionally, nationwide counsel for the NFL and other parties with interests in these plans participated in and had direct input into the dozens of rounds of negotiations and edits. In all, the number of lawyers from the largest defense firms in the nation that participated in the defense of this matter is unknown but far more than just those who formally appeared. On the Plaintiffs' side, although originally staffing the matter with extended litigation in mind, Class Counsel reduced the number of attorneys dedicating extensive time to the matter to four primary attorneys, plus their staff, from two firms: W. Daniel "Dee" Miles, III, Rebecca D. Gilliland, and Leon H. Hampton, Jr., from Beasley Allen and Thomas O. Sinclair from Sinclair

Law Firm. Ultimately, the team for this type of litigation was lean for a multi-year, expert-intensive, multi-party, § 1981 and ERISA class action. The hours recorded throughout this litigation are, if anything, a conservative reflection of what this case required.

Plaintiffs have reviewed Defense time on this matter, but, it should be noted that defense hours are not a reliable benchmark for evaluating the reasonableness of Plaintiffs' counsels' time. Defendants had immediate access to their documents, plan records, physician relationships, and actuarial and neuropsychological data. They had an expert on staff and, because Groom Law Group was involved in the drafting and management of the Plans at issue, the defense was already familiar with the inner workings of the Plans. Class Counsel had to obtain all of that from the outside in addition to conducting confirmatory discovery, review of neuropsychological testing information and related scientific research, and analysis of thousands of pages of Plan records produced by Defendants. The work required to build a plaintiff's case from an adverse record is categorically different from the work required to defend records in one's own possession. *See Rum Creek Coal Sales, Inc.*, 31 F.3d at 175 (hours expended by prevailing counsel evaluated in light of the demands of the particular litigation, not by reference to opposing counsel's time). Moreover, any comparison to defense hours necessarily omits the time spent by Defendants' in-house ERISA and legal personnel, whose involvement in this litigation is not reflected in Groom Law Group's billing records, including that of their expert, Dr. Garmoe, who also happens to be a current reviewing physician for the Plans and is already familiar with the Plans and their requirements.

**2. Novelty and Difficulty**. This case presented questions of genuine legal novelty and factual complexity. The Settlement demonstrates how § 1981's equality guarantee and ERISA's fiduciary and remedial framework can operate together to correct discrimination embedded in institutional plan administration. The use of race-based demographic norms in neuropsychological

testing, although it has been disputed, discredited, and its impacts decried since at least 2009,[4] is a medically specialized practice embedded in clinical literature. The practice is described in an abstract of an article by Philip G. Gasquoine as a "possible justification for inferior/superior treatment of different racial groupings" that can cause "false negative rates (i.e., cognitive deficit misdiagnosed as normal)."[5] Translating that practice into a cognizable legal claim under ERISA and Section 1981, and developing a judicially administrable rescoring remedy, required significant research and expert consultation. This included researching and testing the impact of race-based adjustments on raw scores, reviewing information on the reason for and use of adjustments to cognitive testing, and developing an understanding of domains, and testing scores and parameters.

In addition, Defendants raised substantial defenses, including individualized clinical judgment, lack of Plan knowledge, statute of limitations, and causation challenges, each of which required careful analysis. The Plans, for example, contain a type of limitations period that could limit available damages to Class members injured by the use of race-based adjustments. And both ERISA and § 1981 have their own limitations periods. Further, Class Counsel confronted Defendants' arguments regarding the applicability and possibility of a successful certification under § 1981. Ultimately, not only did Plaintiffs and Class Counsel achieve all of the relief sought in the Complaint, but, despite the original protestations against class resolution and then a § 1981 class, the relief is classwide and exceeds what ERISA could provide.

