**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**BALTIMORE DIVISION**

| | |
|---|---|
| **STACEY BAILEY, et al.,**<br><br>**Plaintiffs,**<br><br>v.<br><br>**THE NFL PLAYER DISABILITY & SURVIVOR BENEFIT PLAN, *et al.***<br><br>**Defendants.** | Case No. 1:23-cv-02661-JRR |

**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR ATTORNEYS' FEES, EXPENSES, AND SERVICE AWARDS**

## TABLE OF CONTENTS

ARGUMENT ........................................................................................................................ 1

I. THE FEE PETITION CONTAINS THREE INDEPENDENT BASES TO AWARD THE REQUESTED LODESTAR........................................................................................................ 3

II. THE OPPOSITION MISSTATES THE ANALYSIS UNDER QUESINBERRY ............ 5

A. There is no requirement of a finding or admission of wrongdoing for the Court to find Culpability or Bad Faith ........................................................................................ 5

III. THE LODESTAR REQUEST IS REASONABLE........................................................ 7

A. The Prevailing Market Rate is ERISA and nationwide. ................................................ 7

B. The Concussion Litigation is not an appropriate comparator........................................ 9

C. The hours expended are reasonable ................................................................................. 10

IV. BIFURCATION IS WITHIN THE COURT'S DISCRETION AND SHOULD BE ALLOWED ........................................................................................................................ 13

A. The "carve out" of monitoring from the Settlement Agreement does not apply to a court-awarded fee ............................................................................................................... 14

B. Class Counsels' Expenses Are Reasonable and Should Be Approved......................... 15

V. THE SERVICE AWARD SOUGHT HERE IS APPROPRIATE TO THE LITIGATION 15

CONCLUSION ................................................................................................................... 15

# TABLE OF AUTHORITIES

**Cases**

*Blum v. Stenson*,
465 U.S. 886 (1984) ... 3, 4, 14

*Burley v. Baltimore Police Dep't*,
No. CV SAG-18-1743, 2020 WL 1984906 (D. Md. Apr. 27, 2020) ... 8

*City of Burlington v. Dague*,
505 U.S. 557 (1992) ... 14

*Fox v. Vice*,
131 S. Ct. 2205 (2011) ... 11

*Hensley v. Eckerhart*,
103 S.Ct. 1933 (1983.) ... 10

*In re National Football League Players' Concussion Injury Litigation,*
2018 WL 1635648 ... 10

*Iron Workers Local #272 v. Bowen*,
624 F.2d 1255 (5th Cir. 1980) ... 5

*Lackey v. Stinnie*,
145 S.Ct. 659 (2025) ... 4

*Maher v. Gagne*,
100 S.Ct. 2570 (1980) ... 4

*Pennsylvania v. Delaware Valley Citizens Council For Clean Air*,
106 S.Ct. 3088 (1986) ... 14

*Perdue v. Kenny A. ex rel. Winn*,
559 U.S. 542 (2010) ... 3, 4, 14

*Pyler v. Evatt*,
902 F.2d 273 (4th Cir. 1990) ... 8

*Quesinberry v. Life Ins. Co. of N. Am.*,
987 F.2d 1017 (4th Cir. 1993) ... 5

**Statutes**

33 U.S.C. § 1365(d) ... 14

42 U.S.C. § 1981 ... 2, 4

42 U.S.C. § 1988 .......... 3, 4, 6, 7

42 U.S.C. § 6972(e), or § 505(d) .......... 14

**Rules**

Fed. R. Civ. P. 23(h) .......... 3, 4

Fed. R. Civ. P. 23 .......... 6, 7, 14

## ARGUMENT

This action produced a Settlement that permanently prohibits race-based cognitive adjustments, requires race-neutral rescoring and reconsideration of benefit claims, provides retroactive benefits with interest, and waives defenses that would otherwise restrict relief. Defendants' primarily urge that the lodestar is not reasonable. To start, Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Attorneys' Fees, Expenses, and Service Awards ("*Opposition*") downplays the adversarial nature of nearly three years of contested negotiations. Crafting an enforceable relief required production and analysis of the historical plans, expert work, testing of class data and eligibility filters, seven in person multi-day mediations presided over by a retired federal judge, a term sheet with multiple revisions and approximately forty settlement drafts over the course of another year. The absence of contested motions does not establish an absence of adversarial or technical work. It is true that "Defendants expressed their commitment to reach an early resolution" quickly.[1] It is false, however, that they "agreed to terms that substantially narrowed any potential dispute" from the outset, or even early.[2] The successes (now set out within the Settlement Agreement) were not because the negotiations were uncontested, cooperative, or were made outside of "extensive litigation."

