# EXHIBIT C

Tamarick Vanover
8428 Monte Lane
Tallahassee, FL 32305
Phone : (850) 485-1141
Email : ttv8714@gmail.com

September 21, 2026

Re: Case No: 1:23-cv-02661-JRR
Bailey v. NFL Disability & Neurocognitive Plan
Clerk of Court,
Honorable Julie R. Rubin
United States District Court for the District of Maryland
101 West Lombard Street
Baltimore, MD 21201

Dear Judge Rubin,

My name is Tamarick Vanover and I am an absent class member to the proposed *Bailey* Settlement. I strongly object to this settlement. It is quite the opposite of "fair, reasonable, and adequate." "Unconscionable" would be a better description.

While it is bad enough that the exceptions will exclude all but a small handful of players, that is not the main reason for my objection. After having suffered the indignity of race-norming, Black players like me will now suffer an even greater injury as the result of this settlement if it gains final approval. I find the broad releases very troubling and discriminatory.

With no means of opting out of this settlement, Black former players who were subjected to race-norming will now be forced to forfeit our rights under ERISA (including but not limited to claims for benefits, breach of fiduciary duty, or equitable relief under 29 U.S.C. §1132) whether or not they are race-related, and under 42 U.S.C. § 1981, or any other federal or state law prohibiting race discrimination.

We will also be barred from participating in any other settlement, per, "The Releasing Parties agree not to sue or assert any of the Released Claims against any of the Released Parties in any forum, **including via any currently pending litigation in any court, and agree to be forever barred from doing so, whether on their own behalf or on behalf of any other person.**" I interpret this to exclude me from any possible settlement in *Alford*, if a class is eventually certified, or even permitted to continue if the named plaintiffs happen to be members of this Class. It also appears that should "John Doe" have a totally

unrelated lawsuit in progress in this or another district court, it would face dismissal for no other reason than he happens to be an unfortunate member of the *Bailey* Class. This is hardly fair or reasonable.

It is also worth noting that no white former players will be subject to the terms that bind the *Bailey* Class, thus discriminating against us once again and leaving us no recourse. For example:

> If Willie White and Bill Black have lawsuits pending against the Disability Plan for reasons completely different from those in the *Bailey* action, Willie White's lawsuit will proceed, and Bill Black's will be dismissed because he is an absent member of the *Bailey* Class. How can this be fair?

I respectfully request time to be heard at the Fairness Hearing through my non-attorney representative, Sheilla Dingus, president of Advocacy for Fairness in Sports, a 501(c)(3) nonprofit. She is a long-time player advocate and very familiar with the NFL Disability Plan as well as this and other legal actions against the Plan. Her contact information is as follows:

Sheilla Dingus
Advocacy for Fairness in Sports
943 E Main Blvd.
Church Hill, TN 37642
(423)408-9688
defendersheilla@gmail.com

Our position statement is attached.

Respectfully,

Tamarick Vanover

cc: W. Daniel "Dee" Miles, III
Leon H. Hampton, Jr.
Paul W. Evans
BEASLEY, ALLEN, CROW, METHVIN, PORTIS & MILES, P.C.

218 Commerce Street
Montgomery, AL 36104

Rebecca Gilliland
BEASLEY, ALLEN, CROW, METHVIN, PORTIS & MILES, P.C.
301 St. Louis Street
Mobile, AL 36602

Thomas O. Sinclair
SINCLAIR LAW FIRM, LLC
PO Box 59627
Birmingham, AL 35259 SINCLAIR LAW FIRM, LLC

Edward J. Meehan
Mark C. Nielsen
Jovana Vujovic
GROOM LAW GROUP, CHARTERED
1701 Pennsylvania Ave. N.W., Suite 1200
Washington, D.C. 20006

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**BALTIMORE DIVISION**

| | |
|---|---|
| **STACEY BAILEY, et al.,**<br>**Plaintiffs,**<br>**v.**<br>**THE NFL PLAYER DISABILITY & SURVIVOR BENEFIT PLAN, et al.,**<br>**Defendants.** | **CASE NO.: 1:23-cv-02661-JRR**<br><br>**POSITION STATEMENT OF OBJECTOR TAMARICK VANOVER** |

**POSITION STATEMENT OF OBJECTOR TAMARICK VANOVER**

Absent Class Member Tamarick Vanover, a retired NFL player who relies on the NFL Disability and Survivor Benefit Plan strongly objects to the proposed *Bailey* Settlement. For the numerous reasons detailed below, he maintains that this Settlement is the absolute antithesis of "fair, reasonable, and adequate."

## I. INTRODUCTION

1. There are many reasons why this Settlement should be rejected. Litigation was unnecessary in that the NFL Player Disability and Neurocognitive Plan (The Plan), had as of June 8, 2021, discontinued the practice of race-norming prior to the filing of the *Bailey* lawsuit in September 2023. Additionally, race-norming was addressed in the *Alford* lawsuit which pre-dated *Bailey* and has, unlike Bailey seen the benefit of discovery and the adversarial process.

2. The narrow qualifications for retesting and potential compensation combined with the numerous exceptions guarantee that few if any players will qualify for compensation, thus undermining the adequacy argument.

3. Given no ability to opt out, absent Class Members will lose substantial and important ERISA rights while gaining nothing in return. Having already endured the humiliation of race-norming, the Settlement seeks to further compound the injury by stripping away important rights that every disabled retired player who was *not* race-normed enjoys.

4. Context is important, as is history. As we will demonstrate, counsel for both Parties has engaged in questionable/and/or unethical conduct. Can these same Parties be trusted to administer the Settlement in a fair and ethical manner? This is an important factor that Your Honor must weigh carefully

## II. ADEQUACY

5. To determine adequacy requires a review of Plan data. Sometimes what is not said is equally as important as what is.

6. On information and belief, players are rarely, if ever, sent to only one Neutral Physician. And since "at least one" Neutral Physician must find the player disabled for a claim to be approved, if the claim was denied then the neuropsychologist is not solely responsible for denial of the claim. How many players qualified for benefits strictly due to a later approval for Social Security Disability? Since they are now receiving benefits, they would be disqualified for compensation. This is kind of data that should be obtained through discovery, because without knowing if anyone meets the criteria for retesting and possible compensation, how can the adequacy or lack thereof be known?

## III. LOSS OF ERISA RIGHTS WITH NO OPPORTUNITY TO OPT OUT

7. The most troubling aspect of this Settlement is that absent Class Members will lose important ERISA rights because of the excessively broad releases, with no opportunity to opt out of the Settlement. The releases are not limited to race-norming, nor matters of race. Instead, they broadly apply to anything related to a claim determination which encompasses every possible issue that a player might need to address. Congress did not endow protections under ERISA law, to see them rendered null and void because absent Class Members were effectively caught in a settlement trap with no means to opt out of it.

8. The release also impacts current, ongoing litigation such as *Alford*. It bars Class Members from inclusion in other class actions against the numerous Released Parties. It also preempts or dismisses any currently pending lawsuit against the Released Parties that any Class Member may be litigating regardless of the merits.

### *RACIAL IMPLICATIONS*

9. Bailey was purportedly filed because Black players had faced racial discrimination through the practice of race-norming. By placing all Black players who were subjected to race-norming into a non-opt-out class and effectively voiding their rights under ERISA as well as federal and state civil rights, they are being subjected to more discrimination simply because they were discriminated against.

