**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

**BALTIMORE DIVISION**

| | |
|---|---|
| STACEY BAILEY and ERIC CURRY, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>vs.<br><br>THE NFL PLAYER DISABILITY & SURVIVOR BENEFIT PLAN *et al*.,<br><br>Defendants. | **No. 1:23-cv-02661-JRR** |

**DECLARATION OF SAMUEL L. KATZ IN SUPPORT OF OBJECTIONS TO CLASS ACTION SETTLEMENT**

SAMUEL L. KATZ declares the following pursuant to 28 U.S.C. § 1746:

1. I am the managing partner of Athlaw LLP ("Athlaw") and am admitted to practice in the State of California. A motion seeking my admission *pro hac vice* in this action has been filed and is currently pending. I submit this Declaration in support of the objections of Jason Alford *et al.* ("Objectors") to the proposed class action settlement in this case (ECF No. 79-3) ("Settlement"). I have personal knowledge of the matters set forth herein based on my role as one of the counsel for Objectors in this case and on my direction and supervision of the file review described below.

2. Athlaw represents retired National Football League players ("Players") in connection with claims for benefits under the plans covered by the Settlement (the "Plans"). *See* Settlement § II.18. Athlaw maintains folders on its server for its current and prospective clients that contain the Players' Plan claim documents. Those documents include, where available, reports from the physicians and neuropsychologists designated by the Plans to examine Players ("Neutral

Physicians"), including reports from the Plans' neuropsychologists ("Plan neuropsychologists"), the neuropsychological test results those reports contain, and the Plans' benefit decision letters.

3. The documents in these folders were obtained from Athlaw's current and prospective clients, and from the Plans, in the ordinary course of Athlaw's representation of, or consultation with, those Players. None of the files were obtained through discovery in *Alford v. The NFL Player Disability & Survivor Benefit Plan*, No. 1:23-cv-00358-JRR ("*Alford*"), or are governed by the Protective Order entered in that case.

4. At my direction, Athlaw attorneys and analysts reviewed these folders to determine (a) which of its current and prospective clients fall within the settlement class defined in Section II.27 of the Settlement ("Settlement Class"), and (b) for each Player who qualified for membership in the proposed settlement class, whether any of his benefit claims would be eligible for rescoring under Section VI.B of the Settlement.

5. Section II.27 of the Settlement defines the Settlement Class as:

> all persons (other than white, non-Hispanic persons) who (i) are participants in any of the Plans; (ii) applied for 88 Plan benefits, Total and Permanent ("T&P") disability benefits, Line of Duty ("LOD") disability benefits, and/or Neurocognitive ("NC") benefits under one or more of the Plans from January 1, 2012 to the present; (iii) underwent neuropsychological testing with that benefits application; and (iv) had their neuropsychological test scores adjusted using (non-white) race-based demographic adjustments.

ECF No. 79-3 at 12-13. Each element of that definition was applied to the documents in the Players' folders, as described below.

6. The available Neutral Physician reports and Plan decision letters were first collected from each Player's folder. Those documents show the relevant Plan and the applied for benefits. These files allowed us, consistent with the quality of the information contained therein, to identify Players who applied for 88 Plan, T&P, LOD, or NC benefits on or after January 1, 2012

and who underwent neuropsychological testing by a Plan neuropsychologist in connection with that application.

7. Consistent with the Settlement Class definition, Players whom we identified as white were excluded. To determine each Player's race, we first checked whether any of the Player's disability reports designated him as non-white. Where a report did, we relied on that designation. Where the reports did not identify the Player's race, we reviewed publicly available information and, in some cases, we asked the Player to confirm his racial identity or designation.

8. We next identified non-white Players with at least one Plan neuropsychological evaluation in connection with an 88 Plan, T&P, LOD, or NC claim, dated between January 1, 2012 and June 8, 2021. We used June 8, 2021 as the end date because the Settlement states that, effective that date, "the Plans directed any and all Neutral Physicians performing neuropsychological testing in connection with claims for benefits under the Plans to cease using race-based demographic adjustments in scoring or interpreting such tests (to the extent they may have been used)." Settlement § VI.A. A Player with no Plan neuropsychological evaluation in that period, such as a Player whose only evaluation occurred after June 8, 2021, was excluded.

9. For each remaining Player, we reviewed every Plan neuropsychologist report in the Player's folder dated between January 1, 2012 and June 8, 2021 to determine whether race-based demographic adjustments were actually applied. The Settlement identifies three tests—the Wechsler Adult Intelligence Scale ("WAIS"), the Wechsler Memory Scale ("WMS"), and the Boston Naming Test ("BNT")—as "the only neuropsychological tests understood to have the possibility of race-based demographic adjustments subject to rescoring." Settlement § VI.B.3. We therefore examined the score tables at the end of each report to determine whether a demographically adjusted T-score was reported for any of those three tests.

