# EXHIBIT E

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

**BALTIMORE DIVISION**

| | |
|---|---|
| JASON ALFORD, DANIEL LOPER, WILLIS MCGAHEE, MICHAEL MCKENZIE, JAMIZE OLAWALE, ALEX PARSONS, ERIC SMITH, CHARLES SIMS, JOEY THOMAS, and LANCE ZENO, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>vs.<br><br>THE NFL PLAYER DISABILITY & SURVIVOR BENEFIT PLAN; THE NFL PLAYER DISABILITY & NEUROCOGNITIVE BENEFIT PLAN; THE BERT BELL/PETE ROZELLE NFL PLAYER RETIREMENT PLAN; THE DISABILITY BOARD OF THE NFL PLAYER DISABILITY & NEUROCOGNITIVE BENEFIT PLAN; LARRY FERAZANI; JACOB FRANK; BELINDA LERNER; SAM MCCULLUM; ROBERT SMITH; HOBY BRENNER; and ROGER GOODELL,<br><br>Defendants. | **Case No. 1:23-cv-00358-JRR** |

**AMENDED CLASS ACTION COMPLAINT**

Plaintiffs Jason Alford, Willis McGahee, Daniel Loper, Michael McKenzie, Jamize Olawale, Alex Parsons, Eric Smith, Charles Sims, Joey Thomas, and Lance Zeno (collectively, "Plaintiffs"), on behalf of themselves and on behalf of the members of the proposed Class and Subclasses defined below, present this Amended Class Action Complaint[1] against Defendants The NFL Player Disability & Survivor Benefit Plan and NFL Player Disability & Neurocognitive

[1] In accordance with Rule 103.6(c) of the Local Rules of the United States District Court for the District of Maryland, a redlined version is appended as Exhibit A hereto.

Benefit Plan (formerly, the Bert Bell/Pete Rozelle NFL Player Retirement Plan) (the "Plan"); the Plan's Administrator and fiduciary, the Disability Board ("Board"); the Board's members, Defendants Larry Ferazani, Belinda Lerner, Jacob Frank, Sam McCullum, Robert Smith, and Hoby Brenner[2]; and the Board's Chairman, National Football League ("NFL") Commissioner Roger Goodell (all collectively, "Defendants"). They seek (1) recovery of benefits for the particular injury of wrongful denial of benefits; and (2) equitable relief, such as an injunction Defendants' acts and practices that violate the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001 *et seq.* ("ERISA"), in breach of their fiduciary duties, including injuries and harm that are separate and distinct from the wrongful denial of benefits, among those breaches being disseminated misinformation about the Plan and harm to the integrity of the claims process. In addition, solely on behalf of the Plan itself, Plaintiffs seek removal of the Board's members by reason of their larger systematic, egregious, and repeated breaches of fiduciary duties that, in the aggregate, have violated ERISA and transgressed its central purpose, and which have harmed the Plan itself, including though the waste of Plan assets.

## I. <u>INTRODUCTION AND NATURE OF THE ACTION</u>

1. Plaintiffs are former NFL football players ("Players" or "Retired Players") who bring this action—on behalf of themselves and on behalf of the members of the proposed Class and Subclasses defined in Paragraphs 268 and 269 below—against the Plan, its Administrator, and its fiduciaries to recover benefits due and wrongfully denied them under the terms of the Plan, and to enforce and clarify their rights under the terms of the Plan.

2. Separate and apart to the recovery of wrongfully denied benefits, Plaintiffs concurrently seek equitable relief for injuries, harms, and losses distinct and severable from the

[2] *See infra* at 7 (Paragraph 20 & n.3) concerning substituted defendant Board members.

wrongful denial of benefits. Plaintiffs seek "to obtain other appropriate equitable relief" to enjoin acts and practices that violate ERISA so as to provide completely adequate remedies for the specific harms to the integrity of the process and material misinformation about the Plan in the Summary Plan Description ("SPD") and decision letters, including restitution, equitable surcharge, and other appropriate relief in connection with Defendants' repeated breaches of their fiduciary duties of loyalty and care and their failure to discharge their duties solely and exclusively in the interest of disabled Players and their beneficiaries.

3. In addition, separate and distinct from the claims asserted on behalf of themselves and on behalf of the members of the proposed Class and Subclasses defined below, Plaintiffs, on behalf of the Plan, seek removal of the Board's members and other fiduciaries in connection with their repeated and substantial misconduct, inattention to matters of administration, waste of Plan assets, and larger systematic abdication of their fiduciary duties of loyalty and care to such an extent that their continuing to act as its Administrator would be detrimental to the Plan's interests.

4. Extraordinary simultaneous relief is justified based on the aggregation of Defendants' overly aggressive and disturbing pattern of erroneous and arbitrary benefits denials; abuses of discretion; continual objectively unreasonable conduct; ever-shifting inconsistent and illogical interpretations of the terms of the Plan to limit the payment of benefits to the very Players whom the Plan was designed to help by, as one court put it, providing "compensation for investing themselves in the sport"; reliance on conflicted advisors motivated by financial considerations; repeated misrepresentations concerning this fact; unscrupulous tactics; flagrant violations of the ERISA statute, implementing regulations, and caselaw; repeated lies; material misrepresentations about the Plan; recurrent hostility, including as one court put it, "act[ing] as an adversary, not a fiduciary"; and active concealment of Defendants' systematic and repeated practice of violations.

5. Plaintiffs seek to pull back the curtain on behalf of all similarly situated Players, bringing many relevant factual and legal issues concerning the Plan to light. As the district court that recently reversed the Board's denial of benefits described, "[t]he curtain has been pulled back as to the inner workings of [the Board]. And what lies behind it is far from pretty with respect to how it handles disability benefit claims sought by former players[.]" *Cloud v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, No. 3:20-CV-1277-S, 2022 WL 2237451, at *1, *44 (N.D. Tex. June 21, 2022) ("Behind the curtain is the troubling but apparent reality that these abuses by the Board are part of a larger strategy engineered to ensure that former NFL players suffering from the devastating effects of severe head trauma are not awarded Active Football benefits."), *appeal pending*, No. 22-10710 (5th Cir. appellant's reply br. filed Mar. 9, 2023) (ECF No. 86).

6. As described herein, "like many other former players suffering from the effects of head trauma" and other injuries and impairment(s), Plaintiffs and members of the proposed Class defined below were "forced to navigate a byzantine process in order to attempt to obtain those benefits, only to be met with denial." *Id.* at *43 ("And in reaching its decision, the Board relied almost exclusively on compromised advisors, failed to consider important—let alone *all*—information in Plaintiff's file, and shirked its fiduciary obligations under both ERISA and the Plan itself.").

7. As in *Cloud*, what will "become clear over the course of this litigation is that [Plaintiffs' and Class members'] claim[s] for disability benefits [were] wrongfully and arbitrarily denied in a process that lacked the procedural safeguards both promised by the benefits plan and required by law." *Id.* at *1; *see id.* at *44 (noting that "the Court's conclusion that the Board abused its discretion and did not provide a full and fair review on numerous bases—indeed, at nearly each step of the review process—is hardly unprecedented, and Plaintiff's allegations against

Defendant and the Board are hardly unique. Dozens of former NFL players have lodged similar challenges, and the Court's findings echo the concerns already expressed by courts across the country.”).

8. Additionally, on account of Defendants’ misconduct in violation of ERISA and their detrimental reliance on an application and appeal process lacking integrity, Plaintiffs suffered harm, including harm to their health, statutory rights to accurate information, and other rights protected by ERISA.

## II. JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction over this action pursuant to Sections 502(a)(1)(B), (a)(2)-(3), (e)(1), and (f) of ERISA, 29 U.S.C. §§ 1132(a)(1)(B), (a)(2)-(3), (e)(1), and (f), and 28 U.S.C. § 1331.

10. Declaratory and equitable, including injunctive, relief are authorized by 28 U.S.C. § 2201 and 2202, Rules 57 and 65 of the Federal Rules of Civil Procedure, and ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).

11. This Court has personal jurisdiction over Defendants because they are located or transact business in, and have significant contacts with, this District, and because ERISA provides for nationwide service of process pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).

12. Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), and 28 U.S.C. § 1391(b) and (c) because many, if not most, of the breaches and violations giving rise to Plaintiffs’ claims occurred in this District.

## III. PARTIES

13. Plaintiffs, who are specifically identified and whose particular facts giving rise to their claims are set forth in Paragraphs 147-266 below, are Retired Players and meet the Plan's definition of "Player."

14. Plaintiffs are Plan "participants," as defined by ERISA § 3(7), 29 U.S.C. § 1002(7).

15. The Bert Bell/Pete Rozelle NFL Player Retirement Plan was a defined benefit pension plan and is also an employee welfare benefit plan, as defined by ERISA § 3(1)-(2), 29 U.S.C. § 1002(1)-(2). The fair market value of assets in the Plan as of March 31, 2015 was $1,809,624,966.

16. The NFL Player Disability & Survivor Benefit Plan and NFL Player Disability & Neurocognitive Benefits Plan are employee welfare benefit plans, as defined by ERISA § 3(1), 29 U.S.C. § 1002(1). For the Plan year ending March 31, 2019, the total additions to the Plan (i.e., employer contributions plus interest income) equaled $182,681,069. After deductions for benefits paid to participants as well as $17,783,557 in "administrative expenses," the Plan had a net increase of $7,856,570, with $48,590,049 in net assets available at the end of year. For the Plan year ending March 31, 2020, the total additions to the Plan equaled $212,906,940. After deductions for benefits paid to participants as well as $20,436,655 in "administrative expenses," the Plan had a net increase of $7,434,746, with $56,024,795 in net assets available at the end of year.

17. In *Cloud*, a Board member testified that the Plan has "assets in excess of $9 billion."

18. The Plan has its principal place of business located at 200 St. Paul Street, Suite 2420, Baltimore, MD 21202-2040.

19. Defendant Board is the Administrator and fiduciary of the Plan, within the meaning of ERISA § 3(16), 29 U.S.C. § 1002(16), and is sued in its capacity as such. The Board is

composed of seven individuals—three selected by the National Football League Players Association ("NFLPA"), and three by the NFL Management Council (i.e., the team owners). Defendant Roger Goodell, the NFL's Commissioner, is the seventh member of the Board and is its non-voting Chairman.

20. Defendants Larry Ferazani, Belinda Lerner, Jacob Frank, Sam McCullum, Robert Smith, and Hoby Brenner are members of the Board, and are sued in their capacity as such. Messrs. Ferazami and Frank and Ms. Lerner are the Board's NFL Management Council appointee members, while Messrs. McCullum, Smith, and Brenner are its NFLPA appointee members.[3]

## IV. FACTUAL ALLEGATIONS

### A. Defendants' History of Parsimonious and Hostile Claims Processing, Abuses of Discretion, Adversarial and Aggressive Administration, Bad Faith, Multiple Erroneous Interpretations of the Same Plan Provisions, and Repeated Substantial Plan and ERISA Violations

21. Federal courts across the country have been pulling back the curtain on Defendants' inconsistency with the plain terms of the Plan, purpose of the Plan, and prior interpretations of the Plan; their biased claims administration; their disturbing pattern of illogical and inconsistent interpretations to the detriment of participants; their flagrant disregard of the full-and-fair review requirement; and other unscrupulous, result-oriented practices. Examples include:

a. *Jani v. Bell*, 209 F. App'x 305, 317-20 & n.11 (4th Cir. 2006) (concluding that Board's denial of Active Football T & P benefits to Hall of Fame Center "Iron Mike" Webster was an abuse of discretion; noting district court's conclusion that Board's decision "indicate[d] culpable conduct, if not bad faith");

[3] Messrs. Ferazani and Brenner have replaced Dennis Curran and Jeff Van Note as, respectively, NFL Management Council and NFLPA appointees to the Board. Accordingly, they are substituted as Board member defendants in this amended complaint.

b. *Brumm v. Bert Bell NFL Ret. Plan*, 995 F.2d 1433, 1434-39 (8th Cir. 1993) (Board abused its discretion by interpreting Plan to exclude cumulative injuries and furnishing notice inadequate under ERISA, and Plan's SPD did not comply with ERISA);

c. *Stewart v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, No. WDQ-09-2612, 2012 WL 2374661, at *14-15 (D. Md. June 19, 2012) ("A 'reasoning mind' would not accept the undetailed reports" of the Board's Neutral Physicians relied upon by the Plan "as 'sufficient to support a particular conclusion.'... [T]he Court concludes that the Defendants abused their discretion in denying … [higher] T & P benefits.");

d. *Mickell v. Bell/Pete Rozelle NFL Players Ret. Plan*, 832 F. App'x 586, 593 (11th Cir. 2020) (finding arbitrary and capricious denial of benefits because "Board wholly failed to consider record evidence that contradicted the opinions of the Plan Neutral Physicians. The Board said it 'reviewed [the] *entire* file,' but that statement [wa]s belied by the record.") (emphasis added); *id*. at 594-95 ("Because the Board failed to consider the combined effect of Mr. Mickell's many physical and mental impairments, it ignored an important consideration in the question of whether he was disabled.");

e. *Carter v. Bert Bell/ Pete Rozelle NFL Ret. Plan*, No. 11-BE-3821-KOB, 2012 WL 6043050, at *3-4 (N.D. Ala. Dec. 3, 2012) ("The Plan's failure to consider [a physical therapist report] made its determination incomplete and unjust" where Player "submitted … Report … with the expectation that the … Board would consider it in its review of his claim");

Case 1:23-cv-02660-JRR Document 1-3 Filed 09/29/23 Page 10 of 121

f. *Dimry v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, 487 F. Supp. 3d 807, 818 (N.D. Cal. 2020) ("Board "acted as an adversary, not a fiduciary"), *aff'd and remanded*, 855 F. App'x 332 (9th Cir. 2021);

g. *Dimry v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, No. 19-cv-05360-JSC, 2022 WL 1786576, at *3 (N.D. Cal. June 1, 2022) (subsequent decision on remand concerning same plaintiff, reasoning Board's hired Medical Advisory Physician's "opinion [wa]s not persuasive and [wa]s instead 'illogical' and 'implausible'"); *id*. (explaining "Board's decision [wa]s owed little deference" because Board's "course of dealing suggests an intent to deny [Player] benefits application regardless of the evidence. ... [Board did not] delv[e] into the record before it. Instead, the … Board 'simply adopted the opinions of its retained physicians by default.' In so doing, the … Board showed an unreasonable bias in favor of Plan-selected physicians") (internal citations omitted);

h. *Solomon v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, 860 F.3d 259, 266 (4th Cir. 2017) (court "reject[ed] the Plan's post-hoc argument that Solomon had to submit contemporaneous medical evidence. … Nowhere does the [Plan's] text require the player to submit 'contemporaneous medical evidence'[.] … In fact, we explicitly rejected this contemporaneous-evidence argument when the Plan raised it before this court more than a decade ago. … Stripped of the arbitrary restrictions on evidence it would consider, the Board provided no justification for denying … benefits, let alone substantial evidence for doing so.") (citing *Jani*, 209 F. App'x at 316-17);

Case 2:23-cv-00603-JRR Document 125-8 Filed 01/22/26 Page 11 of 121

i. *Moore v. Bert Bell/Pete Rozelle NFL Ret. Plan*, 282 F. App'x 599, 601 (9th Cir. 2008) (Board's decision was an unreasonable interpretation of Plan terms in absence of any vocational testimony that there was, in fact, specific job that plaintiff could perform given his substantial impairment);

j. *Giles v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, No. ELH-12-634, 2013 WL 6909200, at *16-17, *26 (D. Md. Dec. 31, 2013) (Board abused its discretion by acting inconsistently with Plan's terms; "Plan's latest rationale for denying… amount[ed] to a 'Hail Mary' pass"; Board's interpretation unreasonable where it interpreted term in Plan to have different meanings); *id.* (Board unreasonably required self-reported symptoms to be supported by objective evidence although Plan's terms contain no such requirement);

k. *In re Marshall*, 261 F. App'x 522, 526 (4th Cir. Jan. 2008) (per curiam) (Board abused its discretion and failed to fulfill its duty through unreasonable effort to determine onset date because it ignored findings favorable to Player in selecting date of physician's examination as disability onset date);

l. *Ashmore v. NFL Player Disability & Neurocognitive Benefit Plan,* No. 16-81710-CIV, 2018 WL 3424453, at *9 (S.D. Fla. June 15, 2018) ("no reasonable basis" for Board's denial which "defie[d] all reason and common sense");

m. *Armstrong v. Bert Bell NFL Player Ret. Plan & Tr. Agreement*, 646 F. Supp. 1094, 1095 (D. Colo. 1986) ("Since his injury on the gridiron, Armstrong has met his most implacable foe on the field of intractability against a home team, the National Football League's retirement plan. Each time he nears the goal line and

Case 1:23-cv-01358-JRR Document 125 Filed 01/09/26 Page 12 of 121

is about to obtain the disability benefits which the plan promises to injured players, the yard markers are changed and the clock is stopped.");

n. *Cloud*, 2022 WL 2237451, at *2 (Board "both failed to provide Plaintiff a full and fair review and abused its discretion").

**B. Background**

22. The NFL is a highly profitable professional football league in the United States, with increasing global appeal playing in foreign countries, that garners the attention of many millions of fans and viewers each week during the NFL season.

23. Even after rule changes for safety, the NFL has been unable to prevent violent injuries from occurring during football activities. *See*, *e.g.*, Nick Zelbe and Zach Koons, "Bills Issue Update on Damar Hamlin's Status After On-Field Collapse" (Jan. 3, 2023), https://www.si.com/nfl/2023/01/03/bills-issue-update-health-status-damar-hamlin-collapse (last accessed May 12, 2023); Madeline Coleman, "Tua Tagovailoa Shares Frightening Details from Night of Concussion" (Oct. 19, 2022) https://www.si.com/nfl/2022/10/19/tua-tagovailoa-shares-frightening-details-from-night-of-concussion (last accessed May 12, 2023).

24. Many Retired Players have turned to the ERISA-regulated Plan to determine whether they qualify for disability benefits. Although the purpose of ERISA is "to protect … the interests of participants in employee benefit plans and their beneficiaries, by requiring the disclosure and reporting to participants and beneficiaries of financial and other information with respect thereto, by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions, and ready access to the Federal courts," 29 U.S.C. § 1001(b), Defendants have erected oftentimes insuperable

obstacles to Players' efforts to recover benefits to which they are rightly entitled, receive accurate information, and obtain a fair and neutral process.

25. Significant orthopedic disabilities are common for retired players. For example, 36.3% of Players report suffering from degenerative joint disease ("DJD") (i.e., osteoarthritis). Moreover, hamstring injuries are a considerable cause of disability in football. "Between 1989 and 1998, injury data were prospectively collected by athletic trainers for every NFL team and recorded … Over the 10-year study period 1716 hamstring strains were reported." Furthermore, "[d]isc herniations represent a common and debilitating injury to the professional athlete." "A retrospective analysis was performed on all disc herniations to the cervical, thoracic, and lumbar spine during a 12-season period (2000-2012) using the NFL's surveillance database." "During the 12 seasons, 275 disk herniations occurred in the spine." The study concluded that "[d]isc herniations represent a significant cause of morbidity in the NFL." Moreover, "[s]houlder instability is a common injury in the NFL." "From 2012 through 2017, 403 missed-time shoulder instability injuries were documented in 355 unique players in the NFL over the full study period."

26. In 2002, Dr. Bennet Omalu discovered Chronic Traumatic Encephalopathy ("CTE") during the study of former Pittsburgh Steeler Mike Webster's brain. CTE has been determined to occur as a result of repeated head trauma and has been commonly linked to football play A 2019 study led by Boston University examined the brains of 266 deceased NFL players and found that 223 of them had CTE. Signs and symptoms of CTE include, but are not limited to, memory loss, attention and processing speed impairment, confusion, impaired judgment, visual spatial impairment, depression, language impairment, Parkinsonism, suicidality, and progressive dementia. These symptoms often manifest years or even decades after a Player's last brain trauma.

27. During the first hearing before the House Judiciary Committee on the impact of head injuries sustained by NFL players, Representative Maxine Waters stated "I believe you are an $8 billion organization that has failed in your responsibility to the players. We all know it's a dangerous sport. Players are always going to get injured. The only question is, are you going to pay for it?" In January 2010, the House Judiciary Committee held further hearings where Representative Linda Sanchez said: "I find it really ridiculous that [the former co-chairman of the NFL's panel on head injuries is] saying that concussions don't cause long-term cognitive problems. I think most people you ask on the street would figure that repeated blows to the head aren't good for you."

28. According to the U.S. Centers for Disease Control and Prevention:

> A concussion is a type of traumatic brain injury—or TBI—caused by a bump, blow, or jolt to the head or by a hit to the body that causes the head and brain to move rapidly back and forth. This sudden movement can cause the brain to bounce around or twist in the skull, creating chemical changes in the brain and sometimes stretching and damaging brain cells.
>
> … [T]he effects of a concussion can be serious.

29. In 2011 and 2012, scores of former NFL players filed numerous lawsuits against the NFL, seeking damages for CTE symptoms stemming from concussive and sub-concussive NFL injuries. The personal injury claims in those suits were all under state law, and the litigation was ultimately centralized as the multidistrict *In re National Football League Players' Concussion Injury Litigation*, No. 2:12-md-2323-AB (E.D. Pa.) ("*NFL Concussion*"), ultimately involving the claims of thousands of former NFL players. In 2015, the court presiding over that litigation gave final approval to a groundbreaking class action settlement, providing for monetary awards and other relief. *In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. 351 (E.D.

Pa. 2015), *aff'd*, 821 F.3d 410 (3d Cir. 2016). The *NFL Concussion* settlement, however, specifically did not release settlement class members' claims relating to benefits under the Plan.

30. Despite the frequency of degenerative football-linked impairments, Players do not receive lifetime medical insurance to care for the lifelong ailments from playing this violent sport.

### C. The Plan and How It *Should* Operate

31. The Plan provides disability and related benefits to eligible NFL Players, including Plaintiffs and Class members. It is jointly administered by employee and employer representatives and is a multi-employer plan as defined in ERISA § 3(37), 29 U.S.C. § 1002(37).

32. An eligible Player (as defined in the Plan) who satisfies the terms of the Plan will receive Total and Permanent ("T & P") Disability benefits (Plan Art. 3 § 3.1 and Plan Art. 4 § 4.1 (formerly at Plan Art. 5 § 5.1)); Line of Duty ("LOD") Disability benefits (Plan Art. 5 § 5.1 (formerly at Plan Art. 6 § 6.1)); or Neurocognitive Disability ("NC") benefits (Plan Art. 6 § 6.1).

33. Between 2014 and 2016, an average of over 1,000 Players applied for benefits each year.

#### i. The NFL Player Benefits Office

34. The benefits application process involves the NFL Player Benefits Office, which is in charge of the day-to-day administration of Plan benefits. All employees at the Benefits Office are employed by Defendants. When a Player applies for disability benefits, his "case" is assigned to a benefits coordinator in the Benefits Office's disability group.

#### ii. The Disability Initial Claims Committee

35. The Plan's Disability Initial Claims Committee ("the Committee") makes an initial decision on Players' claims for disability benefits. The Committee consists of three members, one appointed by the NFL Management Council, one appointed by the NFLPA, and one who is the Plan's Medical Director, jointly designated by the NFLPA and the NFL Management Council.

Case 1:23-cv-00358-JRR Document 136 Filed 05/12/26 Page 15 of 120

36. If the NFLPA and NFL Management Council appointees to the Committee are deadlocked with respect to a benefit entitlement decision, the claim will be a "deemed denial."[4]

37. The Plan states that the Committee members will review *all* facts and circumstances in the administrative record before rendering a decision.

**iii. <u>The Board</u>**

38. Players may appeal Committee decisions to the Board. The Board may not accord any deference to the determination of the Committee or its advisors.

