**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

**BALTIMORE DIVISION**

| | |
|---|---|
| STACEY BAILEY, *et al.*,<br><br>Plaintiffs,<br><br>vs.<br><br>THE NFL PLAYER DISABILITY & SURVIVOR BENEFIT PLAN; *et al.*,<br><br>Defendants. | **No. 1:23-cv-02661-JRR** |

**OBJECTIONS OF JASON ALFORD *ET AL.* TO PROPOSED CLASS ACTION SETTLEMENT AND TO MOTION FOR AWARD OF ATTORNEYS' FEES, EXPENSES AND INCENTIVE AWARDS, AND NOTICE OF INTENTION TO APPEAR AT FINAL FAIRNESS HEARING**

## TABLE OF CONTENTS


**Page**

TABLE OF AUTHORITIES ..... iii

INTRODUCTION ..... 1

ARGUMENT ..... 5

I. THE COURT SHOULD DENY FINAL APPROVAL TO THE SETTLEMENT BECAUSE IT IS NOT FAIR, ADEQUATE, OR REASONABLE ..... 5

A. General Standards for Evaluating Proposed Class Action Settlements ..... 5

B. Notice of the Proposed Settlement Was Inadequate, Barring Approval Now ..... 7

C. The Proposed Settlement Is Unfair ..... 9

1. The Broad Release Extinguishes Claims That Do Not Share Identical Factual Predicates with the Complaint ..... 9

2. This Case's Procedural Posture Weighs Against the Settlement's Fairness ..... 13

3. The Total Absence of Formal, Adversarial Discovery Also Cuts Against the Settlement's Fairness ..... 15

4. Circumstances Surrounding the Negotiations Further Weigh Against the Settlement's Fairness ..... 16

a. Each Step Here Came After a Ruling or a Production in *Alford* ..... 16

b. The Settlement Reflects a Troubling Disparity in Understanding and Experience with the Plan ..... 19

D. The Proposed Settlement Is Inadequate ..... 21

1. The Strengths of Plaintiffs' Claims and Relative Difficulties of Proof and Defenses They Would Face Undercut the Settlement's Adequacy ..... 21

2. The Anticipated Duration and Expense of Additional Litigation Further Weigh Against the Settlement's Adequacy ..... 25

3. The Degree of Opposition to the Settlement Weighs Against Its Adequacy ..... 25

4. The Named Plaintiffs and Absent Class Members Are Not Being Treated Equitably ..... 26

5. Defendants' Solvency and the Likelihood of Recovery on a Litigated Judgment Also Weigh Against the Settlement's Adequacy ..... 28

E. The Proposed Settlement Is Unreasonable ..... 29

1. The Injunctive Relief Is Illusory ..... 30

2. Most Class Members Will Not Receive Any Benefit from the Rescoring Relief ..... 31

a. The Settling Parties Have Not Disclosed How Many Class Members Are Eligible for Rescoring of Claims ..... 32

b. The Exclusion of All Class Members' T&P and LOD Claims Is Plainly Unreasonable ..... 34

c. The Unreasonable Exclusion of Most NC Applicants' Claims from Rescoring Eligibility ..... 37

3. Those Few Class Members Whose Claims Are Eligible for Rescoring Face a Process Stacked Against Them ..... 39

a. No Expert Can Be Expected to Safeguard Class Members' Interests ..... 39

b. The Settlement Unreasonably Gives the Board the Final Say ..... 41

II. THE COURT SHOULD NOT CERTIFY THIS SETTLEMENT CLASS BECAUSE IT IS NOT ADEQUATELY REPRESENTED ..... 42

III. IN THE ALTERNATIVE, THE COURT SHOULD CONDITION ANY APPROVAL OF THE SETTLEMENT ON REVISIONS TO ITS SWEEPING RELEASE LANGUAGE OR AFFORD MEMBERS THE OPPORTUNITY TO OPT OUT OF THE SETTLEMENT CLASS ..... 46

IV. THE REQUESTED AWARDS OF FEES, REIMBURSEMENT OF EXPENSES, AND PLAINIFF INCENTIVE AWARDS ARE EXCESSIVE ..... 47

CONCLUSION ..... 48

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Allen v. Dairy Farmers of Am., Inc.*,
2015 WL 13979694 (D. Vt. Sept. 1, 2015)....................29

*Am. Int'l Grp., Inc. v. ACE INA Holdings, Inc.*,
2011 WL 3290302 (N.D. Ill. July 26, 2011)....................46

*Ault v. Walt Disney World Co.*,
692 F.3d 1212 (11th Cir. 2012)....................7

*Austin v. Pennsylvania Dep't of Corr.*,
876 F. Supp. 1437 (E.D. Pa. 1995)....................26

*Autran v. Procter & Gamble Health & Long-Term Disability Benefit Plan*,
27 F.4th 405 (6th Cir. 2022)....................40

*Berry v. Schulman*,
807 F.3d 600 (4th Cir. 2015)....................9, 19, 43

*Black v. USAA Gen. Indem. Co.*,
2026 WL 1162079 (D. Md. Apr. 29, 2026)....................5, 19

*Blackett v. UNUM Life Ins. Co. of Am.*,
2025 WL 2781544 (D. Md. Sept. 30, 2025)....................40

*Boger v. Citrix Sys., Inc.*,
2023 WL 3763974 (D. Md. June 1, 2023)....................5, 7

*Boyd v. Coventry Health Care Inc.*,
299 F.R.D. 451 (D. Md. 2014)....................28

*Brent v. Advanced Med. Mgmt., LLC*,
733 F. Supp. 3d 376 (D. Md. 2024)....................*passim*

*Calibuso v. Bank of Am. Corp.*,
299 F.R.D. 359 (E.D.N.Y. 2014)....................43

*Clarke v. Unum Life Ins. Co. of Am.*,
852 F. Supp. 2d 663 (D. Md. 2012)....................40

*Clement v. Am. Honda Fin. Corp.*,
176 F.R.D. 15 (D. Conn. 1997)....................34

*Cochran v. Zeon D.P., LLC*,
638 F. Supp. 2d 759 (W.D. Ky. 2009) ........ 29

*Cole v. Lane Bryant, Inc.*,
2025 WL 823268 (N.D. Cal. Feb. 10, 2025) ........ 13

*Correia v. Unum Life Ins. Co. of Am.*,
2016 WL 5462827 (S.D.N.Y. Sept. 29, 2016) ........ 40

*Cottingim v. ReliaStar Life Ins. Co.*,
723 F. Supp. 3d 1174 (M.D. Fla. 2024), *appeal dismissed*,
2026 WL 979377 (11th Cir. Feb. 24, 2026) ........ 40

*Crawford v. Equifax Payment Servs., Inc.*,
201 F.3d 877 (7th Cir. 2000) ........ 32

*Cummins v. Unumprovident Ins. Co.*,
630 F. Supp. 2d 687 (M.D. La. 2007) ........ 40

*Decohen v. Abbasi, LLC*,
299 F.R.D. 469 (D. Md. 2014) ........ 5

*Dennis v. Kellogg Co.*,
697 F.3d 858 (9th Cir. 2012) ........ 27

*Doe v. Mindgeek USA Inc.*,
2021 WL 11723140 (C.D. Cal. June 3, 2021) ........ 14

*Dukes v. Wal-Mart Stores, Inc.*,
603 F.3d 571 (9th Cir. 2010) ........ 16

*Edelen v. Am. Residential Servs., LLC*,
2013 WL 3816986 (D. Md. July 22, 2013) ........ 6

*Eubanks v. Billington*,
110 F.3d 87 (D.C. Cir. 1997) ........ 47

*Evans v. Am. Credit Sys., Inc.*,
222 F.R.D. 388 (D. Neb. 2004) ........ 47

*Faican v. Rapid Park Holding Corp.*,
2010 WL 2679903 (E.D.N.Y. July 1, 2010) ........ 46

*Feinberg v. T. Rowe Price Grp., Inc.*,
610 F. Supp. 3d 758 (D. Md. 2022) ........ 5, 6, 7, 28

*Figueroa v. Sharper Image Corp.*,
517 F. Supp. 2d 1292 (S.D. Fla. 2007) ........ 13, 19

*Fouks v. Red Wing Hotel Corp.*,
2013 WL 6169209 (D. Minn. Nov. 21, 2013) ............ 29

*Goodlaxson v. Mayor & City Council of Balt.*,
776 F. Supp. 3d 311 (D. Md. 2025) ............ 5, 7, 32

*Grady v. RCM Techs., Inc.*,
671 F. Supp. 3d 1065 (C.D. Cal. 2023) ............ 16

*Guoliang Ma v. Harmless Harvest, Inc.*,
2018 WL 1702740 (E.D.N.Y. Mar. 31, 2018) ............ 27

*Hans v. Unum Life Ins. Co.*,
2015 WL 5838462 (C.D. Cal. Oct. 5, 2015) ............ 40

*Hilsley v. Gen. Mills, Inc.*,
2021 WL 2290782 (S.D. Cal. June 4, 2021) ............ 31

*Hofmann v. Dutch LLC*,
2017 WL 840646 (S.D. Cal. Mar. 2, 2017) ............ 31

*In re Am. Cap. S'holder Derivative Litig.*,
2013 WL 3322294 (D. Md. June 28, 2013) ............ 19

*In re Auction Houses Antitrust Litig.*,
2001 WL 170792 (S.D.N.Y. Feb. 22, 2001) ............ 46

*In re Classmates.com Consol. Litig.*,
2011 WL 2680566 (W.D. Wash. July 8, 2011) ............ 46

*In re Dry Max Pampers Litig.*,
724 F.3d 713 (6th Cir. 2013) ............ *passim*

*In re Exide Techs.*,
303 B.R. 48 (Bankr. D. Del. 2003) ............ 34

*In re First Commodity Corp. of Bos. Customer Accts. Litig.*,
119 F.R.D. 301 (D. Mass. 1987) ............ 43

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*,
55 F.3d 768 (3d Cir. 1995) ............ 43

*In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*,
851 F. Supp. 2d 1040 (S.D. Tex. 2012) ............ 29

*In re Jiffy Lube Sec. Litig.*,
927 F.2d 155 (4th Cir. 1991) ............ 6

*In re Jiffy Lube Sec. Litig.*,
1990 WL 39127 (D. Md. Jan. 2, 1990) ... 13

*In re Katrina Canal Breaches Litig.*,
628 F.3d 185 (5th Cir. 2010) ... 7

*In re LinkedIn Advert. Metrics Litig.*,
2021 WL 1599289 (N.D. Cal. Apr. 23, 2021) ... 14

*In re Literary Works in Elec. Databases Copyright Litig.*,
654 F.3d 242 (2d Cir. 2011) ... 43

*In re Lumber Liquidators Chinese-Manufactured Flooring Prods. Mktg., Sales Pracs. & Prod. Liab. Litig.*,
952 F.3d 471 (4th Cir. 2020) ... 5, 6, 13

*In re Lumber Liquidators Chinese-Manufactured Flooring Prods. Mktg., Sales Pracs. & Prods. Liab. Litig.*,
91 F.4th 174 (4th Cir. 2024). ... 9, 11, 12

*In re Lumber Liquidators Chinese-Manufactured Flooring Prods. Mktg., Sales Pracs. & Prods. Liab. Litig.*,
2018 WL 11203065 (E.D. Va. Oct. 9, 2018) ... 13

*In re M3 Power Razor Sys. Mktg. & Sales Prac. Litig.*,
270 F.R.D. 45 (D. Mass. 2010) ... 46

*In re MedStar ERISA Litig.*,
2024 WL 4110941 (D. Md. Sept. 5, 2024) ... 14

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
827 F.3d 223 (2d Cir. 2016) ... 43

*In re Pinterest Derivative Litig.*,
2022 WL 484961 (N.D. Cal. Feb. 16, 2022) ... 29

*In re Serzone Prods. Liab. Litig.*,
231 F.R.D. 221 (S.D.W. Va. 2005) ... 8, 25

*In re Sprint Corp. ERISA Litig.*,
443 F. Supp. 2d 1249 (D. Kan. 2006) ... 14

*In re Subway Footlong Sandwich Mktg. & Sales Pracs. Litig.*,
869 F.3d 551 (7th Cir. 2017) ... 33

*In re TD Ameritrade Accountholder Litig.*,
266 F.R.D. 418 (N.D. Cal. 2009) ... 33

*In re Walgreen Co. S'holder Litig.*,
832 F.3d 718 (7th Cir. 2016) ........................................ 29

*Kamerer v. Unum Life Ins. Co. of Am.*,
334 F. Supp. 3d 411 (D. Mass. 2018) ........................................ 40

*Kelly v. Johns Hopkins Univ.*,
2020 WL 434473 (D. Md. Jan. 28, 2020) ........................................ 28

*Kim v. Allison*,
8 F.4th 1170 (9th Cir. 2021) ........................................ 22, 31

*Koby v. ARS Nat'l Servs., Inc.*,
846 F.3d 1071 (9th Cir. 2017) ........................................ 27, 31, 33, 36

*Kurtz v. Kimberly-Clark Corp.*,
142 F.4th 112 (2d Cir. 2025) ........................................ 43

*Li v. First Unum Life Ins. Co.*,
2025 WL 326492 (S.D.N.Y. Jan. 29, 2025) ........................................ 40

*Lopes v. First Unum Life Ins. Co.*,
2011 WL 1239899 (E.D.N.Y. Mar. 30, 2011) ........................................ 40

*Mandujano v. Basic Vegetable Prods., Inc.*,
541 F.2d 832 (9th Cir. 1976) ........................................ 25

*Mars Steel Corp. v. Continental Illinois Nat'l Bank & Trust Co.*,
834 F.2d 677 (7th Cir.1987) ........................................ 33

*McAdams v. Robinson*,
26 F.4th 149 (4th Cir. 2022) ........................................ 5, 9

*McReynolds v. Richards-Cantave*,
588 F.3d 790 (2d Cir. 2009) ........................................ 47

*Metro. Life Ins. Co. v. Glenn*,
554 U.S. 105 (2008) ........................................ 40

*Mirfasihi v. Fleet Mortg. Corp.*,
356 F.3d 781 (7th Cir. 2004) ........................................ 44

*Mitchell v. Metro. Life Ins. Co.*,
523 F. Supp. 2d 1132 (C.D. Cal. 2007), *aff'd sub nom. Mitchell v. CB Richard Ellis Long Term Disability Plan*, 611 F.3d 1192 (9th Cir. 2010) ........................ 40

*Mitchell-Tracey v. United Gen. Title Ins. Co.*,
237 F.R.D. 551 (D. Md. 2006)........................................................................................ 45

*Molski v. Gleich*,
318 F.3d 937 (9th Cir. 2003) ................................................................................... 15, 47

*Murray v. Grocery Delivery E-Servs. USA Inc.*,
55 F.4th 340 (1st Cir. 2022)............................................................................................ 44

*Newsome v. Up-To-Date Laundry, Inc.*,
219 F.R.D. 356 (D. Md. 2004)........................................................................................ 47

*Penson v. Terminal Transp. Co.*,
634 F.2d 989 (5th Cir. 1981) .......................................................................................... 47

*Perez v. Asurion Corp.*,
501 F. Supp. 2d 1360 (S.D. Fla. 2007) .......................................................................... 26

*Pistilli v. First Unum Life Ins. Co.*,
2025 WL 2814714 (S.D.N.Y. Oct. 3, 2025) *mot. for relief from j. denied*, 2026 WL 836647 (Mar. 26, 2026);......................................................................... 40

*Polar Int'l Brokerage Corp. v. Reeve*,
187 F.R.D. 108 (S.D.N.Y. 1999) .................................................................................... 34

*Reynolds v. Beneficial Nat'l Bank*,
288 F.3d 277 (7th Cir. 2002) .......................................................................................... 42

*Savani v. URS Pro. Sols. LLC*,
121 F. Supp. 3d 564 (D.S.C. 2015)................................................................................. 28

*Schwartz v. Unum Life Ins. Co. of Am.*,
2025 WL 1827904 (N.D. Cal. July 1, 2025)................................................................... 40

*Sharp Farms v. Speaks*,
917 F.3d 276 (4th Cir. 2019) ..................................................................................... *passim*

*Sihler v. Fulfillment Lab, Inc.*,
2025 WL 1706909 (S.D. Cal. June 18, 2025)................................................................. 29

*Singleton v. Domino's Pizza, LLC*,
976 F. Supp. 2d 665 (D. Md. 2013)................................................................................ 28

*Skochin v. Genworth Fin., Inc.*,
2020 WL 6536140 (E.D. Va. Nov. 5, 2020) ..... 28