After the Term Sheet was executed, the research and negotiations continued to ensure the injunctive relief sought by the Class captured and provided relief for all race-related impacts. To put it simply, removing a decades-long engrained practice from fourteen years of benefits determinations was not an easy undertaking. Indeed, Plaintiffs' counsel continue in their efforts to

---

[4] *See* Philip G. Gasquoine*, Race-Norming of Neuropsychological Tests,* 19 Neuropsychol. Rev. 250 (2009).
[5] Abstract available at: https://pubmed.ncbi.nlm.nih.gov/19294515/, discussing Gasquoine, supra note 3.

ensure proper treatment of the Class by reviewing, with the assistance of their expert, a randomized selection of each category of players determined to not fit within the Class definition. Counsel refer to the factors for determining those applicants for benefits not included as members of the Class as the "filters." "Filters" include things like race (Caucasian applicants are not members of the Class), those receiving the highest level of benefits for which they applied, or a disqualified application for benefits under the Plan for a reason unrelated to race. To test the accuracy of these "filters," Counsel and Dr. Spica have continued to analyze a randomized set of testing and medical information for applicants identified as non-Class members. Developing a process to identify members of the Class who may have suffered damage and to remove race from consideration was novel and complex. While others, including those involved in the CTE-related settlement, developed a means to remove race from settlement determinations, that same process could not be directly applied to the Taft-Hartley, ERISA-governed Plans at issue here. Assessing the amount a player may be entitled to receive does not require the same level of review as determining what benefit under which Plan a player should have received, were it not for the use of race.

**3. Skill Required**. This litigation demanded expertise across ERISA, class action practice, civil rights law, neuropsychological science, complex negotiation, and class settlement. Class Counsel brought extensive relevant experience to each dimension of the case. Beasley Allen has a nationwide complex litigation practice with extensive class action, insurance, and civil rights experience. The firm's biographies submitted in connection with the appointment of interim Class Counsel are incorporated by reference. (Dkt. No. 28-1.) Sinclair Law Firm added prior experience serving as Class Counsel in ERISA matters and ERISA expertise and Nace Law Group brought complementary experience and local counsel support. Plus, "[i]t is well established that complex ERISA litigation, such as this, requires special expertise and class counsel of the highest caliber."

*Feinberg*, 610 F. Supp. 3d at 772 (citing *Kelly v. Johns Hopkins Univ.*, No. 1:16-CV-2835-GLR, 2020 WL 434473, at *4 (D. Md. Jan. 28, 2020)). The quality of Class Counsel's representation is further reflected in the caliber of the opposition they faced. "[T]he quality of opposing counsel is important in evaluating the quality of [Class Counsel's] work." *In re Heritage Bond Litig.*, 2005 WL 1594389, at *20 (C.D. Cal. June 10, 2005). From the outset, Defendants were represented by Groom Law Group, which brought substantial institutional knowledge of the Plans and the benefit administration practices at issue. Class Counsel's ability to identify a viable legal theory, develop the factual record, and negotiate a comprehensive settlement against that opposition is itself evidence of the skill and quality of representation brought to this matter.

**4. Preclusion of Other Employment**. The breadth and duration of this engagement, including the demands of seven mediation sessions, expert-coordinated confirmatory discovery, and a 14-year class period, necessarily limited Class Counsel's capacity to take on other matters.

**5. And 6. Customary Fee and Contingency**. Class Counsel undertook this representation entirely on a contingent basis. There was no guarantee of any recovery. Indeed, Defendants maintained throughout that their exposure was limited or nonexistent. A contingency-based fee is entitled to an enhancement over pure lodestar to reflect the risk of nonpayment assumed by counsel. *See Goodlaxson*, 776 F. Supp. 3d at 327. Class Counsel now asks the Court to reserve on the enhancement until after the Rescoring Protocol is conducted and award straight lodestar as an initial recognition of Class Counsel's work and success.[6] The economic rationale for recognizing contingency risk is straightforward: a contingent fee must be higher than a fee for the same legal services paid as they are performed, because it compensates counsel not only for the legal services rendered but for the loan of those services at substantial risk of nonpayment. *See*

[6] Class Counsel has submitted hours through July 15, 2026.

*Rum Creek Coal Sales, Inc*., 31 F.3d at 175 (the contingent nature of a fee arrangement is a relevant consideration in determining a reasonable fee award); *accord Ketchum v. Moses*, 17 P.3d 735, 742 (Cal. 2001) ("A lawyer who both bears the risk of not being paid and provides legal services is not receiving the fair market value of his work if he is paid only for the second of these functions."). Without compensation for contingency risk, competent counsel will be deterred from accepting meritorious but uncertain civil rights and ERISA cases on behalf of plaintiffs who cannot pay hourly rates. The contingency enhancement is not a windfall, but the market price of risk that Class Counsel assumed when they filed this case with no assurance of recovery.