Defendants built an opposition on a single rhetorical point of view: recasting the absence of formal adjudication as the absence of merit. Although the intent to settle was an early decision from Defendants, the ability to successfully reach a settlement was in question and hard-fought. It was Plaintiffs' steadfast pressure and refusal to provide less than complete relief that ultimately pushed this matter to resolve, not an absence of merit. The relief achieved will in turn lead to results that exceeded 100% of the benefits owed to players whose deficit classification changes as

---

[1] Opp'n at 1.
[2] *Id.*

a result of the Rescoring Protocol. In addition to misrepresenting the effort necessary to reach the comprehensive resolution in the Settlement, Defendants frame the Complaint as one that "tracks," "borrows," or "mirrors" allegations in *In re National Football League Players' Concussion Injury Litigation*[3]("Concussion Litigation"). There may appear to be some factual overlap (both settlements include some form of neuropsychological review), but the differences are striking.

Nothing in the Concussion Litigation involved ERISA or 42 U.S.C. § 1981. The Concussion Litigation resolved concerns about neurocognitive injury sustained through football-related trauma. The resolution included neuropsychological testing because diagnoses/injuries from concussions were linked to a particular disease, the affirmative diagnosis of which cannot be made until after death, but Chronic Traumatic Encephalopathy ("CTE") presents in ways identifiable through neuropsychological testing. Hence the CTE settlement included its use. The administration of ERISA governed disability benefits and the use of race-based adjustments in cognitive assessments under the Plans impacting an impaired player's likelihood to qualify for benefits is separate. Here, Plaintiffs asserted claims arising under ERISA and 42 U.S.C. § 1981, obtained a court enforceable, race neutral rescoring protocol, reconsideration of affected benefit determinations, retroactive payment of benefits from the time of the player's original application with interest, and waiver of otherwise applicable limitations and damages limitation defenses. The fact that both matters involve neuropsychological evidence does not make the claims, governing law, relief, or work required to obtain each remotely interchangeable.

The complexities of § 1981 and ERISA, a decade of Collective Bargaining Agreements, and multiple Plans with hundreds of pages of Plan documents with amendments all intertwined and covering a more than 14-year class period bears no relation to another case raising what is

[3] No. 2:12-md-02323 (E.D. Pa.). Opp'n at 1.

essentially personal injury claims. A superficial overlap does not make one a derivative or repetitive of the other. As set forth below, Defendants' arguments each rest on same flawed premise and, therefore, fail for the same reason. No statute or law requires that there be an adjudicated determination or a trial before the Court can award the fee requested, nor should there be such a requirement. Such a requirement would deter results like those achieved in this case.

## I. THE FEE PETITION CONTAINS THREE INDEPENDENT BASES TO AWARD THE REQUESTED LODESTAR.

Plaintiffs' motion seeks fees under three independent and freestanding bases: Rule 23(h), ERISA § 502(g)(1), and 42 U.S.C. § 1988. Pls.' Mem. at 6 ("Section 502(g)(1) of ERISA, Fed. R. Civ. P. 23(h), and.. . .§ 1988 all support awarding attorneys' fees and costs in this case."); *see also* Mot., ¶ 6 (requested award is "reasonable primarily under Rule 23(h), but also merited under ERISA § 502(g)(1) and 42 U.S.C. § 1988"). Despite Defendants' arguments, the *Johnson* factors were never advanced as a fourth, independent entitlement alongside those three, nor were the factors raised to support an enhancement. Plaintiffs cited *Johnson* for the undisputed proposition that courts consider those factors when assessing whether a lodestar figure, the established starting point for an award under Rule 23(h), reflects a reasonable fee. Pls.' Mem. at 7-8. Defendants' Opposition collapses the distinction between awarding lodestar and enhancing lodestar, arguing that "many of the factors on which [Plaintiffs'] rely are already subsumed in the lodestar and therefore cannot justify additional compensation." Opp'n at 12 (citing *Blum v. Stenson*, 465 U.S. 886, 898-900 (1984) and *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 553 (2010)). The citations belie the misunderstanding. Pages 898-900 in *Blum* begins "[t]he issue remaining is the appropriateness of an upward adjustment to the fee award in this case." 465 U.S. at 898-900. Plaintiffs have not yet sought an upward adjustment to lodestar. *Blum* supports the award of reasonable attorney fees calculated as "the 'product of reasonable hours times a reasonable rate'