10. Consider this. Willie White has an ongoing lawsuit in the Eastern District of Pennsylvania regarding fiduciary duty and full and fair evaluation of his claim. Bill Black has a similar lawsuit taking place in the Northern District of California. Neither suit is related to race

in any way. Should this Settlement receive final approval, Mr. White will be able to proceed in his lawsuit without any impact whatsoever, but Mr. Black's lawsuit will be dismissed simply because he is an unfortunate member of the *Bailey* Class. How can this possibly meet the criteria for fairness required in FRCP 23?

***GRAY AREA REGARDING FUTURE CLAIMS***

11. While the statement, "**No Release of Future Claims.** The Released Claims do not include any claim arising from facts or events occurring after the Effective Date," sounds ironclad at face value, it is not. What if a future claim has its basis in a current claim as was the case for Tyrone Keys?

12. Mr. Keys was a defensive lineman in the NFL for seven seasons. He was part of the storied Chicago Bears team that captured the Lombardi at Super Bowl XX in 1985. Tyrone Keys is permanently disabled as a result of his career that ended in 1989, when his final team, the Chargers terminated him because of his inability to play due to injuries.

13 He began receiving Line of Duty disability benefits in 1991—temporary compensation for "substantial disablement" immediately following a player's career. A Plan physician, Dr. Hugh Unger, who examined Keys in 1991 noted multiple orthopedic impairments. He found that Keys had a 50-59% loss of use of his back, a 30-49% loss of use of his shoulder, and a 60-79% loss of use of both knees as a result of playing in the NFL.

14. As his Line of Duty benefits approached their expiration date, Keys applied for Football Degenerative Total and Permanent disability and was initially denied. On May 7, 2002, Keys was involved in a fender-bender, in which another car struck his bumper while he was

sitting at a red light. Naturally, the impact aggravated his existing injuries but certainly didn't cause them. He reapplied for T&P in 2003 and was examined by Plan physician Harold Selesnick, who also found him totally and permanently disabled.

15. In 2017, thirteen years after Mr. Keys was awarded Football Degenerative T&P benefits, **Groom Law Group reviewed his claim file and recommended that his benefits be terminated based upon the 2002 automobile accident.** The Plan adopted that position and terminated Mr. Keys' benefits, contending that the accident rendered him ineligible for football-related disability benefits. Mr. Keys challenged the determination in federal court. The court ultimately found that the Board acted arbitrarily and capriciously in its consideration of the evidence, including by "cherry-picking" evidence, failing to investigate further when confronted with conflicting evidence, and failing to consider key relevant information. *Keys v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, 493 F. Supp. 3d 1147 (M.D. Fla. 2020).

16. But what if the next "Mr. Keys" is a member of the *Bailey* Class? Consider a player who is currently receiving disability benefits when, years later, a review of his file identifies a past event that the Plan contends disqualifies him from those benefits. His benefits are terminated based upon that historical event. What recourse will that player have? The Settlement Agreement does not clearly answer that question. Is the resulting claim a "future claim" because the termination occurs after the Effective Date, or is it a Released Claim because the factual basis for the termination predates the Effective Date? This is not a theoretical concern. The Keys litigation demonstrates that the Plan has previously revisited an existing disability award based upon an historical event and terminated benefits on that basis. Yet under the proposed Settlement, an absent class member could surrender his ERISA claims without

knowing whether he would retain the right to challenge a similar post-Effective-Date termination. Given the significance of disability benefits to a player who may depend upon them as his principal, or even sole source of income, the Court should require this ambiguity to be resolved before absent class members are bound by the release.

## *IV. ARMS LENGTH NEGOTIATION?*

17. In many areas of law such as family, criminal and securities fraud, past behavior is considered predictive of future conduct. Perhaps this should also be considered in multidistrict litigation and ERISA law as well.

18. On February 6, 2026, Plaintiffs' Counsel, Beasley Allen, was disqualified from participating in the talc litigation:

> Conlan's prolonged access to J&J's privileged information, followed by collaborative efforts with its most prominent adversary, leaves us with clear concern for the preservation of trust intrinsic to the attorney-client relationship. After reviewing the factual record, the arguments presented, and the governing legal standards, we find that as CEO of Legacy, Conlan's association with Beasley Allen violated RPC 1.9(a) and 5.3. Thus, the trial court order denying J&J's motion to disqualify Beasley Allen is reversed. *In re Talc Based Powder Products Litigation*, **A-0215-24, slip op. at 3 (N.J. Super. Ct. App. Div. Feb. 6, 2026).**

19. There are indications that Beasley Allen's behavior in *Bailey* is even more egregious.

## *COUNSEL'S IMPROPRIETIES NEGOTIATING THE SETTLEMENT ARE PERTINENT CIRCUMSTANCES STRONGLY FAVORING THAT THE SETTLEMENT IS PROCEDURALLY IMPROPER.*

### *a.* **Attorney Shopping And Reverse Auction**

20. "Simply put, ... [Defendants'] counsel has engaged in attorney shopping." *Sharp Farms v. Speaks, 917 F.3d 276*, 292–93 *(4th Cir. 2019)*; *Figueroa v. Sharper Image Corp.*, 517 F. Supp. 2d at 1321, 1323 (S.D. Fla. 2007) ("On this first point of the procedural fairness *vel non* of the settlement,... the settlement is not the product of informed, arms-length negotiations between effective Class Counsel and the Defendant. [Defendant] did play these Plaintiffs off against the California actions, even conditioning a settlement here to the entry of an injunction prohibiting the already-certified California actions from going forward, to structure a poor settlement with weak parties.") "Nothing better facilitates collusion than the ability on the part of the defendants to choose the counsel who will represent the plaintiff class."[1] "[A] 'reverse auction,' [is] the practice whereby the defendant in a series of class actions picks the most ineffectual class lawyers to negotiate a settlement with, in the hope that the district court will approve a weak settlement that will preclude other claims against the defendant." *Reynolds* at 282. (Citing *Blyden v. Mancusi*, John C. Coffee Jr., Issacharoff, Kahan & Silberman).[2] "Factors that raise suspicions include a quick settlement, settlement of the least well-developed case, or settlement with the least experienced plaintiffs' counsel." *§13:60, Final Approval Criteria–Non-enumerated Factors: Reverse Auction, 4 Newberg and Rubenstein on Class Actions § 13:61 (6th ed.)*.[3]

---

[1] John C. Coffee, Jr., *Class Wars: The Dilemma of the Mass Tort Class Action*, 95 Colum. L. Rev. 1343 (1995), at 1378. "[A] 'reverse auction,' [is] the practice whereby the defendant in a series of class actions picks the most ineffectual class lawyers to negotiate a settlement with in the hope that the district court will approve a weak settlement that will preclude other claims against the defendant."