10. The Plans' Neurology/Neuropsychology Neutral Physician Panel Orientation Manual ("Manual") contains a "Neuropsychology Data Report Form and Narrative Template" that directed how Neutral Physicians were to report those scores. For the BNT, it directed the examiner to "[e]nter the raw score/scale score and the T-score based on the Heaton norms." For the fourth editions of the WAIS and WMS ("WAIS-IV" and "WMS-IV"), it did not require demographically adjusted T-scores, but it directed examiners who reported them to "add the demographically-adjusted T-scores to the column with that label." It further instructed: "If you do not use the demographic adjustments for the WAIS-IV/WMS-IV, do not put entries into the T-Score column for either the Composite Scores or individual subtest scores. Those are only for demographically-adjusted scores if you use them." *See* the accompanying Declaration of Benjamin R. Barnett ("Barnett Decl.") Ex. J at Ex. 3 p. 6 (emphasis omitted).

11. Because the demographic adjustments for the BNT include a racial component, we looked first for a BNT T-score. The WAIS-IV and WMS-IV, by contrast, can be adjusted for education and age alone. For those two tests, we did not rely on the presence of a T-score alone. We looked for reports in which the T-score column was labeled "Demographic Adjusted T score," confirming that the score was generated using a demographic normative adjustment rather than reported as a standard, unadjusted score. Where a Neutral Physician did not specify the type of adjustment (demographic, as opposed to education and age) but identified the normative source used, we researched that source to determine whether it applied race-based norms. We removed from the group every Player whose reports did not show a demographically adjusted T-score on at least one of the three tests.

12. Three Athlaw attorneys and six Athlaw analysts carried out this review at my direction. Each was first assigned a discrete set of files. After compiling a draft dataset, we

assigned each analyst a different set so they could cross-check one another's work, and we repeated that cross-review several times in an effort to eliminate or correct as many errors as possible. At least two attorneys and at least three analysts independently reviewed each Neutral Physician report and decision letter bearing on whether a Player met the Settlement Class definition. I then reviewed the data myself to confirm the findings, and I met with analysts as needed to discuss any difficult or unusual cases.

13. For each claim, we recorded, among other data points, the benefit type, each Neutral Physician's specialty, the date the application was received, the date of each examination, report, and decision, each Neutral Physician's determination, the overall determination, and whether T-scores were used. Because we compiled the data claim by claim, we then reorganized the data so that all the data for each Player was contained in a single row of an Excel file and we performed a second check for each Player to ensure eligibility for the Settlement Class definition. When this work was completed and quality checked, we identified a total 150 Players who met each element of the Settlement Class definition including how the Plans decided their benefit claims. To be clear, the 150 Players are *not* a random sample of the Settlement Class. Rather, the 150 Players are current and prospective Athlaw clients whom our analysis shows as meeting the Settlement Class definition.

14. We then determined for each of the 150 Players whether any of their claims would be eligible for rescoring under Section VI.B.1 of the Settlement or excluded from rescoring under Section VI.B.2. Section VI.B.1 limits rescoring to claims submitted on or after January 1, 2012 that were denied, or approved only in part in the combinations it lists, where the denial or partial denial "was based on valid neuropsychological testing by a Neutral Physician that included race-based demographic adjustments," and that are not otherwise excluded. Section VI.B.2 excludes,

among other things, testing connected with an approved T&P claim (Section VI.B.2(a)); claims denied for reasons other than that the Player did not meet the medical standard based on a Neutral Physician's evaluation that included race-based demographic adjustments (Section VI.B.2(b)); and, where a Player underwent repeated neuropsychological testing, claims for which a contemporaneous or subsequent examination without race-based demographic adjustments found no qualifying impairment (Section VI.B.2(c)). For same if clarity and simplicity, we refer to those three exclusions as Exclusions A, B, and C.

15. In applying Sections VI.B.1 and VI.B.2, we made the following assumptions:

(a) All of a Player's claims involving race-based demographic adjustments may be rescored unless they fail the eligibility requirements of Section VI.B.1 or fall within an exclusion in Section VI.B.2.

(b) Only claims with valid neuropsychological test results are eligible for rescoring, as Section VI.B.1(c) requires. Settlement § VI.B.1(c).

(c) A Player who applied for a benefit applied for the highest level of that benefit available to him under the Plans. Based on my experience representing Players in claims before the Plans, the Plans treat an application as one for the highest level of the benefit for which the Player is eligible An application for NC benefits, for example, is treated as an application for both "mild" and "moderate" NC benefits. We therefore treated an award below that level, such as a "mild" NC award, as an approval "at any benefit level lower than the maximum for which the player applied" under Section VI.B.1(b).