39. The Board is the Plan's named fiduciary within the meaning of ERISA § 402(a)(2), 29 U.S.C. § 1102(a)(2), and is responsible for implementing and administering the Plan.

40. As required by federal law and the Plan, the Board's review of an adverse determination must take into account *all* available information, irrespective of whether that information was presented or available to the Committee.

41. The Plan states that Board members must review *all* facts and circumstances in the administrative record before rendering a decision.

42. Commenting on proposed federal regulations on behalf of the Plan, in a December 2016 letter to the U.S. Department of Labor, the Board's own lawyers and advisors at Groom Law Group, Chartered ("Groom") represented that the Board *knew* that: (i) "[t]he decision-making fiduciaries of the Plan must not only carefully apply all of these rules, they must do so while reviewing voluminous records. It is typical for a claimant to submit hundreds or thousands of

[4] In rare cases that are preliminarily "deemed denials" because of a medical disagreement between the other two members, the Committee member who is a medical professional casts the deciding vote. If the Plan's Medical Director determines that the medical evidence is either inconclusive or insufficient, he or she abstains from voting.

pages of documents, including their entire college and NFL medical records"; and (ii) "[t]he bottom line is that these decisions require careful analysis."

43. The Board's decisions must be reasoned, principled, logical, consistent with the plain language of the Plan, supported by substantial evidence to support its conclusion, consistent with prior interpretations, and consistent with the intent of the Plan, among other factors. Moreover, although the Plan grants the Board broad discretion to interpret, control, implement, and manage the Plan, including discretionary authority to decide claims for benefits, the Board does not have discretion to act in violation of the law and does not have unfettered discretion to deny benefits.

44. As noted in Paragraphs 19 and 20 above, the six voting members of the Board consist of three members appointed by the NFL Management Council and three members appointed by the NFLPA. In addition, the Board's non-voting member (and its honorary Chairman) is the NFL Commissioner. Pursuant to Section 9.1 of the Plan, "either the Commissioner or, in his absence, his designee, will preside at all meetings of the Board." The Commissioner's duties are limited to those specified in the Plan.

**iv. <u>Plan-Defined "Neutral Physicians"</u>**

45. "Neutral Physician" is defined in the Plan as "the health care professional(s) designated under Section 12.3." Section 12.3 states that "[t[he Disability Board will maintain a network of Neutral Physicians to examine Players who apply for benefits under this Plan."[5]

[5] For the sake of brevity and simplicity, references throughout to "physicians" or "Neutral Physicians" also encompass, except where noted, Plan-hired neuropsychologists, even though the latter are not, strictly speaking, physicians.

46. The duties of a "Neutral Physician" include the duty to provide complete reports on the Player's disability (or disabilities) as necessary for the Committee or Board "to make an *adequate* determination" (emphasis added) on the Player's benefits claim.

47. Moreover, the version of the Plan applicable to Players who applied for benefits *prior* to April 1, 2021, provided in Section 12.3 thereof that "[t]he NFLPA and [NFL] Management Council will jointly designate[] such Neutral Physicians. Any Neutral Physician so designated by the NFLPA and Management Council will serve until the earliest of (1) the death, disability or retirement of the Neutral Physician, (2) the NFLPA and Management Council jointly remove and replace the Neutral Physician, or (3) thirty days after either the NFLPA or Management Council gives written notice of the Neutral Physician's removal to the other party, the Neutral Physician, and the Disability Board."

48. The Plan version applicable to Players who applied for benefits before April 1, 2021, does *not* state that "Neutral Physicians" will be neutral, fair, unbiased, impartial, or "absolutely neutral" in this process. Also, this version of the Plan does *not* state that Neutral Physicians' compensation does not depend on whether their opinions favor or disfavor an award of benefits. The terms "neutral exam," "neutral evaluation," and "fair and impartial Player evaluations" also do *not* appear in the version of the Plan applicable to Players who applied for benefits before April 1, 2021.

49. This Plan version also does *not* state that the Board certifies or ensures that "Neutral Physicians" will indeed be neutral, fair, unbiased, impartial, or "absolutely neutral" in this process. Also, this version of the Plan does *not* state that the Board certifies or ensures that Neutral Physician's compensation does not depend on whether their opinions favor or disfavor an award of benefits. The phrases "neutral exam," "neutral evaluation," and "impartial Player evaluations"

Case 1:23-cv-00358-JRR Document 136 Filed 09/29/26 Page 18 of 120

also do *not* appear in the version of the Plan applicable to Players who applied for benefits before April 1, 2021. Unlike the Plan version applicable to Players who submitted an application before the April 1, 2021, the Plan version applicable to Players who apply on or after that date provides that "[a] Neutral Physician must (1) certify that any opinions offered as a Neutral Physician will be provided without bias for or against any Player, and (2) accept and provide services pursuant to a 'flat-fee' agreement, such that the amount of compensation provided by the Plan will not depend on whether his or her opinions tend to support or refute any given Player's application for benefits." "Flat-fee" is not defined in the Plan and the Plan's terms do not provide any limits on the annual or total compensation that a "Neutral Physician" may earn from the Plan.

50. The Plan never refers to "Neutral Physicians" without capitalizing that term.

51. Neither the pre-April 2021 Plan nor the April 2021 Plan contain other procedures to ensure that "Neutral Physicians" are indeed impartial and unbiased. The Plan also does not prescribe procedures to ensure affirmative steps that can be taken to reduce bias and promote accurate claims determinations, such as conducting substantive independent audits of claims, the claims process, and all "Neutral Physicians." The Plan represents to Players that it does not maintain statistics on its hired physicians, and the Plan provides no other penalties for inaccurate, biased, or otherwise inadequate decision-making by Plan-hired "Neutral Physicians."

52. These "Neutral Physicians" are selected and paid by Defendants. Defendants know how much annual compensation each Neutral Physician receives from the Plan.

53. In various ERISA-mandated notices to Players, Defendants affirmatively tout to Players and their beneficiaries that the "Neutral Physicians" are indeed "*absolutely neutral*," and that the examinations they perform are "neutral exams." (Emphasis added.) For example, in decision letters, the Board repeatedly represents, reassures, and lulls Players into believing that

"the Plan's physicians are *absolutely neutral* in this process" and that the "Board has *no doubt* that the Plan's Neutral Physicians fully understand the obligation to conduct fair and impartial Player evaluations." (Emphasis added.) Moreover, Defendants repeatedly represented in the ERISA-mandated SPD that these Neutral Physicians will perform "neutral exams," even though the term "neutral exam" does not appear in the Plan.

54. Players frequently rely on the material information about the Plan conveyed to them in decision letters and SPDs, such as when deciding whether to (i) file an appeal of an adverse decision; (ii) bring an ERISA lawsuit to challenge a final benefits decision; (iii) pursue medical care for their conditions; or (iv) spend inordinate amounts of time and effort, oftentimes being forced to travel long distances for examinations by "Neutral Physicians" at the direction of Defendants and contributing to the worsening of Players' medical conditions.[6]

55. The Board has rejected Plaintiffs' and absent Class members' requests to produce information relevant to the impartiality and conflicts of allegedly "Neutral Physicians," including statistics on Board-hired physicians' rate of finding of disability. Instead, the Board has responded to Players' requests for information by asserting, incredibly, that it does not maintain statistics of the rate of findings of disability by its hired Neutral Physicians.

[6] That Defendants frequently require Players to travel hundreds of miles to be examined by their hired physicians is no small irony. In the *NFL Concussion* settlement, the NFL successfully lobbied for revisions to the rules governing Monetary Award Fund ("MAF") physicians to prevent alleged physician-shopping by Monetary Award applicants. The revised rules adopted in 2019 impose a radius of 150 miles for MAF physician examinations of applicants, and a requirement that neuropsychological examinations may be conducted only by a settlement program-approved neuropsychologist to whom the applicant is referred by the examining MAF physician and whose office is within a 50-mile radius of that physician's office. *See In re Nat'l Football League Players' Concussion Inj. Litig.*, 962 F.3d 94, 100-01 & n.9, 104 (3d Cir. 2020); https://www.nflconcussionsettlement.com/Docs/Rules_Qualified_MAF_Physicians.pdf (Rules 9-10) (last accessed May 12, 2023).

56. The Plan states that if three or more voting members of the Board conclude that a specific medical issue exists as to whether a Player qualifies for a benefit under the Plan (such as where physician reports are in conflict or ambiguous), the Board's members may submit the issue to a "Medical Advisory Physician" ("MAP") for a final and binding determination.[7]

57. Like "Neutral Physicians," the duties of an MAP include the duty to provide complete reports on the Player's disability (or disabilities) as necessary for the Board to make an adequate determination on the Player's benefits claim.

58. If a Player's claim is sent to an MAP, the MAP will have discretion to decide the specific medical issue. In all other respects, including the interpretation of this Plan and whether the claimant is entitled to benefits, the Plan states that the Board will retain its full discretion. If there is a question as to whether the MAP properly applied the terms of the Plan, such as with respect to the standards for Line of Duty benefits (defined and described below), the Board has the right and duty to bring such questions to the attention of the MAP. Under the Plan, after all such questions have been addressed, the MAP's ultimate decision is final and binding on the Board.

**D. Benefits under the Plan**

59. The Plan provides for several categories of disability benefits, as described below.

**i. Total & Permanent Disability Benefits**

60. An Article 3 (or Article 4, depending on which version of the Plan applies to the applicant Player) Eligible Player (as defined in the Plan) is entitled to T & P disability benefits if (1) "he has become totally disabled to the extent that he is substantially prevented from or

[7] Also, the Player may be required to attend additional examinations by Neutral Physicians, including MAPs. In the case of Neurocognitive Disability benefits (described below), the determination will be based on the written evidence in the Player's file and does not involve a new examination by a MAP.

substantially unable to engage in any occupation or employment," and (2) such condition is permanent (the "General Standard").

61. "The educational level and prior training of a Player will not be considered in determining whether such Player is" T & P disabled. "A Player will not be considered to be able to engage in any occupation or employment for remuneration or profit … merely because: such person is employed by the League or an Employer, manages personal or family investments, is employed by or associated with a charitable organization, is employed out of benevolence, or receives up to $30,000 per year in earned income."

62. "A disability will be deemed to be 'permanent' if it has persisted or is expected to persist for at least twelve months from the date of its occurrence, excluding any reasonably possible recovery period."

63. There are different categories of T & P disability benefits: (i) Active Football, (ii) Active Nonfootball, (iii) Inactive A, and (iv) Inactive B. These categories are defined in the Plan and pay different amounts to Players who are eligible for the particular benefit, to compensate Players for having invested their bodies and brains in the sport. Active Football benefits pay $265,000 per year, Active Nonfootball benefits pay $165,000 per year, Inactive A benefits pay $135,000 per year, and Inactive B benefits pay $65,000 per year.

64. For Active Football benefits, the Plan states: "Subject to the special rules of Section 3.5, a Player will qualify for Plan T&P benefits in this category if (i) his disability(ies) arises out of League football activities while he is an Active Player, and causes him to be totally and permanently disabled, and (ii) his application that results in an award of Plan T&P benefits is received by the Plan within 18 months after he ceases to be an Active Player." In prior versions of the Plan, the definition of Active Football required that the disability or disabilities have

rendered the Player totally and permanently disabled (within the meaning of the Plan) shortly after the disability or disabilities first arose.

65. According to the district court in *Cloud*, out of the thousands of Retired Players who filed applications for benefits, as of 2022 a mere 30 Players were receiving Active Football T & P benefits.

66. The difference between Active Football as opposed to Active Nonfootball T & P disability is that the former must "arise out of League football activities."

67. "Arising out of League football activities" means a disablement arising out of any League pre-season, regular-season or post-season game, or any combination thereof or out-of-League football activity supervised by an Employer, including all required or directed activities. The term does not include, without limitation, any disablement resulting from other employment, or athletic activity for recreational purposes. Nor does it include a disablement that would not qualify for benefits but for an injury (or injuries) or illness that arises out of other than League football activities.

68. For Inactive A benefits, the Plan states: "Subject to the special rules of Section 3.5, a Player will qualify for Plan T&P benefits in this category if (i) the Player does not qualify for benefits in categories (a) [Active Football] or (b) [Active Nonfootball] above, and (ii) his application that results in an award of Plan T&P benefits is received by the Plan within fifteen (15) years after the end of his last Credited Season. This category does not require that the disability arise out of League football activities."

69. Section 3.5 of the Plan states with respect to "Psychological/Psychiatric Disorders" that "[a] payment for [T & P disability] as a result of a psychological/psychiatric disorder may only be made, and will only be awarded, for benefits under the provisions of Section 3.4(b) [Active

Nonfootball], Section 3.4(c) [Inactive A], or Section 3.4(d) [Inactive B], except that a [T & P] disability as a result of a psychological/psychiatric disorder may be awarded under the provisions of Section 3.4(a) [Active Football] if the requirements for [T & P disability] are otherwise met and the psychological/psychiatric disorder either (1) is caused by or relates to a head injury (or injuries) sustained by a Player arising out of League football activities (e.g., repetitive concussions); (2) is caused by or relates to the use of a substance prescribed by a licensed physician for an injury (or injuries) or illness sustained by a Player arising out of League football activities; or (3) is caused by an injury (or injuries) or illness that qualified the Player for Plan T&P benefits under Section 3.4(a) [Active Football]."

70. With one exception, Players who receive Social Security disability benefits ("SSD") will also be deemed T & P disabled under the current Plan.[8]

71. For a Player to receive T & P benefits under the General Standard, at least one Plan "Neutral Physician" must find that the Player is T & P disabled after issuing a complete report as necessary for the Committee or Board to make an adequate determination.

**ii. <u>Line-of-Duty Disability Benefits</u>**

72. A Retired Player is entitled to Line-of-Duty ("LOD") benefits if the Player incurred a "substantial disablement" "arising out of League football activities."

73. A "substantial disablement" either (1) rates at least 10 points (or for applications received on and after April 1, 2020, is rated at least 9 points) on the Point System appended to the Plan; (2) "[i]s the primary or contributory cause of the surgical removal or major functional

[8] Beginning in 2024, however, SSD determinations will no longer be accepted in lieu of satisfying the General Standard, and Players who received Inactive A T & P disability benefits by reason of an SSD determination will be subject to a continuation examination by a Board-hired "Neutral Physician" between 2024 and 2026 in order to maintain their benefits.

impairment of a vital bodily organ or part of the central nervous system"; or (3) meets other requirements listed in the Plan. "Arising out of League football activities" is defined the same for T & P disability and LOD benefits eligibility.

74. A Player will receive Points for each occurrence of each listed orthopedic impairment. Points for impairments are specifically listed in the Plan (e.g., "Symptomatic Shoulder Instability" is worth three Points).[9]

75. In the last few years, the standard for LOD eligibility changed. Article 60, Section 8(e) of the Collective Bargaining Agreement ("CBA") dated March 15, 2020 states: "With respect to applications received on or after April 1, 2020, a 'substantial disablement' is a 'permanent disability' other than a neurocognitive, brain-related neurological (excluding nerve damage) or 'psychiatric impairment.'" Previously, Players could apply for and receive LOD benefits for a major functional impairment of the brain (e.g., post-concussion syndrome).

76. For a Player to receive LOD benefits, at least one Plan Neutral Physician must find that the Player meets these requirements, except that, for applications received on or after April 1, 2020, a Player who submits sufficient medical records to establish that he has a "substantial disablement" as determined by the Board will not be subject to an evaluation by a Plan Neutral Physician.

**iii. <u>Neurocognitive Disability Benefits</u>**

77. Neurocognitive Disability ("NC") benefits were created in 2011. A Player will be entitled to NC benefits if he has a "mild neurocognitive impairment," which is a "mild objective impairment in one or more domains of neurocognitive functioning which reflect acquired brain dysfunction, but not severe enough to interfere with his ability to independently perform complex

[9] The Point System replaced a system of impairment percentages used in the past to determine Players' LOD benefits eligibility.

activities of daily living or to engage in any occupation for remuneration or profit."

78. A Player may also be entitled to NC benefits if he has a "moderate neurocognitive impairment," which is a "mild-moderate objective impairment in two or more domains of neurocognitive functioning which reflect acquired brain dysfunction and which may require use of compensatory strategies and/or accommodations in order to independently perform complex activities of daily living or to engage in any occupation for remuneration or profit."

79. A Player may qualify for NC benefits even if his impairment does not arise out of League football activities. If an impairment, however, results primarily from psychological or psychiatric conditions, such as non-cognitive depression, a Player may not be entitled to NC benefits.

80. For a Player to receive NC benefits, at least one Plan Neutral Physician must find that the Player has a mild or moderate neurocognitive impairment.

81. According to a 2018 NFLPA Former Player Benefits Overview document, only 124 Retired Players were receiving NC benefits.

**E. Defendants' Fiduciary Duties Under ERISA**

82. Pursuant to Section 404 of ERISA, 29 U.S.C. § 1104, and caselaw precedent, the Committee and the Board have fiduciary duties, including, among other duties, the duty of loyalty, which is the "highest known to the law," and the duty of care. Specifically, ERISA imposes three broad duties on ERISA fiduciaries: (1) the duty of loyalty, which requires that all decisions regarding an ERISA plan be made with an eye single to the interests of the participants and beneficiaries; (2) the "prudent person fiduciary obligation," which requires a plan fiduciary to act "with the care, skill, prudence, and diligence of a prudent person acting under similar circumstances"; and (3) the exclusive benefit rule, which requires a fiduciary to "act for the exclusive purpose of providing benefits to plan participants."

83. Additionally, Section 404(a)(1) of ERISA, 29 U.S.C. § 1104(a)(1), imposes higher-than-marketplace standards of conduct on Defendants in their management and administration of the Plan. Rooted in trust law, ERISA sets forth a special fiduciary duty of loyalty standard upon the fiduciaries; namely, that Defendants must discharge their duties solely and exclusively in the interests of the Players and their beneficiaries.

84. As part of its fiduciary duty of loyalty, the Board has a duty to deal fairly and honestly with Players, cannot mislead or misinform, and must convey complete and accurate information to Players and beneficiaries.

85. Moreover, the Board may also breach its fiduciary duty under Section 404(a)(1)(B) of ERISA, 29 U.S.C. § 1104(a)(1)(B), by failing to exercise care in hiring, training, compensating, promoting, terminating, monitoring the accuracy of, or by retaining non-fiduciaries, such as medical experts, in circumstances where it should know their work performance to be inadequate.

### F. Additional Requirements for Consideration

86. For T & P disability benefits, the Board must consider the cumulative impact and combined effects of all of a claimant's impairment(s), rather than each impairment or type of impairment in silo. Failure to do so is an unreasonable interpretation of the Plan and an abuse of discretion.

87. Also, the Plan does not require objective medical evidence to support a disability claim. In 2022, a court held that it is an abuse of discretion for the Board to reject a Player's undisputed and reliable self-reported evidence where Plan terms do not limit proof to objective evidence.

88. Moreover, ERISA and its implementing regulations require the Board to "exercise due care" in claims processing and provide a "full and fair review" of an appeal of an adverse

benefits determination, which includes taking "into account *all* comments, documents, records, and other information submitted by the claimant and relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination." 29 C.F.R. § 2560.503-1(h)(1)(iv) (regulation promulgated pursuant to ERISA §§ 503 and 505, 29 U.S.C. §§ 1133 and 1135, to "set[] forth minimum requirements for employee benefit plan procedures pertaining to claims for benefits by participants and beneficiaries") (emphasis added). Furthermore, the Board must engage in "a meaningful dialogue" with Players and their beneficiaries.

89. Pursuant to the mandate of ERISA § 503, 29 U.S.C. § 1133, "[i]n accordance with regulations of the Secretary," the Plan "must ensure that all claims and appeals for disability benefits are adjudicated in a manner designed to ensure the independence and impartiality of the persons involved in making the decision. Accordingly, decisions regarding hiring, compensation, termination, promotion, or other similar matters with respect to any individual (such as a claims adjudicator or medical or vocational expert) must *not* be made based upon the likelihood that the individual will support the denial of benefits." 29 C.F.R. § 2560.503-1(b)(7) (emphasis added).

**G. <u>Summary Plan Description</u>**

90. The Plan's SPD is governed by ERISA. For example, ERISA §§ 102(a) and 104(b) require a plan administrator to provide beneficiaries with SPDs and with summaries of material modifications, "written in a manner calculated to be understood by the average plan participant," that are "sufficiently *accurate* and comprehensive to *reasonably apprise* such participants and beneficiaries of their rights and obligations under the plan." 29 U.S.C. §§ 1022(a), 1024(b) (emphasis added). Inaccurate statements and misinformation fail to reasonably apprise participants and beneficiaries of their rights and obligations.

91. ERISA's implementing regulations provide, in pertinent part: "All [statements of ERISA rights and additional explanatory and descriptive] information shall be written in a manner calculated to be understood by the average plan participant[.] … Inaccurate, incomprehensible or misleading explanatory material will fail to meet the requirements of this section." 29 C.F.R. § 2520.102-3(t)(1).

92. Even though the term "neutral exam" does not appear in the Plan, Defendants represent to Players and their beneficiaries in SPDs that Players will receive "neutral exams."

93. The 2019 SPD represented: (i) "In making its decision on review, the … Board will take into account *all* available information, regardless of whether it was available or presented to the … Committee, and will afford no deference to the determination made by the … Committee."; (ii) "This decision will be made by reviewing your application, *any* supporting documents that you provide, neutral physician report(s), and *any records in your file*."; (iii) "The Committee and/or the … Board … carefully reviews each application, and makes a decision on an individual basis"; and (vi) "The Committee will consider all of the elements of your application." (Emphasis added.)

94. The SPDs provide that, in submitting their applications, Players should "be sure to include information about any and all impairments you have that you think support your claim. … The Committee or Board *will only consider impairments that you include on your initial application* unless a neutral physician who evaluates you recommends otherwise" and that "[b]e sure to include *ALL impairments you want considered* on your initial application." (Emphasis added, except capitalization in original.)

95. The 2022 SPD also stated that Neutral Physicians' "opinions will be provided *without bias* for or against any Player. Because they receive a flat fee for their services, their

compensation *does not* depend on whether their opinions favor or disfavor an award of benefits." (Emphasis added.)

96. The 2022 SPD represented: "The Committee and Board will make *their own* determinations about the timing and cause of your impairments, and the proper category for your T&P benefits, based on your application, Neutral Physician reports, and *other records available to them*." (Emphasis added.)

97. The 2022 SPD represented to Players that, in order to qualify for LOD, T & P disability, and NC benefits, the Committee or Board must find that they meet the Plan's requirements, and that "[t]his decision will be made by *reviewing* your application, *any supporting documents that you provide*, Neutral Physician report(s), and *any records in your file*." (Emphasis added.)

98. The 2022 SPD represented that "[i]In making its decision on review, the *Disability Board will take into* account *all available information*, regardless of whether it was available or presented to the Disability Initial Claims Committee, and will afford no deference to the determination made by the Disability Initial Claims Committee." (Emphasis added.)

99. Neither the 2019, the 2021, nor the 2022 SPD state that anyone other than the Committee or Board members themselves will review *all* of the available information in a Player's file, any supporting documents that a Player provides, or any records in a Player's file.

### H. ERISA-Mandated Decision Letters

100. ERISA § 503, codified at 29 U.S.C. § 1133, provides:

> In accordance with regulations of the Secretary, every employee benefit plan shall—
>
> (1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and

> (2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

29 U.S.C. § 1133 ("In accordance with regulations of the Secretary"); *see* 29 C.F.R. § 2560.503-1 (implementing regulation). The statute's essential purpose is twofold: (1) to notify the claimant of the specific reasons for a claim denial, and (2) to provide the claimant an opportunity to have that decision reviewed by the fiduciary.

101. Decision letters do *not* state that anyone other than the Committee or Board members reviewed all of the available information in a Player's administrative files, any supporting documents that a Player provides, or any records in a Player's file.