*Solomon v. Am. Web Loan, Inc.*,
2020 WL 13894520 (E.D. Va. Nov. 6, 2020) ..... 34

*Staton v. Boeing Co.*,
327 F.3d 938 (9th Cir.2003) ..... 28

*Stoudemire v. Lee Enters., Inc.*,
2025 WL 4114171 (S.D. Iowa Aug. 14, 2025) ..... 14

*Supler v. FKAACS, Inc.*,
2012 WL 5430328 (E.D.N.C. Nov. 6, 2012) ..... 27

*Sylvester v. CIGNA Corp.*,
369 F. Supp. 2d 34 (D. Me. 2005) ..... 15, 19, 33, 36

*Tarlecki v. Bebe Stores, Inc.*,
2009 WL 1364340 (N.D. Cal. May 14, 2009) ..... 34

*Tylka v. Gerber Prods. Co.*,
178 F.R.D. 493 (N.D. Ill. 1998) ..... 47

*United States v. Charles George Trucking Co.*,
823 F.2d 685 (1st Cir. 1987) ..... 20

*Vassalle v. Midland Funding LLC,*
708 F.3d 747 (6th Cir. 2013) ..... 27, 30, 44

*Ward v. Dixie Nat'l Life Ins. Co.*,
595 F.3d 164 (4th Cir. 2010) ..... 42-43

*Waters v. Cook's Pest Control, Inc.*,
2012 WL 2923542 (N.D. Ala. July 17, 2012) ..... 26

*Wit v. United Behavioral Health*,
79 F.4th 1068 (9th Cir. 2023) ..... 31

*Wolf v. W. L. Gore & Assocs., Inc.*,
2023 WL 5627326 (D. Md. Aug. 31, 2023) ..... 14

*Woodson v. Fulton*,
614 F.2d 940 (4th Cir. 1980) ..... 11

*Wyatt ex rel. Rawlins v. Horsley*,
793 F. Supp. 1053 (M.D. Ala. 1991) ..... 26

*1988 Tr. for Allen Child. Dated 8/8/88 v. Banner Life Ins. Co.*,
28 F.4th 513 (4th Cir. 2022) .......... 6, 7, 9, 12

**Statutes**

29 U.S.C. § 1104(a) .......... 13, 24

29 U.S.C. § 1105(a) .......... 13, 24

29 U.S.C. § 1109 .......... 12

29 U.S.C. § 1109(a) .......... 24

29 U.S.C. § 1132(a)(2) .......... 12, 13, 22, 24

29 U.S.C. § 1133(1) .......... 22

29 U.S.C. § 1133(2) .......... 22

**Rules**

Fed. R. Civ. P. 23(a)(4) .......... 2, 6, 42, 43

Fed. R. Civ. P. 23(b)(2) .......... 4, 47

Fed. R. Civ. P. 23(e) .......... 5

Fed. R. Civ. P. 23(e)(1) .......... 2, 8

Fed. R. Civ. P. 23(e)(2) .......... 2, 5, 6, 7

Fed. R. Civ. P. 23(e)(2)(D) .......... 27

Fed. R. Civ. P. 23(h)(1) .......... 8

**Treatises**

202 Am. Jur. Proof of Facts 3d 359 (2023) .......... 31

Herbert B. Newberg and William B. Rubenstein,
*Newberg and Rubenstein on Class Actions* (6th ed. 2022) .......... *passim*

**Other Authorities**

John C. Coffee, Jr., *Class Wars: The Dilemma of the Mass Tort Class Action*,
95 Colum. L. Rev. 1343 (1995) .......... 14, 36

John H. Langbein, *Trust Law As Regulatory Law: The Unum/Provident Scandal and Judicial Review of Benefit Denials Under ERISA*,
101 Nw. U. L. Rev. 1315 (2007) .......... 40

## INTRODUCTION

Objectors Jason Alford *et al.* (collectively, "Objectors")[1] respectfully submit these objections to the proposed class action settlement in this action (ECF No. 79-3). Also, in accordance with the Order Preliminarily Approving Settlement entered on June 1, 2026 (ECF No. 82), Objectors give formal notice of their intention to appear, through their counsel, at the Final Approval (Fairness) Hearing that the Court has scheduled on October 20, 2026, at 10:00 a.m. Eastern Time (ECF No. 86).

Plaintiffs commenced this action three years ago, alleging only that Defendants made racially discriminatory adjustments to the neuropsychological test results of retired NFL players applying for NC disability benefits under the Plan (ECF No. 1).[2] Shortly after filing their complaint, Plaintiffs and Defendants (collectively, "the Settling Parties") began settlement discussions. Two and one-half years after the filing of the case—which has never been litigated in any form—the Settling Parties presented a proposed mandatory class action settlement to the Court (ECF No. 79-3) ("Settlement"). Because the Settlement does not satisfy the requirements of Federal Rule of Civil Procedure ("Rule") 23(a)(4) or Rule 23(e) or comport with Fourth Circuit precedent, the Court should reject it.

[1] A complete list of the 101 class members on whose behalf these objections are filed appears in the Addendum.

[2] "The Plan" includes the NFL Player Disability & Survivor Benefit Plan (formerly the NFL Player Disability, Neurocognitive & Death Benefit Plan, the NFL Player Disability & Neurocognitive Benefit Plan, the NFL Player Supplemental Disability & Neurocognitive Benefit Plan, and the NFL Player Supplemental Disability Plan); the Bert Bell/Pete Rozelle NFL Player Retirement Plan; the Bert Bell NFL Player Retirement Plan; and the Pete Rozelle NFL Player Retirement Plan. "NC benefits" refers to Neurocognitive Disability benefits under Article 6 of the Plan, "T&P benefits" to Total & Permanent Disability benefits under Articles 3 and 4 of the Plan, and "LOD benefits" to Line of Duty Disability benefits under Article 5 of the Plan. Copies of the 2021 and 2017 versions of the Plan are annexed as Exhibits A and B, respectively, to the accompanying Declaration of Benjamin R. Barnett, dated Sept. 29, 2026 ("Barnett Declaration"). "Ex. __" standing alone refers to exhibits to the Barnett Declaration.

The Settlement has two central defects. The first is the breadth of its release. In exchange for relief addressing only that single discrimination-based claim, the class would release *every* ERISA claim relating to *any* evaluation of claims for benefits before the Effective Date, including claims brought on behalf of the Plan itself and the claims on which this Court denied summary judgment in *Alford v. The NFL Player Disability & Survivor Benefit Plan*, No. 1:23-cv-00358-JRR ("*Alford*"), where race-norming allegations were first raised. Controlling Fourth Circuit precedent prohibits a class settlement from extinguishing claims that do not share an identical factual predicate with the complaint.

The Court should also deny approval of the Settlement because an unknown number of absent class members likely did not receive timely or adequate notice. In a September 4, 2026 filing, the Settling Parties moved for leave to issue an Amended Class Notice, admitting that a (conspicuously undisclosed) number of class members were omitted from the June 30, 2026 mailing of Class Notice (ECF No. 96). Despite that failure, they did not request postponement of the October 20, 2026 Fairness Hearing. As a result, some class members will have received barely three weeks' notice to lodge objections and request an opportunity to appear at the Fairness Hearing (and that assumes the second notice was fully curative). That is an inadequate amount of time for purposes of both Rule 23(e)(1) and the constitutional guarantee of due process.

On the merits, the Settlement is not fair, adequate, or reasonable under Rule 23(e)(2). The Settlement was not forged in the crucible of genuinely adversarial proceedings in which claims and defenses were put to the test. In fact, the record is clear that *no* litigation or formal discovery preceded it. Each step toward settlement followed a development in *Alford*, a case in which neither Plaintiffs nor their counsel took part. Furthermore, Plaintiffs' counsel—lacking prior experience with the Plan—negotiated the Settlement against Defendants' long-serving ERISA counsel.

The proposed Settlement is also plainly inadequate. In defending it, the Settling Parties play up the risks to Plaintiffs while overlooking the considerable progress made by the plaintiffs in *Alford* ("the *Alford* Plaintiffs"), which, unlike this case, has actually been litigated for the past three and one-half years, surviving multiple attempts at dismissal. The two named plaintiffs, who are seeking *$50,000 each* in incentive awards for a case in which they bore no discovery or other litigation burden, are not being treated equitably with absent class members, including the *Alford* Plaintiffs. The remainder of the class is being offered paltry and uncertain settlement consideration in return for a sweeping release of all their valuable ERISA claims (including for fiduciary duty breaches), currently being contested vigorously on their behalf in *Alford*. Notably, a large segment of the class, as exemplified by the instant objections and others filed to date, is opposed to it. Given the well-funded state of the Plan, Plaintiffs could and should have exacted much more robust settlement consideration.

Finally, and most troubling, the proposed Settlement is manifestly unreasonable. Its other central defect is that the relief that it would provide to class members in exchange for a sweeping release of "any and all" ERISA claims is anemic. The limited injunctive relief merely memorializes Defendants' agreement to maintain a *voluntary* policy change prohibiting the use of racial discriminatory norms that they purportedly adopted unilaterally *over five years ago*. The other relief component—the potential rescoring of neuropsychological test results—rings hollow because a substantial number of class members will be subject to one or more of the numerous exclusions from rescoring eligibility. Moreover, the few class members eligible for rescoring will face an *unappealable* process overseen by the Settling Parties' designated experts, *both* of whom have an extensive record of *rejecting* disability benefits claims—and at the end of the day the

Board will retain the unfettered and unappealable discretion to deny benefits to any class member, even if their individual claim manages to clear all of these hurdles.

For all of these reasons, the Court should deny final approval of the Settlement. Alternatively, if the Court is inclined to grant final approval, it should do so only on condition that the Settling Parties first revise the sweeping release language to make clear and unambiguous that any release extends *only* to discrimination-based claims, such as those pleaded in the complaint. In the further alternative, the Court should defer entry of final judgment pending the issuance of supplemental notice to the class for the limited purpose of affording absent members the opportunity to opt out of the class. Class members should not be held captive to a settlement that is glaringly weak and to which many of them are steadfastly opposed solely because it is formally certified under Rule 23(b)(2).

Finally, if the Court awards fees and reimbursement of expenses to Plaintiffs' counsel, it should be for an amount markedly less than the over $4 million requested, given that this case was never litigated, no formal discovery was ever conducted, and the meager relief delivered to the class does not merit an award of that magnitude. Moreover, any incentive awards to Plaintiffs should be no more than $5,000-$7,500, which is in line with awards in other class cases in this Circuit, including ERISA cases, especially given that Plaintiffs faced no discovery obligations or other burdens in this case.[3]

[3] "JM" refers to pages of the Memorandum of Law in Support of Joint Motion for Entry of an Order Preliminarily Approving Class Settlement, Conditionally Certifying the Proposed Class for Settlement Purposes Only, and Scheduling a Final Fairness Hearing (ECF No. 79-1); "PFM" to pages of Plaintiffs' Memorandum in Support of Attorneys' Fees, Expenses, and Service Awards (ECF No. 88-1); "DFO" to pages of Defendants' Opposition to Plaintiffs' Motion for Attorneys' Fees, Expenses, and Service Awards (ECF No. 92); "PFR" to pages of Plaintiffs' Reply in Support of Motion for Attorneys' Fees, Expenses, and Service Awards (ECF No. 93); "Katz Decl." to paragraphs of the accompanying Declaration of Samuel L. Katz, dated Sept. 29, 2026. Except where otherwise indicated, internal citations, quotation marks, and footnotes are omitted from all quotations and any emphasis is added.

## ARGUMENT

### I. THE COURT SHOULD DENY FINAL APPROVAL TO THE SETTLEMENT BECAUSE IT IS NOT FAIR, ADEQUATE, OR REASONABLE

#### A. General Standards for Evaluating Proposed Class Action Settlements

Judicial review of proposed class settlements under Rule 23(e) "is more than a rubber stamp[.]" *Brent v. Advanced Med. Mgmt., LLC*, 733 F. Supp. 3d 376, 381 (D. Md. 2024). Rule 23(e) "requires courts to examine whether class settlements are 'fair, reasonable, and adequate' before approving them." *McAdams v. Robinson*, 26 F.4th 149, 159 (4th Cir. 2022) (quoting Fed. R Civ. P. 23(e)(2)); *accord Feinberg v. T. Rowe Price Grp., Inc.*, 610 F. Supp. 3d 758, 767 (D. Md. 2022) (similar language). The "primary concern" of Rule 23(e) "is the protection of class members whose rights may not have been given adequate consideration during the settlement negotiations." *Goodlaxson v. Mayor & City Council of Balt.*, 776 F. Supp. 3d 311, 320 (D. Md. 2025); *Brent*, 733 F. Supp. 3d at 382; *Black v. USAA Gen. Indem. Co.*, 2026 WL 1162079, at *11 (D. Md. Apr. 29, 2026); *Boger v. Citrix Sys., Inc.*, 2023 WL 3763974, at *5 (D. Md. June 1, 2023).

The Fourth Circuit "has developed multifactor standards for assessing whether a class-action settlement is fair, reasonable, and adequate under Rule 23(e)(2)." *In re Lumber Liquidators Chinese-Manufactured Flooring Prod. Mktg., Sales Pracs. & Prods. Liab. Litig.*, 952 F.3d 471, 484 (4th Cir. 2020); *Brent*, 733 F. Supp. 3d at 382. First, in determining a settlement's *fairness*, a court must consider: "(1) the posture of the case at the time settlement was proposed; (2) the extent of discovery that had been conducted; (3) the circumstances surrounding the negotiations; and (4) the experience of counsel in the [particular] area of [the] class action litigation." *Feinberg*, 610 F. Supp. 3d at 767 (brackets both in original and added); *accord Decohen v. Abbasi, LLC*, 299 F.R.D. 469, 479 (D. Md. 2014) (enumerating almost identically worded criteria) (citing cases).

The factors that a court must consider in assessing a proposed settlement's *adequacy* are "'(1) the relative strength of the plaintiffs' case on the merits, (2) the existence of any difficulties of proof or strong defenses the plaintiffs are likely to encounter if the case goes to trial, (3) the anticipated duration and expense of additional litigation, (4) the solvency of the defendant[] and the likelihood of recovery on a litigated judgment, and (5) the degree of opposition to the settlement.'" *In re Lumber Liquidators*, 952 F.3d at 484 (quoting *In re Jiffy Lube Sec. Litig.*, 927 F.2d 155, 159 (4th Cir. 1991)); *accord Sharp Farms v. Speaks*, 917 F.3d 276, 301-02 (4th Cir. 2019) (applying factors and finding settlement inadequate); *Feinberg*, 610 F. Supp. 3d at 767-68 (articulating substantively identical factors).

Whereas "the fairness prong is concerned with the *procedural* propriety of the proposed settlement agreement … the adequacy prong focuses on the agreement's *substantive* propriety." *Edelen v. Am. Residential Servs., LLC*, 2013 WL 3816986, at *8 (D. Md. July 22, 2013); *accord Brent*, 733 F. Supp. 3d at 382 (employing similar language); *see also Sharp Farms*, 917 F.3d at 299-302 (settlement was substantively inadequate to justify extinguishing right to pursue other pending lawsuit). Thus, in judging the adequacy of a settlement, the Court should determine "whether a settlement is good enough to justify extinguishing the claims of absent individual class members." *1988 Tr. for Allen Child. Dated 8/8/88 v. Banner Life Ins. Co.*, 28 F.4th 513, 526 n.7 (4th Cir. 2022) (emphasis omitted) [4]

Although the Fourth Circuit has not enumerated factors for gauging a class settlement's reasonableness, it has suggested that the reasonableness inquiry entails an examination of the

[4] "'[A]dequacy' for Rule 23(e)(2) settlement approval purposes is not identical to 'adequacy' in the Rule 23(a)(4) class certification context, although … the two can overlap in some respects. The former addresses whether a *settlement* is good enough to justify extinguishing the claims of absent individual class members; the latter addresses whether the *class representatives* will do a good enough job to justify allowing the plaintiffs to proceed as a class at all." *Id.* (emphasis in original).

amount of the settlement. *1988 Tr. for Allen Child. Dated 8/8/88*, 28 F.4th at 527; *accord Feinberg*, 610 F. Supp. 3d at 769; *Boger*, 2023 WL 3763974, at *6. "To the extent that reasonableness does any work not already performed by one of the other Rule 23(e)(2) requirements, … it at least ensures that the amount on offer is commensurate with the scale of the litigation and the plaintiffs' chances of success at trial." *1988 Tr. for Allen Child. Dated 8/8/88*, 28 F.4th at 527; *see also*, *e.g.*, *Brent*, 733 F. Supp. 3d at 384 (proponents did not adequately address how "such a small pecuniary benefit [was] reasonable").