**7. And 8. Results Obtained**. The relief delivered by this Settlement is comprehensive. The Court should evaluate those results not only in absolute terms, but against the counterfactual. When this Complaint was filed, the Plans had known for years that race-based demographic adjustments were applied to Plan participants' tests and knew its impact.[7] Despite that knowledge, the Plans took no steps to address that harmful impact until Plaintiffs brought this Class Action. No affected participant had been identified. No prior test had been rescored. No prior benefit determination had been reconsidered. The record is silent on any retroactive remedial effort, because none was undertaken. The only action was a letter to so-called "Plan Neutral Physicians" (physicians paid for by the Plans to perform testing and review claims for benefits) for new applications to stop, on a going forward basis, the use of race in adjusting neurocognitive testing. This explicit admission that more than a decade of claims had been subject to racial discrimination triggered no public recognition or rejection of the practice from the Plans. No effort to correct existing impacted claims. No letters of apology or even notice given to the participants.

[7] *See supra.* Note 1.

The Settlement now requires: a permanent, court-enforceable prohibition on race-based adjustments (instead of just a letter that could be revoked at any time); systematic identification of all affected class members going back to January 1, 2012; rescoring of all eligible prior tests under a negotiated, expert-driven race-neutral methodology that includes review by up to three neuropsychologists (review by the third depends on whether Dr. Spica and Dr. Garmoe initially agree); retroactive benefit payments with six percent annual interest for those who qualify for an increase or newly-awarded benefit; a full waiver of statute of limitations and damages-limitation defenses; recategorization, where applicable, to the higher benefit level going forward; and neutral expert and Class Counsel oversight of the entire process. None of this would exist without this lawsuit. The results were achieved because Class Counsel identified the harm, developed the legal and scientific framework, assembled expert support, and over nearly three years of negotiations forced a retroactive review that the Plans had already declined to undertake voluntarily.

**9.** **Experience and Ability**. Class Counsel's experience is described in the supporting Declarations and in the application for appointment as interim Class Counsel previously submitted to this Court and throughout this Petition. (Dkt. No. 28-1.)

**10.** **Undesirability of the Case**. Suits challenging the internal administration of major professional sports benefit plans carry inherent institutional resistance. Defendants retained Groom Law Group, a large and highly-qualified firm whose practice is dedicated to representing ERISA plan fiduciaries, and maintained a team of multiple attorneys throughout this process. They had every resource and incentive to contest liability, challenge class certification, and defeat any attempt at retroactive relief. The case was not one where liability was obvious, class certification was uncontested, or settlement was inevitable. Other firms, in fact, did turn down this litigation, but Class Counsel took on this matter knowing all of that.

**11. And 12. Relationship and Awards in Similar Cases.** Class Counsel will continue to devote substantial time to these proceedings through final approval, including preparing the motion for final approval, responding to any objections, attending the Final Fairness Hearing scheduled for October 20, 2026, and overseeing the initial implementation of the Rescoring Protocol. Based on the complexity of these proceedings and Class Counsel's prior experience in comparable ERISA class action settlements, Class Counsel anticipate devoting 500 hours or more to those tasks. To the extent Class Counsel incurs additional compensable time, those hours will be reflected in updated Declarations submitted in connection with the update to the Court regarding the enhancement sought by Plaintiffs after the Rescoring Protocol is substantially completed.

**C. Section 1988 Provides an Additional Basis for Awarding Lodestar**

Plaintiffs are the prevailing party, here, and are therefore should be awarded a "reasonable attorney's fee as part of the costs." 42 U.S.C. § 1988; *Perdue*, 559 U.S. at 550-51. The basis for determining that fee begins, as it does under ERISA, with the lodestar "[a]lthough the lodestar method is not perfect . . .." *Perdue*, 559 U.S. at 551. Further, "[t]he purpose of § 1988 is to ensure "effective access to the judicial process" for persons with civil rights grievances. H.R.Rep. No. 94–1558, p. 1 (1976). Accordingly, a prevailing plaintiff '"should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust.'" S.Rep. No. 94–1011, p. 4 (1976), U.S.Code Cong. & Admin.News 1976, p. 5912 (quoting *Newman v. Piggie Park Enterprises,* 390 U.S. 400, 402, 88 S.Ct. 964, 966, 19 L.Ed.2d 1263 (1968))." *Hensley v. Eckerhart*, 461 U.S. at 429.