[because that calculation] normally provides a 'reasonable' attorney's fee within the meaning of [§ 1988]." *Blum*, 465 U.S. at 897. Page 553 of *Perdue*, likewise, is a discussion of an enhancement on top of the lodestar not on whether a lodestar should be awarded or how it should be calculated. For example, the cited page begins "[f]ourth, we have noted that 'the lodestar figure includes most, if not all, of the relevant factors constituting a "reasonable" attorney's fee,' and have held that an enhancement may not be awarded based on a factor that is subsumed in the lodestar calculation."

Defendants' attack *Johnson* as though Plaintiffs offered it as a standalone justification for the fee award, then fault Plaintiffs for relying on factors "already subsumed in the lodestar." Opp'n at 12 (citing *Blum*, 465 U.S. at 898-900; *Perdue*, 559 U.S. at 553). But Plaintiffs' entitlement to a fee award does not depend on *Johnson*, it rests independently on Rule 23(h), ERISA § 502(g)(1), and § 1988. Whether *Johnson* factors are already captured in the lodestar is not relevant when the question is whether to award the requested lodestar. *Johnson* provides a guidepost for determining the "reasonableness of the award," i.e., whether the requested lodestar is reasonable. As described in Plaintiffs' Motion, the *Johnson* factors support that the lodestar requested is reasonable.

Although Defendants brush over its significance, § 1988 expressly authorizes fees in an action to enforce § 1981. Upon final approval, Plaintiffs will have obtained enduring judicially sanctioned relief that materially alters the party's legal relationship: once approved by final order, the Settlement supports an award of fees. *See, e.g., Lackey v. Stinnie*, 145 S.Ct. 659 (2025)( "For the purposes of § 1988(b), a plaintiff 'prevails' when a court grants enduring judicial relief that constitutes a "material alteration of the legal relationship of the parties."); *Maher v. Gagne*, 100 S.Ct. 2570 (1980) ("The fact that respondent prevailed through a settlement rather than through litigation does not weaken her claim to fees. Nothing in the language of § 1988 conditions the District Court's power to award fees on full litigation of the issues or on a judicial determination

that the plaintiff's rights have been violated.") No adjudication or admission is required. A prevailing civil rights plaintiff should recover a reasonable fee absent special circumstances that would make such an award unjust and the Defendants have identified none.

## II. THE OPPOSITION MISSTATES THE ANALYSIS UNDER QUESINBERRY

Defendants argue against *Quesinberry*'s factors favoring Plaintiffs. Opp'n, pp. 7-11. The Fourth Circuit holds "No one of these factors is necessarily decisive, and some may not be apropos in a given case, but together they are the nuclei of concerns that a court should address in applying section 502(g) [1132(g) ]." *Quesinberry v. Life Ins. Co. of N. Am.*, 987 F.2d 1017, 1029 (4th Cir. 1993) (quoting *Iron Workers Local #272 v. Bowen*, 624 F.2d 1255, 1266 (5th Cir. 1980)).

### A. There is no requirement of a finding or admission of wrongdoing for the Court to find Culpability or Bad Faith

Defendants argue that the first *Quesinberry* factor cannot favor Plaintiffs because "[a] settlement reached without any finding of liability and accompanied by an express denial of wrongdoing does not establish culpability or bad faith." Opp'n at 9. That argument, if accepted, would read the first factor out of *Quesinberry* in every case that resolves by settlement rather than trial. Express denials of liability and non-admission clauses are standard features of virtually every class action settlement and are not evidence of the parties' actual conduct, but a negotiated term that every defendant insists upon and every plaintiff accepts as the price of resolution.

*Quesinberry* does not require, nor any court applying it, that an adjudicated finding of wrongdoing is a precondition to this factor. *Quesinberry*, itself, confirms it. Despite success at trial, necessarily including a finding of wrongdoing, the district court found only the second factor weighed in favor of an award (ability to pay). *Quesinberry,* 987 F.2d at 1029-30. Courts look to the record of the parties' conduct, not the procedural label attached to the case. In addition, due to the overlap between the Plans and the NFL, the Defendants knew of the impact of race on testing

scores. Defendants were aware of race being used in adjusting claims within the Plans neuropsychological scores years ago.[4] Despite that unrefuted knowledge, the Plans took no action to address the breach of duty to beneficiaries and the failure to provide the same contractual benefits to non-white players as white players. This behavior shows culpability, demonstrates bad faith, is undisputed in the record, and supports the exercise of the Court's discretion under ERISA, mandatory fee shifting under § 1988, and the award requested under FRCP 23.