[2] "'Reverse auction' is the label for a defendant's collusive selection of the weakest attorney among a number of plaintiff attorneys who have filed lawsuits dealing with the same subject matter." *Managing Class Action Litigation: A Pocket Guide for Judges Third Edition, 2010 WL 5056218.*

[3] "[A]llow[ing] the defendants to pick and choose the plaintiff team with which they will deal… signals to the unscrupulous plaintiffs' attorney that by filing a parallel, shadow action in… court, it can underbid the original plaintiffs' attorney team that researched, prepared and filed the action." *John C. Coffee, Jr., Class Wars: The Dilemma of the Mass Tort Class Action, 95 Colum. L. Rev. 1343 (1995)*, at 1371. "Courts will often give extra scrutiny to settlements made in circumstances where there were originally multiple class suits by different attorneys

21. "Given this history and the differences between the two cases, … the strength of the [*Alford*] case drove the [*Bailey*] settlement negotiations" and "the [*Bailey*] case served as a convenient placeholder for [the Defendants], so as to be able to negotiate with someone other than [*Alford's* counsel]." *Speaks*, 917 F.3d 276, at 292-293; *see also Figueroa*, 517 F. Supp. 2d at 1321 (defendant "selected counsel confronted with a most precarious position, insisted upon… broaden[ing] the scope of this litigation to obtain a global peace, and then proceeded to offer and convince Class Counsel to accept highly undesirable terms to settle the case. What followed, … is the product of procedural unfairness.")

22. It should be noted that Groom has advised and represented the Plan since its creation in 1993.[4] In the years and decades since, this is the *first time* they have entered settlement negotiations with a plaintiff—much less settled without a fight. After the *Bailey* complaint was filed, instead of the typical motion to dismiss, the Plan immediately entered settlement negotiations. This is a complete reversal of their trademark scorched earth litigation approach and a red flag to be viewed with skepticism, considering the indications pointing to a reverse auction strategy to eliminate *Alford*.

**b. Indicia of Collusion: *Bailey*'s Counsel utilized non-public information about the critical June 8, 2021 date in *Bailey*'s September 2023 complaint that could have only been acquired from Defendants prior to the time the *Bailey* complaint was filed.**

and the defendant selected one case in order to resolve all the actions at once." *202 Am. Jur. Proof of Facts 3d 359 (Originally published in 2023).*

[4] In 1993 Groom was the NFLPA's principal outside counsel and their lead negotiator in the 1993 CBA in which the Bert Bell Pete Rozelle NFL Player Retirement Plan and the NFL Player Supplemental Disability Plan were created, the latter being the precursor to the current version of the Disability Plan. The NFL was given the choice of the Plan's actuary; the NFLPA, the Plan's attorney.

23. At the time of *Bailey*'s complaint on September 29th, 2023, ***only* Defendants and its counsel** should have been aware of the specific importance surrounding June 8th, 2021. Yet, *Bailey* counsel's artistic and precise drafting choices in the complaint demonstrate they knew the importance of that date too at a time they should not have.

24. "[T]he district court has a fiduciary responsibility to ensure that the settlement is fair and *not a product of collusion*." *Speaks*, 917 F.3d 276, 291–92, 294. "[E]xtrinsic evidence—such as a meeting between defendant's counsel and settling class counsel before the latter had even filed suit—may be probative." (citing *Reynolds*) *§13:60, Final Approval Criteria–Non-enumerated Factors: Reverse Auction, 4 Newberg and Rubenstein on Class Actions § 13:61 (6th ed.)*.

25. Here, without Defendants' assistance prior to filing the Complaint, the information contained within Defendants' confidential and internal June 8, 2021 directive to Plan neuropsychologists to stop utilizing racial demographics would not have been available to *Bailey*'s counsel at the time that it drafted or submitted its complaint on September 29, 2023. *Bailey's* counsel admits this in their memorandum for attorney's fees.[5] However, indicating collusion, "[i]n drafting the class-action complaint…, [*Bailey*] class counsel" was aware of, able to utilize, and attempted to benefit from this critical, non-public, confidential information in its September 29,

[5] *E.g.*, Pls.' Mem. at 8-9 n.2 ("Notably, the Plans did not amend the Plans to prohibit the conduct, which would have triggered notice to all plan participants of the conduct and given all existing claimants notice that their ongoing claims may have been impacted."; "Not one affected Plan participant was identified or notified. That remained true until September 29, 2023, when Plaintiffs filed this lawsuit.").

2023 Complaint that ***could have only been acquired from Defendants at the time of the Bailey Complaint***. *Speaks*, 917 F.3d 276, 293.[6]

26. As is common practice in drafting class action complaints, many of Plaintiff Stacey Bailey's statements of facts paragraphs mirror Plaintiff Eric Curry's paragraphs. *Compare e.g.*, Compl. ¶93 with ¶144. However, *Bailey*'s counsel also knew to omit listing ***all*** of the crucial **dates** of each Plan neuropsychologist NC evaluation of the Named Plaintiffs that occurred ***after*** the June 8, 2021, Defendants' confidential directive to stop applying racial norms. Such crucial confidential information (which should have only been in Defendants' possession at the time of the *Bailey* Complaint) would have eventually shown that racial norms were not even applied to those particular Plan neuropsychological NC evaluations. Simultaneously, *Bailey*'s counsel flawlessly maneuvered in the complaint around the crucial June 8, 2021 date by ***only*** including the ***dates*** of the Plan neuropsychologist evaluation and application that occurred ***before*** the June 8, 2021 directive to stop applying racial norms. For example, Stacey Bailey's allegations in the complaint *included* both the date of his initial application and the date of his initial neuropsychologist's evaluation (both *prior* to June 8, 2021):

- "Mr. Bailey applied for a benefit from the Disability Plan on **June 16, 2020**." Compl. ¶110. The application date was ***included*** in the complaint by *Bailey's* Counsel who knew it was *prior* to the June 8, 2021 directive.

[6] Pls.' Mem. at 26. ("When this Complaint was filed, the Plans had known for years that race-based demographic adjustments were applied to Plan participants' tests and knew its impact.... The only action [taken by Defendants] was a letter to so-called 'Plan Neutral Physicians'... for new applications to stop, on a going forward basis, the use of race in adjusting neurocognitive testing. This explicit admission that more than a decade of claims had been subject to racial discrimination triggered no public recognition or rejection of the practice from the Plans... No letters of apology or even notice given to the participants.")

- Bailey "was examined by [a] Plan Physician[]... **neuropsychologist,** on **February... 9, 2021**." Compl. ¶110. The neuropsychologist evaluation date was ***included*** in the complaint by *Bailey's* Counsel who knew it was *prior* to the June 8, 2021 directive.[7]

27. On the other hand, for Eric Curry's allegations in the complaint, Counsel carefully ***omitted*** in the complaint any reference to both the *date* of Plaintiff Eric Curry's initial application and the *date* of his initial neuropsychologist's evaluation because they both occurred *after* June 8, 2021. Curry's neuropsychological evaluation occurred ***after*** June 13th, 2021[8] which would have shown that he is ***not even a member of the Class*** that he seeks to adequately represent because racial norms were *never* applied to his neuropsychological testing for NC benefits.

28. Also, *Bailey*'s counsel ***omitted*** any reference in the factual allegations section of the *Bailey* complaint to either Mr. Bailey or Mr. Curry's ***appeals*** (let alone the *dates* of their appeals or neuropsychological evaluations on appeal). The only indication that the named plaintiffs' appeals even took place is a short reference in Count II at the end of the complaint stating that "Mr. Bailey and Mr. Curry... *properly exhaust[ed] the administrative appeals process*." Compl. ¶192. Counsel artistically ***omitted*** any dates associated with Mr. Bailey's and Mr. Curry's neuropsychological evaluations on appeal because both evaluations took place well *after* June 8th, 2021 when racial norms were allegedly no longer applied.[9]:

---

[7] "In a letter dated March 2, 2021, the Disability Plan Initial Claims Committee informed Mr. Bailey that he qualified only for Mild Neurocognitive Benefits, and that he would receive a monthly benefit of $3,000, instead of the $5,000 he would have received had he qualified for Moderate Neurocognitive Benefits." Compl. ¶135. The decision letter date (which includes information on the application and evaluation dates) was ***included*** in the complaint by *Bailey's* Counsel because it was *prior* to the June 8, 2021 confidential directive to stop applying racial norms moving forward.