(d) Exclusion A, read with Section VI.B.2(d), excludes only claims submitted at the same time as a higher paying T&P claim that was approved, whether initially or on appeal. *See* Settlement § VI.B.2(a), (d).

(e) Exclusion B applies where a Neutral Physician in a specialty other than neuropsychology also determined that the Player did not meet the applicable medical standard. It also applies to other claims denied for the other reasons the Settlement identifies, such as a determination that an NC impairment resulted primarily from a psychiatric condition or substance use.

(f) Taking at face value the Settlement's statement that the Plans directed Neutral Physicians to cease using race-based demographic adjustments effective June 8, 2021, we treated every Plan neuropsychologist determination made after that date as a "subsequent examination without race-based demographic adjustments" under Exclusion C.

(g) A Plan neuropsychologist determination made between January 1, 2012 and June 8, 2021 that did not use race-based demographic adjustments and found that the Player did not have a qualifying impairment triggers Exclusion C. For example, where a Plan neuropsychologist who did not appear to use race-based norms in any of his evaluations examined a Player on appeal, or in a contemporaneous evaluation for NC benefits, and found that the Player did not have a qualifying impairment, and the claim was denied, we treated both the appeal and the underlying application as excluded by a "contemporaneous … examination without race-based demographic adjustments."

(h) Exclusion C applies only within the same benefit type. A contemporaneous or subsequent denial of a T&P claim without race-based demographic adjustments, for example, excludes only a T&P claim. We made this assumption because the T&P, LOD, and NC benefits apply different standards. A Player who is not totally and permanently disabled by his neurocognitive impairment may still have a "moderate" impairment for purposes of NC benefits.

(i) A Player who applied for both LOD and NC benefits and was awarded only LOD benefits is eligible to have his NC claim rescored for the "moderate" level, unless his LOD decision letter specified an award amount higher than the "moderate" NC benefit then payable. *See* Settlement § VI.B.1(b)(iii). We made this assumption because the "moderate" NC benefit paid more than the baseline LOD benefit throughout the relevant period.

16. Applying these factors, the Athlaw attorneys and analysts re-reviewed each Player's Neutral Physician reports and decision letters available to us. From each Plan neuropsychologist's report, they determined (1) whether the Player met the validity criteria and (2) whether the neuropsychologist based an adverse determination on a factor other than race-based demographic adjustments. See § Settlement § VI.B.2(b). From the decision letters, they determined (1) whether the Player had a T&P claim that was approved and (2) whether other Neutral Physicians made adverse determinations. The analysts also reviewed each Player's complete file available to us, including Neutral Physician reports dated from January 1, 2012 through the present, for any contemporaneous or later denial based on testing without race-based demographic adjustments.

17. Applying the assumptions described in paragraph 15, 130 of the 150 Players are ineligible for rescoring. Each of their claims either fails the eligibility criteria of Section VI.B.1 or falls within one or more of the exclusions in Section VI.B.2. Only 20 of the 150 Players have at least one claim that would be eligible for rescoring under the Settlement.

18. Based on my experience representing Players in claims before the Plans, a Player who is evaluated by a Plan neuropsychologist in connection with a T&P or LOD claim and receives an adverse determination has also been evaluated by at least one other Neutral Physician who is not a neuropsychologist, such as an orthopedist, psychiatrist, or neurologist. Among Neutral Physicians, only Plan neuropsychologists administer and score the neuropsychological tests at issue.

19. Based on my experience representing Players in claims before the Plans, it is common for a Player who receives a final adverse decision on an NC claim, for a variety of reasons, to reapply each year by waiting one year from the date of the final denial, for as long as he remains eligible for NC benefits under the Plans. *See* Declaration of Benjamin R. Barnet, dated September 29, 2026, Ex. A (2021 version of the Plan §§ 6.1(c), (d), (l), 6.2(g)(1), 6.8, 6.9).

20. Based on my experience representing Players in claims before the Plans, a common reason that a Player is found not to have an impairment on Plan neuropsychological testing, for any type of benefit, is that the Plan neuropsychologist concluded that the Player's test results were invalid.

21. To protect the Players' privacy and their medical information, this Declaration does not identify them by name. That said, counsel is prepared to provide the names to the Court under seal.

22. My firm has an existing attorney-client relationship with each of the 101 Objectors. Each Objector is a claimant for benefits under the Plans with whom Athlaw has a current or former professional relationship. None of those relationships were established solely for the purpose of objecting to the Settlement.

23. Under penalty of perjury, I declare the foregoing to be true and correct.

Executed this 29th day of September, 2026

*s/ Samuel L. Katz*
SAMUEL L. KATZ