102. Moreover, the Board repeatedly represents, reassures, and lulls Players into believing that "the Plan's physicians are *absolutely neutral* in this process" and that the "Disability Board has *no doubt* that the Plan's Neutral Physicians fully understand the obligation to conduct fair and impartial Player evaluations," even though that language is not stated in the Plan. (Emphasis added.)

103. Decision letters frequently advise Players that "the Plan's Neutral Physicians are instructed to *(and do) evaluate Players fully, fairly, and without bias for or against the Player*. For these reasons *neutral evaluations are typically accepted and relied upon by the members* of the Disability Board[.]" (Emphasis added.) Decision letters like this and the SPDs have referred to "neutral physicians" without capitalizing those terms at times.

104. In endeavoring to prepare complete appeals and to respond to reports, as is their statutory right during the administrative process, Plaintiffs, through their counsel, have made requests for relevant information from Defendants. For example, Plaintiffs requested information relevant to the reputations of physicians that the Defendants tout as "*absolutely neutral* in this

process" and whom Defendants have assured Plaintiffs and absent Class members that the "ha[ve] *no doubt* that the Plan's Neutral Physicians fully understand the obligation to conduct fair and impartial Player evaluations." (Emphasis added.) Rather than provide this necessary information, Defendants prejudiced Plaintiffs' right to complete and accurate information, and right to appeal and respond by rejecting their request in an ERISA-mandated disclosure stating:

> How often the Plan utilizes a neutral physician, how much a physician may be compensated, and "statistics" on the outcome of a particular physician's evaluations, are not relevant to your claim. The Disability Board is aware that a judge in a recent court case stated that a Plan physician was conflicted by virtue of receiving compensation from the Plan for his service. The Disability Board, however, does not agree with that conclusion for several reasons.

105. ERISA-mandated decision letters have also advised Players "[t]he Disability Board hopes that the foregoing explanation addresses your concerns … about the fairness of the disability review process. *Substantial effort and resources have been committed to ensure that every Player is fully and fairly evaluated*[.]" (Emphasis added.)

106. ERISA-mandated decision letters have also informed Players:

> *We wish to reassure you* that the Plan's Neutral Physicians *have no incentive to hurt or help Players*, and the Board has no inherent bias for or against Players[.] … The Plan's neutrals include preeminent practicing physicians in their fields of specialty. The Plan compensates them for their time and expertise and for their willingness to evaluate Players on short notice and provide detailed reports in accordance with Plan standards.

(Emphasis added.)

### I. Powerful Statistical Evidence of a Pattern of Parsimonious Assessments Unfavorable to Applicants, Showing a Systematic Practice That Most Highly Compensated Board Physicians Have Financial Conflicts of Interest That Have Infected the Board's Decision-Making and Harmed the Integrity of the Claims Process, and Also Demonstrating the Falsity of Defendants' Disclosures Touting Misinformation That Plan Physicians Are Absolutely Neutral in This Process and Their Reassurances That Actively Concealed ERISA Violations

107. There is powerful statistical evidence that strongly suggests a systematic pattern that the more the Defendants compensate their hired physicians, the higher the likelihood that those

physicians will render flawed, inadequate, result-oriented opinions adverse to benefits applicants. As a result, the integrity of the claim administration process has been compromised, and a pattern of parsimonious assessments unfavorable to Players seeking benefits has infected the Board's decision-making.

108. Besides wrongfully denying benefits, Defendants breached their fiduciary duties to Plaintiffs through inaccurate, misleading, and deceptive information about the Plan to Plaintiffs and absent Class members. For example, Defendants affirmatively misrepresented to Players that "the Plan's physicians are *absolutely neutral* in this process," that the "Disability Board has *no doubt* that the Plan's Neutral Physicians fully understand the obligation to conduct fair and impartial Player evaluations," and that the examinations they perform are "neutral" examinations in various ERISA-mandated notices. (Emphasis added.)

109. In reality, there are larger systematic correlations between the magnitude of annual, average, and total compensation that "Neutral Physicians" derive from business they do with Defendants, and the frequency of flawed reports and result-oriented conclusions they render that are adverse to Players and the integrity of the Plan. Conversely, the less income that they derive from business with Defendants, the lesser the likelihood that they will issue biased reports.

110. Indeed, multiple courts have determined that a sample of statistics showing a parsimonious pattern of assessments unfavorable to claimants can demonstrate "powerful evidence" of conflict. Also, a court has already expressed concern about the possibility that a Board-paid physician who reaps substantial income or business benefits from Board referrals may allow economic self-interest to influence medical opinions about a claimant's disabilities.

111. The statistics in Paragraphs 116-146 below show that highly compensated Board-retained physicians have rendered opinions in the great majority of cases adverse to Players,

thereby harming the integrity of claims processing policies and practices for all, and demonstrate that concerns such as those voiced by courts have come to fruition.

112. As recounted below, there is a larger systematic practice of providing more compensation to, and more frequently retaining physicians with, extremely high benefits denial rates, whom the Board knew or should have known stood to benefit financially from the repeat business that might come from providing result-oriented reports that were to the Board's liking, yet inadequate to base a determination on. The history of these highly paid physicians' conclusions provides evidence of this systematic practice and shows that the higher a physician's compensation from Defendants, the higher their tendency to render flawed or spurious medical justifications to support the denial of benefits to deserving claimants, thereby harming the integrity of the process.

113. Section 3.1(d) of the Plan, for example, states that at least one Board-selected Neutral Physician must find, under the standard of 3.1(e), that the Player is T & P disabled. If no Neutral Physician renders such a conclusion, then the threshold for eligibility is not satisfied. The Plan, however, also provides that the Committee and Board cannot "make an adequate determination" on the Player's benefits claim if a "Neutral Physician" renders an incomplete or otherwise flawed report on a Player's condition(s).

114. Defendants' practices have created a sham process through misinformation that has injured the integrity of the process by touting to Players through repeated misrepresentations that these biased physicians are "*absolutely neutral* in the process." (Emphasis added.) Also, Defendants actively concealed their ERISA violations to Plaintiffs and absent members of the proposed Class through repeated false reassurances such as "that the Plan's Neutral Physicians have *no* incentive to hurt or help Players." (Emphasis added.)

115. Defendants compensated many physicians whom they represented as "absolutely neutral" with perverse incentives, through substantial amounts of money for a high volume of repeat work evaluating Players, as alleged herein. The magnitude of these numbers, particularly when correlated with their conclusions, flawed reports, rate of retention, promotions, and reputation for diminishing legitimate conditions, show that there is a plan-wide conflict that did, in fact, negatively influence the integrity of the claims process, and examinations of Plaintiffs and absent Class members.

116. The statistical sample consists of 784 total Defendant-commissioned T & P disability evaluations conducted by purportedly "Neutral Physicians."

117. Across 51 T & P evaluations performed by Plan physicians having an average annual compensation from Defendants of $200,000 or more,[10] these Defendant-touted "absolutely neutral" seven physicians have *never* rendered a conclusion that any Player is T & P disabled in any year.[11]

118. Across 291 T & P disability examinations performed by Plan physicians having an average annual compensation from Defendants of $125,000 or more, these Defendant-touted "absolutely neutral" physicians have found that only 7.56% of Players were T & P disabled. Nineteen of those Defendant-touted "absolutely neutral" physicians having an average annual

---

[10] According to the U.S. Department of Labor, the average hourly labor rate of a physician in the United States is $157.80.

[11] The calculations of the average annual compensations exclude the compensation for the year starting from March 31, 2020 through April 1, 2021 because "[i]n March 2020, the Plan suspended all applications/evaluations due to the coronavirus and its extraordinary impact." Even if that COVID pandemic-shortened year were to be included in the annual averages, the results would merely change from 51 total T & P disability evaluations, with seven physicians who have *never* rendered a conclusion that any Player is T & P disabled in any year, to 46 total T & P disability examinations, with six physicians who have *never* rendered a finding that any Player is T & P disabled in any year.

compensation from Defendants of $125,000 or more have *never* rendered a finding that any Player is T & P disabled in any year.

119. On the other hand, across 108 T & P evaluations performed by Plan physicians having an average annual Board compensation of $50,000 or less, these Plan physicians have concluded that 25.93% of Players were T & P disabled.

120. As shown in the graph below, the powerful evidence of systematic bias against Players is not an aberration. In the graph below, each dot represents a physician who has evaluated 4 or more Players for T & P disability benefits purposes. The vertical line represents the *average annual* amount of Defendants' compensation to physicians between April 1, 2015 through March 31, 2022, excluding the 2020-21 COVID pandemic year. The horizontal line represents each physician's *overall* T & P disability benefits denial rate across all years.

121. There is a clear pattern and correlation proving that the more Defendants pay physicians in *average* annual compensation, the more likely they are to have a high T & P disability denial rate, and the less likely they are "absolutely neutral," as falsely represented by Defendants.




122. Moreover, despite the high prevalence of neurocognitive impairments in Retired Players as recounted above, *all 14* Defendant-touted "absolutely neutral" neuropsychologists with the highest average annual compensation from Defendants—Dr. Stephen Macciocchi, Dr. Thomas Burns, Dr. Ernest Fung, Dr. Justin O'Rourke, Dr. Janyna Mercado, Dr. Sutapa McNasby-Ford, Dr. Thomas Crum, Dr. Johnny Wen, Dr. Lauren Drag, Dr. Douglas Cooper, Dr. Nicole Werner, Dr. Dean Delis, and Dr. Robert Bornstein, and MAP Dr. William Garmoe—have *never* rendered an opinion that any Player is T & P disabled in any year across the combined 107 T & P disability evaluations they performed in the sample of 784 T & P disability evaluations.

123. On the other hand, the neuropsychologists with an annual average compensation from the Defendants of $50,000 or less concluded that 25% of the Players whom they evaluated were T & P disabled when combining their T & P disability evaluations across all years.




124. Across the 199 total T & P disability evaluations performed by Defendant-compensated neuropsychologists in the sample, only 14 Players in total were deemed T & P disabled by Defendant-compensated neuropsychologists (i.e., an overall 92.96% T & P disability denial rate).

125. Twenty-six out of the 35 Defendant-compensated neuropsychologists who have performed at least one T & P disability evaluation have *never* rendered a conclusion that any Player is T & P disabled in any year, across a combined total of 146 T & P disability evaluations, including the Board's current MAP, Dr. Garmoe.

126. Defendants know or should know that MAP Dr. Garmoe is predisposed to rejecting disability benefits claims and improperly downplaying conditions stemming from traumatic brain injuries. Despite this, Defendants continue to retain him as the MAP. Indeed, they continue to retain him notwithstanding, for example, that in a televised interview on WTTG (the Washington, D.C. FOX affiliate) on December 1, 2014, Dr. Garmoe stated: (i) "One of the things that's

important to know about concussion is that *people are living in fear of them right now* as though there is something that's hidden that's going to explode in their brain and one day they are just going to wake up suicidal or things like that and that is rarely the case."; (ii) "The overwhelming majority of concussions actually heal quite well and don't leave lasting effects."; and (iii) "If you've had a single concussion you've recovered well you don't have to live in fear of something going off in your brain one day and you becoming suicidal or homicidal." (Emphasis added.) The reporter asked the following question: "Injuries still happen and whether it's on the soccer field or the football field I'm sure there are a lot of parents that are saying you know look my kid had a concussion should I be worried now that maybe something will come back in the future that maybe they are not showing signs of now?" Dr. Garmoe replied: "That's a great question the answer to that in almost all cases is no."; and "So for example many of the symptoms of concussion overlap with other types of health conditions such as depression and anxiety."[12] Moreover, in a published opinion affirming the exclusion of his testimony (offered by a murder defendant), Maryland's highest court was "unable to conclude that Dr. Garmoe adequately 'connected the dots,'" holding that "the presence of an 'analytical gap' between the information available to him and Dr. Garmoe's ultimate opinion undermine[d] the validity of this evidence." *Savage v. State*, 166 A.3d 183, 202 (Md. 2017). Despite such a history, including obvious preconceived views, Dr. Garmoe has not been removed as the MAP and, instead, has been rewarded with higher compensation.

127. The Board's highest paid neuropsychologist since 2012 is Dr. Stephen Macciocchi, who has received at least $1,652,800 in compensation from the Board. Dr. Macciocchi's reputation for minimizing concussion symptoms and use of improper race norms in

[12] MedStar National Rehabilitation Network, *WTTG-FOX: Dr. William Garmoe - Neuropsychology and Concussions*, YouTube (Dec. 1, 2014), https://www.youtube.com/watch?v=my3pyLWZ2Io (last accessed May 12, 2023).

Case 1:23-cv-00358-JRR Document 136 Filed 09/22/26 Page 39 of 120

evaluating African-Americans' ailments is evident in his publications, previous statements in court, and marketing materials. For example, he has stated that "sustaining MTBI did not significantly contribute to neuropsychological test performance," and "although undesirable, 2 grade 1 concussions occurring at least 2 weeks apart did not appear to produce significantly greater impairment than a single injury, at least in this population of collegiate football players." Moreover, Dr. Macciocchi's own publications include his stated view that "*African-American race … contributed to lower test performance*"; "[c]onsidering race, ethnicity" "is also essential in post-MTBI test score interpretation"; and that "demographic" "factors explain more in variance in neuropsychological test scores than MTBI.

128. Furthermore, marketing materials for a 2016 seminar featuring Dr. Macciocchi as a panelist had the stated aim of "defending psychological injury claims and mild traumatic brain injury claims in the wake of DSM V." Dr. Macciocchi is introduced in the promotional materials as "a significant researcher and writer in the field of mTBI who also is a lead reviewer for the NFL in their concussion litigation. The panel will inform on *ways to defeat or mitigate these claims based on current science and explore how best to convince a jury that a plaintiff's brain is hard boiled and not scrambled*." (Emphasis added.) Given his biases, it is not surprising that, in the sample of 14 T & P disability evaluations that he performed, Dr. Macciocchi found *no* Player to be T & P disabled (i.e., a 100% denial rate).

129. The six highest Defendant-compensated neuropsychologists from April 1, 2021 through March 31, 2022 were Dr. Thomas Burns, Dr. Dr. Ernest Fung, Dr. Dean Delis, Dr. Douglas Cooper, Dr. Nicole Werner, and Dr. Justin O'Rourke. All six of those Defendant-compensated and Defendant-touted "absolutely neutral" neuropsychologists received at least $258,000 in compensation for that one-year period and have *never* rendered a conclusion that any Player is T

& P disabled in any year. Defendants' highest-compensated neurologist that same year, Dr. Barry McCasland, who received $373,000 for that year, has similarly *never* rendered a conclusion that any Player is T & P disabled in any year, across 24 total T & P disability evaluations.

130. The four highest Defendant-compensated neuropsychologists in the COVID pandemic year (April 1, 2020 through March 31, 2021) were Dr. Garmoe, Dr. Steven Macciocchi, Dr. Cooper, and Dr. Werner. All four of those Defendant-touted "absolutely neutral" neuropsychologists received at least $194,000 in compensation from Defendants for that year and, similarly, have *never* found that any Player is T & P disabled in any year. Defendants' highest-compensated psychiatrist that same year, Dr. Martin Strassnig, has likewise *never* rendered a finding that any Player is T & P disabled in any year, across 15 total T & P disability evaluations.

131. The four highest Defendant-compensated neuropsychologists in the year running from April 1, 2019 through March 31, 2020 were Dr. Macciocchi, Dr. Delis, Dr. Garmoe, and Dr. Janyna Mercado. All four of those Defendant-touted "absolutely neutral" neuropsychologists have *never* rendered a conclusion that any Player is T & P disabled in any year, across 49 total T & P disability evaluations they performed in the sample of 784 evaluations.

132. The three highest Defendant-compensated neuropsychologists in the year running from April 1, 2018 through March 31, 2019 were Dr. McNasby-Ford, Dr. Macciocchi, and Dr. Delis. All three of those Defendant-touted "absolutely neutral" neuropsychologists received at least $217,500 in compensation for that specific year and have *never* rendered a conclusion that any Player is T & P disabled in any year, across 40 total T & P disability evaluations they performed in the sample of 784 evaluations.

133. The five highest Defendant compensated neuropsychologists in the year running from April 1, 2017 through March 31, 2018 were Dr. McNasby-Ford, Dr. Mercado, Dr.

Macciocchi, Dr. Wen, and Dr. Garmoe. All five of those Defendant-touted "absolutely neutral" neuropsychologists received at least $191,500 in compensation for that year and have *never* rendered a conclusion that any Player is T & P disabled in any year, across 47 total T & P disability evaluations they performed in the sample of 784 evaluations.

134. The five highest Defendant-compensated neuropsychologists in the year running from April 1, 2016 through March 31, 2017 were Dr. Wen, Dr. Macciocchi, and Dr. McNasby-Ford. All three of those Defendant-touted "absolutely neutral" neuropsychologists received at least $172,000 in compensation for that specific year and have *never* found that any Player is T & P disabled in any year, across 34 total T & P disability evaluations they performed in the sample of 784 evaluations. Defendants' two highest-compensated orthopedists that same year, Dr. Herndon Murray and Dr. David Apple, have similarly *never* found that any Player is T & P disabled in any year, across 15 total T & P disability evaluations they performed in the sample of 784 evaluations. Defendants' highest-compensated neurologist that same year, Dr. McCasland, who received $307,000, has, as noted above, likewise *never* rendered a conclusion that any Player is T & P disabled in any year, across 24 total T & P disability evaluations.

135. The four highest Defendant-compensated neuropsychologists from April 1, 2015 through March 31, 2016 were Dr. Macciocchi, Dr. Wen, Dr. Garmoe, and Dr. Delis. All four of those Defendant-touted "absolutely neutral" neuropsychologists have *never* found that any Player is T & P disabled in any year, across 54 total T & P disability examinations they performed in the sample of 784. Defendants' highest-compensated neurologist that same year, Dr. McCasland, has, as noted above, *never* found that any Player is T & P disabled in any year, across 24 total T & P disability evaluations.

136. As shown in the graphs below, the powerful evidence of systematic bias, and misinformation that "Neutral Physicians" are "absolutely neutral" in ERISA-mandated disclosures. are not aberrations. Each dot represents a physician who has evaluated 4 or more Players for T & P disability benefits purposes. Moreover, the vertical line in each graph below represents the *amount* of Defendants' compensation to the physicians *each* year between April 1, 2015 through March 31, 2022, excluding the 2020-21 COVID pandemic year. The horizontal line represents that Board physician's overall T & P denial rate across all years.

137. In each year, there is a clear pattern and correlation, demonstrating that the more Defendants pay a physician, the more likely the physician is to have a high T & P disability benefits denial rate, and the less likely the physician is to be "absolutely neutral," as falsely represented by Defendants.

138. Although the Board has a practice of touting to Players in ERISA-mandated disclosures that its hired physicians are "absolutely neutral" in this process, a large statistical sample of T & P disability evaluations that included Class member benefit records shows that the Board's disclosures are misleading, inaccurate, and harmful to Plaintiffs' and absent Class members' rights to accurate information, full and fair review, and plan-wide integrity of the claims process.




139. Over all years, only 1.21% of Players were found T & P disabled by the physicians paid $137,000 or more by the Board from March 31, 2015 through April 1, 2016. In contrast, 20.27% of Players were found T & P disabled by Board-hired physicians who were paid below $60,000 that year.




140. Over all years, only 4.494**%** of Players were found T & P disabled by the physicians paid $200,000 or more by the Board from March 31, 2016 through April 1, 2017. In contrast, 20% of Players were found T & P disabled by Board-hired physicians who were paid between $12,000 and $50,000 that year.




141. Over all years, 0% of Players were found T & P disabled by the physicians paid $250,000 or more by the Board from March 31, 2017 through April 1, 2018. Also, over all years, only 4.123% of Players were found T & P disabled by physicians paid $190,000 or more by the Board from March 31, 2017 through April 1, 2018. In contrast, 20.1% of Players were found T & P disabled by Board-hired physicians who were paid $86,000 or less that year.




142. Over all years, only 3.703% of Players were found T & P disabled by physicians paid $210,000 or more by the Board from March 31, 2018 through April 1, 2019. In contrast, 30.9% of Players were found T & P disabled by Board-hired physicians who were paid $60,000 or less that year.




143. Over all years, only 4.123% of Players were found T & P disabled by the physicians paid $210,000 or more by the Board from March 31, 2019 through April 1, 2020. In contrast, 22.14% of Players were found T & P disabled by Board-hired physicians who were paid between $22,000 and $60,000.




144. Finally, in the year running from April 1, 2021 through March 31, 2022, 9 out of the 10 highest-compensated physicians that year have *never* rendered a conclusion that any Player is T & P disabled in any year. The only one out of those 10 highest-compensated physicians who has found a Player T & P disabled is neurologist Dr. Eric Brahin, who nonetheless has an overall 88.57% T & P disability denial rate across 35 total T & P disability examinations in the statistical sample.[13] In contrast, 23.91% of Players were found T & P disabled by Board physicians who were paid $60,000 or less that year.

145. Of the 784 T & P disability evaluations, 45.4% were performed by Defendant-compensated physicians having an overall 100% T & P disability denial rate. Also, 64.16% of

[13] Even among the mere four Players whom Dr. Brahin found T & P disabled on the basis of neurological ailments, the Board ultimately rejected his conclusion in the case of two of those Players.

those evaluations were performed by Defendant-compensated physicians having an 85% or higher T & P disability denial rate.

146. The statistical sample shows that although 118 different Board-compensated physicians performed at least one T & P disability evaluation, 57.63% of those physicians (i.e., nearly three out of five) have a 100% overall T & P disability denial rate.

**J. <u>Plaintiffs' Applications for Benefits</u>**

**<u>Plaintiff Lance Zeno</u>**

147. Plaintiff Lance Zeno is a resident of Huntington Beach, California.

148. Plaintiff Zeno played the particularly vulnerable position of center in the NFL. Not surprisingly, he suffered multiple concussions and head trauma from football activities.

149. Plaintiff Zeno applied for NC benefits on September 17, 2020. In connection with his application, Mr. Zeno was evaluated by Board-paid neuropsychologist Dr. Delis. The Board has paid Dr. Delis at least $1,407,120 in total compensation, with average annual compensation of $135,712.

150. In a sample of 66 total benefit evaluations that he rendered, Dr. Delis concluded that 92.42% of the Players were not entitled to the applied-for benefit. This sample of 66 Player evaluations by Dr. Delis includes a 100% T & P disability denial rate, involving 22 T & P disability evaluations that he rendered, and a 100% LOD denial rate, involving 14 LOD evaluations that he rendered.

151. The Board knows that, having collected more than $1.4 million from the Plan, Dr. Delis benefits financially from doing repeat business with the Board. It follows that the Board knows that Dr. Delis has an incentive to provide it with reports that will increase the chances that the Board will frequently return to him in the future—in other words, that he will render biased, result-oriented reports upon which the Board can rely in its decisions to deny benefits.

152. Dr. Delis has authored or co-authored publications that downplay the effects of traumatic brain injuries or attempt to shift those effects to other, non-cognitive causes. For example, a 2011 publication co-authored by Dr. Delis concluded that the authors' "findings suggest that, among individuals in early recovery from mild to moderate TBI, self-reported depressive symptoms, rather than patients' cognitive complaints, are associated with objective executive function." Not surprisingly, in 2011, the Board hired Dr. Delis to evaluate cognitive impairments. Also, Dr. Delis has previously expressed the belief "that it would be rare for an individual to be left with even mild cognitive deficits following a mild concussion."