Finally, the burden of proving that a settlement is fair, reasonable, and adequate rests with the settlement's proponents. *Goodlaxson*, 776 F. Supp. 3d at 319 ("[A]fter a final fairness hearing, the court approves the settlement if the proponents of the settlement satisfy their burden of showing that it is fair, adequate, and reasonable.").[5] For the reasons discussed below, the Settling Parties have failed to carry that burden in this case.

**B. Notice of the Proposed Settlement Was Inadequate, Barring Approval Now**

"[C]ourts typically provide for a few months between the issuance of settlement notice and either the deadline for objections or the fairness hearing." 3 Herbert B. Newberg and William B. Rubenstein, *Newberg and Rubenstein on Class Actions* ["*Newberg and Rubenstein*"] § 8.16 & n.6 (6th ed. 2022) (collecting cases). "Since important due process rights are at stake, and time is rarely of immense importance, however, there is no compelling reason that class members should not be given at least 60 days' time frame in which to file objections or appear at a fairness hearing."

---

[5] *Accord In re Dry Max Pampers Litig.*, 724 F.3d 713, 719 (6th Cir. 2013) (citing treatise); *Ault v. Walt Disney World Co.*, 692 F.3d 1212, 1216 (11th Cir. 2012) ("The proponents of class action[] settlements bear the burden of ... demonstrating that the settlement distribution is fair, reasonable, and adequate."); *In re Katrina Canal Breaches Litig.*, 628 F.3d 185, 196 (5th Cir. 2010) ("[T]he burden is on the settlement proponents to persuade the court that the agreement is fair, reasonable, and adequate for the absent class members who are to be bound by the settlement.") (citing treatises).

*Id.*; *see*, *e.g.*, *In re Serzone Prods. Liab. Litig.*, 231 F.R.D. 221, 235 (S.D.W. Va. 2005) (four-month period was "consistent with court-approved best practices for class notice campaigns"). Even courts that have afforded fewer than 60 days have typically given absent class members no fewer than 30-35 days. 3 *Newberg and Rubenstein* § 8.16 & n.7 (citing cases).

Here, the Settling Parties filed a joint motion on September 4, 2026, seeking leave to issue an amended Class Notice. ECF No. 96. In that motion, they advised that there were "*additional* individuals who fall within the Settlement Class as defined in the Settlement Agreement and to whom the June 30, 2026 Notice was not mailed." *Id.* at 2. Significantly, they did not quantify or disclose to the Court the number of "additional" putative class members who had not been sent the original notice.

Even assuming that the Amended Class Notice was mailed to all of those "additional" members whom the Settling Parties acknowledged as having been omitted from the June 30th mailing on the same date that the Court granted their motion (September 4, 2026 (ECF No. 97))—for which there is no evidence in the record —those members have received, at most, roughly three weeks' notice—and quite likely significantly less than that.[6] Those same members were afforded equally inadequate time to evaluate Plaintiffs' counsel's request for fees, expenses, and service awards totaling $4,140,971.69, filed on July 21, 2026, of which the Amended Class Notice gave them their first word. *See* ECF No. 96 at 3. Rule 23(h)(1) requires that notice of a fee motion "be directed to class members in a reasonable manner." Three weeks to consider the Settlement's terms *and* the fee request was inadequate notice under Rules 23(e)(1) and 23(h)(1), and for purposes of satisfying due process.

[6] Indeed, one objector noted that he received Class Notice only on September 10, 2026, just 19 days before the deadline for filing objections. Obj. of Amon Arnold (ECF No. 103 at 2). Another did not even receive notice and learned about the Settlement only from another putative class member. Obj. of Joseph Horn (ECF No. 118 at 4).

**C. The Proposed Settlement Is Unfair**

Even if the Settlement does not fail for lack of proper notice to all putative class members, the Court should deny final approval because it does not pass muster under the fair, reasonable, and adequate test. A court acts as a fiduciary to a proposed settlement class. *Sharp Farms*, 917 F.3d at 293-94. It "must protect the class's interests from parties and counsel overeager to settle (who may deny absent class members relief that they would otherwise receive)[.]" *1988 Tr. for Allen Child. Dated 8/8/88*, 28 F.4th at 521. Here, everything surrounding the Settlement—the complete absence of any litigation from Day One; the lack of any formal, adversarial discovery; the circumstances surrounding the Settlement's negotiation; and the lack of arm's length negotiations resulting from Counsel's lack of prior experience with the particular Plan—all demonstrate its unfairness.

**1. The Broad Release Extinguishes Claims That Do Not Share Identical Factual Predicates with the Complaint**

The Settlement's release contravenes controlling Fourth Circuit decisions concerning the identical factual predicates rule. A class action settlement may release only "claims arising out of the 'identical factual predicate'" as the class representatives' allegations. *Berry v. Schulman*, 807 F.3d 600, 616 (4th Cir. 2015). "Claims have an identical factual predicate [only] when they depend[] upon the *very same set of facts*." *McAdams v. Robinson*, 26 F.4th 149, 160 (4th Cir. 2022) (citing cases). Simply put, "to authorize and approve a class settlement that seeks to settle materially *distinct and non-litigated claims* goes too far." *In re Lumber Liquidators Chinese-Manufactured Flooring Prods. Mktg., Sales Pracs. & Prods. Liab. Litig.*, 91 F.4th 174, 183 (4th Cir. 2024).[7]

[7] *See*, *e.g.*, *Brent*, 733 F. Supp. 3d at 384 (settlement's "release appear[ed] to be broader than permitted in the Fourth Circuit" where it attempted "to release 'any and all claims, costs, damages, exposure, liability, and/or loss, direct or indirect, under any theory or cause of action at law or in equity, asserted or not asserted,

In this case, Plaintiffs filed their complaint on September 29, 2023, predicated "*exclusively* [on] Defendants' discriminatory actions." ECF No. 1 (Compl. ¶ 179); *see also* ECF 83 at 3 (Class Notice, stating: "The Class Action Complaint made *allegations concerning the application of race-based demographic adjustments in neurocognitive testing*.").[8] The extremely narrow identical factual predicates in Plaintiffs' underlying allegations of racial discrimination from the Class Representatives' claims for reclassification to a higher level of benefits are:

(1) Plaintiffs Curry and Bailey each applied for NC benefits *only*,
(2) Both were awarded NC benefits at the *mild* classification level, and
(3) Both sued, alleging a theory that the higher *moderate* classification level of NC benefits was not awarded due *solely* to Defendants' application of racially based demographic adjustments to neuropsychological test scores.

*See* ECF No. 1 at 16-19, 22-23 (Compl. ¶¶ 110-32, 158-68); Ex. A (2021 Plan § 6.4(a)-(b)) (schedules specifying minimum "mild" and "moderate" NC benefits amounts), Ex. B (2017 Plan § 6.4(a)-(b)) (schedules of minimum "mild" and "moderate" NC benefits under previous version of Plan). No other factual predicate is necessary to their non-litigated allegations.

The Settlement's release, though, extinguishes not only claims "that arise out of or relate in any way to the matters, facts, or occurrences alleged in the Action, including but not limited to any claims arising out of or related to the use of race-based demographic adjustments or consideration of race in any way in neuropsychological or cognitive testing or scoring," but also any claim related to any "*evaluation of claims for benefits under the Plans at any time prior to the Effective Date*," and "[t]he Released Claims include, without limitation, *all claims under ERISA*."

---

known or unknown, arising from or in any way related to the Cyberattack under federal, state, foreign, or other law or regulation'") (citing cases).

[8] The Class Notice inaccurately stated that the complaint was filed on July 25, 2023 (ECF No. 83 at 3) when, in fact, it was filed more than two months later, on September 29, 2023 (ECF No. 1).

ECF No. 79-3 at 11-12 (Settlement § II.20).

Furthermore, the Settlement declares that "[t]he Parties intend that this Release be interpreted *broadly* to extinguish any and all claims that were brought or could have been brought." *Id.* at 22 (Settlement § VII.A). The release is impermissibly broad because "the scope of the class claim[] and the facts underlying the class complaint[] conclusively show that the Settlement Agreement did not settle claims premised on" all T&P, LOD, and NC "*evaluation*[*s*] *of claims for benefits under the Plans at any time prior to the Effective Date*" (ECF No. 79-3 at 12 (Settlement § II.20)). *See In re Lumber Liquidators*, 91 F.4th at 184.

This contravention of Fourth Circuit law directly impacts the *Alford* Plaintiffs' existing claims. "Although there are shared factual allegations" between Plaintiffs here and the *Alford* Plaintiffs— for instance, all were evaluated by a Plan physician—"the class representatives [here] notably failed to allege," among other things, that Defendants violated ERISA in their adoption and implementation of: (1) an improper policy and practice of invariably defaulting to Neutral Physicians' opinions irrespective of other evidence contained in the reports of those physicians themselves or medical evidence submitted by the applicant; (2) a practice of disregarding longstanding ERISA precedent requiring consideration of the cumulative effect of T&P applicants' impairments across the spectrum of medical specialties; or (3) the Plan's T&P policy mandating consideration of applicants' educational level despite the Plan's explicit preclusion of such consideration. *See* Ex. C at 12-13, 15-18 (opening mem. in supp. of renewed class certification mot., outlining policies and practices challenged by each proposed class). *See In re Lumber Liquidators*, 91 F.4th at 184-85; *Brent*, 733 F. Supp. 3d at 384 *see also*, *e.g.*, *Woodson v. Fulton*, 614 F.2d 940, 942 (4th Cir. 1980) (class action settling allegations of discriminatory treatment did not bar class members from bringing distinct suit for "his discriminatory discharge claim").

"Of great importance, at no point did any class representative [here] ever allege or pursue" relief *on behalf of the Plan itself* pursuant to ERISA §§ 409 and 502(a)(2), 29 U.S.C. §§ 1109 and 1132(a)(2), as the *Alford* Plaintiffs have plainly done. *See In re Lumber Liquidators*, 91 F.4th at 185. To the contrary, Plaintiffs' counsel here made the conscious decision to *not* pursue relief on behalf of the Plan itself under ERISA § 502(a)(2). *E.g.*, ECF No. 88-3 at 8, 14 (Sinclair Decl. ¶¶ 33, 63) (counsel's strategy disclaimed seeking remedies on behalf of the Plan itself; "design relief that the Court could enforce without replacing the plan-administration structure"; "For example, why ask for removal of the entire board of a plan?").

Notably, in contrast to the impermissibly broad release proposed here, in *1988 Tr. for Allen Children Dated 8/8/88*—two of Plaintiffs' counsel were among the counsel of record—the plaintiffs' counsel ensured that the release explicitly (and properly) was limited to "[a]ny and all claims ... arising out of or relating to the implemented or not implemented COI Rate Increases or any claims or causes of action that were or could have been alleged in the Consolidated Actions Complaints *based on the same factual predicate*[.]" *1988 Tr. for Allen Child. Dated 8/8/88*, 28 F.4th at 518. Indeed, in response to an objector's arguments about the release's breadth, the Fourth Circuit noted, citing their brief, that "the settlement agreement only release[ed] claims 'based on the same factual predicate' as the … complaint." *Id.* at 526 n.8. Thus, Plaintiffs' counsel failed to employ their prior relevant experience to ensure that the release in this case is likewise narrowly tailored to comport with the Fourth Circuit's identical factual predicates rule.

What the class broadly surrenders can be measured against what this Court has already held. The overbroad release covers every claim arising from any "evaluation of claims for benefits under the Plans at any time prior to the Effective Date." ECF No. 79-3 at 12 (Settlement § II.20). Among those claims are the ones on which this Court denied summary judgment in *Alford* three

months before this Settlement was presented for approval: wrongful denial of benefits under ERISA § 502(a)(1)(B), failure to give adequate written notice of the reasons for denial under ERISA § 503(1), denial of full and fair review under ERISA § 503(2), and breaches of fiduciary duty owed to the Plan itself under §§ ERISA 404(a), 405(a), 409, and 502(a)(2). Ex. F at 2-3, 17-40. The Court found that questions including, but not limited to, bad faith and Defendants' breaches of fiduciary duties harming the Plan "remain[] subject to disputes of material fact." *Id.* at 33, 38 ("Because the court declines to enter summary judgment as to Count V, it declines to reach the question whether removal is a proper form of relief should Plaintiffs prevail."). No class member is offered anything for any of it, yet no class member may opt out.

In sum, a release that purports to resolve all ERISA claims not based on discrimination, as well as all ERISA claims brought on behalf of the Plan itself, runs afoul of the identical factual predicates rule. The Settlement cannot be approved with the current overbroad release.[9]

**2. This Case's Procedural Posture Weighs Against the Settlement's Fairness**

Courts look to the procedural posture of the case at settlement to determine whether it is the product of legitimate, arms-length negotiations, and "tend to apply a stricter scrutiny at the approval stages to settlements that are not preceded by meaningful litigation." 4 *Newberg and Rubenstein* § 13:14.[10] In *Brent*, the court rejected the settlement where "little of substance ha[d]

[9] "[T]he broadening of the claims, certainly made to assure [Defendants] that all possible claims could be resolved in this case, as compared to the universe of claims addressed in the [*Alford*] action[], is … evidence of [Defendants] controlling the course of the negotiations." *Figueroa v. Sharper Image Corp.*, 517 F. Supp. 2d 1292, 1323 (S.D. Fla. 2007).

[10] *See Cole v. Lane Bryant, Inc.*, 2025 WL 823268, at *2 (N.D. Cal. Feb. 10, 2025) ("district courts must carefully scrutinize pre-class certification settlements"); *In re Lumber Liquidators*, 2018 WL 11203065, at *4 (E.D. Va. Oct. 9, 2018) ("When a case settles at a very early stage of litigation, questions of possible collusion, and thus the fundamental fairness of the settlement, arise. By contrast, in cases in which discovery has been substantial and several briefs have been filed and argued, courts should be inclined to favor the legitimacy of a settlement."), *aff'd in relevant part*, 952 F.3d 471, 484 (4th Cir. 2020); *In re Jiffy Lube Sec. Litig.*, 1990 WL 39127, at *6 (D. Md. Jan. 2, 1990) (settlement at very early stage of litigation and before any formal discovery is taken raises inference of collusion among the Settling Parties);

occurred on the docket," the case was "still very much in its procedural infancy" and it had been "barely litigated before it went to mediation." *Brent*, 733 F. Supp. 3d 380-81. It noted that "[w]hile there appear[ed] to have been some exchange of information between the parties, there was no formal discovery in th[e] case." *Id.* at 384.

Here, this Settlement warrants heightened scrutiny because it is undisputed that it was not forged in the crucible of litigation. Plaintiffs brought this action, *but they never litigated it*. Issue was not joined because Defendants never answered the complaint. No motion to dismiss, or for judgment on the pleadings, class certification, or summary judgment was ever filed—let alone briefed and adjudicated. The only motion that Plaintiffs' counsel filed was their own uncontested application to be appointed Interim Class Counsel.[11]

---

*see also Brent*, 733 F. Supp. 3d at 381 (court's attention to whether proposed settlement class satisfies Rule 23 is "particularly important … where the case is still very much in its procedural infancy and there has been little opportunity for litigation"); 4 *Newberg and Rubenstein* § 13:50 (noting that "dangers of collusion are greater in … circumstances" involving pre-class certification settlements); John C. Coffee, Jr., *Class Wars: The Dilemma of the Mass Tort Class Action*, 95 Colum. L. Rev. 1343, 1380 (1995) ("the newer pattern [of collusion] has involved a settlement reached after little or no active litigation"); *cf. In re Sprint Corp. ERISA Litig.*, 443 F. Supp. 2d 1249, 1260 (D. Kan. 2006) (settlement fairly and honestly negotiated where serious settlement discussions began after two rounds of motions to dismiss, parties had begun to engage in discovery, and plaintiffs had filed motion for class certification, and thus "counsel litigated th[e] case during its early phases aggressively"); *Stoudemire v. Lee Enters., Inc.*, 2025 WL 4114171, at *2 (S.D. Iowa Aug. 14, 2025) (approving settlement where "the parties did not reach settlement until after litigating the motion to dismiss and engaging in discovery"); *In re MedStar ERISA Litig.*, 2024 WL 4110941, at *4 (D. Md. Sept. 5, 2024) (settlement fair where "the case was vigorously litigated by the parties, and settled only after extensive fact and expert discovery was completed, after various issues were litigated, and after a bench trial was set").