**D. The Hourly Rates Are Reasonable**

The hourly rate awarded as part of a petition for fees must be reasonable. *Rum Creek Coal Sales, Inc.*, 31 F.3d at 175; *Hensley*, 461 U.S. at 433. Reasonableness of a rate is not restricted

solely to the prevailing rate in the community but "where it is reasonable to retain attorneys from other communities" then the rates from that community "may also be considered." *Rum Creek*, 31 F.3d at 175. Evidence of the rate an attorney charges to hourly-paying clients may be preferred,[8] "but where an attorney primarily uses contingent fee agreements, a court should consider 'evidence of rates similarly experienced attorneys in the community charge paying clients for similar work and evidence of fee awards the attorney has received in similar cases.'" *Boxell v. Plan for Grp. Ins. of Verizon Commc'ns, Inc.*, No. 1:13-CV-089 JD, 2015 WL 4464147, at *8 (N.D. Ind. July 21, 2015) (quoting *Pickett v. Sheridan Health Care Ctr.,* 664 F.3d 632, 640 (7th Cir.2011).

For cases like this, the overlap of ERISA and § 1981, the appropriate community should be broadened and, likely, include nationwide review. When "the subject matter of the litigation is one where the attorneys practicing it are highly specialized and the market for legal services in that area is a national market," the relevant "community" is not the local market area, but the community of practitioners in that subject matter." *Boxell*, No. 1:13-CV-089 JD, 2015 WL 4464147, at *9 (quoting *Jeffboat, LLC v. Director, Office of Workers' Compensation Programs,* 553 F.3d 487, 490 (7th Cir.2009)). "ERISA is a specialized field with a limited number of attorneys who specialize in representing plaintiffs seeking disability benefits. . .." *Id.* And, "Courts often recognize national market rates when deciding reasonable billing rates for complex class action litigation." *Ciarciello v. Bioventus Inc.*, 760 F. Supp. 3d 377, 401 (M.D.N.C. 2024); *See Phillips v. Triad Guaranty Inc.*, 2016 WL 2636289, at *7 (citing *In re Microstrategy, Inc.*, 172 F. Supp. 2d 778, 788 (E.D. Va. 2001)). "'[C]ourts have repeatedly recognized [that] complex ERISA class action litigation, such as this, involves a national market' and that 'the relevant market rate for [such cases] is a nationwide market rate.'" *Feinberg*, 610 F. Supp. 3d at 772–73 (quoting *Kelly*,

---

[8] *Rum Creek*, 31 F.3d at 175.

2020 WL 434473, at *6); *see also Sims v. BB&T Corp.*, Civ. No. 1:15-732, 2019 WL 1993519, at *2 (M.D.N.C. May 6, 2019) ("[A] national market rate is appropriate for matters involving complex issues requiring specialized expertise, such as ERISA class actions."); *Kruger v. Novant Health, Inc.*, No. 1:14CV208, 2016 WL 6769066, at *4 (M.D.N.C. Sept. 29, 2016) ("This court finds the relevant market rate for cases such as the present case to be a nationwide market rate.").

Further, despite that fee matrices can be "'a useful starting point to determine fees,'" this Court "'is not bound by' any matrix." *De Paredes v. Zen Nails Studio LLC*, 134 F.4th 750, 753-54 (4th Cir. 2025) (quoting *Newport News Shipbuilding & Dry Dock Co. v. Holiday*, 591 F.3d 219, 229 (4th Cir. 2009)). The Fourth Circuit has directed, instead, that the Court may neither "treat a fee matrix as 'presumptively reasonable'" nor "require special justification to deviate from [the fee matrix]." *Id.* (quoting *Vogel v. Harbor Plaza Ctr., LLC*, 893 F.3d 1152, 1159-60 (9th Cir. 2018)). The true test is what is a reasonable rate in the community and the community is more appropriately measured by the practice area (ERISA and § 1981).