**1. No factor, including the first, requires a finding of culpability or bad faith.** Defendants conflate the timeline and ignore that, regardless of whether they knew prior to June of 2021 (which Plaintiffs allege the Plans did know), the use and impact of race in the administration of claims and inaction to correct existing claims is damning. The Defendants' failure to act despite their knowledge is strong evidence of culpability and bad faith.

**2. Plaintiff does not argue the ability to pay is solely sufficient to merit an award of fees.** Defendants concede their ability to pay.

**3. Deterrence of others supports the fee request.** For Defendants' anti-deterrence position to be viable, it would need to be true that the use of wholly discredited racially biased adjustments to neuropsychological testing ***is non-discriminatory***. And any entity or other Plan fiduciary that is currently allowing (or previously allowed and did not correct) the use of race-based adjustments, would have to take the bold step of arguing in support of those adjustments in other litigation. Instead, this settlement can serve as a guide for how to correctly handle racial impact in benefit determinations and deter others from doing what the Plans did in failing to act.

**4. This Court's review of the record and approval of this Settlement resolves significant Civil Rights and ERISA questions and provides a benefit to all beneficiaries.** The

[4] Joint Motion for Preliminary Approval, ECF No. 79-1, p. 9; ECF No. 82; Settlement Agreement, ECF No. 79-3, Recitals; *see also* ECF No. 79-1, p. 13 (§ VI. A).

class-wide injunctive remedy provides relief to all participants and resolves any lingering doubt about the overlap of racial discrimination laws and ERISA. This Settlement uses both § 1981 and ERISA in concert to prevent the treatment of a group of participants differently from another.[5] Defendants' argument on this point highlights why Plaintiffs ask the Court to allow continued oversight and to bifurcate the fee award: the ultimate value of the Settlement cannot be presently quantified. This acknowledged fact does not weigh against an award of lodestar because the question of whether Plaintiffs have satisfied *Quesinberry* or *Johnson* or Rule 23 or § 1988, initially, focuses on entitlement to a reasonable award rather than the amount of an award. The results of that oversight and the ultimate financial value being currently undetermined simply support that the Court should reserve a ruling on an enhancement and final fees until the implementation of the injunctive relief is complete. Defendants point to the boilerplate language in the Settlement Agreement to deny liability. But standard settlement agreement language, when it comes to this factor, supports the strength of Plaintiffs' claims. The Defendants admit that Class Counsels' efforts to frame and guide this litigation led to immediate recognition that resolution of this matter was required and ultimately this Court's adjudication of the merits of the Settlement Agreement.

**5. No adjudication is required to determine the relative merits of the parties.** Defendants point to the boilerplate language in the Settlement Agreement that they did not accept liability. But that unsurprising language, when it comes to this factor, supports the strength of Plaintiffs' claims. As Defendants repeatedly point out, after reviewing the Complaint, they quickly made the decision to settle (although settlement took a lot longer than two years to finalize).

## III. THE LODESTAR REQUEST IS REASONABLE

### A. The Prevailing Market Rate is ERISA and nationwide.

[5] This Court has preliminarily approved the Settlement as fair, reasonable, and adequate. That determination required the Court to consider, among other things, whether the relief was adequate and whether the relief treats class member equitably relative to each other.