[8] Familiarity with ERISA law and Plan documents yields the only clue as to Mr. Curry's application and exam dates. One would have to know that both ERISA and the Plan require a decision within 45 days of the application; one must then reverse engineer the decision letter to discover that Mr. Curry was not race-normed.

[9] Defendants do not permit neuropsychological evaluations *on appeal* to take place less than six months from the initial neuropsychological evaluations. Thus, providing the dates of these appeals in the complaint would have

**Dates in *Bailey* Complaint vs. Dates Not in Complaint**




29. Again, at the time of *the* complaint ***<u>only</u> Defendants*** should have known of the specific importance surrounding the June 8th, 2021 date. However, *Bailey*'s counsel drafting choices indicate they knew it too. Counsel mentions that "[t]ranslating th[e discriminatory] practice into a cognizable legal claim under ERISA… *required significant… expert consultation*" **<u>prior</u>** to the Complaint. Pls.' Mem. at 23. Yet, this is belied by the record because *Bailey* counsel's billing hours and requested expenses show that ***no*** medical expert consultations took place until *after* the complaint was filed. The *only* explanation for how *Bailey*'s counsel *actually* could have learned these precise non-public facts at the time of drafting its complaint is from confidential information that was ***only*** in Defendants' possession at that time.

---

shown that both Curry and Bailey did not have race norms applied to their post-June 8th, 2021 appeal evaluations and eventually would demonstrate that they are *excluded* from rescoring pursuant to §VI.B.1.c of the Settlement.

30. Indicating a collusive pre-complaint warning from Defendants that neuropsychological evaluations after June 8, 2021 would not have been subjected to racial norms, *Bailey*'s counsel carefully drafted its complaint around that critical information to "manipulate facts in order to construct and present to the [*Bailey*] court and public a false narrative" that Curry's application and appeal as well as Bailey's appeal, were subjected to race norms when they were not. *Sharp* at 92-93. If *Bailey*'s counsel would not have been tipped off in advance by Defendants about the eventual importance of the June 8, 2021 date, *Bailey* would have instead included the omitted dates in the complaint. But those dates would have eventually demonstrated that ***no*** racial norms were ***ever*** even applied as part of Curry's NC application, or Bailey and Curry's subsequent NC appeals in the event that the Defendants' June 8, 2021 directive became public. At a minimum, *Bailey*'s counsel's inclusion of those omitted *post*-June 8th, 2021 neuropsychological evaluation dates *would have* eventually demonstrated that *both* Curry and Bailey's NC applications are ***excluded*** from eligibility for any compensation as a result of their appeals pursuant to the exclusion in VI.B.1.c of the *Bailey* settlement.

| **NFL Disability Benefits Tests In Which Race Norming *Could Have* Applied*** | **NFL Concussion Settlement Tests In Which Race Norming Applied**** | **NFL Disability Benefits Race Normed Tests According To *Bailey's* 9/29/23 Complaint** |
|---|---|---|
| Boston Naming Test | Boston Naming Test | Boston Naming Test |
| WAIS-IV | WAIS-IV | WAIS-IV |
| WMS-IV | WMS-IV | WMS-IV |
| Trail Making | Trail Making | |
| Letter Fluency (F-A-S) | Letter Fluency (F-A-S) | |
| Category Fluency | Category Fluency | |
| CVLT | | |

*Bailey Complaint alleged that "[t]here would have been no way for Mr. Bailey, or any reasonable person in his situation, however, to understand... that his test results were adjusted based on his race"

**Bailey Complaint alleged that they "only discovered the application of race norming to their neuropsychological test results because the information was publicly disclosed and, for all intents and purposes, acknowledged by the NFL in the Concussion Litigation."

| **NFL Disability Benefits Race Normed Tests According To Defendants' CONFIDENTIAL Memorandum***** |
|---|
| Boston Naming Test |
| WAIS-IV |
| WMS-IV |
| |
| |
| |
| |

***Confidential at the time of Bailey's Complaint. Information was only in the Defendants' possession.

31. If *Bailey*'s counsel sincerely "***only*** discovered the application of race norming to their neuropsychological test results because the information was publicly disclosed… in the ***Concussion Litigation***," Compl. ¶133, without Defendants informing *Bailey*'s counsel of which specific tests in Defendants' Plan testing protocol confidentially did and did not apply racial norms, **how could *Bailey*'s counsel have known so precisely and identified that racial norms were *only* applied to these three tests (WMS, WAIS, and BNT) but <u>not</u> CVLT, Trail Making (Parts A and B), Letter Fluency, (F-A-S), or Category Fluency?** Bailey Parties Joint Memorandum, ECF No. 79-1. Especially, since "Ethnicity adjustments exist for… CVLT"[10] but the CVLT is not even part of the NFL Concussion Settlement testing protocol, and *Bailey* counsel's billing hours and requested expenses show that ***no*** medical expert consultations took place until *after* the complaint was filed. Miles Decl., Beasley Allen Itemized Expense Records at 54, ECF No. 88-2 (The first documented expert expense was in 2025.).

32. In sum, "'there is ample evidence of collusion between the parties in [*Bailey*] to (a) exclude counsel in [*Alford*] from participation in the settlement of the claims for the class members whom they represent, and [to] [b] mislead the members of the [*Alford*] class as to the true facts of this matter.'" *Speaks*, 917 F.3d 276, 292-293.

## V. FIDUCIARY OR ADVERSARY?

33. As stated previously, Groom designed the Plan and has served as legal advisor to, and litigator for the Plan since its inception. Throughout this time the agenda has consistently presented an appearance of skewing the responsibilities of fiduciaries to Plan participants and

[10] WAIS-IV, WMS-IV, and ACS Advanced Clinical Interpretation Edited by Holdnack.

beneficiaries. **29 U.S. Code § 1104(a)(1)** ". . . a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—**(A)**for the exclusive purpose of: **(i)** providing benefits to participants and their beneficiaries; and **(ii)** defraying reasonable expenses of administering the plan." Jointly with Groom, the Plan's fiduciaries appear to interpret (i) as "*denying benefits* to participants and beneficiaries for the purpose of (ii), defraying expenses.

34. The following examples from the current Plan and its predecessors illustrate why the Court should carefully consider the practical consequences of releasing the very ERISA rights that would otherwise provide participants with a means of challenging such conduct.

***VIC WASHINGTON***

35 Vic Washington's nine-year professional football career began in 1968 with the Ottawa Rough Riders of the Canadian Football League, who won Canada's Grey Cup championship in 1968 and 1969. In 1971, he was signed by the San Francisco 49ers. He made the biggest play of his career with a 97-yard kickoff return in the 49ers' 1972 playoff loss to the Dallas Cowboys. The following season, his kneecap was fractured by a hard tackle on artificial turf during a preseason game, but painkillers and cortisone injections kept him on the field for the entire season. By 1974, the 49ers regarded him as "damaged goods" and traded him to the Houston Oilers. That year he injured his back. The Oilers subsequently traded him to the Buffalo Bills, where he suffered a severe elbow injury in 1976 that ended his career.