153. As was the case with many Players whom he evaluated, Dr. Delis concluded that Mr. Zeno was not entitled to the NC benefit in a flawed and inadequate report that contained numerous inconsistencies. For example, Dr. Delis' conclusion was that Mr. Zeno showed "no" evidence of even mild acquired neurocognitive impairment. Several of Mr. Zeno's test scores, however, were described by other Board physicians for other Players (as well as Board physicians on Plaintiff Zeno's appeal) as showing mild impairments. Moreover, although Dr. Delis downplayed the significance of even his own tests results demonstrating mild impairments on specific tests, he inconsistently explained in another report that those specific tests are "sensitive to acquired brain damage." According to Dr. Delis, Mr. Zeno's "only risk factor for having permanent, acquired neurocognitive impairment appear[ed] to be the multiple concussions that he sustained while playing football." Both Dr. Delis and the Board-hired neurologist who evaluated Plaintiff Zeno (Dr. Laura Desadier), however, jointly concluded that Plaintiff Zeno showed "no" evidence of even mild acquired neurocognitive impairment—despite the fact that both Dr. Delis' testing and Plaintiff Zeno's submitted medical reports demonstrated the presence of cognitive

Case 1:23-cv-00358-JRR Document 136 Filed 01/22/26 Page 51 of 120

impairments. The Board has not removed Dr. Delis from its network of Neutral Physicians.

154. The Committee denied Plaintiff Zeno's application in a decision that was based on the inadequate report of Dr. Delis. In its December 1, 2021 denial letter, the Committee claimed that it had reviewed his application, the Neutral Physician reports, and the other materials in his file. It asserted that "reached its decision despite the potentially conflicting evidence" in records that he had submitted in support of the application. The Committee reasoned that it relied on Dr. Delis' findings because he is "absolutely neutral in this process."

155. In his appeal to the Board, filed on April 28, 2022, Mr. Zeno provided evidence that he had received a Qualifying Diagnosis of Level 1 Neurocognitive Impairment (i.e., moderate impairment in two or more cognitive domains among other criteria) through the *NFL Concussion* settlement with a November 16, 2017 date of diagnosis, and that the Board-hired physicians who had examined him in connection with his NC benefits application had rendered inadequate conclusions inconsistent with the impairments they found. The Board-hired neuropsychologist Dr. Drag and neurologist Dr. Selena Ellis who evaluated Plaintiff Zeno in connection with his appeal had only recently been hired by the Board, sometime between 2020 and March 2021, and therefore had not been paid substantial sums from the Board at that time. Those two Board-hired physicians jointly concluded after evaluating Plaintiff Zeno that he did, in fact, show objective evidence of acquired mild neurocognitive impairment as defined by the Plan. Both Board-hired physicians on appeal unambiguously concluded that Plaintiff Zeno's neurocognitive impairments were *not* "likely secondary to a primary psychiatric problem or substance use/abuse problem."

156. The Board issued a letter in connection with the appeal on August 31, 2022. In its decision letter, the Board stated that it planned to send Plaintiff Zeno's case to MAP physicians

for a record review and final decision on the sole issue of whether he suffers from a mild cognitive impairment.

157. MAP neuropsychologist Dr. Garmoe, whose predisposition towards denying benefits claims and compensation history are recounted in Section IV.I above, performed a record review of Plaintiff Zeno's benefits claim. Defendants have provided Dr. Garmoe at least $1,351,000 in compensation, and in a sample of three Players whom he evaluated for T & P or LOD benefits purposes, Dr. Garmoe found none qualified.[14]

158. The Board knows that Dr. Garmoe benefits financially from doing repeat business with it, having collected more than $1.35 million from the Board. It follows that the Board knows that Dr. Garmoe has an incentive to provide it with reports that will increase the chances that the Board will frequently return to him in the future— in other words, that he will render biased, result-oriented reports upon which the Board can rely in its decisions to deny benefits.

159. Dr. Garmoe dismissed unanimous findings and, instead, contended in the MAP report that Plaintiff Zeno's objective impairment "might relate to other factors, and does not appear indicative of neurocognitive impairment." He did not explain in his MAP report what those "other factors" might be. Notably, none of the other physicians concluded in their reports that "other factors" could be a factor in Plaintiff Zeno's test results, and therefore, this was not a medical issue in dispute for the MAP to decide. *See* Plan § 9.3(a). Moreover, in his MAP report, Dr. Garmoe

[14] Two of those three Players whom Dr. Garmoe not qualified for Plan benefits received a Notice of Monetary Award in the *NFL Concussion* settlement for a Level 1.5 Neurocognitive Impairment (i.e., early dementia with moderate to severe cognitive impairment in two or more cognitive domains among other criteria). Moreover, although the Plan's terms state that a Player will be denied NC benefits if he fails two or more validity indices, Dr. Garmoe previously admitted to the Board as part of a T & P disability MAP evaluation that "many individuals with dementia will fail validity indices." Thus, many Players applying for the NC benefit because of dementia will ironically be deemed ineligible for the NC benefit *because* of their dementia.

asserted that "[w]ith regard to the conclusion that there is mild language impairment, our analysis does not find … a declining pattern." Dr. Garmoe inconsistently stated in the next line of his report, however, that Plaintiff's Zeno's performance on a cognitive test "declined" and, one line later, that Plaintiff Zeno "showed a mild reduction across two assessments." Also, with respect to his scores on the Montreal Cognitive Assessment ("MoCA") test, Dr. Garmoe dismissed the objective evidence of a language impairment as a "trivial error," without providing any explanation as to why it was "trivial." In response to the MAP report, Plaintiff Zeno's counsel presented the Board with a Notice of Monetary Award of Neurocognitive Impairment Level 1.5 (i.e., early dementia) from the *NFL Concussion* settlement, with a date of diagnosis of December 28, 2020.

160. In its final denial letter, issued on November 22, 2022, the Board stated that the MAPs concluded that Plaintiff Zeno did not show evidence of an acquired neurocognitive impairment because his impairment might relate to other non-cognitive factors. Moreover, the Board affirmatively represented that, at its November 9, 2022 meeting, it had reviewed the administrative record. The Board specified in its denial letter that the "Neutral Physicians are instructed to (and do) evaluate Players fully, fairly, and without bias for or against the Player"; that "neutral evaluations are typically accepted and relied upon" by the Board; and that the "Board ha[d] no doubt that the Plan's Neutral Physicians fully understand the obligation to conduct fair and impartial Player evaluations." The Board added that it "wish[ed] to reassure" Mr. Zeno that Neutral Physicians "have no incentive to hurt or help Players," and that "[s]ubstantial effort and resources have been committed to ensure that every Player is fully and fairly evaluated."

**<u>Plaintiff Willis McGahee</u>**

161. Plaintiff Willis McGahee is a resident of Davie, Florida.

162. Plaintiff McGahee played in the NFL for eleven years as a running back.

163. Plaintiff McGahee applied for T & P disability benefits in 2016.

164. In connection with his application, Plaintiff McGahee was evaluated by neurologist Dr. McCasland. The Board has compensated Dr. McCasland at least $1,842,500, with an average annual compensation of $220,938, both of which represent the highest compensation among all Board-compensated neurologists. In five different years, Dr. McCasland was the Board's highest-compensated neurologist that year, including the most recent Plan year, in which he was paid a staggering $373,000.

165. In a sample of 37 T & P and LOD disability evaluations that he conducted, Dr. McCasland found *no* Player to be entitled to either benefit. The Board knows that, having collected more than $1.8 million from the Board, Dr. McCasland benefits financially from doing repeat business with it. It follows that the Board knows that he has an incentive to provide it with reports that will increase the chances that the Board will frequently return to him in the future—in other words, that he will render biased and result-oriented reports upon which the Board may rely in decisions to deny benefits. In *Mickell v. Bert Bell/Pete Rozelle NFL Ret. Plan*, 832 F. App'x at 589, the Court noted that, by his own admission, Dr. McCasland had reviewed only "certain" medical records before rendering his opinion.

166. In the same year that he was hired by Defendants, Dr. McCasland expressed his incorrect, medically unsound belief in a deposition that "if somebody has progressively worsening and worsening and worsening symptoms, it just can't be due to a concussion. That isn't what concussions do." Dr. McCasland also confirmed that through January of 2012 "a hundred percent" of his "witness work was for defendants, insurance companies or defense lawyers." Not surprisingly, Dr. McCasland asserted that Plaintiff McGahee was not T & P disabled in a flawed report wherein he failed to discuss whether Mr. McGahee was T & P disabled from the cumulative

impact of all of his impairments, and incorrectly stated that Mr. McGahee was unimpaired on two cognitive tests, despite examination results showing cognitive impairment (e.g., drawing a clockface showing eleven past ten o'clock when instructed to draw ten past eleven o'clock). Moreover, Dr. McCasland asserted in his Physician Report Form ("PRF")[15]: "What is the nature of the impairment? None." He rendered this opinion in the face of statements in his own report that Mr. McGahee had several impairments.

167. In connection with his T & P benefits application, Plaintiff McGahee was also evaluated by a neuropsychologist, Dr. Rodney Vanderploeg, who opined that Mr. McGahee was not T & P disabled. The Board has paid Dr. Vanderploeg at least $1,127,500. In a sample of 19 Players whom he evaluated for T & P disability or NC benefits purposes, Dr. Vanderploeg found only two Players qualified (i.e., an 89.5% denial rate). Dr. Vanderploeg failed to consider whether Plaintiff McGahee was T & P disabled from the cumulative impact of his impairments. Moreover, he improperly considered Mr. McGahee's "demographic background" when estimating Mr. McGahee's premorbid IQ. The Committee denied Plaintiff McGahee's application on August 8, 2016. In its denial letter, the Committee did not identify the materials it had considered.

168. In 2020, Plaintiff McGahee reapplied for T & P disability benefits, in connection with which he was evaluated by Board-paid neurologist Dr. George Diaz, who opined that Mr. McGahee was not T & P disabled. A sample of five T & P disability evaluations that he conducted, Dr. Diaz found that *no* Player qualified (i.e., a 100% denial rate). Dr. Diaz's report was inadequate evidence upon which to base a decision. For example, although prohibited by the terms of the

[15] The Board requires that "Neutral Physicians" fill out a PRF, which contains Board-standardized questions for each particular benefit evaluation performed by a Neutral Physician. Generally, Physicians also submit their own narrative report as well behind the completed PRF.

Plan from considering training, Dr. Diaz alleged that Plaintiff McGahee could perform "[a]ny employment he is trained to do." Also, he checked off that the cause of his "concussions" was "illness," "other," and "unknown," instead of "injury."

169. Plaintiff McGahee was also evaluated in connection with his T & P disability claim by Dr. Strassnig. the Board's highest-paid psychologist from April 1, 2020 through March 31, 2021, and who received $142,000 in compensation from the Board the following year. A sample of 15 Players whom he evaluated for T & P disability benefits purposes shows that Dr. Strassnig found *none* T & P disabled (i.e., a 100% denial rate). Not surprisingly, Dr. Strassnig opined that Mr. McGahee was not T & P disabled while unreasonably dismissing self-reported complaints, including "very severe depression." Mr. McGahee was also evaluated by Board-hired neuropsychologist Dr. Thomas Crum, who likewise opined that Mr. McGahee was not T & P disabled, despite Mr. McGahee having expressed "thoughts that he would be better off dead," and experiencing substantial dysfunction with daily tasks. Dr. Crum failed to address the combined impact of Mr. McGahee's impairments and in estimating Mr. McGahee's premorbid IQ, Dr. Crum considered Mr. McGahee's "demographic." A sample of three T & P disability benefits evaluations performed by Dr. Crum showed that he found no Player qualified (i.e., a 100% denial rate). Dr. Crum was rewarded with $168,000 in Plan compensation the following year.

170. In a denial letter dated March 3, 2021, the Committee represented that it had reviewed Mr. McGahee's application and all other materials in his file. The Committee failed to address Plaintiff McGahee's claim that the cumulative effect of his ailments rendered him T & P disabled. The decision was based on the flawed Neutral Physician reports.

171. Plaintiff McGahee timely appealed to the Board. On appeal, he was evaluated by Board-paid psychiatrist Dr. Matthew Norman, who has received Board compensation of at least

$884,000. A sample of 33 Player evaluations rendered by Dr. Norman showed that he found 31 of 33 players not to be disabled (i.e., a 93.94% denial rate). Dr. Norman failed to address whether Mr. McGahee was T & P disabled from the cumulative impact of his impairments. Plaintiff McGahee was also evaluated by Board-paid orthopedist Dr. Herndon Murray, who likewise opined that Mr. McGahee was not T & P disabled. The Board has paid Dr. Murray at least $1,110,247. Not surprisingly, a sample of 10 Player T & P disability evaluations that he performed showed that Dr. Murray found no Player to qualify (i.e., a 100% denial rate). By his own admission, Dr. Murray did not consider the combined impact of Mr. McGahee's impairments and discounted his self-reported symptoms.

172. Mr. McGahee was also evaluated on appeal by Board-paid neurologist Dr. Matthew Gwynn, who opined that Mr. McGahee was not T & P disabled. In a sample of six Player benefit evaluations that he rendered, Dr. Gwynn found no Player qualified. Although he asserted that Plaintiff McGahee could perform "[a]nything that he is qualified for by an orthopedist," Dr. Gwynn failed to review the report of an orthopedist, Dr. Murray. He also dismissed Plaintiff McGahee's self-reported symptoms and even his own objective evidence and admission that Plaintiff McGahee's MoCA score indicated cognitive impairment. Mr. McGahee was also evaluated by Board-paid neuropsychologist Dr. Jason King, who found no Player T & P disabled out of three evaluations in the sample that he rendered. Although noting that Plaintiff McGahee suffered from "clinically significant depression" and required frequent shifts of position due to pain, Dr. King opined that Plaintiff McGahee was not T & P disabled. Dr. King failed to consider whether Plaintiff McGahee was T & P disabled from the combined impact of his impairments, and he gave little to no weight to Plaintiff McGahee's self-reported symptoms.

173. The Board issued a final denial letter on November 22, 2022. In its letter, the Board represented that it had reviewed the entire record but failed to address the cumulative effect of Plaintiff McGahee's conditions, which he had listed as a T & P disabling condition on his application, believing that it would be considered. Moreover, the Board represented that it "found no deficiencies or inaccuracies in the Neutral Physicians' reports," and insisted that "the Plan's physicians are absolutely neutral in this process" and that it "ha[d] no doubt that Plan's Neutral Physicians fully understand the obligation to conduct fair and impartial evaluations." Despite their representations to the contrary in decisions such as that in Mr. McGahee's case, Board members testified in *Cloud* that they have a practice of not actually reviewing all of the evidence submitted.

**Plaintiff Michael McKenzie**

174. Plaintiff Michael McKenzie is a resident of Prairieville, Louisiana.

175. Plaintiff McKenzie played in the NFL for 11 years.

176. Mr. McKenzie applied for T & P disability benefits in December 2018, in connection with which he was evaluated by Board-paid orthopedist Dr. Paul Saenz, who has received Plan compensation of at least $1,225,143. Not surprisingly, in a sample of 18 T & P disability evaluations that he rendered, Dr. Saenz found *no* Player to be T & P disabled (i.e., a 100% denial rate). Dr. Saenz unreasonably dismissed Mr. McKenzie's self-reported symptoms and his flawed report contained inconsistencies, making it an inadequate basis for a claim determination. For example, although Mr. McKenzie stated that his chronic back pain was "aggravated with changes in position," Dr. Saenz concluded that Mr. McKenzie was capable of performing a job with "changes in position." Also, although Dr. Saenz reported a "chronic cervical strain" "[r]esult[ed] [f]rom" an "[u]nknown" cause, at the same time he found the disabilities

"causally related to injuries sustained during this player's course of employment within the [NFL]."

177. Plaintiff McKenzie was also evaluated by Board-paid neurologist Dr. Brahin, who concluded that Mr. McKenzie was not T & P disabled. Due to the severity of Mr. McKenzie's conditions, and the added physical and mental health stressors resulting from being forced to travel long distances for numerous examinations over a short period of time, Dr. Brahin terminated his examination of Mr. McKenzie early due to "serious psychiatric issues" that arose, which warranted "emergent psychiatric" care.

178. Dr. Brahin has received at least $1,711,000 in Board compensation and has a history of conducting inadequate examinations and rendering questionable opinions about concussions. For example, in *Colvin v. 88 Board, Joint Board of Trustees for 88 Plan*, No. SA-17-CV-974-XR, 2018 WL 1756738, at *2 (W.D. Tex. Apr. 11, 2018), the court noted the plaintiff's treating physician's observation that Dr. Brahin had "conducted only a short meeting" with the plaintiff there and that Dr. Brahin's report contained "many factual errors." Additionally, Dr. Brahin has previously stated his questionable position that "[p]osttraumatic encephalopathy, or memory loss/cognitive symptoms due to a traumatic brain injury, is immediate and either remains static or improves over time. Cognitive symptoms that begin days, weeks, or months after an accident are not consistent with posttraumatic encephalopathy." *Gabriel Castillo v. Webber LLC.*, No. DC-17-16837, Tex.-Dallas [101st Dist.], filed Dec. 8, 2017. Not surprisingly, a sample of 74 benefit evaluations rendered by Dr. Brahin shows that he found 67 Players not to qualify for the applied-for benefit (i.e., a 90.54% denial rate).

179. Plaintiff McKenzie was also evaluated by Board-paid neuropsychologist Dr. Janyna Mercado, who concluded that he was not T & P disabled, despite also finding that "based

Case 1:23-cv-00358-JRR Document 136 Filed 07/22/26 Page 61 of 121

on Mr. McKenzie's fragile psychological state, *it is not likely that he would be able to maintain employment*." (Emphasis added.) Dr. Mercado has averaged annual compensation of $211,000 from the Board. Not surprisingly, a sample of 14 benefit evaluations for T & P disability or LOD benefits purposes shows that Dr. Mercado found that *none* of the Players qualified for the applied-for benefit (i.e., a 100% denial rate). Dr. Mercado's flawed report, containing inconsistencies, was an inadequate basis for a claim determination. For example, she alleged that Mr. McKenzie had "invalid test results on the TOMM [Test of Memory Malingering]" and labeled his score of 45 on TOMM trial 2 as "suspect." According to the test manual, though, a score of 45 on the TOMM does *not* indicate the possibility of malingering. Also, although she conceded that "it is not likely that [Mr. McKenzie] would be able to maintain employment," the Committee nonetheless stated in its letter denying Mr. McKenzie's application that "the Plan's neutral physicians … independently concluded that [Mr. McKenzie is] capable of employment." Neither the Committee in its initial decision letter nor Groom in its summary sheet mentioned that McKenzie had claimed T & P disability in his application based on the cumulative impact of his impairments. The Committee also stated in its initial decision letter that it had reviewed Mr. McKenzie's materials in his file and did *not* disagree with the medical records he had submitted.

180. Plaintiff McKenzie appealed the Committee's denial to the Board on August 7, 2019. In connection with his appeal, he was evaluated by Dr. Norman, whose lush Board compensation and history of rendering flawed and biased opinions are recounted above. Dr. Norman's report contained inconsistencies, making it an inadequate basis for a claim decision. For example, Dr. Norman unreasonably discounted "severe depressive symptoms" and "[d]epressed mood most of the day, nearly every day," asserting that "[d]espite his reported symptoms and

Case 1:23-cv-00358-JRR Document 136 Filed 09/22/26 Page 62 of 121

concerns, Mr. McKenzie did not exhibit sufficient objective symptoms." He opined that Mr. McKenzie was not T & P disabled but failed to discuss the overall impact of his impairments.

181. Mr. McKenzie was also evaluated on appeal by Dr. McCasland, whose lush seven-figure compensation from the Board and history of rendering flawed opinions adverse to Players seeking benefits are recounted above. Dr. McCasland opined that Mr. McKenzie was not T & P disabled and expressed his preordained view, remarking that "[t]he likelihood of any headache disorder constituting a total disability … is practically zero." That opinion was inconsistent with prior interpretations of even the Board's own MAP, who has previously determined other Players to be T & P disabled due to headache disorders. Dr. McCasland failed to discuss whether Mr. McKenzie was T & P disabled from the overall impact of his impairments, and he discounted and dismissed both self-reported symptoms and objective evidence of cognitive impairment.

182. Plaintiff McKenzie was also evaluated by Board neuropsychologist Dr. Macciocchi, whose lush seven-figure compensation from the Board, and predilection for minimizing concussion symptoms and use of improper race norms in evaluating African-Americans are recounted above. Not surprisingly, Dr. Macciocchi concluded that Plaintiff McKenzie was not T & P disabled. His flawed report demonstrated bias and inconsistency with the terms of the Plan and was an inadequate basis for a claim decision. For example, although the Plan's terms state that "educational level … will not be considered in determining" T & P disability entitlement, Dr. Macciocchi alleged that Mr. McKenzie could perform an "occupation consistent with educational and experiential background and interest." Also, Dr. Maccioccchi applied

discriminatory race norms to Mr. McKenzie's neuropsychological tests,[16] and he failed to consider whether Plaintiff McKenzie was T & P disabled from the combined impact of his impairments.

183. Mr. McKenzie was also evaluated by Board-paid orthopedist Dr. Virgil Medlock, who concluded that he was not T & P disabled. Dr. Medlock was paid at least $619,500 from the Board. Not surprisingly, a sample of nine Players whom he evaluated for T & P disability benefits purposes shows that Dr. Medlock found *none* of them T & P disabled (i.e., a 100% denial rate). Dr. Medlock unreasonably dismissed Plaintiff McKenzie's complaints of pain.

184. In its final appeal denial letter dated November 22, 2019, the Board contended that it had reviewed the administrative record in deciding Mr. McKenzie's appeal, but it failed to address the overall effect of his ailments, which had been listed on his T & P disability benefits application as a disabling condition.

185. Plaintiff McKenzie applied again for T & P disability benefits in April 2021, in connection with which he was evaluated by Board-paid neurologist Dr. Clark. Dr. Clark concluded that Mr. McKenzie was not T & P disabled, despite reporting that Mr. McKenzie's migraines were partially disabling, noting that Mr. McKenzie's psychiatric status appeared to be "totally" disabling, and adding that "[t]he evidence overall suggest[ed that] his cognitive problems [we]re directly related to his psychiatric condition." Plaintiff McKenzie was also evaluated by Board-

---

[16] In the *NFL Concussion* settlement, the parties negotiated modifications to the settlement agreement that proscribe the use of race norms and demographic estimates based on race from the settlement program. *See In re Nat'l Football League Players' Concussion Injury Litig.*, No. 2:12-md-02323-AB (E.D. Pa. Mar. 4, 2022) (ECF No. 11648) (order approving modifications). Just a few months earlier, in a December 2021 position paper, the American Academy of Clinical Neuropsychology had called for the "elimination of race as a variable in demographically-based normative test interpretation." https://theaacn.org/wp-content/uploads/2021/11/AACN-Position-Statement-on-Race-Norms.pdf (last accessed May 12, 2023).

paid neuropsychologist Dr. Neal Deutch. A sample of 24 Player evaluations rendered by Dr. Deutch shows that he found 87.5% of them not disabled.

186. The Committee issued a decision denying Mr. McKenzie's application. It failed to mention that he claimed benefits based on the cumulative impact of his impairments. Crucially, the Committee made no mention of Dr. Clark's cumulative finding that Plaintiff McKenzie appeared *totally* disabled to the extent that psychiatric factors were considered. In its decision letter, the Committee represented that it had "considered *all* of the medical records you submitted and referenced in support of your application." (Emphasis added.)

187. Mr. McKenzie appealed the Committee's denial to the Board on December 28, 2021, in connection with which he was evaluated by Dr. Strassnig, whose history of rendering inadequate opinions adverse to Players is recounted above. At odds with other evidence concerning Mr. McKenzie's mental state, Dr. Strassnig provided a conclusory assertion that Mr. McKenzie had "[n]o psychiatric restrictions or limitations to gainful employment." Dr. Strassnig did not, however, consider the cumulative impact of Mr. McKenzie's ailments. He detailed his deference to the Plan physicians who had examined Mr. McKenzie in connection with his initial application. Plaintiff McKenzie was also evaluated by Board-paid neuropsychologist, Dr. Laura Lacritz, who likewise opined that he was not T & P disabled. A sample of six Player evaluations that she performed shows that she found no Player qualified for benefits (i.e., a 100% denial rate). Dr. Lacritz failed to consider the combined impact of Mr. McKenzie's impairments.