[11] The motion was unnecessary because there was no competing slate of attorneys. *See*, *e.g*., *Wolf v. W. L. Gore & Assocs., Inc.*, 2023 WL 5627326, at *2 (D. Md. Aug. 31, 2023) (denying motion for interim class counsel appointment because plaintiffs "ha[d] not identified overlapping, duplicative, or competing suits, nor the potential for any additional attorneys to enter the fray"); *Doe v. Mindgeek USA Inc.*, 2021 WL 11723140, at *1-2 (C.D. Cal. June 3, 2021) (denying similar motion where "no other competing or duplicative cases" had been filed in that court); *In re LinkedIn Advert. Metrics Litig.*, 2021 WL 1599289, at *1 (N.D. Cal. Apr. 23, 2021) (denying similar motion where "[t]he parties ha[d] not identified any other related lawsuits or the potential for additional attorneys to enter the fray. Nor [did] there appear to be a gaggle of law firms jockeying to be appointed class counsel.").

In all, Plaintiffs merely filed a complaint, obtained multiple stays of proceedings, joined in a series of boilerplate status reports, and purported to review a set of Plan documents that Defendants *voluntarily* provided. The Settling Parties concede, as they must, the complete absence of adversarial proceedings.[12] Such a procedural posture raises serious concerns about the Settlement's fairness. *See Sharp Farms*, 917 F.3d at 301 (settlement not fair, adequate, and reasonable where Settling Parties reached settlement "after having conducted essentially no adversarial discovery and without the [defendant] even having filed an answer to the … complaint"); *Brent*, 733 F. Supp. 3d at 380-81, 384 (settlement not fair where case barely litigated and no formal discovery).[13]

**3. The Total Absence of Formal, Adversarial Discovery Also Cuts Against the Settlement's Fairness**

Besides the complete absence of any litigation, no formal, adversarial discovery was ever conducted in this case. "[T]he extent of discovery conducted prior to settlement—ha[s] long been a *central* factor" in courts' fairness analysis. 4 *Newberg and Rubenstein* § 13:49; *see Sharp Farms*, 917 F.3d at 301 (reversing approval of settlement that parties reached "after having conducted essentially no adversarial discovery"); *Molski v. Gleich*, 318 F.3d 937, 954 (9th Cir. 2003) (settlement's fairness "particularly problematic because only a minimal amount of discovery

[12] *See* DFO4, 9, 12 (admitting "no dispositive issue was briefed, argued, or decided"; no "adversarial litigation"); PFR1 ("absence of contested motions"; "absence of formal adjudication"); JM19 ("the case 'procedurally speaking—is not very advanced'"; "Defendants engaged in preliminary settlement discussions shortly after the Complaint was filed."); PFM9-11; DFO1, 3, 25 ("limited litigation activity"; "matter stayed for settlement two months after filing and resolved without a single contested motion."); DFO18 ("[t]his case was stayed for settlement shortly after filing").

[13] *See also In re Dry Max Pampers Litig.*, 724 F.3d at 716 (reversing district court finding deal was fair; defendant only "filed a motion to dismiss," and "[b]efore Plaintiffs responded to the motion,... and indeed before any formal discovery in the case—the parties began discussing settlement."; "absent class members cannot opt out of the deal."); *Sylvester v. CIGNA Corp.*, 369 F. Supp. 2d 34, 48 (D. Me. 2005) ("[T]he Court does not believe that either the stage of this litigation or the amount of discovery completed necessarily suggest that the proposed settlement is fair, reasonable and adequate.").

occurred in this case"), *overruled in part on other grounds by Dukes v. Wal-Mart Stores, Inc.*, 603 F.3d 571 (9th Cir. 2010); *Brent*, 733 F. Supp. 3d at 384 (settlement not fair where case settled "in its infancy," "was barely litigated before it went to mediation," and "[w]hile there appear[ed] to have been some exchange of information between the parties, there was no formal discovery in th[e] case"); *Grady v. RCM Techs., Inc.*, 671 F. Supp. 3d 1065, 1074 (C.D. Cal. 2023) ("A settlement that has been reached before plaintiffs' counsel ha[ve] had the benefit of the discovery necessary to make an informed evaluation of the case and, accordingly, to strike a fair and adequate settlement is inherently worthy of a court's skepticism.").[14] The total absence of *any* formal, adversarial discovery casts serious doubt on the Settlement's fairness.[15]

#### 4. Circumstances Surrounding the Negotiations Further Weigh Against the Settlement's Fairness

The chronology of related events discussed below directly bears on the Settlement's fairness. Every step taken in this case followed a development in the far more advanced *Alford* litigation, a case in which neither these plaintiffs nor their counsel took part.

##### a. Each Step Here Came After a Ruling or a Production in *Alford*

Circumstances surrounding the negotiation of the Settlement call its fairness into question,

---

[14] As the authors of the leading class action treatise explain, courts evaluating proposed class settlements have long inquired into whether full discovery has been conducted for two reasons:

> *First*, if extensive discovery has been done, a court may assume that the parties have a good understanding of the strengths and weaknesses of their respective cases and hence that the settlement's value is based upon such adequate information. *Second*, full discovery demonstrates that the parties have litigated the case in an adversarial manner and is, therefore, an indirect indicator that a settlement is not collusive but arms-length.

4 *Newberg and Rubenstein* § 13:49 & n.15 (collecting cases).

[15] Although the Settling Parties refer to "vigorous informal discovery" having been exchanged over the course of their settlement talks (JM19), they do not provide the Court or potential class members any information regarding the informal discovery, and it is almost certain that that it did not involve any depositions. Counsel's time records indicate that the documents voluntarily provided by Defendants are merely documents that any Plan Participant is required to be provided upon request pursuant to ERISA.

namely, whether this case "served as a convenient placeholder for" Defendants. *Sharp Farms*, 917 F.3d at 292 (district court abused its discretion in rejecting possibility of collusion based alone on involvement of a mediator). It is fair to say that "the strength of [another] case drove the settlement negotiations." *Id*. Notably, more than six weeks *before* Plaintiffs filed their only complaint in this case, alleging discriminatory treatment of class members based on race, the *Alford* Plaintiffs had already *explicitly argued* in multiple filings, not only racially discriminatory adjustments to test scores, but also wrongful benefits denials, inadequate notice, patterns and practices of denying full and fair review, and 13 *other* breaches of fiduciary duties *materially distinct* from discrimination, including allegations that these actions harmed the Plan itself.[16] Shortly after the *Alford* Plaintiffs made their arguments, Plaintiffs filed their complaint in this case, exclusively predicated on a discrimination theory already presented in *Alford*. ECF No. 1 (Compl. ¶ 179) ("There are questions of law or fact common to all members of the Class *concerning exclusively Defendants' discriminatory actions*.").[17]

Defendants, by contrast, never answered in this case. Instead, on December 4, 2023, just nine weeks after this case was commenced, the Settling Parties jointly moved to stay the action to pursue settlement discussions (ECF No. 3). Defendants concede that the "litigation never progressed beyond the settlement track." DFO1 ("This case was resolved … before any

[16] *See* Ex. D at 37 (Pls.' Mem. of Law in Opp. to Defs.' Joint Rule 12(b)(6) Mot. to Dismiss Pls.' Am. Class Action Compl.) ("Plaintiffs also plausibly establish that Defendants breached their fiduciary duties by discriminating against African-American Players. [A]t the very least, that *Defendants have sanctioned their physicians' application of discriminatory racial norms to neurocognitive test results*.") (citing Ex. E (Am Compl. ¶¶ 127, 167, 169, 182)).

[17] Before the complaint was even filed in this case, the docket in *Alford* already had extensive adversarial filings, including (i) Defendants' initial motion to dismiss (*Alford* ECF No. 53 (Apr. 21, 2023)), (ii) the *Alford* Plaintiffs' 120-page amended complaint (Ex. E (May 12, 2023)), (iii) Defendants' motion to dismiss the amended complaint (*Alford* ECF No. 69 (June 27, 2023)), (iv) the *Alford* Plaintiffs' opposition to the motion to dismiss (Ex. D (Aug. 11, 2023)), and (v) Defendants' reply in support of their motion to dismiss (*Alford* ECF No. 73 (Sept. 14, 2023)). For ease of reference, a complete docket sheet from the *Alford* action is annexed as Exhibit P to the Barnett Declaration.

adversarial litigation occurred. Plaintiffs filed a Complaint. … Approximately two months later, the parties jointly moved to stay the action so they could pursue settlement discussions."); *see also* DFO2-4, 9, 12, 25.[18]

On March 21, 2024, this Court sustained four of the five counts in the amended *Alford* complaint. Ex. L (mot. to dismiss mem. op.). Just a few days later, on March 25, 2024, the Settling Parties met and shortly thereafter represented to the Court that Plaintiffs' counsel were preparing "a formal settlement proposal with a mechanism for resolution." 5th Joint Status Report (ECF No. 42 (¶¶ 6-7)) (Apr. 10, 2024). Stay after stay of proceedings ensued in this action. *E.g.*, ECF Nos. 32, 40, 46, 50, 58, 62, 66, 69, 72.

Significantly, on May 7, 2025, the adversarial proceedings in *Alford* finally resulted in Defendants' actual production of the June 8, 2021 memorandum directing Plan physicians to thenceforth stop using racially discriminatory norms in neuropsychological testing. *See Alford* ECF Nos. 219-23 (Ex. M) and 348-1 (Ex. U) (filed under seal). Shortly thereafter, the Settling Parties represented to the Court that they had reached an agreement in principle and were "currently preparing a draft Settlement Agreement." 19th Joint Status Report (ECF No. 61 (¶ 16)) (June 10, 2025).

Seven months of status reports followed, with no settlement presented to the Court. On January 28, 2026, the Court denied Defendants' motions for summary judgment in *Alford* on all counts and on all claims. Ex. F (summ. j. op.). The same day, Plaintiffs provided Defendants "with a draft motion for preliminary approval and certification of the settlement class." 27th Joint Status Report (ECF No. 73 at 6-7 (¶ 25) (Feb. 6, 2026)). But it was not until four months later, on

[18] Indeed, even *before* filing their complaint, Plaintiffs' counsel were focusing on settling rather than litigating. *See* ECF No. 88-3 at 31 (time entry dated Sept. 16, 2023, noting drafting of "global strategy document … to guide case strategy" and prepare "options for strategical [sic] guiding the plans into" resolution).

May 29, 2026, that a motion for preliminary settlement approval and a proposed settlement agreement were finally presented to the Court. (ECF No. 79).

**b. The Settlement Reflects a Troubling Disparity in Understanding and Experience with the Plan**

"The fairness analysis is intended primarily to ensure that a settlement [is] reached as a result of good-faith bargaining at arm's length." *Berry*, 807 F.3d at 614. The fairness inquiry's purpose "is to protect against the danger of counsel—who are commonly repeat players in larger-scale litigation—from compromising a suit for an inadequate amount for the sake of insuring a fee." *Black*, 2026 WL 1162079, at *15; *In re Am. Cap. S'holder Derivative Litig.*, 2013 WL 3322294, at *3 (D. Md. June 28, 2013) (same). "'For Plaintiffs to have brokered a fair settlement, they must have been armed with sufficient information about the case to have been able to reasonably assess its strengths and value." *Figueroa*, 517 F. Supp. 2d at 1322.

Here, the Settlement's terms heavily rely on particular knowledge of critical and nuanced intricacies of the Plan's terms, and this specific fiduciary's conduct. *See* DFO5, 21 (settlement "depends on … application of the governing Plan terms"; "counsel had to understand the Plans"). Although Plaintiffs' counsel have substantial class action experience and have previously litigated other ERISA cases, there is no evidence they have any prior or substantial experience with the Plan or the Board. *See Sylvester*, 369 F. Supp. 2d at 48 (noting, in context of fairness analysis, that "[a]t least some members of this team … have been involved in one or more previous cases pressing similar claims against [the same defendant]"). "Plaintiffs' counsel necessarily negotiated from a position of weakness, with the specter of a stay of this case a constant companion." *Figueroa*, 517 F. Supp. 2d at 1322. Indeed, their time entries "confirm[] Class Counsel negotiated from a position of weakness." *Id.*; *see*, *e.g.*, ECF No. 88-3 at 40 (entries 10 months into this case, reflecting review of Plan terms). Plaintiffs' counsel's lack of any specific prior experience with

the Plan's terms combined with the pressure on them to settle from Defendants' "*threat* to unilaterally determine new scores without oversight, [and Defendants'] *threat* to" perform "rescoring according to their own path" (ECF No. 88-3 at 40) rendered counsel susceptible to being taken advantage of by Defendants' seasoned counsel.[19]

In short, given the Settling Parties' inequality of knowledge, the Settlement delivers negligible relief (*see* Section I.E, *infra*) in exchange for an improperly far-reaching release, reflecting the antithesis of the roughly equal bargaining power presumed in an arm's length agreement. It suggests that Plaintiffs' counsel were outmaneuvered—to the detriment not only of absent class members in general, but of the *Alford* Plaintiffs in particular, who, in contrast to Plaintiffs here, have vigorously litigated their claims for the past three and one-half years.

Defendants supply the last word on this subject themselves. Opposing Plaintiffs' counsel's fee petition, they told the Court that the Settlement's "core new relief" is "what Defendants committed to provide from the outset of this case," and that the agreement's "remaining terms reflect the Plans' cooperative posture rather than the fruits of adversarial litigation." DFO2-3. On Defendants' own account, then, thirty months of negotiation, seven mediation sessions, and some 3,000 claimed hours produced what was available at the very start.[20]

[19] In contrast, Groom Law Group's *decades* of representing Defendants has led to it possessing extensive knowledge of the Plan's terms. *See* PFR10 ("sophisticated set of Defendants with high-level defense counsel"); PFM22 ("Defendants had immediate access to their documents, plan records, physician relationships, and actuarial and neuropsychological data. They had an expert on staff and, because Groom Law Group was involved in the drafting and management of the Plans at issue, the defense was already familiar with the inner workings of the Plans."; "Class Counsel had to obtain all of that from the outside" and explaining "[t]he work required to build … from an adverse record is categorically different from … defend[ing] records in one's own possession."; "Defendants' in-house ERISA and legal personnel … including that of their expert, Dr. Garmoe, who also happens to be a current reviewing physician for the Plans and is already familiar with the Plans and their requirements."). "Information is knowledge, and knowledge is power." *United States v. Charles George Trucking Co.*, 823 F.2d 685, 689 (1st Cir. 1987).

[20] Disparity of knowledge and experience aside, there are aspects of how this case was developed that do not add up. In their complaint, Plaintiffs alleged that they discovered the use of racial norming only "because the information was publicly disclosed and, for all intents and purposes, acknowledged by the

### D. The Proposed Settlement Is Inadequate

"The most important factors in [the adequacy] analysis are the relative strength of the plaintiffs' claims on the merits and the existence of any difficulties of proof or strong defenses." *Sharp Farms*, 917 F.3d at 299; *Brent*, 733 F. Supp. 3d at 382. Consideration of those factors here weighs heavily against the Settlement's adequacy.

#### 1. The Strengths of Plaintiffs' Claims and Relative Difficulties of Proof and Defenses They Would Face Undercut the Settlement's Adequacy

"[A]t this very early stage of the case, it is difficult for the Court to assess the relative strength of the [Plaintiffs'] case or the existence of difficulties of proof or defenses." *Brent*, 733 F. Supp. 3d at 384. Because this case was never litigated, the best way to accurately measure the strengths and weaknesses of its merits is to compare this case to the record developed over several years in the vigorously litigated *Alford* action. "A high-level comparison of the two cases provides a useful starting point for [the Court's] analysis" of the Settlement's adequacy, *Sharp Farms*, 917

NFL in the Concussion Litigation" (ECF No. 1 at 19 (Compl. ¶ 133)). Curiously, they referred *only* to the very three neuropsychological tests that the then-confidential June 8, 2021 memorandum addressed (*id.* at 16, 20 (Compl. ¶¶ 111, 137-40). But the referenced agreement reached in the *NFL Players' Concussion Litigation*—which preceded the filing of this case by nearly 18 months—addressed the use of racial norming in a *host* of other overlapping tests with the Plan's testing protocol, not just those three. *See* Ex. G (Order and Exhibits, at Ex. 1 (ECF No. 11648-1 at 3, 7-10), *In re Nat'l Football League Players' Concussion Injury Litig.*, No. 2:12-md-02323-AB (E.D. Pa. Mar. 4, 2022) (enumerating battery of numerous tests and impairment criteria). Also, counsel contend that "[t]ranslating th[e discriminatory] practice into a cognizable legal claim under ERISA … required *significant* ... *expert consultation*" (PFM23), but their time entries reveal that that no expert consultations took place until 16 months *after* they filed their complaint. *See*, *e.g.*, ECF No. 88-2 at 54 (expense records, showing no expert expense before Jan. 2025, 16 months into the case). Additionally, in their complaint, the only Plan neuropsychological evaluation *date* mentioned is Plaintiff Bailey's February 9, 2021 evaluation date (*i.e.*, *pre*-June 8, 2021). *See Alford* ECF Nos. 219-23 (Ex. M) and 348-1 (Ex. U) (filed under seal) (June 8, 2021 mem. directing Plan physicians to thenceforth stop using racially discriminatory norms in neuropsychological testing). All three of Plaintiffs' other neuropsychological NC benefits evaluation dates are conspicuously omitted from the complaint. Using the Plan's procedures and available evidence, one can retroactively approximate the dates of the omitted evaluations; all must have occurred *after* June 8, 2021. At the time that Plaintiffs filed their complaint, only Defendants should have been aware that Plan neuropsychologists had been instructed to stop using race norming in their evaluations after June 8, 2021 and, at least according to Defendants' representations to this Court, arguably did so.