Beasley Allen's Counsel's rates have been accepted in numerous other class action cases. *See e.g.*, Ex. A ¶¶ 4-5, 16-29; *Siqueiros v. Gen. Motors LLC*, No. 16-CV-07244-EMC (N.D. Cal.), ECF 735 ¶¶ 13-14 (approving $55,763,397 with hourly rates up to $1,675, including some of Plaintiffs' Counsel involved here). Sinclair Law Firm has court-approved fees in contested ERISA class actions and decades of ERISA-specific litigation and class action experience. Ex. B ¶¶ 114-121. ERISA's nationwide practice dictates the highest rates available.

The reasonableness of the hourly rates submitted by Class Counsel is further supported by market data compiled in the 2025 Real Rate Report published by Wolters Kluwer ELM Solutions (the "Real Rate Report"),[9] an annually published study of billing rates across practice areas,

[9] Attached hereto as Ex. D.

geographic regions, and experience levels/years of practice. The statistics are derived from over $200 billion in invoice-backed legal spend data. For the ERISA practice area, the Real Rate Report shows a national third quartile partner rate of $1,002 per hour. Thus, twenty-five percent of ERISA partners nationally billed above $1,000 per hour in 2025. In the Washington, D.C. market, an appropriate geographic comparator for complex national ERISA class action work, the Employment and Labor partner third quartile hourly rate was $1,068, and the mean was $903. For Finance and Securities partners, whose practice mirrors the fiduciary plan administration and benefit determination work at issue in ERISA multiemployer plan litigation of this complexity, the Washington, D.C. median partner rate was $1,250 per hour in 2025. Notably, the Real Rate Report draws from corporate defense billing, which carries no contingency risk. While the Report is helpful, numerous Courts have recognized that contingency work should typically increase the reasonable rate for an attorney. *See Rum Creek*, 31 F.3d at 175; *Johnson*, 488 F.2d at 718. Class Counsel in this matter assumed the full risk of nonpayment on a contingent basis. A rate premium over reported defense-side rates is independently warranted to reflect that risk. *See id.*

Beasley Allen and Sinclair Law Firm are highly experienced, with a successful track record in the field of multistate class action and ERISA litigation. Ex. A ¶¶ 10-23 and Ex. B ¶¶13-18. Counsel's rates are reasonable, particularly in light of the specialized practice areas at issue in this case. *See Rum Creek Coal Sales, Inc.*, 31 F.3d at 175; *Hensley*, 461 U.S. at 433; *Lou v. Am. Honda Motor Co.*, 2025 WL 1359067, at *9 (N.D. Cal. May 9, 2025), *judgment entered sub nom. Aberin v. Am. Honda Motor Co.*, 2025 WL 1651941 (N.D. Cal. June 11, 2025) (approving hourly rates up to $1,275); *see Zakikhani v. Hyundai Motor Co.*, 2023 WL 4544774, at *9 (C.D. Cal. May 5, 2023) (accepting hourly rates of $1,285 "in light of Defendants' non-opposition and the fact that this is not a common fund case and so the attorneys' fees award will not reduce the benefits Class

Members will receive under the settlement"); *Siqueiros*, No. 16-CV-07244-EMC (N.D. Cal.), ECF Nos. 728-1, 735 ¶¶ 13–14 (approving attorneys' fees award with hourly rates up to $1,675); Ex. A ¶¶ 19-29, Ex. B ¶¶114-121, and Ex. C ¶¶ 4-9 .