Because ERISA litigation is so highly specialized, the appropriate market is nationwide. Class Counsel's rates in other non-ERISA cases, then, are not limiting. Defendants, apparently, acknowledge this truth when arguing that "[c]ounsel's own assertions regarding their customary rates are not enough." Opp'n at 13, citing *Burley v. Baltimore Police Dep't*, No. CV SAG-18-1743, 2020 WL 1984906, at *4 (D. Md. Apr. 27, 2020) (citing *Pyler v. Evatt*, 902 F.2d 273, 277 (4th Cir. 1990)). While Defendants provide rates for counsel included in fee petitions from certain cases where lower rates were requested, Opp'n at 15, they ignore the rates filed in *Siqueiros v. Gen. Motors LLC*, No. 16-CV-07244-EMC (N.D. Cal.), cited in Plaintiffs' Motion. After a successful class action jury trial, counsel sought fees and filed with the Northern District of California in February of 2024 with hourly rates for Mr. Miles of $1,675, Ms. Gilliland of $1,300, and Ms. Hawthorne of $1,100. ECF No. 654-1, Ex. B-5 at p. 107. That case settled while the motion was pending and counsel were awarded a fee with a lodestar cross-check. That lodestar was based on the fees and rates previously filed. Variations in rate across multiple practice areas are not surprising yet none of the of the cases referred to by Defendants are ERISA or § 1981, much less both. Mr. Sinclair's change is even simpler: his prior rate (for work beginning in 2015 in an ERISA injunctive remedy class action) is over a decade old. Surely Defendants are not suggesting rates, including theirs, have not increased since that time. While Defendants would prefer application of Baltimore rates, Groom Law Firm is located in and all the in-person mediations took place in Washington D.C. Thus, even in this case, Class Counsel were litigating against a firm using D.C. Defense rates, with the known involvement of multiple other defense

firms practicing in unknown markets.[6] Limiting Class Counsel's rates to Baltimore is against undisputed ERISA nationwide rate comparison cases and contrary to how this case proceeded.

Class Counsel's citation to the Washington, D.C. Employment and Labor rate data referenced the wrong table in Exhibit D. The correct figures appear at Report page 147 (ECF No. 88-5), not page 153. The data shows Washington, D.C. Employment and Labor partners billing at a third-quartile rate of $1,092 in 2025, a figure that more strongly supports the rates Class Counsel seek than the mistakenly cited data did. Rather than cite the Employment and Labor or Finance and Securities data relevant to this ERISA action — the former reflecting the collectively bargained, Taft-Hartley nature of the Plans at issue, and the latter the fiduciary and benefit-administration work at the core of the case, which Class Counsel already cited for Washington, D.C., Pls.' Mem. at 31 — Defendants instead point to the Report's generic, practice-area-blind "Litigation" figure for Baltimore, Cities By Matter Type, ECF No. 88-5, p. 12, which blends every practice area the Report tracks, from insurance defense to real estate. Both of the more appropriate categories reflect markedly higher Baltimore partner rates: Employment and Labor shows a third-quartile rate of $1,235, ECF No. 88-5, p. 145, (more than 60% higher than what Defendants suggest) and Finance and Securities shows a third-quartile rate of $1,074, ECF No. 88-5, p. 155 (more than 40% above the figure Defendants selected).

**B. The Concussion Litigation is not an appropriate comparator**

As discussed above, the Concussion Litigation is not a comparator. That case involved neither ERISA nor § 1981. But even if it were a fair comparator, the rates awarded in the July 15, 2025 Order cited by Defendants are not current rates. Opp'n at 17, citing *In re National Football*

---

[6] Multiple defense attorneys from Groom Law were involved and, on several occasions, additional rounds of argument and negotiations were triggered by other defense firms' involvement. While Class Counsel have not sought the billing records of all the defense firms, it is reasonably assumed that such disclosure would only serve to highlight the reasonableness of Class Counsels' time and effort.

*League Players' Concussion Injury* No. 2:12-md-02323-AB (E.D. Pa. July 15, 2025), ECF No. 12481 at p. 1. In that Order, Judge Brody explains that she had previously awarded those rates and ordered they were to be used in all future fee petitions in the case. Despite being awarded in 2025, those rates were set in 2018. And Judge Brody set those rates by blending the rates submitted by the different firms when seeking the 2018 fee award. *See id.*, at p. 7; *see also In re National Football League Players' Concussion Injury Litigation,* 2018 WL 1635648, *9.

**C. The hours expended are reasonable**

As the initial motion recognizes, the case was initially staffed for litigation against a sophisticated set of Defendants with high-level defense counsel. Mot. at 14. Staffing was reduced as the likelihood of settlement solidified. It is incorrect to argue that because Defendants determined early that they wished to avoid the public scrutiny of protracted litigation that negotiations were not lengthy and highly technical. The demands of this litigation were not "little," they were great. *See* Opp'n at 18. And the demands are ongoing. In fact, within the last month, Class Counsel identified errors in Defendants' review of the underlying data used to identify members of the Class. That error by the Defendants, that the "filter" intended to remove Plan participants whose neuropsychological testing scores were not subjected to race-based demographics (as they are not part of the Class) was faulty, will lead to additional notices to the Class.[7] It was not the Defendants or their expert who identified the mistake. It was Class Counsel.