36. Following the abrupt end of his career, Washington developed depression and Post-Traumatic Stress Disorder, which was reportedly triggered by watching football games. In

1983, he applied for "football" disability benefits. The Board of Trustees deadlocked over whether his disability was football-related.

37. In 1986, Washington's case was submitted to an arbitrator. The arbitrator awarded Washington $750 per month for non-football-related disability rather than the $4,000 monthly benefit available for a "football" disability. The arbitrator interpreted the Plan's language providing the higher benefit for "a football injury" to require a single disabling football injury. Because Washington suffered multiple football injuries, he was denied the higher benefit.

38. The Plan adopted the arbitrator's interpretation as its own interpretation of the Plan. From that point forward, the Plan treated the distinction between a single disabling football injury and multiple football injuries as an operative eligibility rule. For approximately seven years, that interpretation became the basis for denying football disability benefits to players whose disabilities resulted from cumulative or multiple football injuries rather than a single injury.

***DONALD BRUMM***

39. Donald Brumm was one of the former players denied the higher-level disability benefit under this interpretation. Brumm challenged the Plan's determination in federal court. Although the district court deferred to the Plan's interpretation, the Eighth Circuit reversed, holding the Board's interpretation arbitrary, capricious, and unreasonable. *Brumm v. Bert Bell NFL Retirement Plan*, 995 F.2d 1433, 1438 (8th Cir. 1993). The court explained:

> "If the Plan's goal is to take care of the players as part of their compensation for investing themselves in the sport, players who suffer a series of football injuries resulting in disability are as entitled to consideration as those suffering a single disabling injury." *Id.*

"The considerable difference between the dollar value of benefits paid to Level 1 recipients ($4000/month) and Level 2 recipients ($750/month) also undermines the district court's support of the Board's scheme. For a player who suffers a single football injury to receive more than five times the amount of a player who suffers a cumulative football injury strikes us as more than a little odd. If, on the other hand, a true football versus non-football distinction is represented by the two-tier scheme, those standing to receive only Level 2 benefits would receive some support from their participation in the Plan, but considerably less than if the disability was a result of their contribution to the sport. We are unconvinced that the Board's interpretation of Section 5.1 is consistent with Plan goals." *Id.*

40. Thus, the Plan's restrictive interpretation adopted after Washington was not merely an isolated decision affecting one player. It became an operative Plan interpretation that was applied to subsequent disability claims until the Eighth Circuit rejected it in *Brumm.*

41. After Groom became involved with the Plan, the Trustees were permitted to modify Plan language without meaningful external oversight, including changes proposed by Groom. One particularly consequential change involved the definition of disability itself. The language was changed from requiring the Plan "to determine whether a player is totally and permanently disabled" to asking whether "the player [is] able to work." While an ability-to-work standard is not inherently improper, the change is consequential because it permits the Plan to frame the inquiry in terms of employability rather than simply whether a player is totally and permanently disabled. The distinction becomes particularly important where multiple impairments, considered individually, might not prevent some form of work, but their combined effects may render the player incapable of sustaining employment.[11]

[11] While "ability to work" is also the standard used for Social Security Disability, when properly applied it is not inherently problematic. The Social Security Administration considers all of a claimant's impairments in combination when determining disability. By contrast, the Plan's application can evaluate impairments in isolation. For example: "Do his orthopedic impairments prevent him from working?" No—he can perform sedentary work. "Do his neurological impairments prevent him from working?" No—he can perform unskilled work that does not require concentration. Under such an approach, a player could be found "not disabled" even though the combination of his

***DONALD BESSILLIEU***

42. Donald Bessillieu retired from the NFL in 1985 with a laundry list of orthopedic damage that included a cervical spine fracture that had to be surgically fused. When he was examined by Plan Neutral Orthopedist Dr. Edward Hanley, the physician found him be disabled dating back to 1986 and attributed his total and permanent disability to football injuries.

REGISTERED
~~RETURN~~ RECEIPT

October 24, 2000

Mr. ~~Donald~~ A. Bessillieu
2703 Pinola Avenue
Columbus, GA 31907

**Re: Bert Bell/Pete Rozelle NFL Player Retirement Plan**

Dear Mr. Bessillieu:

At their meeting held October 12, 2000 the Retirement Board approved your application for Total and Permanent Inactive disability benefits. Your gross monthly benefit will be approximately $1,125.00 effective June 1, 1999.

43. In January 2005, Mr. Bessillieu was sent for reevaluation to Dr. David Apple. Dr. Apple agreed with Dr. Hanley and his assessment of Besselllieu's injuries and that future degeneration would occur.

9. Additional remarks by physician Player has been permanently disabled by two exams and if anything the cervical spine arthritis and knee arthritis are advancing with age.

---

orthopedic and neurological impairments may make him incapable of performing any realistic job. SSA's analysis considers the claimant's residual functional capacity and, where applicable, whether jobs consistent with that residual capacity exist in sufficient numbers to constitute a viable option for employment.

44. Strangely, Dr. Apple reached a different conclusion than Dr. Hanley regarding Mr. Bessillieu's ability to work.

8. In your opinion, is the patient totally disabled to the extent that he is substantially unable to engage in any occupation for remuneration or profit?

(A) Yes ______ (B) No ✓

45. In mid-February, Bessillieu received a letter from the Plan Office informing him that his disability benefit would be terminated because Dr. Apple found him able to work.

REGISTERED/RETURN RECEIPT

February 16, 2005

Certified Article Number
7160 3901 9848 6972 8750
SENDERS RECORD

Mr. Donald Bessillieu
2703 Pinola Avenue
Columbus, GA 31907

**Re: Bert Bell/Pete Rozelle NFL Player Retirement Plan**

Dear Mr. Bessillieu:

At its February 15, 2005 meeting, the Disability Initial Claims Committee ("Committee") of the Bert Bell/Pete Rozelle NFL Player Retirement Plan ("Plan") considered your continuing eligibility for total and permanent ("T&P") disability benefits. We regret to inform you that the Committee deadlocked on this issue and therefore failed to continue your T&P benefits.

46. Why did Dr. Apple find Mr. Bessillieu able to work? During his exam the two men engaged in conversation and Mr. Bessillieu mused that he would like to go to Iraq and barber the troops.

If you checked (B), in what type of employment can he engage? He is a master barber and wants to go to Iraq to barber the troops

The fact that he would like to do something did not mean that he physically was able to do it.

***CONGRESSIONAL HEARINGS***

47. By 2007 so few players were being approved for NFL disability that it attracted a firestorm of media attention, as disabled retirees became more and more vocal about the denials. Feeling abandoned by the NFL and NFLPA, players called upon their congressional representatives for help, resulting in hearings in both chambers of Congress. Of particular concern to Congress was the fact that so many players who qualified for Social Security Disability were denied by the NFL Plan when the criteria of being able to work appeared to be the same.