188. Mr. McKenzie was also evaluated by Board-paid orthopedist Dr. Hussein Elkousy, who has received at least $1,276,076 in compensation from the Board. Not surprisingly, a sample of nine Player T & P disability evaluations performed by Dr. Elkousy shows that he found eight of those Players not T & P disabled (i.e., an 88.89% denial rate). Dr. Elkousy opined that

Mr. McKenzie was not T & P disabled, but his flawed report was inconsistent and contained errors, including that he failed to consider the cumulative impact of Mr. McKenzie's ailments, unreasonably ignored self-reported chronic pain, and presented conclusions that could not be reconciled with those in other medical reports. For example, Dr. Elkousy reported that Plaintiff McKenzie's lumbar spine was allegedly normal and that his x-rays demonstrated only "mild degenerative changes." Yet, those findings are at odds with even Dr. Saenz's 2019 x-ray finding of "moderate degenerative disc disease" with "retrolisthesis … and appreciable foraminal narrowing," and Dr. Saenz's diagnoses of permanent lumbar herniated nucleus pulpous and a marked decrease of range of motion. Also, Dr. Elkousy's knee x-ray finding of only "mild" DJD was inconsistent with Dr. Saenz's 2019 x-ray finding of "marked" DJD.

189. The Board issued a decision denying Plaintiff McKenzie's appeal on June 6, 2022. In its denial letter, the Board erroneously stated that Mr. McKenzie was ineligible for NC benefits, even though he had applied only for T & P disability benefits. Although the Plan precludes the Board's reliance on the same advisors upon which the Committee has relied, the Board stated in its letter that it had based its denial on the opinions of all eight Neutral Physicians. The Board maintained that it had reviewed all of the records in Mr. McKenzie's case.

**Plaintiff Charles Sims**

190. Plaintiff Charles Sims is a resident of Rosenberg, Texas.

191. Plaintiff Sims played in the NFL for four years as a running back. Mr. Sims applied for T & P disability benefits in 2020. Although Mr. Sims was deemed T & P disabled, the Committee advised him in its decision letter dated June 11, 2021 that because the members had been deadlocked as to the appropriate classification, he would not receive the Active Football benefit level. Specifically, one member, without explanation, believed that Mr. Sims' condition

had not begun during his NFL career. The Committee omitted that Mr. Sims had also applied for T & P disability benefits on the basis of the combined impact of his NFL football play-related impairments.

192. On December 7, 2021, Plaintiff Sims appealed the Committee's refusal to award him Active T & P disability status to the Board, pointing out that the physician who deemed him T & P disabled reported that his conditions had started while he was an Active Player. Also, Mr. Sims submitted additional medical records, including team records discussing that his conditions had arisen while he was an active player.

193. Although the Plan rules for Active T & P disability benefits do not contain an objective evidence standard, and despite the uncontradicted objective evidence, the MAP who reviewed Plaintiff Sims' claim file, Dr. Riggio, faulted Mr. Sims because his conditions were "primarily via self-report with some corroboration from his wife, and while important, lack[ed] objective data to sustain the claim." Based on this flawed report, the Board issued a final decision on Mr. Sims' claim on June 3, 2022, contending that Mr. Sims' "file contain[ed] no evidence that [his] disability arose while an Active Player." The Special Rules of Section 3.5 of the Plan were not cited or referenced in the Board's decision. Contrary to the Plan's terms and omitted from the decision letter was the clandestine interpretation that the Board has applied. In the *Cloud* action, Board members testified that it was their understanding that Active Football T & P disability benefits are intended only for cases where Players suffer a catastrophic injury, such as a paralyzing collision, during a game.

**Plaintiff Jamize Olawale**

194. Plaintiff Jamize Olawale is a resident of Southlake, Texas.

Case 1:23-cv-00358-JRR Document 136 Filed 07/22/25 Page 66 of 120

195. Plaintiff Olawale played in the NFL for eight credited seasons. He applied for T & P disability, LOD disability, and NC benefits in March 2021, in connection with which he was evaluated by Dr. Saenz, whose lush, seven-figure compensation from the Board, biased history, and flawed reports are recounted above. Dr. Saenz incorrectly stated that Mr. Olawale "was not likely seeking Disability on the basis of orthopedic impairments." He awarded six out of the nine points needed to qualify for LOD (three points each for knee and ankle moderate DJD).

196. Although required to award points for each Plan-listed orthopedic impairment, and although Mr. Olawale suffered from "Lumbar Stress Fracture with Spondylolysis," which is worth three points, Dr. Saenz failed to credit those three points to Mr. Olawale. In his remarks, Dr. Saenz opined that there was radiographic evidence of L5 pars defect/stress fractures with spondylolysis,[17] but he claimed that there was no documentation that it arose during Mr. Olawale's NFL career. On the very next page of his report, however, Dr. Saenz explicitly indicated that Plaintiff Olawale's lumbar spondylolysis was caused by an "injury." Moreover, Dr. Saenz reported "an array of team-maintained injury reports" to Mr. Olawale's lumbar spine. Also, although Mr. Olawale's hip X-ray revealed DJD, Dr. Saenz failed to award three points for that condition.[18] In all, Mr. Olawale would have received the nine points needed to qualify for LOD disability benefits but for Dr. Saenz's opinions that were inconsistent with the Plan's plain terms.

197. Mr. Olawale was also evaluated by Board neurologist Dr. Brahin, whose lucrative compensation from the Board, history of bias, and flawed reports are recounted above. Although Plaintiff Olawale scored 24/30 on the MoCA Test, a grade that is 2 points below normal, Dr.

[17] Notably, the Board's current MAP awarded a different Player three points for "Lumbar Stress Fracture with Spondylolysis" for "L5-S1 pars defect."

[18] A sample of 14 Players whom he evaluated for LOD benefits shows that Dr. Saenz awarded no Player the indicated points for occurrences of lumbar stress fracture or hip DJD.

Case 1:23-cv-01358-JRR Document 126 Filed 05/12/25 Page 67 of 120

Brahin incorrectly marked that Mr. Olawale was unimpaired on a Visuospatial/Executive Functioning test, despite results that showed cognitive impairment. Dr. Brahin concluded that Mr. Olawale was not T & P disabled and did not have even a mild objective cognitive impairment in any cognitive domain to qualify for NC benefits. Even though Mr. Olawale recounted to Dr. Brahin that he had thoughts of suicide as recently as two weeks before the examination, Dr. Brahin noted that Mr. Olawale had no suicidal ideations. Mr. Olawale was also examined by Board-chosen neuropsychologist Dr. Justin O'Rourke. In his first year of performing evaluations for the Board, Dr. O'Rourke was compensated $258,000. A sample of 10 Players evaluated by Dr. O'Rourke shows that he found none of them disabled (i.e., a 100% denial rate). Not surprisingly, Dr. O'Rourke concluded that Mr. Olawale did not qualify for any benefit.

198. Plaintiff Olawale was also evaluated by Board-chosen psychiatrist Dr. Norman, whose lucrative compensation from the Board and history of bias are recounted above. Dr. Norman's flawed report provided an inadequate basis for a claim determination because he failed to consider whether Mr. Olawale was T & P disabled from the cumulative impact of his impairments, and his conclusion was inconsistent with findings in his report that Mr. Olawale had "self-reported a moderately severe depression" and "thoughts of suicide or being better off dead." Dr. Norman unjustifiably dismissed these subjective complaints with circular reasoning that "[a]lthough Mr. Olawale endorsed many symptoms of depression ... he did not spontaneously report any symptoms except agitation, irritability, depressed mood, and mood volatility."

199. The Committee issued a decision denying Plaintiff Olawale's application on August 13, 2021. Neither the letter nor the summary sheet in his claim file mentioned that he had claimed benefits based on the overall impact of his impairments. The Committee asserted that it had considered all of the evidence.

200. Mr. Olawale appealed the Committee's decision to the Board. In connection with his appeal, Plaintiff Olawale was evaluated by Board-paid Dr. Elkousy, whose lush, seven-figure compensation from the Board and history of rendering flawed reports are recounted above. As was the case with most Players whom he has evaluated, Dr. Elkousy concluded that Mr. Olawale was not T & P disabled based on an inadequate report. For example, Dr. Elkousy failed to consider the cumulative impact of Plaintiff Olawale's ailments, unreasonably dismissed Mr. Olawale's complaints of pain, and his report contained inconsistencies. Whereas even Dr. Saenz had found that knee and ankle x-rays showed moderate and marked DJD, Dr. Elkousy maintained that only mild DJD was present. Although more than a third (36.3%) of Retired Players report suffering from DJD, Dr. Elkousy did not accord points for DJD for any body part for which the Plan's terms award Points to any Player among the sample of 15 Players whom he evaluated for LOD benefits.[19] Similarly, despite the prevalence of hamstring injuries, disc herniations, and shoulder instability amongst NFL Players, Dr. Elkousy likewise has never awarded any Player in the sample points for hamstring tears, disc herniations, or shoulder instability. Although Dr. Elkousy reported that his imaging of Mr. Olawale showed a lumbar spine stress fracture with spondylolysis, Dr. Elkousy nonetheless failed to award him the three points in accordance with the Plan's terms. Among the sample of 15 Players who applied for LOD disability benefits and who were evaluated by Dr. Elkousy, not one received points for lumbar stress fracture with spondylolysis. In all, Dr. Elkousy awarded Plaintiff Olawale not a single point of the nine needed to qualify for LOD benefits.

201. On June 6, 2022, the Board issued a decision denying Mr. Olawale's appeal. In its letter, the Board represented that it had reviewed all of the evidence in his file; incorrectly stated

[19] For example, an occurrence of moderate DJD is three points for each knee, shoulder, elbow, wrist, hip, ankle, and two points for each hind or mid-foot.

that Mr. Olawale had been evaluated by Dr. Strassnig, when he had not; and it failed to address the cumulative effect of Plaintiff Olawale's conditions, which he had listed as a T & P disabling condition on his application, believing that his cumulative ailments would be considered.

**Plaintiff Daniel Loper**

202. Plaintiff Daniel Loper is a resident of Gallatin, Tennessee.

203. Plaintiff Loper applied for LOD benefits in March 2018, in connection with which he was evaluated by Board-chosen orthopedist Dr. Murray, whose lush compensation from the Board and history of rendering opinions adverse to claimants are recounted above. Dr. Murray awarded Mr. Loper only six LOD Points.

204. On April 26, 2018, an advisor from Groom emailed the Plan's director, Mr. Sam Vincent, Mr. Loper's summary sheet for the upcoming Committee meeting at which Mr. Loper's application would be taken up. The summary sheet presented to the Committee emphasized:

> **THIS IS A SUMMARY ONLY. The entire administrative record compiled in conjunction with this claim has been made available and should be reviewed prior to making a final determination on the Player's claim for benefits.**

205. The Committee issued an initial denial letter dated April 30, 2018, in which it represented that it had reviewed the entire record.

206. Mr. Loper appealed the Committee's decision on October 26, 2018, and submitted additional medical evidence. In connection with his appeal, he was evaluated by Board-paid orthopedist Dr. Glenn Perry. Dr. Perry has received compensation from the Board of at least $1,950,302. Not surprisingly, in a sample of seven T & P disability evaluations that he performed, Dr. Perry concluded that none of the Players was T & P disabled (i.e., a 100% denial rate). In his flawed narrative report, Dr. Perry avoided crucial details. For example, despite moderate right and

severe left AC[20] joint arthrosis shown by MRIs, Dr. Perry failed to acknowledge those impairments. He awarded Plaintiff Loper only six of the ten points required to qualify for LOD benefits.

207. On December 7, 2018, an advisor from Groom emailed a benefits coordinator Mr. Loper's summary sheet prepared by the advisors at Groom. The Groom advisor failed to mention Mr. Loper's AC joint impairments. In the summary sheet, the Groom advisor emphasized to the Board that "**[t]he administrative record compiled in conjunction with this claim has been made available and should be reviewed prior to making a final determination on the Player's claim for benefits**." The Board issued a decision letter on February 19, 2019, denying Plaintiff Loper's appeal.

208. In March 2020, Plaintiff Loper reapplied for LOD benefits, in connection with which he submitted club medical records, imaging results, and a surgery report.

209. In connection with this second application, Mr. Loper was evaluated by Board-chosen orthopedist Dr. David Apple. Dr. Apple has received at least $2,479,364 in compensation from the Board. Not surprisingly, Dr. Apple has a 100% T & P disability benefits denial rate. As recounted above, even though more than a third of Retired Players report suffering from DJD, *no* Player in the sample of 15 Players whom Dr. Apple evaluated for LOD benefits purposes received *any* points for DJD for *any* of the body parts for which the Plan's terms award points. Similarly, despite the prevalence of hamstring injuries, disc herniations, and symptomatic rotator cuff tears in Retired Players, Dr. Apple has never awarded any Player in the sample any points for those impairments.

[20] Acromioclavicular; the joint formed by the cap of the shoulder and the collar bone.

210. In all, Dr. Apple awarded Mr. Loper a mere three points out of the 10 needed to qualify for LOD benefits. Despite acknowledging that Mr. Loper's left wrist "S/P [status post] Carpal Tunnel Release" is worth 2 points, Dr. Apple commented that he was not awarding Mr. Loper the points for his condition because the "[s]urgery occurred after [Mr. Loper's] NFL career." Dr. Apple ignored or was unaware that a material modification to the Plan clarified that Players who apply after April 1, 2019 may receive points for surgeries after the end of their NFL career as long as the surgeries took place prior to their deadline to apply for LOD. Mr. Loper's deadline to apply for LOD benefits was August 31, 2020 and he had undergone surgery on January 9, 2020. Therefore, Mr. Loper should have received these two points. Moreover, Dr. Apple disregarded documented NFL football play-related injuries to Mr. Loper's left wrist. Also, even though Dr. Apple noted that Mr. Loper had a symptomatic rotator cuff tendon tear, he failed to award the prescribed two points for "Symptomatic Rotator Cuff Tear."

211. Groom stated in the summary sheet concerning Mr. Loper's second LOD benefits claim that it prepared for the Committee that Mr. Loper had been awarded no points for carpal tunnel release because it was "[n]ot NFL Related." The summary sheet, however, failed to specify that Dr. Apple awarded no points for "S/P Carpal Tunnel Release" for a different, but just as erroneous, reason—because the surgery had taken place after the end of Mr. Loper's NFL career.

212. The Committee issued a decision denying Plaintiff Loper's second LOD benefits application on January 22, 2021. It stated in its letter that it had denied Mr. Loper's application after reviewing the record. The Committee did not delve into the administrative record or attempt to reconcile Dr. Apple's inconsistencies with the Plan's terms. Instead, it rubber-stamped Dr. Apple's incorrect and inadequate conclusion as its own.

Case 1:23-cv-00358-JRR Document 125-6 Filed 09/22/25 Page 72 of 120

213. Plaintiff Loper appealed the Committee's denial to the Board in May 2021. In support of his appeal, Plaintiff Loper submitted new records, including two surgery reports. Also, in connection with his appeal, Mr. Loper was evaluated by Board-paid orthopedist Dr. Marcus Cook, who awarded nine points out of the 10 needed to qualify. Although Dr. Cook noted in his narrative report that Mr. Loper was status post-carpal tunnel release surgery, Dr. Cook failed to award Mr. Loper the two points for an "S/P Carpal Tunnel Release" condition.

214. The Board issued a decision on November 15, 2021, denying Plaintiff Loper's appeal. In its decision, the Board represented that it had "reviewed the current record." Mr. Loper first became aware from the June 2022 *Cloud* decision, however, that the Board ignores Groom's advice to review the entire administrative record prior to making a decision in that Board members admitted that the Board does *not*, in fact, review all of the records submitted.

**<u>Plaintiff Eric Smith</u>**

215. Plaintiff Eric Smith is a resident of Whippany, New Jersey.

216. Plaintiff Smith played safety in the NFL for seven credited seasons and suffered thirteen documented traumatic brain injuries. His brain imaging showed white matter changes.

217. Mr. Smith was denied LOD benefits on an application he filed in 2013. At the time, he was examined by orthopedist Dr. Terry Thompson, who has a 100% T & P disability benefits denial rate. Dr. Thompson has received $999,182 in compensation from the Board. Mr. Smith appealed that denial, but the Board denied his appeal in 2014.

218. Because his NFL football play-related conditions continued to deteriorate, Mr. Smith reapplied for LOD benefits in 2015. In connection with his 2015 application, Mr. Smith was examined by an orthopedist, Dr. Charles Bush-Joseph, who has received a modest average annual compensation by the Board of $46,123. Dr. Bush-Joseph has never been paid by the Board

more than $72,765 in a single year. Dr. Bush-Joseph awarded Mr. Smith 20 LOD impairment points. As a result, Mr. Smith's LOD benefits application was approved. The following year, Dr. Bush-Joseph's compensation from the Board fell sharply, to only $16,711.

219. Plaintiff Smith applied for T & P disability and NC benefits in December 2018. In connection with those applications, the Committee forced him to travel from New Jersey to North Carolina and Ohio for examinations, knowing full well that Mr. Smith has difficulty sitting without pain, and that sitting worsens his condition. Plaintiff Smith was evaluated by Board-paid orthopedist Dr. Perry, whose lucrative compensation and history of rendering adverse T & P disability benefits evaluations are recounted above. As in the case of other Players whom he evaluated, Dr. Perry avoided crucial details in his report and did not explain why he believed that Mr. Smith was not T & P disabled. Dr. Perry did not reconcile his opinion that Mr. Smith could perform "moderate lifting" with his own findings of marked decreased shoulder range of motion, rotator cuff weakness, and moderate to severe shoulder arthritis. Moreover, Dr. Perry failed to mention Mr. Smith's head, neck, and lumbar spine impairments, and there is no evidence in the narrative report that he inquired into Mr. Smith's documented work difficulties.

220. In connection with his 2018 T & P disability and NC applications, Mr. Smith was evaluated by Board-paid neuropsychologist Dr. McNasby-Ford, who received compensation from the Board of at least $1,569,000; had an average annual compensation from the Board of at least $173,667; and at the time of her examination of Mr. Smith, was the Board's highest-paid neuropsychologist that year. Not surprisingly, a sample of nine T & P disability and LOD evaluations rendered by Dr. McNasby-Ford shows that she found no Player to qualify for either benefit. Dr. McNasby-Ford failed to reconcile her finding that Mr. Smith was not T & P disabled with her significant concerns about an elevated risk of harm to himself and to others. Dr.

McNasby-Ford failed to discuss the MRI findings, including white matter changes in Plaintiff Smith's brain and the possibility of demyelinating disease.

221. Mr. Smith was also evaluated by Board-paid psychiatrist Dr. Moira Artigues. In a sample of four Player benefit evaluations that she rendered, Dr. Artigues found no Player to qualify for benefits (i.e., a 100% denial rate). She unjustifiably found that Mr. Smith was not T & P disabled, asserting that there were "[n]o employment restrictions from a psychiatric standpoint." That statement was inconsistent with her own finding of a severe major depressive disorder. Moreover, it was nearly identical language that she used in the report she prepared concerning another T & P disability applicant, whom a court deemed mentally incapacitated. Dr. Artigues also failed to consider whether Plaintiff Smith was T & P disabled from the cumulative impact of his impairments.

222. In a denial letter issued on February 6, 2019, the Committee represented that it had reviewed the materials in Mr. Smith's file, and it stated that it did not disagree with the statements in the medical records that Mr. Smith had submitted. The Committee, though, failed to address the overall effect of Plaintiff Smith's impairments, which he had listed as a T & P disabling condition on his application, believing that his cumulative ailments would be considered.

223. Plaintiff Smith appealed the Committee's denial to the Board on August 5, 2019. In connection with his appeal, the Board forced him to travel from New Jersey to Missouri and Maryland for examinations. Mr. Smith was evaluated by Board-paid orthopedist Dr. Alvin Detterline. Of a sample of six evaluations for T & P disability benefits purposes, Dr. Detterline found no Player T & P disabled (i.e., a 100% denial rate). In his flawed report concerning Mr. Smith, Dr. Detterline failed to discuss the cumulative impact of Mr. Smith's impairments and his report contained several inconsistencies. For example, although Dr. Detterline concluded that Mr.

Smith was not T & P disabled, he indicated in his report that Mr. Smith had significant impairments that affected his daily functioning. Also, although he described injuries from NFL football play to Mr. Smith's wrist, lumbar spine, hip, and both knees, Dr. Detterline oddly concluded that the cause of the impairments to those body parts was "[u]nknown."

224. Mr. Smith was also evaluated by Board-paid neuropsychologist Dr. Nicole Werner, who concluded that Plaintiff Smith did not qualify for benefits. Dr. Werner has received at least $638,500 in compensation from the Board, with an average annual compensation of $143,375. Most recently, the Board rewarded Dr. Werner with $288,000 in compensation for the year from April 1, 2021 through March 31, 2022, which is a significant increase from the $47,500 she received from the Board in her first year of conducting applicant evaluations for it. Not surprisingly, a sample of 16 benefit evaluations rendered by Dr. Werner shows she found *none* of the Players in question to qualify for benefits (i.e., a 100% denial rate). The Board knows that Dr. Werner benefits financially from doing repeat business with it. It follows that the Board knows that she has an incentive to provide it with flawed reports containing questionable or dubious medical justifications that diminish the significance of Players' cognitive impairments, which will increase the likelihood that the Board will frequently engage her services in the future—in other words, that she will render result-oriented reports upon which the Board may rely in justifying benefit denials.

225. Dr. Werner's flawed report concerning Mr. Smith violated the Plan's terms, contained dubious findings, and was an inadequate basis for a benefits determination. For example, although the Plan's terms state explicitly that "prior training of a Player will not be considered in determining" T & P disability benefits eligibility, Dr. Werner acted inconsistently with the Plan by concluding that Mr. Smith could engage in "[e]mployment consistent with his

training." Also, Dr. Werner inexplicably indicated that the cause of Mr. Smith's post-concussive memory loss was "unknown," despite acknowledging in her report that his concussions had "resulted in altered awareness or memory loss." Moreover, Dr. Werner failed to consider the cumulative impact of Mr. Smith's impairments.

226. On November 22, 2019, the Board issued a decision denying Mr. Smith's appeal. In its decision, the Board failed to reconcile the tension between Dr. Werner's opinion and the explicit terms of the Plan. Also, the Board failed to address Mr. Smith's claim that he qualified for T & P disability benefits based on the cumulative impact of his impairments, which he had listed as a T & P disabling condition on his application, believing that his cumulative ailments would be considered. The Board represented that a reason for its denial was that the "the Plan's physicians are absolutely neutral in this process" and that it "ha[d] no doubt that the Plan's neutral physicians fully understand the obligation to conduct fair and impartial Player evaluations, and that they ha[d] done so in [Mr. Smith's] case." Moreover, although the Board represented that it had reviewed the administrative record, Mr. Smith first became aware from the June 2022 *Cloud* decision that Board members testified that, contrary to the representation in his decision letter, the Board's ordinary practice is *not* to review all of the records submitted.

227. Plaintiff Smith reapplied for T & P disability benefits in April 2023. Within this application, he listed the overall impact of all of his impairments as one of his conditions to be considered. Although this application is currently pending, among the "Neutral Physicians" that the Board has scheduled appointments for Plaintiff Smith to be examined by are Dr. Stephan Sergay, Dr. George Canizares, and Dr. Vanderploeg. As the Board's highest-paid orthopedist, Dr. George Canizares has received at least $2,978,063 in total compensation from the Board, with an average annual Board compensation of $238,816. Not surprisingly, in a sample of five Player T

& P disability evaluations that he performed, Dr. Canizares found no Player T & P disabled. Moreover, Dr. Sergay, who has received at least $429,000 in compensation from the Board, similarly has found no Player T & P disabled in a sample of five T & P disability evaluations that he rendered. Furthermore, Dr. Vanderploeg's lush Board compensation and history of rendering flawed opinions unfavorable to Player applicants are recounted above. What is more, although Plaintiff Smith lives in New Jersey, Defendants are forcing him to travel to Florida—that is, over 900 miles—for these examinations.