F.3d at 300, and illustrates how the Settling Parties have both seriously undervalued the claims at issue while also overvaluing the anticipated risks that Plaintiffs face to justify this weak Settlement.

Although the Settling Parties offer conclusory assertions about various hurdles that would have to be overcome for Plaintiffs to prevail, including defeating dispositive and summary judgment motions and engaging in protracted discovery (JM21), they ignore the critical fact that the *Alford* Plaintiffs have *already surmounted* many of those hurdles. *See Kim v. Allison*, 8 F.4th 1170, 1174-75, 1179 (9th Cir. 2021) (reversing approval of pre-certification class settlement where, *inter alia*, district court "materially underrated the strength of the plaintiff's claims [and] substantially overstated the settlement's worth"); *see Sharp Farms*, 917 F.3d at 299-302.

Notably, the *Alford* Plaintiffs largely defeated Defendants' motion to dismiss (Ex. L (mem. op. on defs' mot. to dismiss)[21]; negotiated a Stipulated Protective Order and an Order Governing Production of Electronically Stored Information and Documents (*Alford* ECF Nos. 104, 110)); pursued discovery, including taking fact and expert witness depositions; presented multiple discovery disputes for the Court's resolution with some success (*Alford* ECF Nos. 134-1, 134-12, 252); briefed motions to exclude experts (*Alford* ECF Nos. 172, 308, 309, and 309-1), including filing partial objections to the Magistrate Judge's ruling on those motions (*Alford* ECF No. 320);

[21] The *Alford* Plaintiffs' success in having most of their claims sustained in the face of Defendants' motion to dismiss is particularly noteworthy because, unlike Plaintiffs here, they asserted additional, materially distinct ERISA §§ 503(1), 503(2), and 502(a)(2) (29 U.S.C. §§ 1133(1)-(2) and 1132(a)(2)) claims, sought equitable relief (such as removal of Board members) not pursued by Plaintiffs here, and asserted claims on behalf of the Plan itself. *See* Ex. E (Am. Compl. ¶¶ 330-49, 387); Ex. D at 58-59; *infra* at 24-25. Put another way, the *Alford* Plaintiffs pled broader claims, seeking more far-reaching remedies benefiting both individual Plan participants and the Plan itself and have successfully staved off dismissal. Moreover, whereas the Settling Parties point to the need to overcome a statute of limitations defense among their litany of uncertainties (JM21), the *Alford* Plaintiffs defeated that defense with respect to their breach of fiduciary duty claim. *See* Ex. L at 13 n.8 (mem. op. on defs.' mot. to dismiss). That is not surprising, because the *Alford* Plaintiffs pleaded facts to support fraud and concealment as bases for the tolling of limitations period (Ex. E (Am. Compl. ¶¶ 160, 170, 173, 184, 186, 189, 201, 214, 222, 237, 252, 263, 266)), while Plaintiffs here did not. Finally, the primacy of the *Alford* action is illustrated by the fact that six lines of Plaintiffs' statute of limitations allegations were lifted verbatim from the *Alford* complaint (*compare* ECF No. 1 (Compl. ¶ 198)) *with* Ex. E (Am. Compl. ¶ 352)).

defeated three summary judgment motions (Ex. F); and recently briefed Defendants' challenge to the standing of one of the named plaintiffs (*Alford* ECF No. 353).

Moreover, although the Settling Parties point to the Court's denial of the *Alford* Plaintiffs' initial motion for class certification (JM21) as evidence of uncertainty of outcome, they ignore that, two months before the motion for preliminary approval of the Settlement was filed in this case, the *Alford* Plaintiffs *renewed* their class certification motion. The *Alford* Plaintiffs now seek certification of four streamlined classes, each challenging a discrete, uniform policy or practice. The amended *Alford* classes were narrowly tailored to adhere to the principles that the Court set forth in its January 28, 2026 memorandum opinion (Ex. O at 7-16; *see* Ex. C (opening mem.), Ex. H (reply mem.).[22] This motion is currently *sub judice*.

As further "significant uncertainty about the outcome," the Settling Parties assert that Plaintiffs would need to "prove the Defendants' knowledge and use [of] race-based adjustments to neuropsychological testing" in order to prevail (JM21). That assertion, however, overlooks the obvious. In the spirited *Alford* litigation, the record already shows Defendants' undisputed knowledge and use of race-norming. Defendants produced Plan neuropsychologist manuals mandating the use of race-based adjustments to neuropsychological test scores, including a manual issued on the same date as the directive that purportedly halted the policy. Ex. I (at Ex. 3, pp. 1, 6) (2021 manual), Ex. J (at Ex. 3, pp. 1, 6) (2018 manual). Not only that, but the *Alford* Plaintiffs adduced evidence showing that racial norming continued at least as late as into the second half of 2022 (*Alford* ECF No. 364-3 (Ex. BB) (under seal)).

---

[22] Besides Defendants' improper use of race-norming, the proposed classes in *Alford* challenge the inflexible default to Plan physicians' opinions, irrespective of countervailing or contradictory evidence; the violation of longstanding ERISA precedent mandating that the cumulative effect of benefits applicants' impairments must be considered; and the improper consideration of T&P applicants' educational level and training. *See* Ex. C at 11-12, 15-18 (pls.' opening mem. in supp. of renewed mot. for class certification).

Indeed, a revised Plan Neuropsychologist Manual issued the same date as the June 8, 2021 memorandum *continued to mandate* the use of the so-called Heaton norms (Ex. I (at Ex. 3, pp. 1, 16)), and a revised manual proscribing the policy was not issued until August 2024 (Ex. K, at Ex. 3, p. 6))—well into the course of the *Alford* litigation. In its January 28, 2026 summary judgment opinion, the Court itself found "a plain and material fact dispute" as to whether demographic norming was applied, noting that "some [Neutral Physician] reports say scores were demographically adjusted." Ex. F at 25. *See Sharp Farms*, 917 F.3d at 301-02 (inadequate settlement when "many of the weaknesses identified do not apply to the claims of the [rival action's] class members").

Also, the only ERISA remedies that Plaintiffs here sought were declaratory relief as to the legality of Defendants' race-norming policy, injunctive relief prohibiting it, and mandated reconsideration of racially normed claims (ECF No. 1 at 31-32). In contrast, the *Alford* Plaintiffs have litigated on behalf of the Plan itself. They are pursuing distinct additional remedies that inure to the benefit of the Plan pursuant to ERISA §§ 404(a), 405(a), 409(a), and 502(a)(2), 29 U.S.C. §§ 1104(a), 1105(a), 1109(a), and 1132(a)(2), such as Plan reformation, stripping of the Board's deference, removal of Board members who cannot be trusted to exercise their discretion, and injunctions to rectify Defendants' misconduct and bring the integrity of the Plan's claims process into compliance with ERISA. *See* Ex. E (Am. Compl. ¶¶ 364, 369-70, 374, 376-77, 381, 387). Notably, the *Alford* Plaintiffs defeated Defendants' efforts to avoid a trial on claims brought on behalf of the Plan. *See* Ex. F at 37-40 (denying summary judgment as to *Alford* Plaintiffs' fiduciary duty breach claims).

**2. The Anticipated Duration and Expense of Additional Litigation Further Weigh Against the Settlement's Adequacy**

The Settling Parties contend that "a resolution would be years away should the case proceed" because this case "has not advanced to formal discovery while the Parties diligently negotiated the Settlement," and "the expense resulting from further ligation would be substantial given the number of potential class members and length of time involved, which would result in voluminous discovery and many fact and expert depositions." JM23. This is just another instance of the Settling Parties justifying the extinguishing of valuable claims for little in return by overstating the hurdles that Plaintiffs would face. They speculate about the duration and expense of further litigation, but in doing so overlook that the *Alford* Plaintiffs invested time and resources and did so s*uccessfully* to move their claims forward. Plaintiffs' attempt to turn their counsels' lack of litigation activity while hewing to a settlement-only strategy into a *virtue* is novel, but the Court should reject it.

**3. The Degree of Opposition to the Settlement Weighs Against Its Adequacy**

The degree of opposition to the Settlement further reflects its inadequacy. *See In re Serzone Prods. Liab. Litig.*, 231 F.R.D. at 245 ("While approval of a proposed class settlement is not a matter to be decided by a plebiscite, the views of putative class members are certainly relevant and entitled to great weight."); *accord Mandujano v. Basic Vegetable Prods., Inc.*, 541 F.2d 832, 837 (9th Cir. 1976) ("The opposition of a significant number of the members of the class to a proposed settlement is a factor to be considered when approving a settlement.") (citing cases); *see generally* 4 *Newberg and Rubenstein* § 13.58 & n.12 (noting that no objections are filed in half of all class action settlements, while on average 1% of class members object and that "if only 2% of the class objects in a run-of-the-mill case, that is a large number of objections") (discussing empirical evidence for various types of cases).

The instant objections are filed on behalf of no fewer than 101 class members. *See* Addendum. *All* of them *already had* an attorney-client relationship with Athlaw LLP; *none* retained it merely to file objections to the Settlement. Katz Decl. ¶ 22. In addition, at least thirteen other class members have filed objections (ECF Nos. 99-103, 109, 114-16, 118-21). Given the size of the class that the Settling Parties identified (*see* ECF No. 96 (notice was mailed to 631 members)), this shows that a substantial segment of the proposed class disfavors the Settlement. *See*, *e.g.*, *Perez v. Asurion Corp.*, 501 F. Supp. 2d 1360, 1381 (S.D. Fla. 2007) ("a high percentage of objections indicates that a class action settlement may very well not be fair and reasonable"); *Austin v. Pennsylvania Dep't of Corr.*, 876 F. Supp. 1437, 1458 (E.D. Pa. 1995) ("there is a point when the objections are so numerous that disapproval is warranted"); *Wyatt ex rel. Rawlins v. Horsley*, 793 F. Supp. 1053, 1055 (M.D. Ala. 1991) ("[T]he proportion of a class that objects to a proposed settlement may at some point become so large or the number of members endorsing the settlement so small, that in a very real sense it may be said that the attorney has settled the lawsuit unilaterally, without the backing, and presumably not in the best interests, of the class."); *Waters v. Cook's Pest Control, Inc.*, 2012 WL 2923542, at *13 (N.D. Ala. July 17, 2012) ("[A] high percentage of objections signals that a proposed settlement is not fair and reasonable.").

**4. The Named Plaintiffs and Absent Class Members Are Not Being Treated Equitably**

The Settlement also fails on account of inequitable treatment. On behalf of the class, the named plaintiffs would accept a sweeping release of *all* potential ERISA claims against Defendants, including claims having nothing to do with alleged discrimination (and claims that could be brought on behalf of the Plan itself). Absent class members would receive a largely symbolic injunction to put in place a policy that Defendants represent was already in place before the complaint was even filed, and the potential rescoring of claims, for which many, and

conceivably most, of them will be barred, including *all* T&P and LOD benefits claims. *See* Section I.E, *infra*. Meanwhile, Plaintiffs seek to pocket $50,000 each for themselves in incentive awards.

A class action settlement must "treat[] class members equitably relative to each other." Fed. R. Civ. P. 23(e)(2)(D). Therefore, "in evaluating the fairness of a settlement," courts look in part "to whether the settlement gives preferential treatment to the named plaintiffs while only perfunctory relief to unnamed class members." *In re Dry Max Pampers Litig.*, 724 F.3d at 718; *Vassalle v. Midland Funding LLC,* 708 F.3d 747, 755 (6th Cir. 2013). "[S]uch inequities in treatment make a settlement unfair." *Id.* A court must be mindful of "the danger that the parties and counsel will bargain away the interests of unnamed class members in order to maximize their own." *In re Dry Max Pampers Litig.*, 724 F.3d at 715. Indeed, where "class counsel negotiates a settlement agreement before the class is even certified, courts must be particularly vigilant not only for explicit collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the negotiations." *Dennis v. Kellogg Co.,* 697 F.3d 858, 864 (9th Cir. 2012).

"This case illustrates these dangers." *In re Dry Max Pampers Litig.*, 724 F.3d at 715. Absent members stand to receive little in the way of relief: a severely circumscribed rescoring opportunity that, on the only claim histories available for review, fewer than one in seven class members can obtain, together with "nearly worthless injunctive relief." *Id.*[23]; *see* Section I.E *infra*

[23] *Accord Koby v. ARS Nat'l Servs., Inc.*, 846 F.3d 1071, 1080 (9th Cir. 2017) (settlement's injunctive relief "of no real value" because it did "not obligate [the defendant] to do anything it was not already doing"); *In re Dry Max Pampers Litig.*, 724 F.3d at 715 (reversing approval of class settlement that provided absent class members "nearly worthless injunctive relief"); *Guoliang Ma v. Harmless Harvest, Inc.*, 2018 WL 1702740, at *8 (E.D.N.Y. Mar. 31, 2018) (settlement provided class "meaningless injunctive relief"); *Supler v. FKAACS, Inc.*, 2012 WL 5430328, at *3 (E.D.N.C. Nov. 6, 2012) (proposed injunctive relief "not meaningful" because defendant no longer in business of collecting debtors' past-due accounts, where it allegedly committed violations that plaintiff challenged).

(discussing Settlement's extremely limited relief). Meanwhile, Plaintiffs' counsel have petitioned the Court for over *$4 million* in fees and reimbursement of expenses—*for a case they never litigated* (yet claim to have devoted 3,000 hours to)[24]—and have also asked for the two named plaintiffs to receive a staggering $50,000 each in incentive awards, for a case in which they never had to produce documents or sit for a deposition. *See* ECF No. 88-1 at 37.[25] Putting aside that the requested $50,000 awards for, apparently, attending a single mediation session are well out of line with the efforts, actions, and results obtained in comparable litigation in this Circuit, including in ERISA cases,[26] such favorable treatment for Plaintiffs in contrast to the meager results for the overwhelming majority of the class is grossly inequitable.

#### 5. Defendants' Solvency and the Likelihood of Recovery on a Litigated Judgment Also Weigh Against the Settlement's Adequacy

The Settling Parties do not dispute that Defendants' ability to satisfy a judgment bears on

[24] If "fees are unreasonably high, the likelihood is that the defendant obtained an economically beneficial concession with regard to the merits provisions, in the form of lower monetary payments to class members or less injunctive relief for the class than could otherwise have [been] obtained." *Staton v. Boeing Co.*, 327 F.3d 938, 964 (9th Cir. 2003).

[25] "To determine whether an incentive payment is warranted, a court should consider the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, and the amount of time and effort the plaintiff expended in pursuing the litigation." *Boyd v. Coventry Health Care Inc.*, 299 F.R.D. 451, 468-69 (D. Md. 2014).