**E. The Hours Expended Are Reasonable**

Class Counsel dedicated considerable time and effort to this litigation. Ex. A ¶¶ 19-29, Ex. B ¶¶ 6-21, 114-126 and Ex. C ¶¶ 4-9. In total, Class Counsel devoted approximately 3,000 hours to this case through July 15, 2026. *Id.* Although Class Counsel worked efficiently and resolved this case prior to a class trial, this favorable resolution would not have been possible without the careful work that went into the case. As discussed above, this case was complex and required a heavy amount of research and dedicated time to reviewing documents and data in order to craft the exceptional relief achieved. The hours recorded were incurred on matters benefiting the litigation and the Class. Given the effort expended and the complexity of the issues involved, the hours incurred are reasonable. *Id.*. Class Counsel will continue to devote substantial time to final approval proceedings, calls from potential members of the Class, settlement administration, oversight of the Rescoring Process, and any appeals, further supporting the reasonableness of the requested fee. *Id.*. Based on prior experience, Class Counsel expects to expend more than 500 hours on final approval, fees petition briefing, and settlement administration, separate from any appeals. *Id.*

**F. The Court Should Award Basic Lodestar Now for Hours to Date and Reserve Jurisdiction to Consider Future Hours and any Enhancement Upon Completion of the Rescoring Protocol[10]**

[10] If the Court rejects Plaintiffs' request to bifurcate the fee award and reserve on any enhancement, Plaintiffs ask for additional time to brief the merits of an appropriate enhancement.

The fee structure appropriate to this case reflects a straightforward principle established by the Supreme Court in *Hensley*: the lodestar is the minimum reasonable fee to which counsel in this case is entitled, and it may be adjusted upward when the results and circumstances warrant. 461 U.S. at 433-34. Class Counsel are entitled to their basic lodestar now, without reduction, based on the work performed to July 15, 2026, and the comprehensive results achieved. Every element of relief sought by the Complaint has been obtained. The *Johnson* factors, analyzed above, confirm that the lodestar is fully supported by the record.

The question of future work to be performed in implementation of the injunctive remedy and any upward adjustment, cannot be accurately resolved at this stage, not because results are in doubt, but because the future hours and economic value of the relief to the class will be concrete numbers in the near future. As designed, the Settlement provides class-wide, comprehensive, injunctive relief. The Settlement's injunctive relief is expert-driven. Specifically, the Rescoring Protocol will determine how many class members' tests are rescored, how many qualify for higher or newly awarded benefits, and the aggregate amount of retroactive payments and interest and future benefit payments that result from the performance of the injunction. Because the medical determination whether the rescored and race-neutral scores result in an award to a particular member of the Class cannot accurately be estimated, those figures will not be available until the Protocol is substantially complete. Presenting the Court with actual economic data, rather than projections, serves the accuracy of the Court's determination and the interests of the class.

Class Counsel request the Court bifurcate the fee award and: (1) award the current lodestar for time billed through July 15, 2026 at final approval, as the minimum fee to which Class Counsel are entitled as a matter of law along with a determination that Class Counsel’s rates are reasonable, the time expended, through July 15, 2026, is reasonable, and costs incurred are reasonable; and (2)

reserve jurisdiction to consider a supplemental fee petition, to be filed upon substantial completion of the Rescoring Protocol, in which Class Counsel will present the Court with the economic value delivered to the class and seek an enhancement commensurate with that value. The form and basis of that additional award will be addressed by supplemental petition. This two-step structure is within the Court's equitable discretion under Rule 23(h) and *Hensley* and is consistent with the Fourth Circuit's recognition that courts retain broad authority to structure fee awards in class actions. *McAdams*, 26 F.4th at 162. Class Counsel respectfully request that the Court's order on this motion expressly reserve jurisdiction for that purpose.

**G. Class Counsels' Expenses Are Reasonable and Should Be Approved**

Rule 23(h) authorizes an award of "nontaxable costs" in addition to attorneys' fees in a certified class action. Fed. R. Civ. P. 23(h). Similarly, ERISA § 502(g)(1) provides that the court may award "a reasonable attorney's fee and costs of the action." 29 U.S.C. § 1132(g)(1). The standard for reimbursement of litigation costs is whether they were reasonably and necessarily incurred in the prosecution of the litigation. Courts in this district and throughout the Fourth Circuit routinely award reimbursement of out-of-pocket litigation expenses including travel costs, mediation fees and expenses, expert fees, legal research costs, filing fees, and related expenditures incurred in the course of pursuing the case. *See, e.g., Feinberg*, 610 F. Supp. 3d at 773-74 (awarding full reimbursement of litigation costs in ERISA class action); *Goodlaxson*, 776 F. Supp. 3d at 326 (same in civil rights class action). Unlike taxable costs under 28 U.S.C. § 1920, nontaxable litigation costs reimbursable under Rule 23(h) and ERISA § 502(g)(1) include the full range of reasonable out-of-pocket expenditures that would ordinarily be billed to a paying client.