Defendants invoke *Hensley* but disregard the billing method it prescribes. "Counsel for the prevailing party should make a good faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission." *Hensley v. Eckerhart*, 103 S.Ct. 1933

[7] Class Counsel and Defense Counsel will, shortly, seek permission from the Court to issue a supplemental notice that provides sufficient time for notice and objection to those newly-identified members of the Class.

(1983.) "But trial courts need not, and indeed should not, become green-eyeshade accountants. The essential goal in shifting fees (to either party) is to do rough justice, not to achieve auditing perfection. So trial courts may take into account their overall sense of a suit, and may use estimates in calculating and allocating an attorney's time." *Fox v. Vice*, 131 S. Ct. 2205 (2011). After review, what remains and was submitted is not administrative debris, it is the substantive plan, strategy, negotiation, implementation, travel, and fee recorded work that Defendants' label obscures. Defendants challenge 55 entries as "block-billed," arguing that combining any two tasks in a single entry precludes meaningful review. Opp'n, Ex. 1(A). But block billing is not *per se* improper; the relevant question is whether the entry is sufficiently detailed for the Court to assess the reasonableness of the time claimed, not whether every sub-step of a single undertaking was separately timed and billed. Many of the entries Defendants' flag describe sequential steps toward one deliverable, not unrelated matters bundled together. For example, drafting the Complaint, reviewing the applicable local rules, and preparing the accompanying civil cover sheet, Ex. 1(A) No. 3, or preparing, circulating, and obtaining signature on a single *pro hac vice* application, Ex. 1(A) No. 5. Entries of this kind allow the Court to readily assess the reasonableness of the total time claimed for the underlying task and should not be wholly reduced.

Defendants characterize certain entries at Exhibit 1(B-2) as duplicative billing by three or more attorneys for the same task. Opp'n at 18-19. That overstates the concern for entries relating to, for example, the Complaint, the Settlement Agreement, and the motion for preliminary approval. Those documents had to satisfy both ERISA's and § 1981's distinct substantive requirements. As the accompanying Supplemental Declarations of W. Daniel "Dee" Miles, III and Thomas O. Sinclair explain, review of these documents by Mr. Miles, Ms. Gilliland, Mr. Hampton, and Mr. Sinclair reflected differentiated, non-duplicative contributions (Ex. A, Miles Decl. and

Ex. B, Sinclair Decl.): Mr. Miles's review addressed overall litigation strategy and the interests of the certified class; Ms. Gilliland focused on case management and the structure and enforceability of the negotiated relief; Mr. Hampton's review, as the team's most experienced civil rights litigator, addressed Plaintiffs' § 1981 theory and remedies; and Mr. Sinclair addressed the Plans' statutory and regulatory requirements. Ex. A, ¶¶ 3-6. The billing entries themselves reflect this substantive engagement, not passive duplication. For example, on May 22, 2026, Mr. Miles's review of proposed settlement language was directed at ensuring the document "reflect[ed] [the] entire relief in the best interest of the Class." Ex. 1(B-2), Group 32 (WDM entry, 5/22/2026). No single attorney on the team possessed the combination of civil-rights litigation experience, ERISA and plan-administration expertise, and case-management responsibility necessary to finalize these documents alone, and the entries at Groups 1-3, 9, 16, 20-27, 29, and 31-36 of Exhibit 1(B-2) should be compensated accordingly.

Defendants' cross-firm duplication argument, Ex. 1(I), overlooks that Mr. Miles and Mr. Sinclair were appointed by this Court as Interim Co-Lead Class Counsel. ECF 31. Mr. Sinclair heads a separate law firm from Beasley Allen; Co-Lead Class Counsel cannot discharge that independent responsibility by relying solely on another, separately retained firm's review. Some measure of independent review by each Court-appointed firm is an ordinary and expected feature of a multi-firm leadership structure that this Court itself established, not gratuitous duplication. That independent obligation is reinforced here by Mr. Sinclair's role as the team's ERISA specialist, whose review of the Plans' statutory and regulatory obligations necessarily proceeded from a different vantage point than Beasley Allen's review of the same materials. Other entries in Exhibit 1(B-2) reflect a different, but equally non-duplicative, form of collaboration: sequential review. Rather than several attorneys independently reviewing the same document at the same

time, these entries show one attorney serving as primary drafter or editor, with other attorneys' time limited to a shorter follow-on review of that attorney's work product (for example, review of "RDG's initial comments" on the proposed protective order, Ex. 1(B-2) Group 7, review of "the T&E protocol that RDG circulated," *id.* Group 11). *See* Ex. A, ¶ 7. This sequential drafter-then-reviewer structure is the ordinary and efficient way that any litigation team manages collaborative work product. It is not evidence of duplication. These are precisely the kind of differentiated, purpose-specific contribution that Appendix B contemplates as compensable.