**a. Hearing Before the House of Representatives**

48. A public hearing before the House of Representatives convened on June 26, 2007.[12] The late Rep. John Conyers of Michigan, who chaired the Committee on the Judiciary and Rep. Linda Sanchez of California, who chaired the sub-committee presided over a room packed with former players, and media. In her opening statement, Rep. Sanchez stated:

> "The NFL is considered to be the most brutal major American professional sports league. Half of all players retire because of injury, 60 percent of players suffer concussion, at least one-fourth of players suffer multiple concussions, and nearly two-thirds suffer an injury serious enough to sideline them for at least half a football season."[13]
>
> "To be sure, these retired football players not only choose this career but they actually dedicate themselves to training and competing for jobs in this elite sports league, knowing full well about the game's violent nature. I have heard from many

[12] *The National Football League's System for Compensating Retired Players: An Uneven Playing Field?*, Hearing Before the Subcomm. on Commercial & Admin. Law of the H. Comm. on the Judiciary, 110th Cong. (2007), https://www.congress.gov/110/chrg/CHRG-110hhrg36344/CHRG-110hhrg36344.pdf.
[13] *Id.* 2 (Linda T. Sánchez, Opening Statement)

former players who said they would still choose to play football, even knowing of the physical toll that the game took on them. However, only 284 former players out of nearly 10,000 currently receive long-term disability benefits. That translates to less than 3 percent of retired players, a very small number for any industry, much less one as physically demanding as professional football."[14]

"The fundamental question then becomes whether this disability process is fair for the retired employees of the NFL. The evidence suggests that the vast majority of former players needing benefits do not receive them. What is even more troubling is that through projects such as the NFL films, the NFL continues to profit off those very same players who are denied benefits. Essentially, is the NFL, a multibillion dollar organization, fairly treating the employees who helped build it?".[15]

49. In his remarks, Representative Tom Feeney of Florida likewise recognized the limited procedural protections provided by ERISA, stating: "Broadly speaking, ERISA and the regulations promulgated by the Department of Labor provide minimum due process requirements that employers are required to develop in establishing their plans."[16] A recurring theme among the Representatives was whether additional legislation was necessary and, if so, what form the appropriate remedy should take. Among the possibilities discussed were modifications to ERISA, the Taft-Hartley Act, and the Labor Management Relations Act, as well as the NFL's antitrust exemption, which permits the League to generate substantial revenues from television broadcasts.

50. Attorney Cyril Smith's testimony was particularly compelling. He had represented Mike Webster, the first player diagnosed with CTE. He described Mr. Webster's long battle for benefits:

"As many of you probably know, Mike played center for the Steelers. He was on their Super Bowl teams. He was named to the NFL's all-time team, and he was both a great player and person. It was very clear the violent world of NFL football had given him repeated concussions and disabling brain injuries. Unfortunately, it took him 7 years from the time that his first application was filed with the pension plan

[14] *Id.*
[15] *Id.*
[16] *Id.* 3 (statement of Rep. Tom Feeney)

to a final court ruling which awarded him full benefits. Four years of that were just to get a final decision from the plan, even before he got to Federal court, to the point that he died in 2002 before he actually got a final decision from the plan."[17]

"In his case, there was unanimous medical evidence about whether he was totally and permanently disabled, why that happened and when it happened. A psychologist, a psychiatrist, a neurologist who were appointed by the pension plan all found that he had multiple head injuries. But, despite this overwhelming evidence, the pension plan refused to pay him full benefits. They refused to credit what his treating physician said. They relied on observations by Mike's oncologist, his cancer doctor, about whether he had a brain injury. They tried to discredit their own doctor, who is a board-certified neurologist.[18]

The bottom line in my experience was that at every turn the plan delayed and erected barriers to prompt and fair consideration of his claim. He had no choice but to go to Federal court in Baltimore in 2004. Over the next 3 years, four different Federal judges agreed that the plan was not just wrong but had abused its discretion. One judge said that, given the overwhelming evidence, the plan's decision indicates culpable conduct, if not bad faith. Mr. Ell said that statements that he had heard about the plan were wrong or misleading. I will let the judicial record speak for itself. Another judge said it would require a leap of faith to rule for the plan.[19]

**b. Hearing before the Senate**

51. In September 2007, another high-profile hearing took place—this time before a Senate committee. Numerous retired NFL players were scheduled as panelists. Notably present for this hearing were NFL Commissioner Roger Goodell, and NFLPA Executive Director Gene Upshaw.

52. Senator Byron Dorgan of North Dakota called the hearing to order. In his opening remarks he cut to the heart of the matter:

"It seems to me that the Players Association represents active players, and the Commissioner represents the owners. We have many who will testify here who are former players in this sport, and I don't quite know who represents them, if anyone.

---

[17] *Id.*50 (Testimony of Cyril V. Smith)
[18] *Id.*
[19] *Id.*

> In many cases, they are great athletes who ended their careers with real damage to their bodies. Some live in pain. And the question is, what happens to them? Who represents them? What role do they have with respect to this growing industry and the resources that this growing industry provides? It's a very large and a very profitable industry, and, it seems to me, an industry that ought to be able to take care of the needs of those who helped build this wonderful sport."[20]

53. Representative Maxine Waters was the first witness at the Senate hearing, and she shared her experiences in trying to help a former player in dire need obtain disability benefits.

> "My purpose here today is to talk about a very specific case that I worked on for almost a year for a gentleman by the name of Jim Shorter. Mr. Shorter was a friend of my husband's and a former NFL player. Mr. Shorter died a horrible death, a death caused by years of neglect of football-related injuries. These injuries were compounded by the onset of adult diabetes and a lack of healthcare. When he died, Mr. Shorter had undergone several amputations, was blind, had had a heart attack, and was on dialysis. Furthermore, Jim Shorter died a broke man, stripped of his dignity and his silver years by an unfair and unyielding NFL disabilities program. This program, which is built like the rest of the functions of the NFL, from the blood, sweat, and tears of men like Jim Shorter, was designed, in my belief, to refuse benefits for the very players that needed them most."[21]

54. Daryl Johnston, who played 11 years for the Dallas Cowboys testified next. He told the Senate that his career ended prematurely because of a neck injury, and he knew first-hand the frustration of trying to obtain disability.

> "The initial doctor that filed my claim, and the doctor who heard my appeal, are designated as neutral physicians, but, in reality, are handpicked doctors by the NFL Players Association. The Board that denied my claim is selected by NFL ownership and the NFL Players Association. Obviously, this is a system that is, by design, not interested in assisting the retired player."[22]

---

[20] *Oversight of the National Football League (NFL) Retirement System*, Hearing Before the Comm. on Commerce, Sci. & Transp., 110th Cong. 1177 1-2 (2007). https://www.congress.gov/110/chrg/CHRG-110shrg76327/CHRG-110shrg76327.pdf?

[21] *Id.*, 3-4 (Testimony of Rep. Maxine Waters)

[22] *Id.* 6 (Testimony of Daryl Johnston)

55. Johnston stated that he was fortunate to have played after the 1993 CBA, in which several post-career benefits were bargained and contrasted his situation with that of Mike Mosely who played in the 80s. He told how Mosely "received full disability for 6 years, until a doctor, hired by the NFL, ruled sedentary work was possible, and, without warning, withdrew his payments in 2004. Mike now lives at home," Johnston explained, "with his 75-year-old mother, his 14-year-old daughter, and they're asked to survive on his mother's $306-per-month Social Security check."[23]