**Plaintiff Alex Parsons**

228. Plaintiff Alex Parsons is a resident of Mesa, Arizona.

229. Mr. Parsons submitted an LOD benefits application in 2017. In connection with that application, he was evaluated by Board-paid orthopedist Dr. Steven Meier, who has been paid at least $753,674 from the Board. Not surprisingly, a sample of eight T & P disability benefits evaluations that Dr. Meier rendered shows that he found no Player T & P disabled (i.e., a 100% denial rate). The Board knows that Dr. Meier benefits financially from doing repeat business with it. It follows that the Board knows that he has an incentive to provide it with reports containing questionable or dubious medical justifications that diminish the significance of Players' impairments, so as to increase the chances that the Board will frequently return to him in the future—in other words, that he will render inadequate, result-driven reports upon which it may rely in justifying its decision to deny benefits.

230. Dr. Meier was the physician at issue in the *Dimry* case noted in Paragraph 21 above. Commenting on his level of compensation at the time, the court in *Dimry* explained:

> Dimry tenders evidence that the Plan paid Dr. Meier … approximately $188,683 in direct compensation between April 2014 and May 2015. … The amount paid to Dr. Meier is substantial and exceeds the [$125,000] amount[] found to be of concern in *Demer* [*v. IBM Corp. LTD Plan*, 835 F.3d 893, 901 (9th Cir. 2016)].

> The Plan has not rebutted this showing. It does not contest the dollar amounts paid to Dr. Meier, and says mainly that they are of no moment because the Plan's referral physicians are paid a fixed fee for examinations regardless of their final conclusions. That may be, but the observation is off point because the inquiry under *Demer* is whether the *magnitude* of the payments raises a fair inference of a financial conflict. The sizable payments to Dr. Meier do just that, and the Plan has not negated the inference by tendering evidence of "neutrality in practice."
>
> …
>
> The problem is that the Board denied benefits based upon an unreasonable bias in favor of Plan-selected physicians. Although the Board noted "potentially conflicting medical evidence contained in the record," it did not resolve the conflicts by examining the evidence or delving into the record before it. It simply adopted the opinions of its retained physicians by default. The Board underscored the reflexive and non-discretionary quality of this action by stating that it "uniformly" accepts and relies upon the reports of its retained doctors. … But it was not entitled to decide a benefits claim by mere default to a Plan-selected physician. That is the abandonment of discretion, not the exercise of it.

*Dimry*, 2018 WL 1258147, at *3-4 (emphasis added).

231. Although more than a third of Retired Players report DJD, *no* Player in the sample of 15 Players whom Dr. Meier evaluated under the LOD point system received *any* points for DJD for *any* of the body parts for which the Plan's terms award points. Similarly, despite the prevalence among Retired Players of cervical spine impairments, symptomatic shoulder instability, symptomatic rotator cuff tears, shoulder loss of motion, and hamstring injuries, Dr. Meier awarded no Player in the sample LOD points for any of those Plan-listed orthopedic impairments. Dr. Meier's flawed report concerning Mr. Parsons contained various inconsistencies, rendering it an inadequate basis for a claim decision. For example, Dr. Meier noted imaging submitted by Mr. Parsons that demonstrated DJD "with bone on bone contact." He failed, however, to award Mr. Parsons points for DJD. Dr. Meier also failed to award points for Mr. Parsons' shoulder instability and disc herniations. In total, Dr. Meier awarded Plaintiff Parsons only two LOD points.

232. In its October 31, 2017 letter denying Mr. Parsons' application, the Committee represented that it had reviewed the records in his administrative record.

233. Plaintiff Parsons appealed the Committee's denial to the Board on April 9, 2018, submitting additional evidence of his disc herniations and DJD, as well as an abnormal EMG test of his spine, indicating radiculopathy.

234. In connection with his appeal, Mr. Parsons was evaluated by Board-paid orthopedist Dr. Gregory Mack. Dr. Mack has received at least $1,043,527 in compensation from the Board. Not surprisingly, in a sample of 16 T & P disability evaluations that he rendered, Dr. Mack concluded that 15 of the Players—or 93.75%—were not entitled to T & P disability benefits.

235. Dr. Mack provided a flawed report concerning Mr. Parsons, rendering it an inadequate basis for a claim decision. For example, Dr. Mack afforded deference to Dr. Meier's demonstrably incorrect conclusions. Moreover, although he reported that Mr. Parsons' "shoulder does not feel stable … [t]he 'left shoulder feels a lot looser' than the right," and diagnosed Mr. Parsons with "instability, status post AC joint separation, left shoulder," Dr. Mack failed to award the three points for "Symptomatic Shoulder Instability" without explanation. Indeed, notwithstanding the prevalence of disablements common among Retired Players, in a sample of 28 Players evaluated for LOD benefits, Dr. Mack failed to award points to *any* Player for common impairments such as disc herniations, shoulder instability, and rotator cuff or hamstring tears. Also, whereas a sample of 295 LOD evaluations performed by Board orthopedists shows that points for non-surgery hand or wrist ailments were accorded to Players in 18.64% of those evaluations, Dr. Mack, although claiming to be a hand specialist, did not award any Player points for a non-surgery hand ailment in the sample of 28 LOD evaluations that he rendered.

Case 1:23-cv-01358-JRR Document 136 Filed 05/09/25 Page 80 of 120

236. The summary sheet presented to the Board likewise made no mention of Mr. Parsons' symptomatic shoulder instability. The summary sheet emphasized to the Board:

> **THIS IS A SUMMARY ONLY. The entire administrative record compiled in conjunction with this claim/appeal has been made available and should be reviewed prior to making a final determination on the Player's claim for benefits.**

237. The Board issued a final denial on Mr. Parsons' application on May 18, 2018. In that denial letter, the Board represented that it had reviewed the entire record. The Board neither discussed nor acknowledged the medical views in the reports submitted on appeal.

238. Parsons first became aware from the *Cloud* decision that, contrary to the Board's representation in its 2018 decision, Board members had testified that the Board's ordinary practice is *not* to review all of the information and evidence submitted.

**Plaintiff Joey Thomas**

239. Plaintiff Joseph "Joey" Thomas is a resident of Seattle, Washington.

240. Plaintiff Thomas suffered a career-ending concussion on August 28, 2010 while playing for the Oakland Raiders during a game against the San Francisco 49ers.

241. Plaintiff Thomas applied for LOD benefits in 2010. His application was denied. In connection with that application, he was evaluated by Board-paid orthopedist Dr. James Glick, who concluded that he did not qualify for LOD benefits. Dr. Glick disregarded impairments to Mr. Thomas' neck, back, and hips, and his report contained various inconsistencies.

242. Plaintiff Thomas was also evaluated by Board-paid neurologist Dr. Jonathan Schleimer, who found that he did not qualify for LOD benefits. The Board has paid Dr. Schleimer at least $605,300. Not surprisingly, from a sample of 23 LOD and T & P disability evaluations, Dr. Schleimer found that none of the Players qualified for either benefit (i.e., a 100% denial rate). Like most flawed reports that he rendered, Dr. Schleimer provided an inconsistent and incomplete

report that was an inadequate basis for a claim decision. For example, Dr. Schleimer reported that Mr. Thomas had an "[i]mpairment [due] to … Post concussion syndrome Recent injury 8/2010"; that this injury resulted from football play; and that Mr. Thomas' condition was "permanent" under the Plan's terms, yet Dr. Schleimer did not explain why, in light of those reported facts, Mr. Thomas did not qualify for LOD benefits pursuant to Section 6.4(a)(3) of the Plan.

243. The Committee denied Mr. Thomas' application on January 25, 2011. Although Dr. Schleimer conceded that Plaintiff Thomas suffers from a permanent post-concussion syndrome impairment stemming from football play, the Committee stated in its letter that Dr. Schleimer "did not report a substantial neurological disablement."

244. Mr. Thomas applied for T & P disability benefits in 2011. In connection with that application, he was evaluated by Board-paid orthopedist Dr. Mack, whose lush compensation from the Board and history of rendering opinions adverse to Players seeking benefits are recounted above. Dr. Mack failed to consider the combination of Mr. Thomas' impairments, and even discounted that "Mr. Thomas' current treating neurologist, Lily Jung Henson, M.D., has stated that Mr. Thomas is unable to engage in any occupation for remuneration or profit" on the grounds that "[t]he stated basis for her opinion appear[ed] to include the diagnosis of post concussion syndrome." Moreover, although multiple courts have held that the Plan's terms do not require contemporaneous documentation, Dr. Mack claimed that "[n]o contemporaneous documents regarding musculoskeletal injury were available for review."

245. Mr. Thomas was also examined in connection with his T & P disability benefits application by Dr. Delis, whose lush seven-figure compensation from the Board and history of rendering opinions adverse to Players seeking T & P disability or LOD benefits are recounted above. Dr. Delis opined that Mr. Thomas was not T & P disabled. He did not discuss the overall

impact of Plaintiff Thomas' conditions and did not discuss views favorable to Plaintiff Thomas' benefits claim that were reported by his treating physician. The Committee issued a denial letter to Mr. Thomas on December 20, 2011.

246. Mr. Thomas applied for LOD benefits in 2012. In connection with that application, Mr. Thomas was evaluated by Board-paid orthopedist Dr. Robert Rovner. Dr. Rovner explained in his report that the Board had not made various medical records available. He unambiguously checked "Yes" on the PRF when asked "Is the patient's condition the primary or contributory cause of the … major functional impairment of a vital bodily organ[?]" Nonetheless, the Committee issued a denial letter on January 24, 2013, in which it failed to award Mr. Thomas LOD benefits on that basis, disregarding its own hired physician's opinion that satisfied the Plan's explicit terms in Section 6.4(a)(3) for entitlement to LOD benefits.

247. Despite Mr. Thomas having submitted overwhelming evidence of documented post-concussion syndrome resulting from NFL football play, the Committee contended that he had presented "no evidence that this condition arises out of League football activities." The Committee omitted in its denial letter that Dr. Rovner had reported that Plaintiff Thomas satisfied the explicit requirements for LOD benefits based on Section 6.4(a)(3) of the Plan at the time. Moreover, the Committee did not have Plaintiff Thomas examined by a neurologist to evaluate his post-concussion syndrome, despite it being claimed in his application.

248. Plaintiff Thomas applied for LOD and NC benefits in 2014. In connection with that application, he was evaluated by Board-paid orthopedist Dr. Meier. As recounted above, the court in *Dimry* reasoned that "[t]he amount paid to Dr. Meier [wa]s substantial and exceed[ed] the [$125,000] amount[] found to be of concern in *Demer*. 835 F.3d at 902." 2018 WL 1258147, at *3. Moreover, as is true for other benefit applicants whom he evaluated, Dr. Meier discounted

evidence favorable to Mr. Thomas, provided inconsistencies, and used boilerplate language. Mr. Thomas was also evaluated by Board-paid neurologist Dr. Edward O'Connor. The Board has paid Dr. O'Connor at least $673,300 in compensation. Not surprisingly, a sample of 20 LOD evaluations rendered by Dr. O'Connor showed that he found *no* Player to qualify (i.e., a 100% denial rate). Dr. O'Connor provided a report containing various inconsistencies and dismissed both self-reported complaints and objective evidence of cognitive impairment.

249. In connection with his 2014 applications, Plaintiff Thomas was also evaluated by Board-paid neuropsychologist Dr. Johnny Wen, who has received at least $820,500 in compensation from the Board, with an average annual Board compensation of $164,100. Not surprisingly, a sample of 30 benefit evaluations rendered by Dr. Wen show that he found *no* Player qualified for any benefits (i.e., a 100% denial rate). The Board knows that Dr. Wen benefits financially from doing repeat business with it. It follows that the Board knows that he has an incentive to provide it with flawed, inadequate reports containing dubious medical justifications that diminish the significance of Players' impairments and which will increase the chances that the Board will frequently return to him in the future—in other words, that he will render result-driven reports upon which the Board may rely in justifying its decision to deny benefits.

250. As with many Players whom he evaluated, Dr. Wen's flawed report contained various errors. Confusingly, when asked whether Mr. Thomas "show[ed] evidence of acquired neuro-cognitive impairment," Drs. O'Connor and Wen appeared to have answered both "Yes" and "No." Also, when asked, "If yes, is the Player's acquired neuro-cognitive impairment mild or moderate," Dr. Wen responded affirmatively, indicating a "Mild" impairment. In a denial letter issued on May 23, 2014, the Committee omitted findings favorable to Mr. Thomas.

Case 1:23-cv-01358-JRR Document 123 Filed 05/19/26 Page 84 of 120

251. Mr. Thomas again applied for NC benefits in 2019. In connection with this reapplication, he was evaluated by Board-paid neurologist Dr. Lawrence Murphy. A sample of 17 benefit evaluations rendered by Dr. Murphy shows that he found *none* of the Players qualified for any benefit (i.e., a 100% denial rate). Not surprisingly, Dr. Murphy concluded that Mr. Thomas did not qualify for NC benefits based on conclusory assertions that were not consistent with the objective evidence and the terms of the Plan. For example, although his MoCA testing of Plaintiff Thomas demonstrated the presence of at least a mild cognitive impairment, Dr. Murphy found "[n]o cognitive impairment." Plaintiff Thomas was also evaluated by Board-paid neuropsychologist Dr. Alan Breen. From a sample of six evaluations for NC benefits, Dr. Breen found that none of the Players were entitled to the benefit (i.e., a 100% denial rate). Not surprisingly, Dr. Breen provided a report that contained inconsistencies with the terms of the Plan.

252. The Committee issued a denial letter on April 23, 2019, stating that it had considered the materials in Plaintiff Thomas' file but that it had "reached its decision despite potentially conflicting medical evidence in those records." The Committee failed to reconcile Dr. Breen's reasoning with the terms of the Plan.

253. Mr. Thomas submitted an appeal to the Board on October 1, 2019. In connection with his appeal, Plaintiff Thomas was evaluated by neurologist Dr. Brahin, whose lucrative compensation from the Board and history of flawed reports are recounted above. Dr. Brahin provided a report that contained various inconsistencies with the plain terms of the Plan, and even his own objective testing. For example, he concluded there was no evidence of cognitive impairment, but he stated in his report that Plaintiff Thomas' score on MoCA testing "could be consistent with mild cognitive impairment." Also, he incorrectly marked multiple tests within the MoCA test as showing Thomas to be unimpaired.

254. Mr. Thomas was also evaluated by Board-paid neuropsychologist Dr. Francisco Perez, who has received at least $250,500 from the Board. In a sample of two NC benefit evaluations that he rendered by Dr. Perez found that neither Player qualified. Dr. Perez made factually inconsistent statements in his report. For example, he alleged that Mr. Thomas' "neurological status ha[d] remained normal in all the medical evaluations." In fact, the opposite was true. Each of Mr. Thomas' previous MoCA evaluations showed cognitive impairment. When his own testing demonstrated cognitive impairments, Dr. Perez dismissed even his own results: "Some of the data may suggest a mild cognitive impairment. However, in my opinion … the present results … do not provide consistent evidence of a cognitive impairment." Dr. Perez belittled Mr. Thomas' application as a "quest for disability benefits."

255. On February 13, 2020, the Board issued a decision denying Mr. Thomas' appeal. In its letter, the Board claimed that it had "reviewed *all* of the evidence in [Mr. Thomas'] Plan file and unanimously concluded that [he was] ineligible for NC benefits." (Emphasis added.) Moreover, the Board stated that "Dr. Perez had concluded that while some data may suggest a mild cognitive impairment, it is not related to an acquired disorder." The Board did not explain or attempt to reconcile how Plaintiff Thomas' post-concussion syndrome was not an acquired cognitive disorder.

**<u>Plaintiff Jason Alford</u>**

256. Plaintiff Jason "Jay" Alford is a resident of Bloomfield, New Jersey.

257. Plaintiff Alford suffered repetitive head trauma from NFL football play and still experiences cognitive symptoms.

258. Plaintiff Alford applied for NC benefits in 2019. In connection with that application, Mr. Alford was examined by Board-paid neuropsychologist Dr. Robert Bornstein. Dr.

Bornstein has received at least $637,500 in compensation from the Board, with average annual compensation of at least $127,550. Not surprisingly, a sample of 12 T & P disability evaluations rendered by Dr. Bornstein shows that he found no Player qualified (i.e., a 100% denial rate). Dr. Bornstein concluded that Plaintiff Alford did not qualify for NC benefits. Confusingly, Dr. Bornstein stated in his report that Mr. Alford's "overall pattern of performance *does* suggest a clear pattern of cognitive impairment. Therefore[,] these results *do not* provide evidence of acquired neurocognitive impairment." (Emphasis added.)

259. Plaintiff Alford was also evaluated by Board-paid neurologist Dr. Chad Hoyle who, in concluding that Mr. Alford did not qualify for NC benefits, applied an incorrect standard for NC eligibility.

260. The Committee issued a denial letter on May 29, 2019, in which it did not even attempt to reconcile Dr. Bornstein's contradictory statements. The Committee claimed in its denial letter that it had reviewed the entire record. Mr. Alford appealed the Committee's decision on November 24, 2019, but the Board denied Mr. Alford's appeal on February 14, 2020. The Board asserted in its denial letter that it had "reviewed *all* of the evidence in [Mr. Alford's] Plan file." (Emphasis added.)

261. Plaintiff Alford again submitted an NC benefits application in 2022. In connection with that application, he was evaluated by Board-paid neurologist Dr. Salman Azhar. From a sample of 5 NC benefits evaluations that he rendered, Dr. Azhar found that none of the applicant Players qualified (i.e., a 100% denial rate). His reports include various inconsistencies with the objective evidence and the plain terms of the Plan.

262. Plaintiff Alford was also evaluated by Plan-hired neuropsychologist Dr. Charlene Bang who, in a sample of 10 Player benefit evaluations, has found no Player to qualify for any

benefit (i.e., a 100% denial rate). As a reward, she received a significant raise in her pay to $166,000 in just the Plan's most recent year, which is more than three times the combined Board compensation that she had received between April 1, 2017 and March 31, 2020.

263. The Committee issued a denial letter to Plaintiff Alford dated April 12, 2022. In its denial letter, the Committee represented that it had reviewed the entire administrative record.

264. Plaintiff Alford submitted an appeal on October 3, 2022. In connection with his appeal, the Board forced Plaintiff Alford to travel from New Jersey to Georgia for examinations. Plaintiff Alford was examined by Board-paid neurologist Dr. McCasland, whose lush seven-figure compensation from the Board and history of bias against Players and flawed reports are recounted above. Dr. McCasland discounted evidence weighing in Mr. Alford's favor, including problems with short-term memory. Instead, he concluded that "the player's neurological examination was normal."

265. Plaintiff Alford was also evaluated by Board-hired neuropsychologist Dr. Ernest Fung, who received $306,000 in compensation from the Board from April 1, 2021 through March 31, 2022, and who, as noted in Section IV.I above, ranks among Plan-hired neuropsychologists having the highest average annual compensation. Although Dr. Fung described Mr. Alford's scores on a cognitive memory test and language test as "Low Average," other Board-hired physicians have classified the same scores as showing mild impairments.

266. The Board issued a letter denying Plaintiff Alford's appeal dated March 10, 2023. In its denial letter, the Board represented that is had "reviewed *all* of the evidence in [Mr. Alford's] Plan file," and that it "ha[d] no doubt that the Plan's Neutral Physicians fully understand the obligation to conduct fair and impartial Player evaluations, and ha[d] done so in [Mr. Alford's] case." (Emphasis added.)

## V. CLASS ACTION ALLEGATIONS

267. Besides asserting Counts I-IV (Paragraphs 280-329) below on their own behalf, Plaintiffs assert them on behalf of a proposed nationwide class ("Class") and four nationwide Subclasses, pursuant to Rule 23 of the Federal Rules of Civil Procedure.

268. The proposed Class is defined as follows:

> **All participants in the Plan who filed an application for one or more categories of disability benefits under the Plan on or after August 1, 1970.**

269. The four proposed Subclasses are defined as:

> **(a) The T & P SUBCLASS: All members of the Class who filed an application seeking Total & Permanent Disability benefits on or after August 1, 1970, except for the members of the ACTIVE FOOTBALL SUBCLASS.**
>
> **(b) The ACTIVE FOOTBALL SUBCLASS: All members of the Class who filed an application for Total & Permanent Disability benefits on or after August 1, 1970 and were within the timeframe to qualify for Active Football benefits at the time they applied.**
>
> **(c) The LOD SUBCLASS: All members of the Class who filed an application for Line-of-Duty Disability Benefits on or after August 1, 1970.**
>
> **(d) The NC SUBCLASS: All members of the Class who filed an application for Neurocognitive Disability benefits on or after April 1, 2012.**

270. Upon completion of discovery with respect to the scope of the Class and Subclasses, Plaintiffs reserve the right to amend the Class and Subclass definitions.

271. Excluded from the Class and Subclasses are Defendants and any entity in which any Defendant has a controlling interest, and their legal representatives, officers, directors, affiliates, assignees, successor, employees, and agents. Also excluded from the Class and Subclasses are any judge to whom this action is assigned, together with any relative of that judge

within the third degree of relationship, and the spouse or employee of any such person.

272. The Class and Subclasses satisfy the requirements of numerosity, commonality, typicality, and adequacy under Rule 23(a) of the Federal Rules of Civil Procedure.

273. **Numerosity**: The members of the Class and Subclasses are so numerous (believed to be at least in the hundreds) and geographically dispersed that it is impracticable to join all of them in a single action. The exact number and the identity of Class and Subclass members can readily be ascertained from Defendants' benefits application files and records.

274. **Commonality**: There are numerous questions of law and fact common to the members of the Class and Subclasses. Among the many common questions are:

(a) Whether Defendants have failed to review "all comments, documents, records, and other information submitted by the claimant," as required under ERISA § 503(2), 29 U.S.C. § 1133(2), and its implementing regulation at 29 C.F.R. § 2560.503-1(h)(2)(iv) (all Subclasses);

(b) Whether Defendants have failed to adopt procedures to ensure accurate claims processing (all Subclasses);

(c) Whether Defendants failed to put in place a review system to ensure impartiality and neutrality of those involved in the benefits claims process (all Subclasses);

(d) Whether Defendants practice of hiring, compensating, retaining, terminating, and promoting hired physicians is methodically designed in a manner that violates ERISA (all Subclasses);

(e) Whether Board-hired physicians have had financial conflicts of interest that influenced their opinions or created the appearance of a financial conflict of interest (all Subclasses);

(f) Whether Defendants violated ERISA by misinforming Players in SPDs and decision letters that Neutral Physicians are genuinely neutral in the benefits claims process (all Subclasses);

(g) Whether Defendants have had a willful and systematic pattern or practice of hiring and retaining physicians that has harmed the integrity of the claims processes (all Subclasses);

(h) Whether Defendants breached their fiduciary duty under ERISA through routine misrepresentations that Committee and Board members have reviewed the entire administrative record as required by law when, in fact, they do not (all Subclasses);

(i) Whether Defendants violated ERISA by breaching their fiduciary duties in that they have routinely disregarded the advice of their counsel to review the entire administrative record before rendering a decision (all Subclasses);

(j) Whether Defendants have routinely or systematically failed to consider the cumulative effect of all impairments (T & P Subclass);

(k) Whether Defendants breached their fiduciary duty under ERISA through misrepresentations in SPDs and other disclosures that Committee and Board members consider all of a Player's claimed impairments when they do not (all Subclasses);

(l) Whether the Board has improperly afforded deference to the Committee's decisions instead of conducting a genuinely de novo review of the Committee's decisions (all Subclasses);

(m) Whether Defendants have unreasonably interpreted the Plan's explicit requirements for Active Football T & P disability eligibility (Active Football Subclass);

(n) Whether Defendants have routinely failed to specify in decision letters why they disagree with findings and reports that support a Player's entitlement to benefits (all Subclasses);

(o) Whether Defendants have failed to provide adequate notice when impermissibly amending the Plan (all Subclasses);

(p) Whether Defendants have a practice of considering factors expressly barred by the Plan's plain terms, such as educational level and prior training (T & P Subclass);

(q) Whether Defendants abandoned their discretion by routinely defaulting to the opinions of their hired physicians (all Subclasses);

(r) Whether Defendants' conduct in the aggregate demonstrates substantial and repeated breaches of trust that are detrimental to the interests of all Plan Participants and beneficiaries (all Subclasses);

(s) Whether Defendants' repeated and substantial misconduct in violation of ERISA demonstrates that they have systematically failed, and

prospectively cannot be trusted, to exercise their discretion honestly and fairly (all Subclasses); and

(t) Whether the Plan Administrator's refusal to pay contractually authorized benefits had been willful and part of a larger systematic breach of fiduciary obligations (all Subclasses).