[26] *See*, *e.g.*, *Feinberg*, 610 F. Supp. 3d at 774 (class representatives awarded $10,000-$15,000 each where they "spent considerable time representing the Class, including producing documents, answering interrogatories, traveling to and sitting for lengthy depositions taken by aggressive defense counsel, and attending the motion to dismiss hearing and settlement conference"); *Savani v. URS Pro. Sols. LLC*, 121 F. Supp. 3d 564, 577 (D.S.C. 2015) (approving $15,000 award in "complex ERISA case given the benefits accruing to the entire class in part resulting from [class representative's] efforts"); *Singleton v. Domino's Pizza, LLC*, 976 F. Supp. 2d 665, 690-91 (D. Md. 2013) (approving $2,500 incentive award in class action that survived motion to dismiss and had limited discovery); *Kelly v. Johns Hopkins Univ.*, 2020 WL 434473, at *7-8 (D. Md. Jan. 28, 2020) (approving, in ERISA class action, incentive awards of $20,000 each to class representatives, who "provided invaluable assistance to Class Counsel in prosecuting the case" and "risked their reputation and alienation from employers or peers" in bringing action against prominent university in their community); *Skochin v. Genworth Fin., Inc.*, 2020 WL 6536140, at *11 (E.D. Va. Nov. 5, 2020) (approving $25,000 award in light of "the time and effort expended by Named Plaintiffs and in perspective of the fact that their efforts helped to secure a settlement that is highly beneficial to the class").

adequacy. Rather, they breezily dismiss it as a negative factor, contending that, standing alone, it does not counsel against approval (JM23). In tandem with the weighty negative factors discussed above, however, it further tips the scales against the Settlement's adequacy. In this respect, it bears noting that the Plan has substantial assets. Ex. E (Am. Compl. ¶ 17) (Board member's testimony that Plan had assets of over $9 billion). Put simply, Plaintiffs could have exacted a great deal more from the well-funded Defendants than the insubstantial consideration they did. *Cf. Sihler v. Fulfillment Lab, Inc.*, 2025 WL 1706909, at *3 (S.D. Cal. June 18, 2025) (although settlement amount represented "a negligible percentage of Plaintiffs' estimate of actual damages for a nationwide class," larger recovery not possible given defendants' precarious financial condition).

**E. The Proposed Settlement Is Unreasonable**

At the end of the day, in deciding whether to approve a class action settlement, a court must consider whether the agreement actually benefits class members. *In re Walgreen Co. S'holder Litig.*, 832 F.3d 718, 723 (7th Cir. 2016); *accord Allen v. Dairy Farmers of Am., Inc.*, 2015 WL 13979694, at *3 (D. Vt. Sept. 1, 2015) (court evaluates whether settlement "provides tangible and valuable benefits to the class or illusory" relief). Settlements that provide a minimal recovery must be closely scrutinized. *See Cochran v. Zeon D.P., LLC*, 638 F. Supp. 2d 759, 762 n.3 (W.D. Ky. 2009). In particular, "[s]ettlements involving nonmonetary provisions merit careful scrutiny to ensure that these provisions have actual value to the class." *In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*, 851 F. Supp. 2d 1040, 1077 (S.D. Tex. 2012); *In re Pinterest Derivative Litig.*, 2022 WL 484961, at *3 (N.D. Cal. Feb. 16, 2022) (same); *Fouks v. Red Wing Hotel Corp.*, 2013 WL 6169209, at *7 (D. Minn. Nov. 21, 2013) (same).

The Settling Parties contend that "the relief secured in the Settlement is equal to or exceeds what Class Members could recover in litigation" (JM25). In reality, however, the "relief actually provided to the unnamed class members is perfunctory at best," with the injunctive component

"offer[ing] only prospective relief that likely does not benefit class members at all." *Vassalle*, 708 F.3d at 756.

Start with what Defendants have agreed to concede, which is nothing. The Settlement's own recitals state that Defendants "assert they had no prior knowledge of, nor directed any Neutral Physician to apply, any race-based demographic adjustments," and that any adjustments "(to the extent they may have been used) were applied solely in the exercise of individual Neutral Physicians' independent medical judgment." ECF No. 79-3 at 8 (Settlement, Recitals). The June 8, 2021 memorandum is described the same way, as an instruction not to apply adjustments "(to the extent they may have been used)." *Id.* The Settlement does not say the practice occurred. It says the adjustments *may* have been used, that Defendants did not know of them, and that individual physicians applied them on their own judgment. On that footing, the class releases every ERISA claim arising from any benefit determination made before the Effective Date. ECF No. 79-3 at 11-12 (Settlement § II.20).

**1. The Injunctive Relief Is Illusory**

The Settlement's injunctive relief component is worth little on either account of the facts. Defendants agree to maintain their June 8, 2021 directive (which purportedly halted the use of racially based demographic adjustments to neuropsychological test scores). Settlement § VI.A (ECF No. 79-3 at 13). Plaintiffs' counsel apparently agreed to this relief by accepting Defendants' representation that they halted the use of racial norms at that time. But the *Alford* record indicates otherwise: race-adjusted scoring continued into 2022, and no physician manual prohibiting the practice was issued until August 2024. *See* Section I.D.1, *supra*. If Defendants *did* stop using Heaton norms following issuance of the June 2021 memorandum, an injunction provides no value to the class. On the other hand, if Defendants did *not* stop discriminating after June 8, 2021, an

injunction alone is a paltry remedy for the class because it provides only prospective relief.[27] Put simply, the Settlement's injunctive relief component amounts to an illusory contract.[28]

**2. Most Class Members Will Not Receive Any Benefit from the Rescoring Relief**

The centerpiece of the proposed Settlement is Defendants' agreement to rescore certain eligible applicants' claims impacted by the application of racially discriminatory norms. Settlement § VI.B at 12-16 (ECF No. 79-3 at 14-18).[29] Unfortunately, for the great majority of class members that relief is illusory because most members' claims will be foreclosed, under the Settlement's strict terms, from actually having their neuropsychological test results rescored. *See generally* Settlement § VI.B.2 (ECF No. 79-3 at 14-15).

Eligibility for rescoring requires that class members' claims not be subject to any of the Settlement's exclusions. *See id.* § VI.B.1(d) & VI.B.2 (ECF No. 79-3 at 15-16). Most members'

---

[27] *See* DFO2-3 ("The Settlement's prohibition on race-based adjustments simply confirms a practice limited to certain Neutral Physicians that the Plans ended in June 2021, more than two years before the Complaint was filed."); *Koby v. ARS Nat'l Servs., Inc.*, 846 F.3d 1071, 1080 (9th Cir. 2017) (injunctive relief embodying change in defendant's business practice that it had already adopted voluntarily "for its own business reasons (presumably to avoid further litigation risk), not because of any court- or settlement-imposed obligation," was "of no real value" to class members); *Hilsley v. Gen. Mills, Inc.*, 2021 WL 2290782, at *5 (S.D. Cal. June 4, 2021) (denying approval where "proposed injunctive relief provide[d] very little value to the class, if any"); *Hofmann v. Dutch LLC*, 2017 WL 840646, at *7 (S.D. Cal. Mar. 2, 2017) (denying approval where injunctive relief was "worthless" because it did not obligate defendant "to do anything it was not already doing").

[28] "One common type of illusory value is presented by an agreement for injunctive relief that provides no real benefit to class members. … [A]n agreement to make meaningless changes in conduct cost the defendant very little money, and provide the class very little relief." 202 Am. Jur. Proof of Facts 3d 359 (2023); *see Kim*, 8 F.4th at 1181 (value of particular injunctive relief "appear[ed] to be a benefit of zero").

[28] "One common type of illusory value is presented by an agreement for injunctive relief that provides no real benefit to class members. … [A]n agreement to make meaningless changes in conduct cost the defendant very little money, and provide the class very little relief." 202 Am. Jur. Proof of Facts 3d 359 (2023); *see Kim*, 8 F.4th at 1181 (value of particular injunctive relief "appear[ed] to be a benefit of zero").

[29] Ironically, Defendants agree to a form of reprocessing relief here—while arguing in *Alford* that the Ninth Circuit's decision in *Wit v. United Behavioral Health*, 79 F.4th 1068 (9th Cir. 2023) (which they misread) forecloses the Court from granting such relief. *See* Ex. M at 24-25, 33-34 (defs.' opp. mem. to Pls.' renewed class certification mot.).

claims are excluded from rescoring or are otherwise not eligible to receive any chance at "relief for harms that may already have been done. They gain nothing … but lose something." *Crawford v. Equifax Payment Servs., Inc.*, 201 F.3d 877, 880 (7th Cir. 2000). The very few claims that are not excluded from rescoring eligibility must still run a veritable gauntlet to obtain any real benefit.

**a. The Settling Parties Have Not Disclosed How Many Class Members Are Eligible for Rescoring of Claims**

Class Notice was mailed to 631 class members. ECF No. 96 at 1 (Joint Mot. for Approval of Am. Notice). Ten weeks later, the Settling Parties reported that the list was incomplete. There were "additional individuals who fall within the Settlement Class … and to whom the June 30, 2026 Notice was not mailed," along with "a small set of individuals who were inadvertently removed from the Class List during an earlier de-duplication review." *Id.* at 2. They did not say how many. How many of them will have a claim rescored, the Settling Parties never say—either in the joint motion, the fee petition, or the fee reply. That is the fact bearing most directly on whether this Settlement is worth anything to the class, and, as noted above, the proponents of a settlement carry the burden of establishing that it is fair, reasonable, and adequate. *Goodlaxson*, 776 F. Supp. 3d at 319. Only Defendants can supply the number. They hold the claims files and the testing records, and under the Settlement they alone determine who is even in the class. ECF No. 79-3 at 13 (Settlement § II.27) ("Settlement Class membership shall be determined by the Plans using the Plans' records").

Objectors have supplied what they can. Counsel at Athlaw LLP represent retired players in connection with claims for benefits under the Plans and, in that capacity, holds its own clients' Plan claim files, benefit determination letters, and neuropsychological testing records, obtained from those clients and from the Plans in the ordinary course of representation. Katz Decl. ¶¶ 2-3. None of it derives from any document production in *Alford*, and none of it was obtained under the

protective order entered in that case. *Id.* ¶ 3. From those files, Objectors' counsel conducted a thorough analysis and identified 150 individuals whose records establish both that they fall within the Settlement Class definition and what became of each of their benefit claims. *Id.* ¶¶ 4-13. Applying a thorough analysis of the Settlement's eligibility criteria and exclusions to those 150 claim histories, 130 are excluded from rescoring eligibility in full. ¶¶ 14-17. Only 20 are not. *Id.* ¶ 17. Thus, fewer than one in seven retains any chance at the Settlement's principal relief.

To be clear, Objectors do *not* present the 150 class members as a random sample. They represent, however, the only significant set of class members whose claim histories anyone other than Defendants is in a position to examine. The Settling Parties may respond that the figure does not reflect class-wide eligibility. If so, they can say what class-wide eligibility is. Should the Court wish to resolve the question rather than infer an answer, it should direct the Settling Parties to state, from the Plan's own records (such as the V3 data produced in *Alford*), how many identified class members will have a claim rescored under Sections VI.B.1 and VI.B.2 and how many will not, broken out by benefit type and by the exclusion applied.

A class in which six out of every seven members have no chance at the Settlement's principal relief has been given little, if anything.[30] Courts have refused approval where a settlement provides little or no value, either to the class as a whole or to a large segment of it.[31]

[30] *See Sylvester*, 369 F. Supp. 2d at 51 n.23 (under Judge Posner's analytical framework in *Mars Steel Corp. v. Continental Illinois Nat'l Bank & Trust Co.,* 834 F.2d 677, 682 (7th Cir.1987), if over 80% of class stands to receive nothing from settlement, settling parties would need show that probability of success is 0% to justify finding that settlement is fair).

[31] *E.g.*, *In re Subway Footlong Sandwich Mktg. & Sales Pracs. Litig.*, 869 F.3d 551, 556 (7th Cir. 2017) ("[I]f the class representatives have agreed to a settlement that provides meaningless relief to the putative class, the district court should refuse to certify or, alternatively, decertify the class."); *Koby v. ARS Nat'l Servs., Inc.*, 846 F.3d 1071, 1079 (9th Cir. 2017) (reversing approval of settlement because it afforded no value to class members); *In re Dry Max Pampers Litig.*, 724 F.3d at 721 (reversing settlement's approval because relief that "it provide[d] to unnamed class members [was] illusory"; settlement gave "only perfunctory relief to unnamed class members"); *In re TD Ameritrade Accountholder Litig.*, 266 F.R.D. 418, 423 (N.D. Cal. 2009) (denying final approval where "three broad groups of class members" would derive

**b. The Exclusion of All Class Members' T&P and LOD Claims Is Plainly Unreasonable**

Read together, the exclusions in Settlement §§ VI.B.2(a), VI.B.2(b), and VI.B.1(b) reach the T&P[32] and LOD[33] claims of the class, including valuable rights to pursue relief under ERISA for outright benefit denials, improper reclassifications, violations of ERISA, and equitable relief for breaches of fiduciary duties—all in exchange for *nothing*.

Settlement § VI.B.1(b) precludes class members who were awarded LOD benefits from eligibility for rescoring to a higher benefit class. Pursuant to the exclusion from rescoring in Section VI.B.2(a), "neuropsychological testing will not be rescored or reassessed under this Rescoring Protocol if – (a) the neuropsychological testing occurred in connection with a claim for T&P benefits that was approved in any of the four available categories." ECF No. 79-3 at 15. Thus, class members who underwent neuropsychological testing as part of their T&P application

no benefit from the relief provided); *Polar Int'l Brokerage Corp. v. Reeve*, 187 F.R.D. 108, 118 (S.D.N.Y. 1999) (denying approval of settlement that "neither put[] more money in [class members'] pockets nor provide[d] the potential for any benefit in the future"); *Clement v. Am. Honda Fin. Corp.*, 176 F.R.D. 15, 28 (D. Conn. 1997) (denying final approval where value provided class was "too speculative" and "virtually worthless"); *In re Exide Techs.*, 303 B.R. 48, 71 (Bankr. D. Del. 2003) (proposed settlement not fair and equitable where "minimal amount offered in settlement [did] not provide any benefit that outweigh[ed] the cost and delay of going forward, especially since it [was] too early to judge the likelihood of success on the merits"); *Solomon v. Am. Web Loan, Inc.*, 2020 WL 13894520, at *2 (E.D. Va. Nov. 6, 2020) (denying final approval where settlement provided "very little value"); *Tarlecki v. Bebe Stores, Inc.*, 2009 WL 1364340, at *3 (N.D. Cal. May 14, 2009) (denying final approval where "the fact that only seventeen percent of the class will benefit from this class action bespeaks poorly of the settlement").

[32] For all but one of the four levels of T&P classifications, an award of T&P benefits provides each disabled retired player more than seven figures in compensation every 8 years. Likewise, the right to pursue relief for Defendants' improper T&P classification is also highly valuable because of the differences among the four T&P classifications: Active Football ($265,000 per year), Active Non-Football ($165,000 per year), Inactive A ($135,000), and Inactive B ($65,000). *See* Ex. A (2021 Plan §§ 3.6(b), 4.2(a)).

[33] Currently, the minimum amount provided by an LOD Award is $405,000 ($4,500 per month for 90 months). For retired NFL players with more Credited Seasons, the LOD award amount can be worth approximately $450,000 to $900,000 paid over the 90 months. *See* Ex. A (2021 Plan § 5.2).

and were approved at *any* level but wrongly denied a *higher* T&P classification for *any* reason will have their valuable claims extinguished.

Crucially, hidden in Section VI.B.2(b)'s exclusion from eligibility for rescoring is Defendants' ERISA non-compliant policy of blindly defaulting to the opinions of the Plan Neutral Physicians (a claim being actively pursued in *Alford*). Unreasonably extinguishing the entire value of class members' T&P and LOD claims stretching back to least 2017, Section VI.B.2(b) stipulates that "neuropsychological testing will not be rescored or reassessed under this Rescoring Protocol if" the class member's application or appeal was denied for reasons "delineated in the Plans" *other than* merely the use of neuropsychological testing based on race-based norms. The "Neutral Physician" Rule has been delineated in the Plan since 2017. *See* Ex. (2017 Plan §§ 1.24, 3.1(c), 3.3(c), 5.1(b), 5.4(b), 6.1(c), 12.3). As the *Alford* Plaintiffs have noted, Defendants' consistent practice has been to implement that rule in violation of ERISA by invariably defaulting to the conclusions of their Plan physicians, irrespective of countervailing evidence and potential inadequacies in those physicians' reports, and in complete disregard of the cumulative effect of applicants' impairments. *See* Ex. H at 11-13 (reply mem. in supp. of renewed class certification mot.), Ex. F at 26-28 (summ. j. op.).