The costs incurred by Class Counsel in this matter are modest relative to the complexity and duration of the litigation, and consist primarily of travel expenses associated with the seven

in-person mediation sessions conducted before the Honorable Gerald E. Rosen (Ret.) in Washington, D.C. Those sessions were not optional formalities. Travel expenses incurred in attending court-ordered or case-necessary proceedings, including mediations, are among the most routinely approved categories of litigation costs in this district and elsewhere. *See McAdams v. Robinson*, 26 F.4th 149, 162 (4th Cir. 2022) (affirming award of costs and expenses). All costs submitted for reimbursement were actually incurred, were reasonable and necessary to the prosecution of this litigation and are fully documented in the supporting Declarations.

## II. CLASS REPRESENTATIVE SERVICE AWARDS ARE WARRANTED, HERE

Service awards to class representatives are appropriate where the representatives "have actively participated in, assisted with, and supported the lawsuit on behalf of the class, rather than serving as a mere figurehead." *Birks v. Small Cmty. Specialists*, L.L.C., No. 8:23-CV-00837-BAH, 2024 WL 5344437, at *15 (D. Md. Dec. 10, 2024) (citation omitted). “Incentive awards are intended to compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general.” *Goodlaxson*, 776 F. Supp. 3d at 326–27 (quoting *Berry v. Schulman*, 807 F.3d 600, 613 (4th Cir. 2015) (quotation marks and citations omitted)). “To determine whether an incentive payment is warranted, the court should consider ‘the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, and the amount of time and effort the plaintiff expended in pursuing the litigation.’” *Goodlaxson*, 776 F. Supp. 3d at 326–27 (quoting *Decohen v. Abbasi*, LLC, 299 F.R.D. 469, 483 (D. Md. 2014) (citing *Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998))). Courts in this district routinely approve such awards to compensate representatives for their time

and to recognize the personal risk and effort involved in serving as a class representative. *See Feinberg*, 610 F. Supp. 3d at 785; *Goodlaxson*, 776 F. Supp. 3d at 330.

**A. The Class Representatives Merit a Service Award**

This case is a rare one where Class Representatives risked much, including their reputations, to affect system-wide change. They came forward to prosecute the litigation for the Class's benefit; sought successfully to remedy a widespread wrong; and have conferred valuable benefits upon the Class. Both devoted substantial time and effort here by: (a) providing information and input in connection with the drafting of the Complaints; (b) overseeing the prosecution of the litigation; (c) attending in-person mediation in Washington, DC; (d) repeatedly consulting with Class Counsel; and (e) being involved in all aspects of the case, including settlement. Plaintiffs were each prepared for and committed to continue their service, including attending and testifying at trial. *See* Ex. A ¶¶ 38-41; Ex. B. ¶¶ 139-41. Because of the sensitive nature of the allegations in this case, that one of the most recognizable private organizations in the country (the National Football League and its retirement/disability Plans) who has been the subject of racial tension, knew of the use of race and the impact on neuropsychological testing and failed to take any action to cure the discriminatory practice's impact, Mr. Bailey and Mr. Curry should receive an appropriate service award. Without the willingness of Mr. Bailey and Mr. Curry to come forward, serve as class representatives, and shoulder the burdens of named-plaintiff status, the Class would have had no vehicle through which to pursue the relief the Plans declined to undertake voluntarily. Their contributions were not incidental to recovery, they were essential.