## IV. BIFURCATION IS WITHIN THE COURT'S DISCRETION AND SHOULD BE ALLOWED

There is no case that holds the Court cannot bifurcate the determination of an enhancement. Defendants do not point to one, either. It is plainly within the Court's discretion to do so. Instead, Defendants turn to the Settlement Agreement and other related filings. None of those documents explicitly forbid a bifurcation. The terms of the Settlement Agreement leave bifurcation as an option. The operative language states in its entirety:

> **A. Attorneys' Fees, Costs and Expenses.** Class Counsel will apply to the Court for an award of Attorneys' Fees, Costs, and Expenses incurred in connection with the Action in a timely manner so that the Court may address it contemporaneously with the Final Approval.

Plaintiffs have complied with this language by applying to the Court for "an" award so that the Court "may" address it contemporaneously with the Final Award. The exact words were negotiated and edited multiple times between the parties. Grammatically, "an" is an indefinite article, referring to one of many rather than a specific one.[8] And "may" is a permissive term, not a mandatory one. Additionally, the Order granting preliminary approval dictates that Class Counsel shall file an application "for ***an*** award of Attorneys' Fees, Costs, and Expenses. . ." and reserves

[8] *Merriam-Webster's Collegiate Dictionary* (11th ed. 2020) available at Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/an (last visited August 14, 2026).

that Defendants have all rights to oppose "***any***" such application.[9] Even paragraph 7, describing the Final Fairness Hearing, says that the hearing is for the Court "to determine, among other things" fees, costs, expenses, and service awards.[10] The Notice is even less clear. In short, nothing in the Settlement Agreement, Preliminary Approval Order, or Notice eliminates bifurcation.

Neither FRCP 23, ERISA, nor § 1988 bar enhancement. Defendants note *Dague* states "enhancement for contingency is not permitted under the fee-shifting statutes. . .." Opp'n at 27 (quoting *City of Burlington v. Dague*, 505 U.S. 557, 567 (1992)). The case actually addresses enhancements solely for contingency arrangements, and is limited to the statutes "at issue," the final two words that were conveniently left off by Defendants in their quotation. Instead, they follow the quote with "including § 1988 and ERISA § 502(g)(1)." Opp'n at 27. But neither § 1988 nor ERISA were "at issue" in *Dague.*[11] *Blum v. Stenson* put it best, though. There, the Supreme Court said, "We therefore reject petitioner's argument that an upward adjustment to an attorney's fee is never appropriate under § 1988." *Blum*, 465 U.S. at 901; *see also Perdue*, 559 U.S. at 553. Finally, Defendants disregard that Plaintiffs also seek and are entitled to an award under Fed. R. Civ. P. 23, which undoubtedly does allow enhancements.

**A. The "carve out" of monitoring from the Settlement Agreement does not apply to a court-awarded fee**

Monitoring and ongoing fees and costs associated with implementation and monitoring of a settlement are not unusual, particularly in the context of civil rights litigation. *Pennsylvania v.*

[9] ECF No. 82.

[10] Defendants argue that bifurcation of fees, as Plaintiffs' request, would require another notice to the Class. That does not eliminate the Court's discretion. And, because the fee requested will not in any way reduce any payment to the members of the Class, the bifurcation would not "expose the Settlement Class Members to a materially larger fee without a further opportunity to be heard." Opp'n at 26.

[11] *Dague*, 505 U.S. at 559 ("This case presents the question whether a court, in determining an award of reasonable attorney's fees under § 7002(e). . ., 90 Stat. 2826, as amended, 42 U.S.C. § 6972(e), or § 505(d). . ., 86 Stat. 889, as amended, 33 U.S.C. § 1365(d), may enhance the fee award above the 'lodestar' amount in order to reflect the fact that the party's attorneys were retained on a contingent-fee basis . . ..")