56. Johnston also related the tragic story of Brian DeMarco.

> "Brian DeMarco, a former offensive lineman for the Jacksonville Jaguars and Cincinnati Bengals, is damaged so badly from his 5 years playing pro football that he is only a fraction less disabled than a quadriplegic at age 35. He has had so many injuries that only people who have been in horrendous car crashes might understand—all from playing America's favorite sport. DeMarco's career ended amid severe health problems after the 1999 season. After 4 attempts over several years to navigate the NFL's disability system's red tape, he was unable to even get his application process started and be assigned a doctor for evaluation—even though his back was broken in 17 places. He's been homeless 3 times in the last 4 years, and has lived in storage units for 5 months with his wife and 2 children. He has constant pain from his crushed spine, numerous physical ailments, and is unable to hold a job. This is a man who's given up his quality of life for this sport. Because of injuries and runaway medical bills and an inability to work or get any kind of health insurance, the once proud and well-off DeMarco was as down and out as you can get in this country. The NFL Players Association has given him virtually no help. He has called the NFLPA over 100 times in the last year but has experienced no success in getting a claim opened. At one point, he was actually told that he needed to help himself before the NFLPA could help him and he was told to get a job and sent bus fare to search for one by an NFLPA representative. And, finally, whenever he has had the temerity to raise his voice and discuss his problems in public, the NFL's and NFLPA's representatives have branded him a fraud."[24]

---

[23] *Id.* 7.
[24] *Id.* 9. (Prepared statement of Daryl Johnston)

57. Brent Boyd testified of his own disability nightmare in both the House and Senate, and the denial of his football-induced brain injury claim. As he offered his Senate testimony, his mind went blank and he had to stop for a bit to regain his thoughts. After he managed to pull himself together, he related some grim statistics to the Committee.

> "There are—they keep changing the number of former players, but, you know, there are approximately 8,000 former players in this most violent sport since the gladiators. We read, Sunday, only four qualify for concussion disability. They claim 317 disability recipients, which is a ridiculous number, to begin with, but their 2006 tax filings show only 121 of the 8,000 former players are receiving any disability payments." [25]
>
> "The most disgusting number is this. They're taking $3.1 million out of our own pension fund to pay Doug Ell and Groom law firm to fight us, with our own money, and to alter and change the plan, and turn it into a jungle of red tape. By contrast, baseball is paying their attorneys $170,000 to do the same job."[26]

58. During the break between panels at the Senate hearing, Massachusetts Senator John Kerry addressed the room. He addressed the injury rates and the vast wealth of the NFL and then subtly reminded that legislation wasn't off the table if the league failed to "get its act together."[27]

> "So, my hope is, the League will get its act together here. That's really what's needed. Better communication, a standardized sort of understanding of the process. And, frankly, a presumption in favor of those who went out on the field and put themselves at risk in the way that they do on a weekly basis.[28]
>
> So, I hope we don't have to do something. And, Mr. Chairman, I'm sure you are—I am prepared, if the League doesn't do that, to introduce—which I would hope we wouldn't ever have to do—legislation to create some kind of appropriate accountability and oversight. I hope that it never comes to that."[29]

---

[25] *Id.* 24 (Testimony of Brent Boyd)
[26] *Id.*
[27] *Id.* 40 (Statement of Sen. John F. Kerry)
[28] *Id.*
[29] *Id.*

59. Under intense pressure from both chambers of Congress, the NFL and NFLPA agreed to amend the Plan to accept Social Security Disability (SSD) determinations without additional medical review. This is currently how most players qualify for NFL Disability benefits, many of whom were denied by the Plan prior to their applications and approval of Social Security Disability benefits.

***ATTEMPTS TO BACK AWAY FROM ACCEPTANCE OF SOCIAL SECURITY DISABILITY DETERMINATIONS***

60. At the time of the Congressional hearings, Disability was a part of the Retirement Plan, with the same ERISA protections as regular pensions, and guaranteed by the Pension Benefit Guaranty Company (PBGC), should their plan become insolvent or otherwise terminate. The Supplemental Disability benefit was a welfare plan, and as the name suggests, the benefit supplemented the retirement-based disability benefit for the amount in excess of PBGC's maximum coverage.

61. As one might expect, the number of former players receiving disability benefits has grown enormously since players have been able to qualify through their SSD determinations. Careful scrutiny of subsequent CBAs and Plan documents reveals a plan to roll back the reforms that resulted from the congressional hearings.

### a. 2011 CBA

62. The 2011 CBA[30] created numerous changes in how disability benefits are handled, the most significant of which was changing disability from a defined pension benefit plan to a welfare plan that lacks the extensive guardrails of the former

**.ARTICLE 61**

**NFL PLAYER DISABILITY PLAN**

> **Section 1. Maintenance:** The parties agree to create a new Taft-Hartley, welfare benefit plan for the payment of disability benefits to former players who are eligible and qualify. This new disability plan will combine the provisions of the Retirement Plan that deal with the payment of disability benefits, including but not limited to eligibility, criteria for qualifying for the benefit, and amounts of benefits and the provisions of the NFL Supplemental Disability Plan into one separate plan to be known as the NFL Player Disability Plan (the "Disability Plan"). Upon creation of this Disability Plan, the Retirement Plan shall be amended to eliminate its provisions relating to disability benefits that are incorporated into this new Disability Plan and the Supplemental Disability Plan shall terminate. The benefits payable under this new Disability Plan shall be reduced beginning at the player's normal retirement age by the monthly benefit the player is entitled to receive under the Retirement Plan beginning at the player's normal retirement age in the form of a life annuity. The benefits payable under this Disability Plan shall be reduced by the amount which would have resulted due to the application of Section 4.5 of the Retirement Plan due to the player electing an Early Payment Benefit. Subject to Section 4 below, this new Disability Plan will be continued and maintained in full force and effect during the term of this Agreement.

63. This subtle but important change took place largely unnoticed since few players understood the distinction between a pension benefit and a welfare benefit, and they were distracted by the raises given in Section 3:[31]

| | |
|---|---|
| Active Football | $250,000 (increased to $265,000 effective January 1, 2016) |

[30] National Football League & National Football League Players Association, *Collective Bargaining Agreement*, Aug. 4, 2011, at 237, U.S. Department of Labor PDF.
[31] *Id. 239.*

| | |
|---|---|
| Active Nonfootball | $150,000 (increased to $165,000 effective January 1, 2016) |
| Inactive A | $120,000 (increased to $135,000 effective January 1, 2016) |
| Inactive B | $50,000 (increased to $60,000 effective January 1, 2016) |

64. The NFL Player Disability and Neurocognitive Plan was Amended and Restated on April 1, 2014. It further clarifies and enacts the provisions of the 2011 CBA.

This document contains the amended and restated Plan as of April 1, 2014 (unless otherwise indicated). Unless otherwise stated, this Plan applies to benefits payable, and claims for benefits made, on or after April 1, 2014. Effective April 1, 2014, the Plan is renamed the NFL Player Disability & Neurocognitive Benefit Plan.

The 2011 Collective Bargaining Agreement continued and improved supplemental total and permanent disability benefits. This restatement provides that all total and permanent disability benefits relating to initial claims filed on and after January 1, 2015 will be paid out of this Plan, and that all line-of-duty disability benefits for periods on and after January 1, 2015 will be paid out of this Plan, other than line-of-duty disability benefits paid by the Bert Bell/Pete Rozelle NFL Player Retirement Plan to a Player who elected as of November 12, 2014 to roll over those benefits. The Bert Bell/Pete Rozelle NFL Player Retirement Plan will continue as before to pay certain total and permanent disability benefits based on claims filed prior to January 1, 2015 and line-of-duty disability benefits paid to a Player who elected as of November 12, 2014 to roll over those benefits.