275. Because these and similar questions will either focus exclusively on Defendants' acts or practices that violate ERISA and their fiduciary duties of loyalty and care, or will entail consideration of Plan provisions and interpretations uniformly applicable to Class or Subclass members, rather than require an inquiry into the circumstances of individual Plaintiffs' or Class and Subclass members' benefits applications, they are necessarily common. Moreover, the determination of these questions will resolve issues central to the validity of the claims in one stroke, and a classwide proceeding would generate common answers apt to drive the resolution of this litigation.

276. **Typicality**: Plaintiffs' claims are typical of the claims of absent Class and Subclass members because they have sustained the same injuries—violations of statutory duties under ERISA, breaches of the fiduciary duties of loyalty of care, and the wrongful denial of benefits on account of Defendants' violations of Plan terms—as detailed herein. Moreover, Plaintiffs assert the same causes of action and seek the same remedies as would absent members. Consequently, they have every incentive to pursue these claims vigorously on behalf of absent Class members.

277. **Adequacy**: Plaintiffs will fairly and adequately protect the interests of absent members of the Class. Their claims are typical of those of absent members, which gives them every incentive to vigorously pursue those claims on behalf of absent members, and they have no conflicts of interest with absent members. Moreover, Plaintiffs have retained counsel who are competent and experienced in class action and ERISA litigation and familiar with the Plan and its

disability benefits structure and processes.

278. Certification of the Class and Subclasses is appropriate under Rule 23(b)(1)(A) of the Federal Rules of Civil Procedure because there is a risk that the prosecution of separate actions would result in inconsistent adjudications, thereby establishing incompatible standards of conduct for the Plan's Administrator and other fiduciaries.

279. Certification of the Class and Subclasses is also appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure because Defendants have acted or refused to act on grounds generally applicable to the Class and Subclasses, making final injunctive relief or corresponding declaratory relief appropriate with respect to the Class and Subclasses as a whole.

## VI. CAUSES OF ACTION

### Count I: Pursuant to Section 502(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B) – Wrongful Denial of Benefits (on Behalf of the Class and All Subclasses)

280. Plaintiffs repeat, reallege, and incorporate by reference Paragraphs 1, 4-7, 9-52, 56-81, 86-89, 107, and 116-279 as though fully set forth herein.

281. The Plan is an "employee welfare benefit plan" within the meaning of Section 3(1) of ERISA, 29 U.S.C. § 1002(1).

282. Defendants wrongfully denied Plaintiffs and absent Class members the benefits due to them in accordance with Plan documents.

283. Defendants acted inconsistently with the Plan's terms. For example, Defendants considered educational level and prior training when deciding Plaintiffs McKenzie's, McGahee's, Olawale's, and Smith's T & P disability benefits claims, despite that the Plan's explicit terms prohibit consideration of educational level and prior training. Also, in cases involving LOD benefits claims, Defendants failed to award Players points pursuant to the Plan's terms, which state that a Player will be awarded the indicated number of points for each occurrence of each listed

impairment. For example, Mr. Loper suffered a "S/P Carpal Tunnel Release" resulting from League football activities, but the Board unjustifiably failed to award Mr. Loper the prescribed 2 points for such an impairment. Furthermore, Defendants unreasonably dismissed reliable evidence of undisputed self-reported symptoms for lack of objective medical evidence, even though the Plan does not limit proof to objective evidence. Also, as recounted in Paragraph 193 above, Defendants' parsimonious interpretation of the requirements for Active Football T & P disability is inconsistent with the Plan's terms.

284. Moreover, the Board acted inconsistently with the Plan's goal of compensating Players for having invested themselves in NFL football play. For example, Defendants unreasonably interpreted the Plan to ignore consideration of whether a Player is T & P disabled from the cumulative impact and effect of his impairments, and instead compartmentalized and considered each impairment or type of impairment only in silo. Also, Defendants failed to rely on adequate materials to make their benefit determinations. For example, Defendants failed to review all records and information in a Player's administrative file. Furthermore, Defendants based their determinations on incomplete, flawed, and undetailed reports from biased physicians who acted inconsistently with the Plan's terms.

285. Defendants acted inconsistently with earlier interpretations of the Plan. For example, although the Board's current MAP previously interpreted a three-point LOD occurrence of "Lumbar Stress Fracture with Spondylolysis" as an "L5-S1 pars defect" and Plaintiff Olawale demonstrated unrebutted radiographic evidence of L5 pars defect/stress fractures with spondylolysis, Defendants failed to award Plaintiff Olawale the three points.

286. Defendants' decision-making process was neither reasoned nor principled. For example, Defendants abdicated their decision-making by rubber-stamping reports from biased

physicians who acted inconsistently with Plan terms, and often their own findings from examining Players and other medical evidence in Players' files, and whose reports amounted, all in all, to an inadequate basis for basing claims decisions. Moreover, Defendants routinely failed to review all of the evidence in the administrative record. Rather than properly exercise their discretion under the Plan, Defendants abandoned it.

287. Furthermore, Defendants have improperly relied upon, and even defaulted their decision-making, to many physicians with significant financial conflicts of interest that substantially impacted their professional and ethical obligations. As recounted in Section IV.I above, in the large statistical sample, physicians who have conducted examinations for T & P disability benefits purposes and who have an average annual compensation from Defendants of $200,000 or more, have *never* rendered a conclusion that any Player is T & P disabled in any year. What is more, 57.63% of the 118 physicians who have evaluated Players for T & P disability benefits purposes overall—that is, nearly *three out of five* physicians—have a denial rate of 100 percent.

288. Also, Defendants have acted inconsistently with external standards relevant to the exercise of discretion. For example, despite Plaintiff Lance Zeno having been found under the *NFL Concussion* settlement to have a Level 1.5 Neurocognitive Impairment (i.e., a moderate to severe cognitive impairment in at least two or more cognitive domains) based on the reports of genuinely neutral medical experts, the Board rendered an irreconcilable decision that Mr. Zeno did not qualify for even the mild NC benefit, which requires only a mild objective impairment in one cognitive domain.

289. In addition, Defendants' decisions were inconsistent with the procedural and substantive requirements of ERISA. For example, Defendants failed to review the entire

administrative record, defaulted to biased physicians, and failed to explain why they disagreed with medical views in the record that favored the award of benefits.

**Count II: Pursuant to Section 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3): Violation of Section 503(1) of ERISA, 29 U.S.C. § 1133(1) – Failure to Provide Adequate Notice in Writing of the Specific Reasons for a Denial (on Behalf of the Class and All Subclasses)**

290. Plaintiffs repeat, reallege, and incorporate by reference Paragraphs 1, 4-7, 9-81, 86-89. 100-06, and 147-279 as though fully set forth herein.

291. Section 503(1) of ERISA requires, in pertinent part, that

> [i]n accordance with regulations of the Secretary, every employee benefit plan shall— (1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant[.]

29 U.S.C. § 1133(1).

292. Pursuant to the regulations adopted to implement Section 503(1), Defendants must provide a discussion of the decision, including an explanation of the basis for disagreeing with or not following the views of medical and healthcare professionals. *See* 29 C.F.R. § 2560.503-1(g)(vii)(i)-(ii).

293. Defendants violated Section 503(1) of ERISA by providing inadequate notice, which failed to list the specific reasons for adverse determinations. For example, the Board issued a final decision on Plaintiff Sims' claim in which it contended that Mr. Sims' "file contain[ed] no evidence that [his] disability arose while an Active Player." Moreover, the Special Rules of Section 3.5 of the Plan were not cited or referenced in the Board's decision letter.

294. What was omitted from the decision letter issued to Plaintiff Sims is that, contrary to the Plan's terms, the Board has adopted an unreasonable, clandestine interpretation of the Plan that Active Football T & P benefits are intended only for situations where a Player suffers a

catastrophic injury, such as a paralyzing collision, during a game. Board members acknowledged this crabbed interpretation in the *Cloud* action.

295. Moreover, Defendants have violated Section 503(1) by failing to discuss the specific reasons for disagreeing with medical views that favor an award of benefits. For example, for Plaintiff McKenzie, Defendants' own physician, Dr. Clark, expressed his view that if he were permitted to consider neurological impairments *and* psychiatric impairments together, Mr. McKenzie's psychiatric status appeared to be "totally" disabling. The decision letter issued to Plaintiff McKenzie, however, did not even acknowledge this medical opinion favorable to Mr. McKenzie, let alone explain the Board's disagreement with it.

**<u>Count III: Pursuant to Section 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3): Violation of Section 503(2) of ERISA, 29 U.S.C. § 1133(2) – Denial of Right to Full and Fair Review (on Behalf of the Class and Subclasses)</u>**

296. Plaintiffs repeat, reallege, and incorporate by reference Paragraphs 1, 4-7, 9-52, 55-81, and 86-279 as though fully set forth herein.

297. Defendants have violated Section 503(2) of ERISA, 29 U.S.C. § 1133(2), and regulations promulgated thereunder at 29 C.F.R. §§ 2560.503-1(b)(5), (b)(7), (h)(2)(iv), (h)(3)(ii), and (m)(8), by depriving Plaintiffs and absent Class members of full and fair review of adverse benefits determinations. Relief under Section 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3) is therefore necessary to enjoin Defendants' violations and to mandate their compliance with the statutory mandate of affording full and fair review.

298. For example, Defendants routinely have not complied with 29 C.F.R. § 2560.503-1(h)(2)(iv) by failing to review *all* records, documents, and other information in the administrative file for Plaintiffs and absent Class members. Board members testified for the first time in *Cloud* that the Board does *not* review *all* evidence in the administrative record, and it does not provide

directions to its advisors to review all of the evidence. The Board's practice thus does not comport with Section 503(2) implementing regulations.

299. Also, Defendants have not complied with 29 C.F.R. § 2560.503-1(b)(7) because they have failed to ensure the independence and impartiality of persons involved in making decisions (on Behalf of the Class and Subclasses). "In the case of a plan providing disability benefits, the plan must ensure that all claims and appeals for disability benefits are adjudicated in a manner designed to ensure the independence and impartiality of the persons involved in making the decision. Accordingly, decisions regarding hiring, compensation, termination, promotion, or other similar matters with respect to any individual (such as a claims adjudicator or medical or vocational expert) must not be made based upon the likelihood that the individual will support the denial of benefits." 29 C.F.R. § 2560.503-1(b)(7).

300. Defendants failed to take affirmative steps to limit the likelihood of bias and to promote accurate claims determinations. For example, Defendants fail to conduct independent substantive audits to ensure that decisions are not based upon the likelihood that a physician who is asked to evaluate an applicant will issue a result-driven report to support the denial of benefits.

301. As recounted above, Defendants deprived Plaintiffs and absent Class members of a full and fair review because Plaintiffs have been examined by conflicted physicians. For example, Dr. McCasland, who has received over $1.8 million in compensation from Defendants, conducted examinations of Plaintiffs McKenzie, McGahee, Alford, and many absent Class members. In a sample of 37examinations that he conducted for T & P disability and LOD disability benefits purposes, Dr. McCasland found *no* Player to be entitled to either benefit. Furthermore, as recounted above, across 51 T & P disability evaluations performed by seven Plan physicians having an average annual compensation from Defendants of $200,000 or more, those physicians

have *never* found that any Player is T & P disabled in any year. Moreover, across 291 T & P disability evaluations performed by Plan physicians having an average annual compensation from Defendants of $125,000 or more, those physicians concluded that only 7.56% of Players were T & P disabled. Nineteen of those physicians with an average annual compensation from Defendants of $125,000 or more have *never* found that *any* Player is T & P disabled in any year. Additionally, in the year running from April 1, 2021 through March 31, 2022, nine out of the ten highest-compensated physicians that year have *never* found that any Player is T & P disabled in any year. Finally, despite the high prevalence of neurocognitive impairments in Retired Players, *all* 14 neuropsychologists with the highest annual average compensation from Defendants have *never* found that any Player is T & P disabled in any year across the combined 107 T & P evaluations they performed in the overall sample of 784 evaluations.

302. Also, Defendants failed to comply with 29 C.F.R. § 2560.503-1(h)(3)(ii)'s mandate to "not afford deference to the initial adverse benefit determination" and to have review conducted by an individual who did not "ma[k]e the adverse benefit determination that is the subject of the appeal" or who was not that individual's subordinate. In deciding appeals, the Board has relied on advisors who heavily influence and are involved in the Committee's initial benefits determinations. For example, on Plaintiff McKenzie's appeal, the Board afforded deference to the healthcare professionals that the Committee had relied upon in its initial decision. Moreover, Groom advises both the Committee *and* the Board, despite the inherent conflict of interest arising from acting in such a capacity at two distinct, independent levels of benefits determination.

303. Additionally, Defendants have violated 29 C.F.R. §§ 2560.503-1(b)(5) and (m)(8). As alleged above, Defendants failed to produce requested information relevant to the reputation and predisposition of Plan-compensated physicians. For example, Defendants failed to produce

this relevant information to Plaintiff McKenzie when he requested it, as recounted above. Defendants' failure to produce such information demonstrates that they have failed to put into place administrative processes and safeguards to ensure that Plan provisions have been applied consistently to similarly situated applicants.

304. In addition, Defendants failed to put into place administrative processes and safeguards to ensure that Plan provisions have been applied consistently to similarly situated applicants. For example, as recounted above, Mr. Olawale demonstrated unrebutted radiographic evidence of L5 pars defect/stress fractures with spondylolysis. Despite the Board's current MAP having previously awarded a Player three LOD points for "Lumbar Stress Fracture with Spondylolysis" for an "L5-S1 pars defect," Defendants failed to award Mr. Olawale these points.

**Count IV: Pursuant to Section 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3): Breaches of Fiduciary Duties of Loyalty and Care in Violation of Sections 102(a), 404, 404(a)(1), 404(a)(1)(B), 405 of ERISA, 29 U.S.C. §§ 1022, 1104, 1104(a)(1), 1104(a)(1)(B), and 1105, by the Board (Equitable Relief, Including but Not Limited to, Surcharge, Estoppel, and Injunctive Relief) (on Behalf of the Class and Subclasses)**

305. Plaintiffs repeat, reallege, and incorporate by reference Paragraphs 1-2 and 4-279 as though fully set forth herein.

306. Pursuant to ERISA § 502(a)(3), a civil action may be brought

> by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan.

29 U.S.C. § 1132(a)(3).

307. Defendants have breached their fiduciary duties through their violations of ERISA §§ 404 and 405, 29 U.S.C. §§ 1104 and 1105—breaches that are separate from their wrongful denials of benefits, requiring equitable relief pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), to rectify Defendants' material misinformation, misrepresentations, deceptions, and

inaccurate and contradictory disclosures about the Plan, which have deprived Plaintiffs and absent Class members of their right to accurate information under ERISA.

308. ERISA § 102(a) requires a plan administrator to provide beneficiaries with SPDs and with summaries of material modifications, "written in a manner calculated to be understood by the average plan participant," that are "sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan." 29 U.S.C. § 1022(a).

309. Defendants violated ERISA by failing to discharge their fiduciary duties to act solely in the interests of Players and their beneficiaries by providing material misinformation about the Plan, in violation of ERISA §§ 102(a), 404(a)(1), and 404(b), because the SPDs and summaries of material modifications provided inaccurate and contradictory statements and other material misinformation about the Plan that failed to reasonably apprise participants and beneficiaries of their rights and obligations, depriving Plaintiffs and absent Class members of their right to accurate information.

310. In violation of ERISA §§ 102(a) and 404(a)(1), Defendants breached their fiduciary duty to provide accurate information about the Plan in SPDs by misrepresenting to all Players that they will receive a "neutral exam." The term "neutral exam" is absent from the Plan's plain terms. Defendants' deceptive use of the term "neutral exam" provides material misinformation that lulls Players into believing that the Plan provides for "neutral exams" and that the examinations they will undergo by Defendants' hired physicians will actually be unbiased. In reality, many, if not most, examinations are a part of a sham process. as recounted in Section IV.I.

311. In several instances in SPDs, Defendants provided misleading material information by using the term "neutral physician," without capitalizing those words, to lull Players into

believing that "Neutral Physicians" will be unbiased or fair-minded, even though the Plan's terms do not provide that a "Neutral Physician" will indeed be impartial.

312. Also, Defendants breached their fiduciary duties under ERISA §§ 102(a) and 404(a) to act solely in the interests of Players and their beneficiaries because they provided material misinformation in SPDs to lull Players into believing that the "Committee will consider *all* of the elements of your application"; "[t]he Committee and Board will make *their own* determinations"; "the Disability Board will take into account *all* available information"; and that their decisions "will be made by reviewing your application, *any* supporting documents that you provide, Neutral Physician report(s), and *any* records in your file." (Emphases added.)

313. The 2019, 2021, and 2022 SPDs failed to inform Players that the Board's *actual* practice is *not* to review all of evidence. Moreover, the SPDs failed to inform Players that anyone other than the Committee or Board members themselves will review *all* of the available information in a Player's file or any supporting documents that a Player provides. Moreover, the SPDs deceptively provided inaccurate information that Players in submitting their applications should "be sure to include information about any and all impairments you have that you think support your claim. … *The Committee or Board will only consider impairments that you include on your initial application* unless a neutral physician who evaluates you recommends otherwise" and that "[b]e sure to include *ALL impairments you want considered* on your initial application." (Emphasis added.) The SPDs have materially misled Players into believing that the Committee and Board will consider all of a Player's impairments as a condition, especially if they apply specifically on that basis. Furthermore, Defendants failed to inform Players in SPDs that they have a clandestine practice of rejecting Players' undisputed and reliable self-reported evidence, even though Plan terms do not limit proof in support of a benefits claim to objective evidence.

314. Defendants know and have previously disclosed that "[t]he decision-making fiduciaries of the Plan must not only carefully apply all of these rules, *they* must do so while reviewing voluminous records. It is typical for a claimant to submit hundreds or thousands of pages of documents, including their entire college and NFL medical records." (Emphasis added.)

315. Because Committee and Board members, however, are not qualified to fulfill their statutory responsibilities themselves to review the entire record as required by ERISA and as promised by the SPD, they have a clandestine practice, in violation of ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), of delegating to others without direction to actually review the entire administrative record, in violation of ERISA §§ 404(a)(1)(B) and 503(2), 29 U.S.C. §§ 1104(1)(B) and 1133(2). Committee and Board members themselves do not review the entire administrative record as required by statute and in stark contrast to what Players are led to believe.

316. Additionally, Defendants have engaged in a plan-wide practice in breach of their fiduciary duty to all Players in violation ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(1)(B), by repeatedly, imprudently, and knowingly ignoring the advice of their own advisors to read the entire administrative record before making a decision. Board members' practice is that they do not, in fact, review all of the records and documents in a claims file. Although the Board knows that it must review the entire record, it ignores advice in the summary sheets prepared by its advisors that emphasize in bold font and remind the Committee and Board that they must review the entire administrative record prior to making a decision. For example, the summary sheet provided to Defendants by their advisors at Groom, and allegedly reviewed by the Board members for Plaintiff Loper explicitly emphasized in boldface text:

> **THIS IS A SUMMARY ONLY. The *entire* administrative record compiled in conjunction with this claim has been made available *and should be reviewed prior to making a final determination* on the Player's claim for benefits.**

(Italics added.)

317. The Board ignored the advice from its own advisors, demonstrating its failure to exercise skill, prudence, and proper care, in violation of ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(1)(B).

318. Additionally, Defendants breached both their fiduciary duties of (i) loyalty, under ERISA § 404(a)(1), through material misinformation about the Plan in decision letters, in violation of ERISA § 503(1), 29 U.S.C. § 1133(1); and (ii) care, under ERISA 404(a)(1)(B), through failure to exercise due care in compensating, hiring, retaining, terminating, promoting, training, and imprudently relying on "Neutral Physicians" whom the Board knows or should know have demonstrated inadequate performance.

319. Defendants have breached the fiduciary duty of loyalty through their plan-wide practice of providing decision letters to Players containing material misrepresentations that the Committee and the Board have reviewed *all* of the information in the record as required by statute when, in fact, Board members testified that their practice is that they *do not*, in fact, review *all* of the information in the administrative file. For example, the Board made misrepresentations to Plaintiff Olawale in his decision letter that it had "reviewed *all of the evidence in your Plan file*." (Emphasis added.)

320. Moreover, in violation of ERISA §§ 404, 405, and 503, Board members have knowingly participated in fellow Board members' breaches of fiduciary duties, knowing that those actions and omissions are breaches. Board members know that they are each responsible for reviewing the entire administrative record. Indeed, the summary sheets prepared by their advisors repeatedly emphasized and reminded the Board that the Board members must review the *entire* administrative record prior to making a final decision. As described above, Plaintiffs could not

have had actual knowledge prior to the testimony given in the *Cloud* action of the Committee's and Board's systematic practice of misrepresenting that all information in the administrative file has been reviewed.

321. Also, Defendants violated ERISA §§ 404(a)(1), 404(a)(1)(B), 503(1), and 503(2) because they have breached their fiduciary duty of care by failing to exercise due care, prudence, diligence, and skill under the circumstances necessary to ensure the independence and impartiality of "Neutral Physicians." Instead, Defendants methodically designed practices and policies regarding hiring, compensation, retention, termination, promotion, and training of "Neutral Physicians" that demonstrated that Defendants failed to discharge their fiduciary duty to act solely in the interests of Players. Furthermore, Defendants breached their fiduciary duty of loyalty by providing deceptive and material misinformation about "Neutral Physicians" in decision letters.

322. Pursuant to the regulations implementing ERISA § 503:

> In the case of a plan providing disability benefits, the plan must ensure that all claims and appeals for disability benefits are adjudicated in a manner designed to ensure the independence and impartiality of the persons involved in making the decision. Accordingly, decisions regarding hiring, compensation, termination, promotion, or other similar matters with respect to any individual (such as a claims adjudicator or medical or vocational expert) must not be made based upon the likelihood that the individual will support the denial of benefits.

29 C.F.R. § 2560.503-1(b)(7).

323. In issuing regulations to effectuate ERISA § 503 with respect to disability benefits plans, the U.S. Department of Labor declared that:

> a plan cannot contract with a medical expert based on the expert's reputation for outcomes in contested cases, rather than based on the expert's professional qualifications. These added criteria for disability benefit claims address practices and behavior which cannot be reconciled with the "full and fair review" guarantee in section 503 of ERISA *and with the basic fiduciary standards* that must be followed in implementing the plan's claim procedures.