Every member of the class is someone who was examined by a Plan neuropsychologist who applied racial norms to neuropsychologist test results. Settlement § II.27 (defining Settlement Class) (ECF No. 79-3 at 12-13). Moreover, every class member who was evaluated by a Plan neuropsychologist for T&P or LOD benefits and received an adverse determination must *also* have been evaluated by another Plan physician distinct from the Plan's neuropsychologist who applied racial norms (*e.g.*, a Plan orthopedist, psychiatrist, or neurologist). Only Plan neuropsychologists apply racial norms to neuropsychological test results. Therefore, if the T&P or LOD applicant

class member received an adverse determination, and a second Plan physician who was not a neuropsychologist also decided that the applicant did not meet "the medical standard for the benefit," then that class member will be excluded from rescoring eligibility because he "was denied for reasons *other than* that the Settlement Class Member did not meet the medical standard for the benefit based on a Neutral Physician's evaluation that included the use of race-based demographic adjustments." Settlement VI.B.2(b) (ECF No. 79-3 at 15).

Thus, the Settlement is unreasonable because Sections VI.B.2(a), VI.B.2(b), and VI.B.1(b) "impose[s] rigorous eligibility criteria that would disqualify many or most within the plaintiff class—but in a manner that is not self-evident to the court or to other third parties." Coffee, *Class Wars*, 95 Colum. L. Rev. at 1377. By subtly excluding from rescoring eligibility *every* T&P and LOD determination since at least 2017, the Settlement conceals what is effectively a poison pill for most class members. *Neither* named plaintiff in this case even *alleged* wrongdoing with respect to a T&P *or* LOD benefits application or appeal—yet they now seek Court approval to surrender absent class members' valuable ERISA rights relating to T&P and LOD benefits claims in exchange for nothing.

Because the Settlement gives absent class members who underwent neuropsychological testing in connection with T&P and LOD applications "nothing of value, they could not fairly or reasonably be required to give up anything in return." *Koby*, 846 F.3d at 1080. "As fiduciaries to the Class, it is the responsibility of Plaintiffs' counsel to ensure that the settlement provides real value[.]" *Sylvester*, 369 F. Supp. 2d at 49. The Settlement provides no real value to absent class members who had T&P and LOD claims.

**c. The Unreasonable Exclusion of Most NC Applicants' Claims from Rescoring Eligibility**

Many, if not most, NC benefits applicants whose test results were adjusted using racial norms fare no better under the proposed Settlement. The Settlement contains so many exclusions from eligibility for rescoring that it fails to provide any value even to most class members who applied for NC benefits.[34] First, pursuant to Section VI.B.2(c),

> neuropsychological testing will not be rescored or reassessed under this Rescoring Protocol … (c) in cases where a Settlement Class Member has undergone repeated neuropsychological testing with a Neutral Physician, a contemporaneous or subsequent examination without race-based demographic adjustments found that the Settlement Class Member did not have a neurocognitive impairment that would qualify him for a Plan benefit or an increased Plan benefit, as the case may be. This includes, for example, (1) claims initially denied on the basis of neuropsychological testing involving race-based demographic adjustments that were denied on appeal based on additional neuropsychological testing without race-based demographic adjustments; or (2) a later application by the same Player that includes neuropsychological testing without race-based demographic adjustments, and that testing showed the Settlement Class Member did not have a neurocognitive impairment that would have qualified him for a Plan benefit or an increased Plan benefit with the original application.

ECF No. 79-3 at 16. Taking Defendants' representation that use of racial norms ceased after June 8, 2021 at face value, any class member who continued to reapply (or appeal), was evaluated by a Plan neuropsychologist *after* June 8, 2021, and was found "not [to] have a neurocognitive impairment that would qualify him for a Plan benefit or an increased Plan benefit" would see his valuable claim extinguished for nothing in return. The provision thus treats every post-June 8, 2021 examination as conclusive proof that the earlier race-adjusted denial caused no harm, on the strength of a cutoff date that the record developed in *Alford* calls into question. *See* Section I.D.1, *supra*.

[34] Currently, the amount that an NC benefit "mild" award provides is approximately $891,500 paid over 180 months, while an NC benefit "moderate" award pays approximately $1,251,000 over 180 months. *See* Ex. A (Plan §§ 6.4(a)-(b), 6.6(a)).

Moreover, it is common practice for retired players to receive a final adverse decision on an NC benefits claim for a variety of other reasons but continue to reapply for NC benefits each year by simply waiting one year from the date of each final denial.[35] On Defendants' own account of when the practice stopped, all class members who underwent NC benefits-related neuropsychological testing before June 8, 2021 but underwent "repeated neuropsychological testing" *after* that date which "found that the Settlement Class Member did not have a neurocognitive impairment that would qualify him for a Plan benefit or an increased Plan benefit," would likewise see their NC benefit claims extinguished for nothing in return.[36]

Furthermore, a common reason that absent class members are found not to have an impairment on Plan-commissioned neuropsychological testing for all benefits is that a Plan neuropsychologist concluded that a Player's neuropsychological test results are invalid (*e.g.*, for alleged malingering). Yet, for neuropsychological testing to be eligible for rescoring, "the denial, or partial denial … [must be] based on *valid* neuropsychological testing by a Neutral Physician." Settlement § VI.B.1(c) (ECF No. 79-3 at 15). An invalidity finding by the same Plan

[35] Retired players can continue to reapply for NC benefits or an NC reclassification so long as they are vested (3 credited seasons) and have not yet taken their normal pension. *See* Ex. A (2021Plan §§ 6.2(g), 6.7, 6.8), Ex. B (2017 Plan §§ 6.2(g), 6.7, 6.8).

[36] For example, Plaintiff Bailey applied only for NC benefits. He was examined by a Plan neuropsychologist on February 9th, 2021 (*i.e.*, prior to June 8, 2021). Having appealed his mild NC classification, he would have been examined by a Plan neuropsychologist in connection with his appeal for the moderate reclassification more than six months following the February 9, 2021 initial neuropsychological examination date. Pursuant to the Settlement release and exclusion in Section VI.B.2(c), the value of Plaintiff Bailey's NC moderate reclassification claim would be extinguished; "neuropsychological testing will not be rescored or reassessed under this Rescoring Protocol" because he "has undergone repeated neuropsychological testing with a Neutral Physician, [and] a … subsequent examination without race-based demographic adjustments found that" Plaintiff Bailey "did not have a neurocognitive impairment that would qualify him for … an increased Plan benefit." Settlement § VI.B.2(c) (ECF No. 79-3 at 15).

neuropsychologist whose race-adjusted scoring is the subject of this case therefore ends the claim, and nothing in the Settlement permits that finding to be revisited.[37]

### 3. Those Few Class Members Whose Claims Are Eligible for Rescoring Face a Process Stacked Against Them

The small subset of class members whose unsuccessful claims are not filtered out by the Settlement's multiple exclusions from rescoring eligibility then face a rescoring gauntlet operated and overseen solely by Defendants, who continue to insist on the public record that no class member's benefits determination was *ever* "actually affected by [racially based] adjustments." DFO8-9. Those few class members will receive an unappealable rescoring, overseen by two experts, *both* of whom will be paid by Defendants and *both* of whom have lengthy records of opposing or rejecting disability benefits claims.

#### a. No Expert Can Be Expected to Safeguard Class Members' Interests

The Settling Parties have put forward Dr. Malcolm Spica as the plaintiff-appointed expert for the rescoring process. Settlement § II.17 (ECF No. 79-3 at 11) (defining "Plaintiffs' Expert" as Dr. Spica); JM7 n.4; *see* ECF No. 79-4 (*curriculum vitae* of D. Malcom Spica, Ph.D.). It is troubling, however, that Defendants will be compensating Dr. Spica for his work. *See* Settlement § VIII.E (ECF No. 79-3 at 24) (Defendants to pay fees of Plaintiffs' expert).

That is not a minor matter. Although he is designated the "*Plaintiffs'* Expert" and will be

[37] This is not a theoretical shortcoming. For example, in *Alford*, a Plan physician *incorrectly* determined that Plaintiff Michael McKenize's testing was invalid (Ex. E (Am. Compl. ¶ 179) (Plan neuropsychologist concluded that Plaintiff McKenzie had "'invalid test results on the TOMM [Test of Memory Malingering]' and labeled his score of 45 on TOMM trial 2 as 'suspect.' According to the test manual, though, a score of 45 on the TOMM does *not* indicate the possibility of malingering.") (emphasis in original)). The Settlement would exclude his claim from rescoring eligibility. In addition, NC claims are excluded from rescoring eligibility if they were denied for other reasons delineated in the Plan, such as (1) a Medical Advisory Physician reached a conclusion (even if flawed) through only a document review that a Player does not meet the applicable benefit or classification standard, or (2) a Plan physician determined that the applicant's neurocognitive impairment primarily resulted from a substance or psychiatric/psychological impairment. Settlement § VI.B.2(b) (ECF No. 79-3 at 15).

tasked with rendering an "independent" determination (Settlement § IV (ECF No. 79-3 at 13)), Dr. Spica's publicly available expert opinions consistently favor the position of whoever is paying his fees, with the vast majority of his expert work having been for insurance companies seeking to *deny or defeat* disability benefits claims, and evidently *none* of it on behalf of disability benefits claimants.[38] Indeed, Dr. Spica has worked for decades as an in-house neuropsychologist for Unum, a frequent disability benefits defendant in federal courts across the country. Several years after Unum hired Dr. Spica, one of the country's leading ERISA scholars, Professor John Langbein of Yale Law School, documented Unum's history of disability claims abuses.[39]

Given this background, the Court should be troubled by the fact that the Settlement places class members' "*final and binding*" trust in Dr. Spica's determinations, and that it denies them any right to appeal or challenge his determinations. Settlement § VI.B.6 (ECF No. 79-3 at 17)

---

[38] *E.g.*, *Autran v. Procter & Gamble Health & Long-Term Disability Benefit Plan*, 27 F.4th 405, 411 (6th Cir. 2022) (Dr. Spica paid by insurance company and opined against plaintiff disability benefits claimant); *Kamerer v. Unum Life Ins. Co. of Am.*, 334 F. Supp. 3d 411, 428 (D. Mass. 2018) (same); *Li v. First Unum Life Ins. Co.*, 2025 WL 326492, at *6-7 (S.D.N.Y. Jan. 29, 2025) (same), *aff'd*, 2026 WL 112655 (2d Cir. Jan. 15, 2026); *Pistilli v. First Unum Life Ins. Co.*, 2025 WL 2814714, at *3 (S.D.N.Y. Oct. 3, 2025) (same), *mot. for relief from j. denied*, 2026 WL 836647 (Mar. 26, 2026); *Clarke v. Unum Life Ins. Co. of Am.*, 852 F. Supp. 2d 663, 674-75 (D. Md. 2012) (same); *Cummins v. Unumprovident Ins. Co.*, 630 F. Supp. 2d 687, 705 (M.D. La. 2007) (same); *Mitchell v. Metro. Life Ins. Co.*, 523 F. Supp. 2d 1132, 1142 (C.D. Cal. 2007) (same), *aff'd sub nom. Mitchell v. CB Richard Ellis Long Term Disability Plan*, 611 F.3d 1192 (9th Cir. 2010); *Blackett v. UNUM Life Ins. Co. of Am.*, 2025 WL 2781544, at *3 (D. Md. Sept. 30, 2025) (same); *Schwartz v. Unum Life Ins. Co. of Am.*, 2025 WL 1827904, at *8 (N.D. Cal. July 1, 2025) (same); *Correia v. Unum Life Ins. Co. of Am.* 2016 WL 5462827, at *16 (S.D.N.Y. Sept. 29, 2016) (same); *Hans v. Unum Life Ins. Co.*, 2015 WL 5838462, at *6 (C.D. Cal. Oct. 5, 2015) (same, "Dr. Malcolm Spica is Unum's on-site clinical neuropsychologist"); *Lopes v. First Unum Life Ins. Co.*, 2011 WL 1239899, at *7 (E.D.N.Y. Mar. 30, 2011) (Dr. Spica paid by insurance company and opined against plaintiff disability benefits claimant); *Cottingim v. ReliaStar Life Ins. Co.*, 723 F. Supp. 3d 1174, 1187 (M.D. Fla. 2024) (same; plaintiff's expert castigated Dr. Spica for "cherry-picking" test scores to support his conclusion), *appeal dismissed*, 2026 WL 979377 (11th Cir. Feb. 24, 2026).

[39] John H. Langbein, *Trust Law As Regulatory Law: The Unum/Provident Scandal and Judicial Review of Benefit Denials Under ERISA*, 101 Nw. U. L. Rev. 1315, 1315-16 (2007) (discussing "[a]uthoritative evidence … that for a period of some years" Unum "was engaged in a deliberate program of bad faith denial of meritorious benefit claims"); *see also Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 117 (2008) (citing Professor Langbein's study).

("Settlement Class Members shall have *no right to further appeal or challenge*" medical determinations). Indeed, that Plaintiffs' counsel spent thirty months negotiating and, after all that time, were able to put forward only someone of Dr. Spica's pedigree as the expert meant to ensure that absent members get a fair shake in the rescoring process only casts further doubt on whether Plaintiffs adequately protected the interests of the class.

In stark contrast to Plaintiffs' counsel's dubious choice of a "Plaintiffs' Expert," Defendants made sure to designate an expert demonstrably predisposed against class members, Dr. William Garmoe. *See* Settlement § II.8 (ECF No. 79-3 at 1). Defendants' choice of Dr. Garmoe to safeguard their interests should come as no surprise. This Court is already familiar with him from the allegations in the *Alford* litigation concerning his bias, and the *Alford* Plaintiffs continue to seek his removal from the Plan's physician network for his role in harming the integrity of the Plan's current claims process. *See* Ex. E (Am. Compl. ¶¶ 122, 125-26, 130-31, 157-59, 365), Ex. N at 18, 20, 37 (pls.' consol. summ. j. opp. mem.). Ironically, the Settling Parties would install Dr. Garmoe into a role in the rescoring process here that will permit him to second-guess findings favorable to class members.[40]

**b. The Settlement Unreasonably Gives the Board the Final Say**

Even if a class member is fortunate enough to survive review by *two* defense-oriented experts, the Settlement still entrusts the Board, in its subjective and unappealable discretion, with determining whether the class member should receive any ultimate value from the Settlement. *See* Settlement § VI.B.8 (ECF No. 79-3 at 17). As the *Alford* Plaintiffs have alleged, the Board has a

---

[40] Directly antagonistic to the fundamental interests of the *Alford* Plaintiffs, who seek to fix the Plan's broken claims process by removing Dr. Garmoe, the Settling Parties would install Dr. Garmoe in an expanded role in the rescoring process here. The inclusion of Dr. Garmoe is unreasonable and reflects inadequate representation because his expanded role here conflicts with the interests of the overlapping *Alford* Plaintiffs and absent class members in *Alford*, who specifically seek Dr. Garmoe's removal from his existing role. *See* Ex. E (Am. Compl. ¶ 365).

history of "acting as an adversary, not a fiduciary," engaging in bad faith claims administration, and developing disability processes chronically lopsided against disabled retired players, including the inflexible default to Neutral Physicians' opinions in violation of ERISA and the refusal to weigh the combined impact of applicants' different types of impairments for T&P benefits. *E.g.*, Ex. E (Am. Compl. ¶ 21) (collecting cases), Ex. H at 11-13 (reply mem. in supp. of renewed class certification mot.).

As expressed through its own counsel's filing, the Board's *own* view of the policy that gave rise to this action is that there is no proof that "any Settlement Class Member's benefit determination was actually affected by [racially based] adjustments." DFO8-9. Yet, the standard for determining whether any class member qualifies for benefits following a rescoring is "whether a Settlement Class Member met the applicable standard for benefits in accordance with the Plan terms but for the use of any race-based demographic adjustments." Settlement § VI.B (ECF No. 79-3 at 14). Given its stated position that no applicant was ever wronged on account of race-norming, it is completely unrealistic to trust the Board to find that "any Settlement Class Member's benefit determination was actually affected by such adjustments" (DFO8-09).

## II. THE COURT SHOULD NOT CERTIFY THIS SETTLEMENT CLASS BECAUSE IT IS NOT ADEQUATELY REPRESENTED

In light of the manifold flaws in the Settlement, the Court should decline to certify the settlement class because it is inadequately represented and hence does not satisfy the test under Rule 23(a)(4). Indeed, the inadequate representation of the class is an independent reason for disapproving the settlement. *See Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 284 (7th Cir. 2002) (citing cases).