**B. The Requested Service Awards Are Reasonable**

Class Counsel respectfully request service awards in the amounts of $50,000 for Stacey Bailey and $50,000 for Eric Curry. These amounts are consistent with service awards approved in

comparable ERISA class actions and civil rights benefits cases. *See, e.g., Feinberg*, 610 F. Supp. 3d at 785; *Siqueiros*, No. 16-CV-07244-EMC (N.D. Cal.), ECF No. 735 ¶ 15 (service awards of $30,000 to each plaintiff "are fair and reasonable for their efforts in prosecuting the claims in the Settlement Agreement"); *In re High-Tech Emp. Antitrust Litig.*, 2015 WL 5158730, at *18 (N.D. Cal. Sep. 2, 2015) (awarding each of five class representatives amounts ranging from $80,000 to $120,000 in case that settled pre-trial); *Galeener v. Source Refrigeration & HVAC, Inc.*, 2015 WL 12977077, at *2 (N.D. Cal. Aug. 21, 2015). Moreover, as with attorneys' fees and expenses, the requested service awards will not reduce Class-wide relief. Both are to be paid separately and in addition to any monetary relief flowing form the injunction's performance.

## CONCLUSION

For the reasons set forth above and in the accompanying Joint Declaration, Plaintiffs respectfully request this Court bifurcate an award of attorneys' fees and costs and enter an Order, along with Final Approval of the Settlement that Plaintiffs' counsel's hourly rates are reasonable, that the time expended was reasonable, that costs were reasonable, awarding the Lodestar and costs, including $4,500 for anticipated costs related to the Final Fairness Hearing, of $4,040,971.69, and reserving jurisdiction to address a potential enhancement to Lodestar and future award of additional attorneys' fees, and awarding $50,000 to Mr. Stacey Bailey and $50,000 to Mr. Eric Curry in recognition of their service to the Class.

Respectfully submitted this 21st day of July, 2026.

*/s/ Christopher T. Nace*
Christopher T. Nace (16442)
**NACE LAW GROUP**
1025 Thomas Jefferson Street, NW, Suite 810

Washington, D.C. 20007
Telephone: 202-463-1999
Facsimile: 202-223-6824
ctnace@nacelawgroup.com

W. Daniel "Dee" Miles, III (*pro hac vice)*
Alison D. Hawthorne (*pro hac vice*)
Leon H. Hampton, Jr. (*pro hac vice*)
Paul W. Evans (*pro hac vice*)
**BEASLEY, ALLEN, CROW, METHVIN, PORTIS & MILES, P.C.**
218 Commerce Street
Montgomery, AL 36104
Telephone: 334-269-2343
Facsimile: 334-954-7555
Dee.Miles@BeasleyAllen.com
Alison.Hawthorne@BeasleyAllen.com
Leon.Hampton@BeasleyAllen.com
Paul.Evans@BeasleyAllen.com
(Signed by Christopher T. Nace with the permission of W. Daniel "Dee" Miles, III)

Rebecca D. Gilliland (*pro hac vice*)
**BEASLEY, ALLEN, CROW, METHVIN, PORTIS & MILES, P.C.**
301 St. Louis Street
Mobile, AL 36602
Telephone: 251-308-1515
Facsimile: 334-954-7555
Rebecca.Gilliland@BeasleyAllen.com
(Signed by Christopher T. Nace with the permission of Rebecca Gilliland)

Thomas O. Sinclair (*pro hac vice*)
**SINCLAIR LAW FIRM, LLC**
Post Office Box 59627
Birmingham, Alabama 35259
Telephone: 205-868-0818
Facsimile: 205-868-0894
tsinclair@sinclairlawfirm.com
(Signed by Christopher T. Nace with the permission of Thomas O. Sinclair)

***Counsel for Plaintiffs***

## CERTIFICATE OF SERVICE

I hereby certify that on July 21, 2026, I filed a copy of the foregoing document using the Court's ECF/CM system, which will automatically send notice of such filing to all counsel of record in this matter and have served the following counsel via electronic mail:

Anillo Alvaro
Edward J. Meehan
Mark C. Nielsen
Michael L. Junk
Jovana Vujovic
**Groom Law Group, Chartered**
1701 Pennsylvania Ave. N.W. Suite 1200
Washington, D.C. 20006
Telephone: 202-861-5429
aia@groom.com
emeehan@groom.com
mnielsen@groom.com
mjunk@groom.com

***Counsel for Defendants***

*/s/ Christopher T. Nace*
Christopher T. Nace