*Delaware Valley Citizens Council For Clean Air*, 106 S.Ct. 3088 (1986). Although the cases are not aligned, the oft-pointed to Concussion Litigation also allowed for the award of this time. Class Counsel would be happy to include any fees and costs associated with future work as part of the second-stage fee request where the Court may address a potential enhancement above lodestar including reports on the implementation and impact of the injunctive remedy.

**B. Class Counsels' Expenses Are Reasonable and Should Be Approved**

Dr. Spica's invoices are attached to Mr. Miles' Supplemental Declaration.[12]

## V. THE SERVICE AWARD SOUGHT HERE IS APPROPRIATE TO THE LITIGATION

While Plaintiffs do not agree that the facts, law, or work involved are related to the Concussion Litigation, the service awards there were $100,000 to each Class Representative. The $50,000 per representative request in this case, involving not only personal medical information, but allegations of racial discrimination that were not raised in the Concussion Litigation by the Class (or in the other cases cited by Defendants), is reasonable and should be approved.

## CONCLUSION

For the reasons stated, Plaintiffs respectfully request this Court bifurcate an award of attorneys' fees and costs and enter an Order, along with Final Approval of the Settlement that Plaintiffs' counsel's hourly rates are reasonable, that the time expended was reasonable, that costs were reasonable, awarding the Lodestar and costs, and reserving jurisdiction to address a potential enhancement to Lodestar and future award of additional attorneys' fees, and awarding $50,000 to Mr. Stacey Bailey and $50,000 to Mr. Eric Curry in recognition of their service to the Class.

Respectfully submitted this 21st day of July, 2026.

[12] Plaintiffs also seek $4,500 as anticipated travel costs to attend the Final Fairness Hearing, but if the Court reserves on an enhancement, that could also be addressed in the second phase.

*/s/ Christopher T. Nace*
Christopher T. Nace (16442)
**NACE LAW GROUP**
1025 Thomas Jefferson Street, NW, Suite 810
Washington, D.C. 20007
Telephone: 202-463-1999
Facsimile: 202-223-6824
ctnace@nacelawgroup.com

W. Daniel "Dee" Miles, III (*pro hac vice)*
Alison D. Hawthorne (*pro hac vice*)
Leon H. Hampton, Jr. (*pro hac vice*)
Paul W. Evans (*pro hac vice*)
**BEASLEY, ALLEN, CROW, METHVIN, PORTIS & MILES, P.C.**
218 Commerce Street
Montgomery, AL 36104
Telephone: 334-269-2343
Facsimile: 334-954-7555
Dee.Miles@BeasleyAllen.com
Alison.Hawthorne@BeasleyAllen.com
Leon.Hampton@BeasleyAllen.com
Paul.Evans@BeasleyAllen.com
(Signed by Christopher T. Nace with the permission of W. Daniel "Dee" Miles, III)

Rebecca D. Gilliland (*pro hac vice*)
**BEASLEY, ALLEN, CROW, METHVIN, PORTIS & MILES, P.C.**
301 St. Louis Street
Mobile, AL 36602
Telephone: 251-308-1515
Facsimile: 334-954-7555
Rebecca.Gilliland@BeasleyAllen.com
(Signed by Christopher T. Nace with the permission of Rebecca Gilliland)

Thomas O. Sinclair (*pro hac vice*)
**SINCLAIR LAW FIRM, LLC**
Post Office Box 59627
Birmingham, Alabama 35259
Telephone: 205-868-0818
Facsimile: 205-868-0894
tsinclair@sinclairlawfirm.com
(Signed by Christopher T. Nace with the permission of Thomas O. Sinclair)

***Counsel for Plaintiffs***

**CERTIFICATE OF SERVICE**

I hereby certify that on August 18, 2026, I filed a copy of the foregoing document using the Court's ECF/CM system, which will automatically send notice of such filing to all counsel of record in this matter and have served the following counsel via electronic mail:

Anillo Alvaro
Edward J. Meehan
Mark C. Nielsen
Michael L. Junk
Jovana Vujovic
**Groom Law Group, Chartered**
1701 Pennsylvania Ave. N.W. Suite 1200
Washington, D.C. 20006
Telephone: 202-861-5429
aia@groom.com
emeehan@groom.com
mnielsen@groom.com
mjunk@groom.com

***Counsel for Defendants***

*/s/ Christopher T. Nace*
Christopher T. Nace