The Plan is jointly administered pursuant to the requirements of the Taft-Hartley Act. It is intended that this Plan constitutes an employee welfare benefit plan within the meaning of section 3(1) of the Employee Retirement Income Security Act of 1974, as amended, and that the Trust accompanying this Plan will constitute a voluntary employees' beneficiary association, or "VEBA," within the meaning of section 501(c)(9) of the Internal Revenue Code of 1986, as amended.

65. The Plan created two categories of players—Article 3 Eligible Players and Article 4 Eligible Players.

> **1.3 "Article 3 Eligible Player"** means a Vested Inactive Player (other than a Player who has no Credited Seasons after 1958 or who is vested solely because of Section 1.47(f) - (i) of the Bert Bell/Pete Rozelle Plan) or an Active Player, who is not an Article 4 Eligible Player.

> **1.4 "Article 4 Eligible Player"** means: (1) any Player who is receiving total and permanent disability benefits under the Bert Bell/Pete Rozelle Plan; (2) any Player who (A) was receiving total and permanent disability benefits under Section 5.1(a), (b), or (c) of the prior versions of the Bert Bell/Pete Rozelle Plan, (B) converted to retirement benefits under prior versions of the Bert Bell/Pete Rozelle Plan, and (C) remains totally and permanently disabled; and (3) any Player who would receive total and permanent disability benefits under the Bert Bell/Pete Rozelle Plan but for Section 5.5(d) or (e) of that Plan.

66. More simply stated, because of the ERISA safeguards applicable to defined benefit pension plans, players whose claims were filed before January 1, 2015, would continue to receive their base benefit from the Retirement Plan. The second payment they previously received from the Supplemental Disability Plan would instead be paid from the newly created plan. The base benefit paid from the Retirement Plan would continue to receive the protections applicable to a pension plan, including the PBGC guarantee. By contrast, players who applied after January 1, 2015, would receive their entire benefit from the newly created welfare plan, rather than from the Retirement Plan, and therefore would not have the pension protections or PBGC guarantee applicable to the Retirement Plan. guarantee, whereas players who applied after January 1, 2015 would receive the entire benefit from the newly created welfare plan, which would not be treated as a pension with PBGC guarantees.

**b. The 2020 CBA**

67. The 2020 CBA sought to complete what was started in 2011 through placing disability provisions in a welfare plan that can be modified with few restrictions. In their initial fact sheet, the NFLPA, made no mention of the changes to Disability they planned to enact.

NFLPA

**CBA PROPOSAL FACT SHEET**

***Former Players***

- Retroactive increase to $550 per month for all pre-2012 vested players
- Expand pension eligibility to all former players with three credited seasons
- Establish a $50,000 HRA for vested veterans with no HRA
- Creation of new network of hospitals in each team city for former players to receive no cost physicals, preventative care, mental health counseling, and out-patient orthopedic services. Coverage of common surgeries to be phased in during course of deal.

68. After the fact sheet was released, a copy of the proposed CBA was leaked and disabled players learned that their benefits were seriously threatened. Two changes were particularly alarming. First, the CBA planned to offset Inactive A disability pay by deducting the amount of a recipient's SSDI benefit. For many players, this represented approximately one-third of their income. The second change was removal of qualifying through SSD determinations and then retesting players who qualified in this manner with their own doctors.

69. Many disabled players took to social media in hopes of catching the attention of active players and convincing them to vote against the proposed CBA. This and other conversations took place.

**Marcellusrivers** @marcellusrivers · Mar 5

Are the current players aware that the owners are planning on taking disability benefits from former and future players that qualified for them through social security? Then ultimately doing away with the automatic qualifier through social security and disability benefit?

5 13 18

**Cody Davis** @CodyDavis Following

Replying to @marcellusrivers @NFLPA

Yes I'm aware. The staff has made it seem like this was a backdoor/loophole to earn the benefit. Obviously understand this decision affects real families, both the pros of the deal and the cons. I will look into this further

5:00 PM - 5 Mar 2020

1 Retweet 2 Likes

70. Retired players and their families were horrified to find they were viewed as a "loophole" and the player's disability qualification, a "backdoor." It also appears to be an omen of the future should disability qualification through Social Security be eliminated, which was the second change. True to his word, Davis did give the issue further consideration.

Marcellusrivers and 1 other liked

**Cody Davis** @CodyDavis · Mar 10

Replying to @marcellusrivers

FYI this issue has been brought to the forefront by staff/players & explained without shying away facts. This is a major negative of this deal. Players will have to weigh all positive/negatives to come to their vote. @SheillaDingus @flmiamigardens @BenefitsHuddle @Ulmer50Ulmer

3 4 6

71. The CBA passed by a narrow margin, but soon two lawsuits, *Cason v. National Football League Players Association,* filed in the District of Columbia, and *Brown v. The Bert Bell/Pete Rozelle NFL Player Retirement Plan*, in the Northern District of Illinois. Shortly after the second lawsuit was filed, the NFL and NFLPA announced that the offsets scheduled to commence in January, 2021 would be delayed until January, 2024, thus nullifying the "imminent harm" argument and resulting in dismissal without prejudice for both lawsuits.

72. As the January 2024 deadline approached, the Undersigned, unsure if the previous suits would be revived, sought representation for the players and found it with Fox Rothschild attorney Kathleen Barrow. Retired players were invited to a Zoom conference on October 11, 2023, at which Ms. Barrow carefully explained applicable ERISA law and plans to file suit as soon as the financial injury occurred.

73. Coincidentally or not, the following day, October 12, 2023, the NFLPA made the following announcement.

NFLPA

For Immediate Release

**NFLPA Update on Former Player Benefits: "Inactive A"**

Today, our union has preserved an important benefit to former players in need. As you may know, those players who are receiving the Inactive A Total and Permanent Disability benefit under our CBA AND Social Security disability benefits were set to suffer a dollar-for-dollar reduction in payment as of the end of this year. Our union leadership approached the NFL to preserve the full amount of this benefit for this group of former players and we are happy to share that the NFL has agreed to our proposal.

As it stipulates in our CBA, there will be a new application process for the Total and Permanent Disability "Inactive A" benefit starting on April 1, 2024. This includes both players who are applying for the first time and former players who have previously qualified through the Social Security disability benefit.

74. Later, the NFLPA announced that acceptance of SSD determinations would remain in place and that players who qualified through an SSD determination would not be required to retest with a Plan retained doctor. This is likely at least in part due to the scrutiny placed on the Plan's "Neutral Physicians" by *Alford*. Could this be an additional reason the Plan was so eager to settle in *Bailey*?

## VI. CONCLUSION

75. Poet and civil rights activist Maya Angelou famously said, "When someone shows you who they are, believe them." Perhaps truer words were never spoken.

76. Plaintiffs' counsel, Beasley Allen was removed and disqualified from the talc litigation for collusion. Evidence strongly suggests that collusion has taken place in *Bailey*, as well.

77. The incidences of unfiduciary-like behavior have been demonstrated in this objection numerous times and are only a small fraction of what could have been written.

78. The *Bailey* Settlement appears to have little to no regard for Class Members. While its releases deprive them of important rights, the Parties set to administer it have demonstrated troubling and unethical behavior.

79. For these reasons, Tamarick Vanover respectfully requests that the Court protect the absent Class and reject the *Bailey* Settlement.

Date: September 21, 2026

Respectfully,

Sheilla J. Dingus
943 E Main Boulevard
Church Hill, TN 37642
Phone: (423) 408-9688
Email: defendersheilla@gmail.com
Representative for Tamarick Vanover