81 Fed. Reg. 92316, 92319 (Dec. 19, 2016) (emphasis added).

324. In breach of their fiduciary duty of care and loyalty, Defendants designed and implemented policies and practices that have caused plan-wide injuries through egregious and methodical failure to ensure that their hired and retained physicians' compensation is not based upon a reputation for desired outcomes.

325. In violation of the fiduciary duty of loyalty, Defendants implemented policies and practices regarding hiring, compensation, termination, promotion, and other similar matters involving "Neutral Physicians" who are unqualified, inadequate, and biased as part of a plan-wide scheme to defraud Players.

326. Defendants' practices have created a sham process through deception and misinformation that has injured the integrity of the process by touting to Players through repeated misrepresentations about the Plan in disclosures to Plaintiffs and absent Class members that these biased physicians are "*absolutely neutral* in the process." (Emphasis added.) Furthermore, Defendants actively concealed their ERISA violations from Plaintiffs and absent Class members through repeated false reassurances such as disclosing that "[w]e wish to reassure you that the Plan's Neutral Physicians have *no* incentive to hurt or help Players," and that "[s]ubstantial effort and resources have been committed to ensure that every Player is fully and fairly evaluated." (Emphasis added.)

327. In *Mickell v. Bell/Pete Rozelle NFL Players Ret. Plan*, 832 F. App'x at 589, Dr. McCasland, by his own admission, had reviewed only "certain" medical records before rendering his opinion. Moreover, Dr. Macciocchi, the Board's highest paid neuropsychologist since 2012, has a reputation for minimizing concussion symptoms and of endorsing the use of improper race norms in evaluating African-Americans' neurocognitive impairments, which is evident in his publications, previous statements in court, and marketing materials. For example, he has stated

that "sustaining MTBI did not significantly contribute to neuropsychological test performance," has repeatedly stated his view that "*African-American race… contributed to lower test performance*," and that "demographic" "factors explain more in variance in neuropsychological test scores than MTBI." (Emphasis added.) Even marketing materials for Dr. Macciocchi promoted that he "will inform on *ways to defeat or mitigate* [*MTBI*] *claims based on current science and explore how best to convince a jury that a plaintiff's brain is hard boiled and not scrambled*." (Emphasis added.) Defendants' implementation of their hiring, compensation, and promotion practices demonstrates that they failed to exercise due care and failed to act solely in the interest of Players because, despite these recurring problems with Drs. McCasland and Macciocchi, Defendants failed to investigate and remedy the situation. Although Defendants know or should know that Dr. McCasland, Dr. Macciocchi, and *many* other Defendant-compensated physicians have a history of bias and of providing the Board inadequate, result-driven reports on which to base a decision, Defendants continued to retain, and even reward Dr. McCasland, Dr. Macciocchi, and others like them through substantial increases in annual compensation.

328. Defendants' methodical implementation of policies and practices regarding retention, promotion of biased physicians—and decreases in compensation to or termination of other physicians who demonstrate less or no bias towards Players—breaches their fiduciary duties of loyalty and care. For example, systematically, across 51 T & P evaluations performed by Plan physicians having an average annual compensation from Defendants of $200,000 or more, those Defendant-misrepresented "absolutely neutral" seven physicians have *never* found that any Player is T & P disabled in any year. Moreover, 19 of the Defendant-misrepresented "absolutely neutral" physicians having an average annual compensation from Defendants of $125,000 or more have

also *never* found that any Player is T & P disabled in any year. In contrast, in T & P disability evaluations performed by Plan physicians having an average annual Board compensation of $50,000 or less, those physicians have found that 25.93% of Players were T & P disabled.

329. Plaintiffs and absent Class members frequently rely on and are harmed by the material misinformation about the Plan conveyed to them in SPDs and decision letters, such as when deciding whether to spend inordinate amounts of time and effort to (i) file a claim or appeal; (ii) bring an ERISA suit to obtain judicial review of a benefits denial; (iii) pursue proper medical care for their conditions (many of which are improperly diagnosed and downplayed by biased physicians); (iv) hire and spend money on an attorney; or (v) oftentimes submitting to long distances of travel for these misrepresented neutral examinations at the direction of Defendants that contributes to worsening their medical conditions. For example, due to the added physical and psychological health stressors caused by being forced to travel long distances for his numerous biased examinations over a short period of time, Plaintiff McKenzie required "emergent psychiatric" care. Players have also suffered enhanced financial and emotional stress as a result of Defendants' misinformation.

**Count V: Pursuant to Sections 409(a) and 502(a)(2) of ERISA, 29 U.S.C. §§ 1109(a) and 1132(a)(2) — Violations of ERISA §§ 404(a)(1), 404(a)(1)(B), and 405(a), 29 U.S.C. §§ 1104(a), 1104(a)(1)(B), and 1105(a), Warranting Removal of Board Members for Repeated, Substantial, and Willful Dishonesty; Deception; and Incompetence, Demonstrating Systematic Breaches of the Fiduciary Duty of Loyalty and Care That Have Harmed The Integrity of the Claims Process and Ultimately the Plan Itself (on Behalf of the Plan Only)**

330. Plaintiffs repeat, reallege, and incorporate by reference Paragraphs 1-266 as though fully set forth herein.

331. Plaintiffs assert this claim solely on behalf of the Plan itself, pursuant to Sections 404(a)(1), 404(a)(1)(B), 405(a), 409(a), and 502(a)(2) of ERISA, 29 U.S.C. §§ 1104(a)(1),

1104(a)(1)(B), 1105(a), 1109(a) and 1132(a)(2), rather than on behalf of themselves or absent members of the Class or any Subclass.

332. Board members have engaged in repeated and substantial violations of their fiduciary duties of loyalty under ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), and care, ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B), of such a magnitude as to warrant their removal under ERISA § 409(a). When the Board's conduct is considered in the aggregate, it becomes evident that its members abdicated their fiduciary obligations on a plan-wide basis to such a large extent that permitting current Board members to continue in their roles would be detrimental to the interests of the Plan.

333. *First*, the Board's repeated refusal to pay contractually authorized benefits has been willful and part of a larger systematic breach of its fiduciary obligations on a plan-wide basis. The Board created and promoted systematic perverse incentives regarding compensation, promotion, and retention of significantly biased physicians on a plan-wide basis, and fraudulently misrepresent those same biased physicians as "absolutely neutral in this process" to actively conceal their substantial misconduct. The magnitude of these plan-wide perverse incentives, particularly when correlated with their irreconcilable conclusions; solicitation of and reliance upon flawed reports; and retention and lavish renumeration of physicians having a track record of minimizing genuine medical conditions shows that there is a plan-wide conflict that does, in fact, repeatedly and on an ongoing basis, significantly harm and negatively influence the plan-wide implementation and integrity of the claims administration process, in violation of ERISA.

334. Considered in the aggregate with other willful misconduct, as the Fourth Circuit has permitted for removal of fiduciaries, Board members' significant methodical misconduct has caused plan-wide harm to the Plan's integrity, in flagrant violation of ERISA and their statutorily

enumerated fiduciary duties to exercise their responsibilities prudently and solely in the interest of retired players and their beneficiaries. Their significant misconduct demonstrates transgressions of both ERISA's central purpose and statutory directives. Through perverse financial incentives regarding the continual retention and promotion of physicians with significant bias of such a systematic magnitude, the integrity of the claims administration process is harmed by permitting them to continue in their roles.

335. The Board's systematic policies and practices of hiring, generously compensating, retaining, promoting, and training these physicians have caused plan-wide injury to the Plan itself through its blatant failure to ensure that its hired physicians' compensation is not based upon their reputation for and likelihood that they will support the denial of benefits.

336. The Board has deliberately perpetuated and designed a sham claims process through plan-wide methodical implementation and plan-wide misinformation that has injured the integrity of the process. For example, the Board touts to Players through repeated misrepresentations that these biased physicians are "*absolutely neutral* in the process." (Emphasis added.) Also, the Board has actively concealed its ERISA violations through repeated false reassurances such as "that the Plan's Neutral Physicians have *no* incentive to hurt or help Players." (Emphasis added.)

337. In reality, however, these reassurances could not be further from the truth because across a large statistical sample of 784 T & P disability evaluations, the larger systematic patterns of breaching their fiduciary duties become clear. For example, all seven different retained Plan physicians with an average annual compensation from Defendants of $200,000 or more, whom the Board misrepresents as "absolutely neutral in this process" in violation of their fiduciary duty of loyalty to convey accurate information (ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1)), have by

design, *never* rendered an opinion that any Player is T & P disabled in any year, across their 51 T & P evaluations in the sample.

338. Moreover, as recounted above, across 291 T & P disability benefits evaluations performed by 30 different Plan-retained physicians having an average annual compensation from Defendants of $125,000 or more, whom the Board has misrepresented as "absolutely neutral in this process," have concluded that only 7.56% of Players were T & P disabled. Nineteen of those 30 Defendant-touted "absolutely neutral" physicians having an average annual compensation from Defendants of $125,000 or more have *never* rendered a conclusion that any Player is T & P disabled in any year. Those 19 biased physicians hired and retained by the Plan, and provided perverse financial incentives for their result-oriented 100% T & P disability denial rates that harm the integrity of the Plan, accounted for 167 of the 784 total evaluations in the sample.

339. This plan-wide harm to the implementation and integrity of the claim process is glaringly a larger systematic harm, when comparing the 100% T & P denial rate of the seven highest-paid physicians with average annual compensation of $200,000 or more, and comparing that rate of denial to the 25.93% overall findings of T & P disability by Plan physicians with an average annual Board compensation of $50,000 or less. This disparity is not coincidental but, rather, willful, systematic, and methodical.

340. Moreover, as recounted above, despite the high prevalence of neurocognitive impairments in Retired Players and the NFL's long-history of concealing the impact of neurocognitive impairments from football activities, the 14 Defendant-compensated neuropsychologists with the highest annual average compensation, including the Plan's MAP, have *never* found that any Player is T & P disabled in any year, across the combined 107 T & P examinations in the sample that they performed. There is a systematic disparity between those

highly compensated neuropsychologists and those with an annual average compensation from Defendants of $50,000 or less, who found that 25% of the Players that they evaluated overall were T & P disabled across all years.

341. Such methodical and fixed patterns are willful and egregious breaches of the fiduciary duties of loyalty and care. As a result, the Plan has wasted at least $29,659,657 since April 1, 2009 on this sham process, through payments to physicians with high T & P disability denial rates.

342. *Second*, the Board's bizarre interpretations, continuous disregard for legal precedent, and multiple erroneous interpretations of the same or similar provisions, evinces violations of both the Plan and ERISA that support the overall conclusion that the Board has not acted prudently, *see* ERISA § 404(a)(1)(b), 29 U.S.C. § 1104(a)(1)(B), and that it has failed to act solely in the interest of Plan participants. For example, although federal courts have repeatedly held that the Board acts unreasonably when failing to consider the collective impact of all elements and impairments asserted by Players, the Board continues, on a plan-wide basis, to blatantly disregard those holdings.

343. The Board's multiple erroneous interpretations of the same Plan provisions and repeated bad faith demonstrate that its members can no longer be trusted to exercise their discretion honestly and fairly on a plan-wide basis. The Board continually acts in an objectively unreasonable manner that conflicts with its duties of loyalty and care.

344. *Third*, Board members are, by their own admission, unqualified to perform their statutory responsibilities themselves to review the entire record as required by ERISA and have, instead, implemented surreptitious practice to delegate their own responsibilities to others without directions to review the entire administrative record. As a result, Board members themselves do

not review the entire administrative record as required by statute and in stark contrast to what Players are lulled into believing from information about the Plan in SPDs and decision letters.

345. Furthermore, the Board also has a plan-wide practice that breached its fiduciary duty to all Players in violation of ERISA §§ 404(a)(1), 404(a)(1)(B), and 405(a), 29 U.S.C. §§ 1104(a)(1), 1104(a)(1)(B), and 1105(a), by repeatedly and knowingly ignoring the advice of its own advisors to read the entire administrative record before making a decision. Board members' willful inattention to and ignorance of matters of administration, individually, and as a whole, demonstrates transgressions of ERISA's central purposes of promoting the interests of employees and their beneficiaries in employee benefit plans, and of protecting contractually defined benefits.

346. Moreover, the Board breached its fiduciary duty of loyalty and care through material misrepresentations in the SPDs and decision letters that it reviews *all* of the information in the record as required by law when, in fact, Board members' practice is that *they* do not, in fact, review *all* of the records and documents in a claims file. Although they know that they each must review the *entire* record, Board members themselves ignore advice in the summary sheets prepared by their advisors, which repeatedly emphasize in boldface font and remind them that they must review the *entire* administrative record prior to making a final decision. For example, the summary sheet provided to the Board by its advisors, and allegedly reviewed by the Board in deciding the LOD benefits application of Plaintiff Loper explicitly emphasized in bold font:

> **THIS IS A SUMMARY ONLY. The *entire* administrative record compiled in conjunction with this claim has been made available *and should be reviewed prior to making a final determination* on the Player's claim for benefits.**

(Italics added.)

347. Board members ignored the advice of their own advisors, demonstrating their failure to exercise skill, prudence, and care, in violation of ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

348. Board members' misconduct cannot be justified, and the only adequate remedy for these plan-wide harms to the integrity of the claims process is to remove them as fiduciaries pursuant to ERISA § 409(a), 29 U.S.C. § 1109(a).

349. Permitting Board members who have demonstrated an utter disregard for ERISA's central purpose and terms to continue to act as trustees would be detrimental to the interests of the Plan. The Board's breaches of fiduciary duty and significant breaches of trust warrant the replacement of its members and this Court's appointment of new members in their stead, whether entirely on this Court's initiative or through a directive from the Court to Defendants to propose new Board members for the Court's consideration and appointment.

## VII. CONDITIONS PRECEDENT

350. All conditions precedent to the relief being sought by Plaintiffs in this suit have been performed or have occurred.

## VIII. EXHAUSTION OF ADMINISTRATIVE REMEDIES

351. Plaintiffs have either exhausted all available administrative remedies under the terms of the Plan or, alternatively, they are deemed to have exhausted administrative remedies because Defendants failed to afford Plan participants a full and fair review process (Count III), attempting to receive a fair review would be futile, and the Plan lacks procedures in place that would be adequate to provide a full and fair review. The administrative process that they purport to afford Plan participants is a sham. Additionally, exhaustion of administrative remedies is not

required for the claims asserted in Counts II-V because those claims are for breaches of ERISA provisions, including implementing regulations, distinct from violations of Plan terms.

## IX. TOLLING OF LIMITATIONS PERIODS

352. Given the continuing nature of Defendants' breaches of their ERISA fiduciary duties, the limitations periods applicable to Plaintiffs' and absent Class members' claims have not begun to run. Alternatively, as recounted above, because Defendants have for decades actively and fraudulently concealed their misconduct, including through repeated misrepresentations to Plaintiffs and absent Class members, all applicable statutes of limitations affecting Plaintiffs' and Class members' claims have been tolled.

## X. ATTORNEY'S FEES AND INTEREST

353. As a result of Defendants' actions as complained of herein, Plaintiffs have been forced to retain the undersigned counsel to represent them. Accordingly, Plaintiffs are entitled to reasonable and necessary attorneys' fees and costs incurred and to be incurred in bringing this suit pursuant to all applicable law, including in accordance with ERISA § 502(g)(1), 29 U.S.C. § 1132(g)(1).

354. Plaintiffs are also entitled to recover pre-judgment and post-judgment interest as allowed by law.

## XI. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that they be granted judgment against Defendants providing as follows:

355. As to Counts I through IV certifying this action as a class action;

356. Appointing Plaintiffs as representatives of the Class and their respective Subclasses;

357. Appointing counsel for Plaintiffs as counsel for the Class and Subclasses;

358. Awarding Plaintiffs and Class members monetary relief sufficient to place them in the same position in which they would have been in if Defendants had granted and paid them the full amount of benefits that they deserved, in accordance with the terms of the Plan;

359. Reinstating individual benefits to Plaintiffs and Class members whose previously granted benefits the Plan terminated, where the decision was based on a physician who averaged $125,000 or more in annual compensation from Defendant having an 85% or higher T & P disability denial rate in the statistical sample of 784 T & P evaluations;

360. Injunctive relief prohibiting Defendants from terminating or reducing Plaintiffs' and Class members' benefits until the end of the maximum benefit period, or such other point that the Court deems proper;

361. Injunctive relief prohibiting Defendants from reducing benefits payable to Plaintiffs and Class members due to their participation in this lawsuit;

362. Injunctive relief prohibiting Defendants from terminating or reducing Plaintiffs' and Class members' benefits until the end of the maximum benefit period, or such other declaration the Court deems proper;

363. Injunctive relief prohibiting Defendants from reducing benefits payable to Plaintiffs and Class members om account of their participation in this lawsuit;

364. A declaration that Defendants did not afford Plaintiffs and Class members full and fair review;

365. Injunctive relief, permanently enjoining Defendants' retention of Drs. McCasland, Garmoe, Strassnig, Delis, Wen, Mercado, Saenz, Macciocchi, Bornstein, Perry, Schleimer, Werner, Apple, Elkousy, McNasby, Cooper, Thompson, Canizares, Crum, Artigues, Sergay, Diaz,

Medlock, Lacritz, Murphy, O'Connor, Mack, Brahin, Perez, Meier, Bang, and Norman to conduct examinations of Plan benefits applicants in the future, and replacing them with new "Neutral Physicians," who are genuinely "absolutely neutral in th[e] process," as Defendants have promised in ERISA-mandated disclosures;

366. Equitable relief placing Plaintiffs and absent Class members in the same position they would have been in had the material misinformation about the Plan been true;

367. Equitable relief in the form of equitable surcharge, including relief for Plaintiffs' and Class members' actual harm, detrimental reliance, prejudice, or losses that would not have occurred but for Defendants' breaches of the fiduciary duty of loyalty or care in violation of ERISA, not limited to losses as a consequence of Defendants' misinformation and other misconduct or loss of rights protected under ERISA or trust law antecedents;

368. Equitable relief enjoining Defendants' plan-wide practices in violation of ERISA, described herein;

369. Equitable relief enjoining Defendants from engaging in the misinformation practices described herein in violation of ERISA;

370. Equitable relief stripping the Board of its discretion as to presently pending and future claims for benefits by reason of its failure to exercise that discretion fairly and competently, as well as abandoning its discretion;

371. Equitable relief enjoining the Board from compensating any "Neutral Physician" more than $86,000 annually for a period of 5 years, so as to remove perverse financial incentives for "Neutral Physicians" that have inured to the detriment of benefit applicants; bring Defendants' plan-wide decisions regarding retention, compensation, promotion, and termination of "Neutral

Physicians" into compliance with ERISA; and promote honesty, even-handedness, and integrity in the benefits claims process.

372. Equitable relief enjoining Defendants' statutory breaches of fiduciary duties, including utilization of unqualified, inadequate, and biased physicians as part of a nationwide scheme to defraud Players so as to bring the policies and practices into compliance with ERISA.

373. Equitable relief requiring Defendants to hire an independent auditor to perform regular audits, to ensure that policies and practices implementing decisions regarding "Neutral Physicians" hiring, compensation, retention, termination, promotion, and training are designed in a manner that ensures compliance with ERISA in that neutral examinations result in opinions that provide adequate bases for the Board's determination.

374. Equitable relief to bring Defendants' practices and policies into compliance with ERISA by requiring that the Board review the entire administrative record and all elements of a Player's claim in every case, as mandated under ERISA and as promised in SPDs and decision letters.

375. Declaratory and injunctive relief to remedy Defendants' past and ongoing violations of ERISA and breaches of fiduciary duty, including but not limited to enjoining further dissemination of misinformation and other conduct that harms the integrity of the claims process, and requiring Defendants to issue accurate SPDs and decision letters;

376. Equitable relief to adequately remedy defective, illegal, and systemic plan-wide claims-handling procedures and policies and bring them into compliance with ERISA.

377. Equitable relief requiring the reopening of all claims that resulted in an adverse determination by Defendants and mandating that Defendants conduct a full and fair review of those claims in accordance with the requirements of ERISA;

378. Equitable relief in the form of accounting of profits;

379. Equitable relief in the form of restitution (disgorgement of profits resulting from the Defendants' breaches of the fiduciary duty of loyalty);

380. Equitably tolling all deadlines and limitations periods;

381. Equitable relief in the form of reformation of Plan terms that violate or foster violations of ERISA, such as default to the conclusions of Plan-hired physicians;

382. A declaration that Defendants breached their fiduciary duty of loyalty owed to Plaintiffs and Class members, in violation of ERISA;

383. Awarding, pursuant to ERISA § 502(c)(1), 29 U.S.C. § 1132(c)(1), to Plaintiffs and absent Class members $100 per day for each failure by the Board to provide any Plaintiff or individual Class member information that was requested and which it had an obligation to provide.

384. An award of reasonable and necessary attorneys' fees and costs, pursuant to ERISA § 502(g)(1), 29 U.S.C. § 1132(g)(1);

385. Pre-judgment and post-judgment interest at the maximum rate allowed by law;

386. Such other relief, general or special, at law or in equity, to which Plaintiffs may be justly entitled pursuant to ERISA §§ 502(a) and 503(2), 29 U.S.C. §§ 1132(a) and 1133(2), other applicable law, Rule 54(c) of the Federal Rules of Civil Procedure, or otherwise;

387. As to Count V, awarding the Plan declaratory, injunctive, and equitable relief: (a) declaring that the Board's members' acts and omissions in the aggregate evince their willful abdication of their fiduciary duties to the Plan demonstrating that they can no longer be trusted to exercise their discretion fairly, having continually acted in an objectively unreasonable manner that has conflicted with their fiduciary duties to such an extent and degree that their continuing to serve as trustees of the Plan would be detrimental to the interests of the Plan; and (b) removing

Board members from their positions on account of their repeated and substantial breaches of fiduciary duties to the Plan, and replacing them with new members, appointed either by the Court on its own initiative or through a directive from the Court to Defendants to propose new Board members for the Court's consideration and appointment.

Dated: May 12, 2023

**MIGLIACCIO & RATHOD LLP**

By: <u>*/s/ Jason S. Rathod*</u>
Jason S. Rathod
Nicholas A. Migliaccio
412 H Street, N.E.
Washington, DC 20002
Telephone: (202) 470-3520
Facsimile: (202) 800-2730
jrathod@classlawdc.com
nmigliaccio@classlawdc.com

Christopher A. Seeger *(admitted pro hac vice)*
Diogenes P. Kekatos *(admitted pro hac vice)*
**SEEGER WEISS LLP**
55 Challenger Road, 6th Floor
Ridgefield Park, NJ 07660
Telephone: (973) 639-9100
cseeger@seegerweiss.com
dkekatos@seegereiss.com

Samuel L. Katz *(admitted pro hac vice)*
Julia M. Damron *(admitted pro hac vice)*
**ATHLAW LLP**
8383 Wilshire Blvd., Suite 800
Beverly Hills, CA 90211
Telephone: (818) 454-3652
samkatz@athlawllp.com
julia@athlawllp.com

Bryan F. Aylstock *(admitted pro hac vice)*
Justin G. Witkin *(admitted pro hac vice)*
Douglass A. Kreis *(admitted pro hac vice)*
D. Nicole Guntner *(admitted pro hac vice)*
**AYLSTOCK, WITKIN, KREIS, & OVERHOLTZ, PLLC**
17 E. Main Street, Suite 200
Pensacola, FL 32502
Telephone: (850) 202-1010

BAylstock@awkolaw.com
JWitkin@awkolaw.com
DKreis@awkolaw.com
NGuntner@awkolaw.com

Robert K. Scott *(admitted pro hac vice)*
Gerry H. Goldsholle *(admitted pro hac vice)*
**ADVOCATE LAW GROUP P.C.**
2330 Marinship Way, Suite 260
Sausalito, CA 94965
Telephone: (949) 753-4950
bob@advocatelawgroup.com
gerry@advocatelawgroup.com