"Under the adequacy requirement of Rule 23(a)(4), a district court may certify a class only if the class representative 'will fairly and adequately protect the interests of the class.'" *Ward v.*

*Dixie Nat'l Life Ins. Co.*, 595 F.3d 164, 179 (4th Cir. 2010) (quoting Fed. R. Civ. P. 23(a)(4)). The need for adequacy of representation "is particularly acute in settlement class situations[.]" *In re Dry Max Pampers Litig.*, 724 F.3d at 721; *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 795 (3d Cir. 1995) (same).[41] "'[T]he court's role as fiduciary is primarily to ensure that the class's own agents—its class representatives and class counsel—have not sold out its interests in settling the case.'" *Kurtz v. Kimberly-Clark Corp*., 142 F.4th 112, 118 (2d Cir. 2025) (quoting 4 *Newberg and Rubenstein* § 13:40); *see Berry*, 807 F.3d at 612 ("[W]hen a proposed settlement is intended to preclude further litigation by absent persons, due process requires that their interests be adequately represented."). Moreover, the involvement of a mediator in settlement negotiations cannot cure inadequate representation.[42]

Here, for the multiple reasons discussed in Section I above, "the bargain that was struck between relief and release on behalf of absent class members is so unreasonable that it evidences inadequate representation." *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 827 F.3d at 236. That is not surprising. Neither class representative alleged that he filed an LOD or T&P application and had it affected by racially based adjustments to neuropsychological test results; much less did either assert claims for any wrongdoing on behalf of LOD and T&P applicants. Yet, they seek judicial approval to compromise the interests of applicants in those two

---

[41] *Accord Calibuso v. Bank of Am. Corp.*, 299 F.R.D. 359, 366 (E.D.N.Y. 2014) ("salience of the adequacy factor … is particularly acute" in settlement class context); *In re First Commodity Corp. of Bos. Customer Accts. Litig.*, 119 F.R.D. 301, 310 (D. Mass. 1987) ("The adequacy of representation goes directly to the integrity of the process by which [a] proposed settlement was developed.").

[42] *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 827 F.3d 223, 234-35 (2d Cir. 2016) ("One aspect of the Settlement Agreement that emphatically cannot remedy the inadequate representation is the assistance of judges and mediators in the bargaining process."); *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 252-53 (2d Cir. 2011) ("an intense, protracted, adversarial mediation," with "highly respected and capable" mediators "does not compensate for the absence of independent representation").

benefits categories in return for nothing.[43] Because there was plainly a fundamental intra-class conflict here, LOD and T&P applicants should have been represented by separate counsel to safeguard their interests.[44]

Another fundamental divergence of interests is that, as discussed above in Section I.C.3.a, Plaintiffs' counsel made the conscious decision not to pursue claims on behalf of the Plan itself. Yet, the Settlement compromises interests held by absent class members, such as the *Alford* Plaintiffs, who *have* asserted such claims. Indeed, in complete divergence with the *Alford* Plaintiffs, who assert breaches of fiduciary duty on behalf of the Plan and seek replacement of the members constituting its fiduciary (the Board), Plaintiffs here agreed to a settlement that places an "unappealable" *trust* in that fiduciary.[45]

"'Adequacy does not require complete identity of claims or interests between the proposed representative[s] and the class, but there must be sufficient similarity of interest such that there is no affirmative antagonism between the representative[s] and the class." *Sharp Farms*, 917 F.3d

---

[43] Given that they obtained an anemic settlement that will exclude all claims for T&P and LOD applicants, as well as many, if not most, NC claims, from rescoring relief, there is a legitimate concern here that the two named plaintiffs, on whose behalf $50,000 in incentive awards is now being sought, simply put their interests ahead of those of the class they purport to represent. *See In re Dry Max Pampers Litig.*, 724 F.3d at 722 ("[H]aving been promised the award, the class representatives had no interest in vigorously prosecuting the [interests of] unnamed class members[.]"; "payments provided a *disincentive* … to care about the adequacy of relief afforded unnamed class members, and instead encouraged the class representatives to compromise the interest of the class for personal gain") (emphasis in original).

[44] *See Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781, 785 (7th Cir. 2004) (reversing approval of class settlement where, among its "questionable features" was "the fact that the class that was denied relief did not have separate counsel from the counsel for the favored class"); *see also Murray v. Grocery Delivery E-Servs. USA Inc.*, 55 F.4th 340, 346 (1st Cir. 2022) ("[I]ntra-class conflict is unacceptable when it presents an actual and substantial risk of skewing available relief in favor of some subset of class members.").

[45] *See Vassalle*, 708 F.3d at 757 (reversing approval of class settlement where class representatives had fundamental conflict because they had "no interest in vigorously prosecuting the unnamed class members' most important interest"); *see also Sharp Farms*, 917 F.3d at 295, 297 (district court abused its discretion in certifying settlement class given fundamental conflicts between class representatives and class members from other action, stemming from, *inter alia*, divergent legal theories; that they were "pursuing different legal claims only underscore[ed] the conflict").

at 297 (citing treatise; brackets added by court). "At the very heart of [the adequacy] inquiry is whether the absent class members, who will be bound by the result, are protected by a vigorous and competent prosecution of the case by someone that shares their interests." *Mitchell-Tracey v. United Gen. Title Ins. Co.*, 237 F.R.D. 551, 558 (D. Md. 2006) (citing authorities). In this case, the conflicts among segments of the class (arising from different legal theories and relief pursued) and the bargaining away of the interests of large swaths of the class for nothing in return show that many, if not most, absent members' interests—especially those of the *Alford* Plaintiffs and absent members of the proposed classes in *Alford*—were not adequately represented.

Putting all of this aside, Plaintiff Curry may not be an adequate class representative because he does not even appear to be a "Settlement Class Member" as defined in Settlement § II.28 (ECF No. 79-3 at 13). Pursuant to Section II.27, to be a member of the "Settlement Class," the benefits applicant must have had "their neuropsychological test scores adjusted using (non-white) race-based demographic adjustments." ECF No. 79-3 at 12. Because racial norms were probably not applied to his NC benefits-related neuropsychological evaluations at issue—in that his neuropsychological evaluation would have occurred on or after June 13, 2021[46]—Curry does not even appear to fall within the defined "Settlement Class."[47]

[46] Although not readily discernible in the complaint to those unfamiliar with this Plan, post-June 8, 2021 application and NC evaluation dates for Plaintiff Curry can be gleaned from the only date provided with respect to his NC benefits application, which is the date of his decision letter (July 27, 2021). ECF No.1 (Compl. ¶ 158). Under the Plan, the Disability Initial Claims Committee ("Committee") had no more than 45 days from the date of the initial application to render a decision. *See* Ex. A at 66 (2021 Plan § 13.14(a)), Ex. B (2017 Plan § 13.13(a)). Therefore, the date of the application and the later Plan neuropsychological examination date for Plaintiff Curry could not have happened prior to June 13, 2021, which is 5 days *after* Defendants purportedly halted the race-norming practice.

[47] Even if Curry is a class member based on, for example, another neuropsychological evaluation not discussed in the complaint, his T&P and LOD benefits claims and his NC reclassification claim would still be excluded from eligibility for rescoring pursuant to Sections VI.B.2(b), VI.B.2(a), and VI.B.2(c) of the Settlement. ECF No. 79-3 at 15-16. Similarly, Plaintiff Bailey alleged in the complaint that he applied only for NC benefits and that he was evaluated by a Plan neuropsychologist on February 9, 2021 (*i.e.*, prior to June 8, 2021). Bailey's claim to the "moderate" level of NC benefits would be excluded from rescoring

## III. IN THE ALTERNATIVE, THE COURT SHOULD CONDITION ANY APPROVAL OF THE SETTLEMENT ON REVISIONS TO ITS SWEEPING RELEASE LANGUAGE OR AFFORD MEMBERS THE OPPORTUNITY TO OPT OUT OF THE SETTLEMENT CLASS

Alternatively, if the Court is inclined to certify the settlement class and approve the Settlement, it should at, at a minimum, either (a) condition approval of the Settlement on the revision of its unduly broad release language in order to make clear that the release extends *solely* to discrimination-based claims, so as to comport with controlling Fourth Circuit precedent concerning the identical factual predicates rule; or (b) at least afford Objectors and other absent class members the opportunity to opt out of the settlement class.

As to the former option, the Court's power to condition its approval of the Settlement on modifications to it cannot genuinely be disputed.[48] With respect to the latter option—affording class members a right to opt out, as discussed in Sections I.D.4 and I.E above, a significant percentage of the class strongly opposes the Settlement and much of the class stands to reap little or no benefit from it. Under such circumstances, class members should not be held captive to the

---

eligibility because "neuropsychological testing will not be rescored or reassessed under this Rescoring Protocol" if the class member "has undergone repeated neuropsychological testing with a Neutral Physician, a … subsequent examination" following June 8, 2021 "without race-based demographic adjustments [which] found that" Bailey "did not have a neurocognitive impairment that would qualify him for … *an increased Plan benefit*." Settlement § VI.B.2(c) (ECF No. 79-3 at 16). Having appealed his "mild" NC benefits classification determination, Bailey would likely have been evaluated on appeal by a Plan neuropsychologist after June 8, 2021 and thus, excluded from eligibility for rescoring.

[48] *See*, *e.g.*, *In re M3 Power Razor Sys. Mktg. & Sales Prac. Litig.*, 270 F.R.D. 45, 64 (D. Mass. 2010) (court "may require modifications either in the certification of the class or in the settlement provisions as a condition to approval of the settlement"); *In re Classmates.com Consol. Litig.*, 2011 WL 2680566, at *3 (W.D. Wash. July 8, 2011) ("the court's approval is conditioned upon the parties agreeing … to the additional revisions to the revised settlement agreement"); *Am. Int'l Grp., Inc. v. ACE INA Holdings, Inc.*, 2011 WL 3290302, at *9 (N.D. Ill. July 26, 2011) (although "the court cannot itself unilaterally modify, delete, or insert a clause in the settlement agreement," that does not preclude court from making its approval "contingent on the settling parties' agreement to make revisions"); *Faican v. Rapid Park Holding Corp.*, 2010 WL 2679903, at *1, *3 (E.D.N.Y. July 1, 2010) (conditioning approval of class settlement on modifications); *In re Auction Houses Antitrust Litig.*, 2001 WL 170792, at *18 (S.D.N.Y. Feb. 22, 2001) (same), *aff'd,* 42 F. App'x 511 (2d Cir. 2002).

Settlement merely because it is certified pursuant to Rule 23(b)(2). Although Rule 23(c)(2) does not explicitly provide for the right to opt out of Rule 23(b)(2) classes, this Court and others have recognized that they have the discretion to require the opportunity to opt out of 23(b)(2) classes.[49] Accordingly, the Court should direct the issuance of a supplemental class notice for the limited purpose of affording members a reasonable opportunity to opt out of this settlement class before it enters final judgment approving the Settlement and closes the case.

## IV. THE REQUESTED AWARDS OF FEES, REIMBURSEMENT OF EXPENSES, AND PLAINIFF INCENTIVE AWARDS ARE EXCESSIVE

Finally, if the Court approves the Settlement and is inclined to grant Plaintiffs' counsel's motion for an award of attorneys' fees, reimbursement of expenses, and incentive awards to the two named plaintiffs (ECF No. 88), any awards should be markedly less than the amounts sought. Objectors will not nitpick counsel's tine records as to the number of hours or the billing rates claimed. Nevertheless, an award of over *$4 million* in fees and expenses (*see* PFM30 (ECF No. 88-1 at 37)) for a case that was never litigated after the filing of a complaint and in which no formal discovery was conducted would be excessive.

Moreover, as discussed in Section I.D.2 above, the requested incentive awards of $50,000 for each named plaintiff are likewise excessive given that they did not have to satisfy any discovery obligations and incurred no significant burdens of any sort. It far exceeds awards in ERISA and other class cases in this Circuit, as noted above in Section I.D.4. Given the meager results achieved

---

[49] *E.g.*, *McReynolds v. Richards-Cantave*, 588 F.3d 790, 800 (2d Cir. 2009) ("'[T]he language of Rule 23 is sufficiently flexible to afford district courts discretion to grant opt-out rights in (b)(1) and (b)(2) class actions.") (quoting *Eubanks v. Billington*, 110 F.3d 87, 94 (D.C. Cir. 1997)); *Molski*, 318 F.3d at 947 (district court may "require notice and the right to opt-out [of (b)(2) classes] under its discretionary authority") *Penson v. Terminal Transp. Co.*, 634 F.2d 989, 994 (5th Cir. 1981) (district court has discretionary power, to require opt-out right "to protect the interests of the absent class members"); *Evans v. Am. Credit Sys., Inc.*, 222 F.R.D. 388, 396 (D. Neb. 2004); *Newsome v. Up-To-Date Laundry, Inc.*, 219 F.R.D. 356, 364 (D. Md. 2004) ("the Court has discretion to order that notice and opt-out rights be given to a (b)(2) class"); *Tylka v. Gerber Prods. Co.*, 178 F.R.D. 493, 501-02 n.8 (N.D. Ill. 1998).

for the class, incentive awards of $5,000-$7,500 would be more than adequate.

## CONCLUSION

For the foregoing reasons, the Court should deny final approval of the Settlement. In the alternative, if the Court approves the Settlement, it should either (a) do so only the condition that the Settling Parties revise the Settlement's sweeping release language to make clear that it releases only discrimination-based claims, or (b) first direct that a supplemental class notice be issued for the limited purpose of affording settlement class members the opportunity to opt out of the class before entering final judgment. If the Court grants an award of fees, reimbursement of expenses, and plaintiff incentive awards, the amounts should be markedly less than those requested.

Dated: September 29, 2026

Respectfully submitted,

**SEEGER WEISS LLP**

By: *s/ Benjamin R. Barnett*
Benjamin R. Barnett
**SEEGER WEISS LLP**
325 Chestnut Street, Suite 917
Philadelphia, PA 19106
Telephone: (215) 553-7980
bbarnett@seegerweiss.com

Christopher A. Seeger*
Diogenes P. Kekatos *(admitted pro hac vice)*
Hillary R. Fidler *(admitted pro hac vice)*
**SEEGER WEISS LLP**
55 Challenger Road, 6th Floor
Ridgefield Park, NJ 07660
Telephone: (973) 639-9100
cseeger@seegerweiss.com
dkekatos@seegerweiss.com
hfidler@seegerweiss.com

Samuel L. Katz*
Julia M. Damron*
Noah T. Reid*
**ATHLAW LLP**
8383 Wilshire Blvd., Suite 800
Beverly Hills, CA 90211
Telephone: (818) 454-3652
samkatz@athlawllp.com
julia@athlawllp.com
noahreid@athlawllp.com

***Counsel for Objectors***

* Denotes motion for *pro hac vice* admission pending

**ADDENDUM**

**Putative Class Members on Whose Behalf the Objections Are Filed (Listed in Alphabetical Order)**

Chidi Ahanotu
Jason Alford
Matthew Asiata
Kentwan Balmer
Kahlil Bell
Arrelious Benn
Davone Bess
Darnell Bing
Harold Bishop
Robert Blanton
Michael Boley
Tyron Brackenridge
Allen Bradford
Ahmad Bradshaw
Andre Brown
Kaelin Burnett
Antoine Cason
Timothy Castille
Antonio Chatman
David Clowney
Marquice Cole
Richard Crawford
Britt Davis
Emmanuel Davis
Jason Davis
Louis Delmas
Alfonzo Dennard
Sedrick Ellis
Larry English
John Estes

Ray Feinga
Jermichael Finley
Aaron Francisco
Michael Gandy
Quinton Ganther
Jonathan Goodwin
Amon Gordon
Norristorius Gurley
Nicholas Harper
Stanley Havili
Michael Haynes
Reynaldo Hill
Daryl Hobbs
Davon House
Bradley Jackson
Lawrence Jackson
Julius Jones
Davin Joseph
Richard Marshall
Tod McBride
Marcus McCauley Jr.
LeRon McClain
Willis McGahee
Michael McKenzie
Jerris McPhail
Qasim Mitchell
Sinorice Moss
Ogemdi Nwagbuo
Kevin Ogletree
Jamize Olawale
Kassim Osgood
Ben Patrick
Karl Paymah
Charles Peprah

Jason Perry
Will Poole
Brian Price
Sidney Rice
Frederick Robbins
Laurent Robinson
Ramzee Robinson
Orlando Scandrick
Marcel Shipp
Charles Sims
John "LJ" Smith III
Tajiddin Smith-Wilson
Al Smith
Duane Starks
Cameron Stephenson
Hilee Taylor
Adalius Thomas
Joseph Thomas
Gregory Tolver
Christian Tupou
Steven Turner
Marviel Underwood
DeMarcus Van Dyke
Clarence Vaughn
Michael Vick
Reginald Walker
Danny Ware
Chauncey Washington
Nathaniel "Nate" Washington
Jeff Webb
Reginald Wells
Patrick White
Bobbie Williams
Errick "Ricky" Williams

Jack Williams
Lamanzer Williams
Garrett Wolfe
Robert Young