**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **STACEY BAILEY,** ***et al.*****,**<br><br>***Plaintiffs*****,**<br><br>v.<br><br>**THE NFL PLAYER DISABILITY & SURVIVOR BENEFIT PLAN,** ***et al.*****,**<br><br>***Defendants*****.** | **Case No. 1:23-cv-02661-JRR** |

**MEMORANDUM OPINION**

Pending before the court is Plaintiffs' Motion for Attorneys' Fees, Expenses, and Service Awards (ECF No. 88; the "Motion").[1] The court has reviewed all papers. By way of background, on October 20, 2026, the court held a hearing on the parties' joint motion for final approval of settlement (ECF No. 139); by order at ECF No. 152, the court granted that motion and held the instant Motion *sub curia*. (ECF No. 152 ¶ 12.) No further hearing is needed. Local Rule 105.6 (D. Md. 2025).

## I. INTRODUCTION

This action was initiated on September 29, 2023, with the Class Action Complaint at ECF No. 1 (the "Complaint"). Defendants waived service and before an answer was due, the parties requested the court stay the case for 90 days so they could try to settle it. (ECF No. 30.) The court granted that request by order at ECF No. 32, which required the parties to file periodic joint status reports. The stay was serially extended by joint request until the parties reached a proposed

[1] For efficiency, the court incorporates and uses here the defined terms set forth in the order at ECF No. 152 and the Settlement Agreement at ECF No. 79-3, as amended per ECF No. 152 at pp. 7-12 (Exhibit A, Class Action Settlement Agreement First Amendment). Further, all page references are to CM/ECF pagination.

settlement.[2]

The Complaint was brought pursuant to the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§ 1001, *et seq*. ("ERISA") and 42 U.S.C. § 1981. The Complaint alleged that Defendants employed race-based demographic adjustments (also referred to as race norming) in connection with the implementation of certain Plan awards and benefits, which, as a result, deprived Plan participants (ultimately, the Settlement Class)[3] of equal treatment under the Plans and subjected them to discriminatory Plan administration. The Complaint sought declaratory and injunctive relief (Count I); recovery for violation of ERISA § 502(a) (Count II); and recovery for violation of 42 U.S.C. § 1981 (Count III).[4]

In the instant Motion, Plaintiffs' counsel request an attorneys' fees award of $3,809,000.00

---

[2] As mentioned above, following a fairness hearing in October 2026, the court approved that proposed settlement subject to a single amendment. (ECF No. 152.)

[3] The Settlement Class is: All persons (other than white, non-Hispanic persons) who (i) are participants in any of the Plans; (ii) applied for 88 Plan benefits, Total and Permanent ("T&P") disability benefits, Line of Duty ("LOD") disability benefits, and/or Neurocognitive ("NC") benefits under one or more of the Plans from January 1, 2012 to the present; (iii) underwent neuropsychological testing in connection with that benefits application; and (iv) had their neuropsychological test scores adjusted using (non-white) race-based demographic adjustments.

[4] The *ad damnum* requested the following relief:

> a. Certify the Class under the Federal Rules of Civil Procedure;
> b. That Plaintiffs be appointed as the representatives of the Class;
> c. That counsel for Plaintiffs be appointed as counsel for the Class;
> d. Declare the Plans' use of race norming to violate the Plans terms;
> e. Declare the Plans' use of race norming to violate ERISA;
> f. Declare that Defendants breached their fiduciary duties under ERISA;
> g. Enjoin Defendants from continuing the discriminatory practices alleged in this Complaint;
> h. Pursuant to the injunctive remedy requiring Defendants to reconsider any claims which were impacted by the discrimination described herein and provide the relief required by the Plan terms to any resultant award of benefits with said reconsideration to be supervised by Class counsel;
> i. Enjoin the Defendants from reducing benefits payable to Plaintiffs and Class members due to their participation in this lawsuit;
> j. Award Plaintiffs and the other members of the Class the costs incurred in this lawsuit and reasonable attorneys' fees;
> k. Award the Plaintiffs and the Class members pre-judgment and post-judgment interest at the maximum rate allowed by law for any benefits that were withheld because of the use of race norming;
> l. Awarding compensatory and punitive damages; and
> m. Awarding the Class such other relief, general or special, at law or in equity, which the Court may deem just, proper, and equitable.

(ECF No. 1 at pp. 31–32.)

plus expenses of $248,921.69.[5] The Motion also seeks class representative service awards of $50,000.00 for each of named Plaintiffs Stacey Bailey and Eric Curry. (ECF No. 154.) The Motion seeks a grand total of $4,157,921.69. *Id.* Plaintiffs further request that the court retain jurisdiction to consider "potential enhancement" of the attorneys' fees and expenses awards for anticipated services to be performed in connection with the Rescoring Protocol described in the Settlement Agreement. (ECF No. 88-1 at pp. 37, 32.) While acknowledging the court's discretion to award fees, expenses, and class representative service awards as a general proposition, Defendants take considerable issue with the Motion on the whole. (ECF No. 92.)

## II. APPLICABLE LAW AND OTHER AUTHORITIES

There are three legal pathways on which the Motion rests: ERISA, 42 U.S.C. § 1988, and Federal Rule of Civil Procedure 23. Each legal pathway comes with its own body of law that requires the court to evaluate a litany of factors and considerations in determining whether to award fees and expenses and, if so, how much. As seen below, there is significant overlap among the factors considered within each legal basis for the Motion. Importantly, it remains Plaintiffs' burden throughout to persuade the court that they are entitled to an award, and that the specific individual awards they seek as to fees, expenses, and service awards are reasonable and a proper exercise of the court's discretion. They further bear the burden as to their request that the court effectively bifurcate the fee petition process and retain jurisdiction to consider a second fee petition related to oversight of the Rescoring Protocol once that has concluded.

### A. ERISA

Pursuant to ERISA § 502(g)(1), "the court in its discretion may allow a reasonable attorney's fee . . . ." ERISA § 502(g)(1), 29 U.S.C. § 1132(g)(1). In *Hardt v. Reliance Standard*

[5] *See* ECF No. 154 clarifying Plaintiffs' requests per the court's order at ECF No. 153.

*Life Ins. Co.*, the Supreme Court explained that because the statute does not expressly limit a fee award to a prevailing party (or some iteration of that description, *e.g.*, "substantially prevailing party" or "successful litigant"), Congress intended a fee award under § 502(g) to be available to a party who demonstrates "some degree of success on the merits." 560 U.S. 242, 255 (2010) (quoting *Ruckelshaus v. Sierra Club*, 463 U.S. 680, 694 (1983)). "A claimant does not satisfy that requirement by achieving 'trivial success on the merits' or a 'purely procedural victor[y],' but does satisfy it if the court can fairly call the outcome of the litigation some success on the merits without conducting a 'lengthy inquir[y] into the question whether a particular party's success was substantial or occurred on a central issue.'" *Id.* (quoting *Ruckelshaus,* 463 U.S. 680, 688 n.9). "Thus, ERISA places the determination of whether attorneys' fees should be awarded in an ERISA action completely within the discretion of the district court." *Quesinberry v. Life Ins. Co. of N. Am.*, 987 F.2d 1017, 1028 (4th Cir. 1993).

In *Quesinberry,* the Fourth Circuit explained:

> In *Reinking v. Philadelphia American Life Insurance Co.,* 910 F.2d 1210, 1217–18 (4th Cir.1990), we adopted a five factor test to guide the district court's exercise of discretion in awarding attorneys' fees under ERISA. The five factors are:
>
> (1) degree of opposing parties' culpability or bad faith;
>
> (2) ability of opposing parties to satisfy an award of attorneys' fees;
>
> (3) whether an award of attorneys' fees against the opposing parties would deter other persons acting under similar circumstances;
>
> (4) whether the parties requesting attorneys' fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA itself; and
>
> (5) the relative merits of the parties' positions.

*Id.* at 1028–29 (quoting *Iron Workers Local # 272 v. Bowen*, 624 F.2d 1255, 1266 (5th Cir. 1980)).

The *Quesinberry* court further explained that "[t]his five factor approach is not a rigid test, but rather provides general guidelines for the district court in determining whether to grant a request for attorneys' fees." *Id.* at 1029 (citing *Gray v. New England Tel. & Tel. Co.*, 792 F.2d 251, 258 (1st Cir. 1986)). "No one of these factors is necessarily decisive, and some may not be apropos in a given case, but together they are the nuclei of concerns that a court should address in applying section 502(g)." *Id.* (quoting *Iron Workers Local # 272*, 624 F.2d at 1266.

**B. 42 U.S.C. § 1988**

"In any action or proceeding to enforce a provision of section[] 1981 . . . the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee as part of the costs" and "the court, in its discretion, may include expert fees as part of the attorney's fee." 42 U.S.C. § 1988(b), (c). In *Hensley v. Eckerhart*, 461 U.S. 424 (1983), the Supreme Court explained that because the "purpose of § 1988 is to ensure 'effective access to the judicial process' for persons with civil rights grievances[,] . . . a prevailing plaintiff 'should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust.'" 461 U.S. at 429 (internal citations omitted). The Court further instructed that "[t]he amount of the fee, of course, must be determined on the facts of each case" and noted congressional citation with approval to the 12 factors set out in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974), as an evaluation yardstick.[6] *Hensley*, 461 U.S. at 429–30.

The twelve *Johnson* factors are:

> (1) the time and labor required;
> (2) the novelty and difficulty of the questions;
> (3) the skill requisite to perform the legal service properly;
> (4) the preclusion of employment by the attorney due to acceptance

[6] As set forth below, the Fourth Circuit has adopted the *Johnson* factors in the context of general Rule 23 fee petitions—*i.e.* regardless of whether the action involved an ERISA or § 1981 claim, or neither.

> of the case;
>
> (5) the customary fee;
>
> (6) whether the fee is fixed or contingent;
>
> (7) time limitations imposed by the client or the circumstances;
>
> (8) the amount involved and the results obtained;
>
> (9) the experience, reputation, and ability of the attorneys;
>
> (10) the 'undesirability' of the case;
>
> (11) the nature and length of the professional relationship with the client; and
>
> (12) awards in similar cases.

*Johnson*, 488 F.2d at 717–19; *see Rum Creek Coal Sales, Inc. v. Caperton*, 31 F.3d 169, 175 (4th Cir. 1994) (explaining on review of § 1988 fee petition ruling that, "[i]n determining the reasonableness of the number of hours, the Supreme Court endorses the use of the factors established in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974), and recognized by this court in [*Daly v. Hill,* 790 F.2d 1071, 1085 (4th Cir. 1986)]")

Regarding the statutory meaning of "prevailing party" in the context of § 1988, *Hensley* provides:

> The standard for making this threshold determination has been framed in various ways. A typical formulation is that "plaintiffs may be considered prevailing parties for attorney's fees purposes if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." This is a generous formulation that brings the plaintiff only across the statutory threshold. It remains for the district court to determine what fee is "reasonable."

*Hensley*, 461 U.S. at 433 (quoting *Nadeau v. Helgemoe*, 581 F.2d 275, 278–79 (1978)); *see also id*. at 433 n.8 (citing *Taylor v. Sterrett,* 640 F.2d 663, 669 (5th Cir. 1981) ("[T]he proper focus is whether the plaintiff has been successful on the central issue as exhibited by the fact that he has acquired the primary relief sought.")). Importantly, the Court further instructs that the "most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably

expended on the litigation multiplied by a reasonable hourly rate"—otherwise known as the lodestar. *Hensley*, 461 U.S. at 433. The court addresses below the more specific guidance *Hensley* provides on this analysis.

**C. Federal Rule of Civil Procedure 23(h)**

Federal Rule of Civil Procedure 23(h) provides in relevant part: "In a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." FED. R. CIV. P. 23(h). Here, as explained above, both ERISA and § 1988 provide that a court, in its discretion, may awards fees and costs based on the relevant considerations. Because the Complaint includes ERISA and § 1981 claims, the Motion is properly before the court. Further, the Settlement Agreement provides at Section VIII in relevant part: "Class Counsel will apply to the Court for an award of Attorneys' Fees, Costs, and Expenses incurred in connection with the Action" which "Defendants reserve all rights to oppose[.]" (ECF No. 79-3 at p. 23.)

As set forth above, the Supreme Court in *Hensley* instructs that a reasonable fees and costs award is a function of reasonable hours multiplied by a reasonable hourly rate. Further, the Fourth Circuit has expressly adopted the *Johnson* factors wholesale: "We agree that these factors must be considered by district courts in this circuit in arriving at a determination of reasonable attorneys' fees in any case where such determination is necessary; and in order to make review by us effective, we hold that any award must be accompanied by detailed findings of fact with regard to the factors considered." *Barber v. Kimbrell's, Inc.*, 577 F.2d 216, 226 (4th Cir. 1978).

In determining a lodestar per *Hensley*, including consideration of the fifth *Johnson* factor regarding a "customary rate," courts in the Fourth Circuit follow the "locality rule," whereby "[t]he community in which the court sits is the first place to look to in evaluating the prevailing market

rate." *Montcalm Pub. Corp. v. Commonwealth of Va.*, 199 F.3d 168, 173 (4th Cir. 1999) (citation omitted). "Evidence of the prevailing market rate usually takes the form of affidavits from other counsel attesting to their rates or the prevailing market rate. However, in the absence of sufficient documentation, the court may rely on its own knowledge of the market." *CoStar Group, Inc. v. LoopNet, Inc.*, 106 F. Supp. 2d 780, 788 (D. Md. 2000) (internal citation omitted).[7]

In determining the reasonable hourly rate to be used in calculating an attorney's lodestar, Appendix B Guideline 3 of this court's Local Rules provides:

> Reasonable hourly rates should be determined by the Court using declarations, affidavits, stipulations by the parties, or other evidence. A useful guideline for hourly rates may be provided by the Fitzpatrick Matrix as adjusted annually, with a reduction of 5% to 20% (to reflect differences between the legal markets in Washington, D.C. and Maryland). These guideline rates are intended solely to provide practical guidance to lawyers and judges when requesting, challenging, and awarding fees. The factors established by case law govern. These guidelines do not create any presumptions regarding reasonable rates. The Court recognizes that a fee award should be determined in accordance with relevant case law.

Local Rules App'x B(3) (D. Md. 2025).[8]

In other words, the Fitzpatrick Matrix does not supplant applicable law; rather, it is a tool to implement the locality rule and to evaluate the reasonableness of the fee award request against fees customarily charged in the market (as judicially noticed by the court by way of the Local Rules) within the broader process of applying the *Johnson* factors as a whole.

## III. ANALYSIS

The court turns now to the substance of the Motion. First, the court will assess the

---

[7] As discussed more below, Plaintiffs do not attach affidavits of outside counsel on this issue. Instead, they offer the 2025 Real Rate Report at ECF No. 88-5.

[8] The Fitzpatrick Matrix is available at https://www.mdd.uscourts.gov/sites/mdd/files/fitzpatrick-matrix.pdf.

*Quesinberry* factors to determine whether Plaintiffs are entitled to an award per ERISA. Second, the court will consider whether Plaintiffs are entitled to an award under 42 U.S.C. § 1988. For the reasons explained below, the court finds Plaintiffs are entitled to a fees/costs award under both statutes. Third, the court will then proceed to apply the *Johnson* factors, and address other considerations relevant to this action, to arrive at the proper award. Finally, the court will address Plaintiffs' service award requests for named Plaintiffs Bailey and Curry, as well as Plaintiffs' request that the court bifurcate the fee petition process and reserve jurisdiction to consider another fee petition following the Rescoring Protocol.

**A. ERISA and the *Quisenberry* Factors**

For the reasons that follows, the court finds an award of reasonable attorneys' fees is proper under ERISA § 502(g)(1), 29 U.S.C. § 1132(g)(1), in accordance with the factors announced in *Quesinberry v. Life Ins. Co. of N. Am.*, 987 F.2d 1017 (4th Cir. 1993). Before addressing the factors, however, the court pauses to extinguish argument that because the case settled, Plaintiffs are not entitled to an award of fees. Such argument neither contends with nor acknowledges the language of § 502(g), which does not cabin the court's discretion to award fees to a prevailing party only (as do other federal statutes). This argument also ignores Supreme Court precedent squarely on point. As set forth above, the Supreme Court instructs that Congress intended a fee award under § 502(g) to be available to a party who demonstrates "some degree of success on the merits." *Hardt v. Reliance Standard Life Ins. Co.,* 560 U.S. 242, 255 (2010) (quoting *Ruckelshaus v. Sierra Club*, 463 U.S. 680, 694 (1983)).

**1. Degree of opposing parties' culpability or bad faith**

Similarly, the court is unpersuaded that the absence of a judicial finding or admission of Defendants' wrongdoing, culpability, or bad faith weighs against an award. First, while a judicial

finding of wrongdoing by Defendants would surely favor the Motion, absence of such a finding does not foreclose its merit. *See Hardt, supra.* Second, regarding the absence of a settlement agreement admission, that is neither surprising nor determinative of the outcome of this factor evaluation. As the court pointed out at the fairness hearing, but for the truly rare bird, settlements do not include an admission of liability; to the contrary, settling parties more typically include in the agreement an express recital disclaiming admission of liability.

The court further rejects Defendants' argument that this factor disfavors an award because of the NFL's pre-Complaint policy discontinuing or prohibiting use of race-based demographic factors in administering the Plans in a manner relevant to the Complaint. As urged by all counsel (including, of course, defense counsel) in support of the court's approval of the Settlement Agreement, a policy—no matter how formal or widely published—is not on par with a court order or an enforceable contract. Further, Defendants' argument oversimplifies the matter by ignoring controversy, scrutiny, and doubt (by some) as to whether Plan physicians contracted or engaged by Defendants continued to employ such practices following announcement of the policy.

Moreover, at the fairness hearing last month, in response to objections that the Settlement Agreement, *inter alia*, offers little to no value to the Settlement Class, defense counsel convincingly explained:

> We came to bury race norming as an issue. . . . [T]he focus was to be done.

(ECF No. 151, Hearing Transcript at p. 48, ll. 8–12.)

Still later, defense counsel urged:

> So the defendant made the decision right up front to end this, to bury it, to move beyond it. And that's every aspect of what the defendant has done insofar as I can attest, that's every focus of the plaintiffs to move past this in the most efficient way; and we've come up with a structure that we think will get this done as rapidly as possible, as

> fairly as possible, as completely as possible.

*Id*. at 54, ll. 8-14.

In agreement with the overall fairness of the Settlement Agreement, the court ultimately concluded, *inter alia*:

> The proposed settlement agreement secures the relief sought through the complaint as well as other relief that the court would not have had the authority to order had the case gone to trial or been resolved on summary judgment. In other words, the proposed agreement provides proposed class members with relief that they would not have been able to obtain in a litigated outcome.

Id. at 62, l. 25—p.63, ll. 1-7.

Finally, the court is further unpersuaded by Defendants on this factor because—even if the June 2021 policy announcing the prohibition on race norming has been followed to a tee by all (including physicians)—before Plaintiffs instituted this action, to the court's knowledge, Defendants never sought to rectify potential Plan-related harms visited upon NFL players who may have been inappropriately classified in connection with relevant Plan benefits as a result of the very race norming Defendants expressed to the court they want to bury.

The Settlement Agreement, *inter alia*, represents a permanent injunction and a specific, methodical protocol assessing whether, from 2012 to the present, NFL players were damaged by consideration of race-based demographic factors in neurocognitive testing; and, if so, to what extent; and then to make those players and their families financially whole. To persuade the court to approve the Settlement Agreement, Defendants lauded the material injunctive relief benefits set forth therein on the premise that the June 2021 policy was just that—a mere policy. But to oppose Plaintiffs' requested fees, expenses, and service awards, Defendants harness the policy to minimize the impact of the Complaint and resultant Settlement Agreement. Defendants may not use the June 2021 policy as both a sword and shield; they will not be heard at once to rest on the

significance of the policy to oppose a fee petition and to diminish its significance while advocating the fairness of the Settlement Agreement.

The court agrees with Plaintiffs on this point. While Defendants announced a prohibition on the challenged practice (which Defendants contend was "limited to certain Neutral Physicians," ECF No. 92 at p. 10) in June 2021—two years before the Complaint was filed—it was this action that not only brought it to a contractually mandated close confirmed by court order, but also—critically—resulted in agreement that Defendants take specific action to make any harmed Settlement Class members whole. Accordingly, this factor favors an award under ERISA § 502(g)(1).

**2. Ability of opposing parties to satisfy an award of attorneys' fees**

There is no dispute Defendants are able to satisfy an award of attorneys' fees. This factor favors an award under ERISA § 502(g)(1).

**3. Whether an award of attorneys' fees against the opposing parties would deter other persons acting under similar circumstances**

The court agrees with Plaintiffs that a fee award here would send a "clear signal to ERISA plan fiduciaries." (ECF No. 88 at p. 19.) Specifically, an award here would deter other plan fiduciaries who discover that plan benefits have been administered in a discriminatory or otherwise unlawful manner from merely discontinuing the improper administration and declining "to undertake voluntary retroactive remediation" where a plan member has been harmed by the identified wrongful or unlawful plan administration. In this manner, an award of fees in this action serves to advance ERISA's remedial purpose to protect plan participants and beneficiaries, and to ensure fiduciaries act accordingly (*i.e.*, to deter fiduciaries elsewhere from failing to engage in retroactive measures to ensure the proper administration of plan benefits to which plan members and beneficiaries may be entitled). *See Teamsters Joint Council No. 83 v. Centra, Inc.*, 947 F.2d

115, 123 (4th Cir. 1991) (noting ERISA is a "remedial statute" and should therefore be "liberally construed in favor of protecting the participants in employee benefits plans"). Therefore, this factor favors an award of fees.

**4. Whether the parties requesting attorneys' fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA itself**

The Complaint sought relief for a putative class of "[a]ll Participants in the Plan[s]." (ECF No. 1 at ¶ 174.) As set forth above, the Settlement Class is defined as:

> All persons (other than white, non-Hispanic persons) who (i) are participants in any of the Plans; (ii) applied for 88 Plan benefits, Total and Permanent ("T&P") disability benefits, Line of Duty ("LOD") disability benefits, and/or Neurocognitive ("NC") benefits under one or more of the Plans from January 1, 2012 to the present; (iii) underwent neuropsychological testing in connection with that benefits application; and (iv) had their neuropsychological test scores adjusted using (non-white) race-based demographic adjustments.

(ECF No. 79-3 at pp. 12–13.)

Thus, Plaintiffs appear to have set out to create a class of all participants based on the Complaint; ultimately, however, the Settlement Class was considerably narrower. That said, material relief afforded by the Settlement Agreement inures to the benefit of all participants—not just members of the Settlement Class, including permanently prohibiting Defendants from using race-based demographic adjustments in the administration of neuropsychological tests for any Plan participant. (ECF No. 79-3 at § VI.A.) While the court agrees with Defendants that this action did not resolve a significant ERISA question, the court finds this factor favors the Motion for the above-stated reasons.

**5. The relative merits of the parties' position**

In support of their Motion, on this factor, Plaintiffs argue: "[F]aced with justifying a

discriminatory practice or the failure to cure the known impact, [Defendants] chose instead to negotiate a comprehensive class-wide settlement that provides every element of relief sought by the Complaint. Defendants did not settle because Plaintiffs' case lacked merit." (ECF No. 88-1 at p. 20.) This punchy sentiment surely has appeal, but—at bottom—because this action resolved absent any material judicial involvement up until the fairness hearing, the court is not in a position to evaluate the merits of the parties' respective positions. Therefore, this factor neither favors nor disfavors an award of fees.

In summary, for the reasons set forth above and in accordance with the above-cited jurisprudence, the court finds Plaintiffs are entitled to an award of attorneys' fees pursuant to ERISA § 502(g)(2). *Quesinberry v. Life Ins. Co. of N. Am.*, 987 F.2d 1017 (4th Cir. 1993); *Hardt v. Reliance Standard Life Ins. Co.,* 560 U.S. 242 (2010); *Ruckelshaus v. Sierra Club*, 463 U.S. 680 (1983).

**B. 42 U.S.C. § 1988**

As explained above, in *Hensley v. Eckerhart*, the Supreme Court held that the "typical formulation" for making the "threshold determination" as to whether a plaintiff may be considered a prevailing party for purposes of § 1988, "is that 'plaintiffs may be considered prevailing parties for attorney's fees purposes if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit.'" 461 U.S. 424, 433. The court also may consider whether the plaintiff achieved the primary or a major form of relief sought. *Id.* at 429–33, 433. n.8 (internal citations omitted). For the reasons set forth above in the court's evaluation of the *Quesinberry* factors, the court is satisfied that Plaintiffs are properly considered prevailing parties for purposes of 42 U.S.C. § 1988 and are therefore entitled to an award of reasonable attorneys' fees, which may include expert witness expenses.

**C. The *Johnson* Factors**

Having determined that the court will exercise its discretion to award reasonable attorneys' fees under ERISA § 502(g)(2) and 42 U.S.C. § 1988, the court will proceed to analyze the *Johnson* factors. *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1974). As explained, the Fourth Circuit has adopted the *Johnson* factors and instructs this court to assess them to determine the appropriate award of fees, expenses, and service awards under ERISA, § 1988, and Rule 23. *Rum Creek Coal Sales, Inc. v. Caperton*, 31 F.3d 169, 175 (4th Cir. 1994). Before setting out on its analysis, the court first identifies the exhibits offered by the parties.

**1. Exhibits Offered in Support of, and in Opposition to, the Motion**

In support of the Motion, Plaintiffs offer Exhibit A, the Declaration of W. Daniel Miles, III, of Beasley Allen.[9] (ECF No. 88-2; the "Miles Declaration.") Pursuant to Federal Rule of Civil Procedure 23(g), the court appointed Beasley Allen as co-Class Counsel for the Settlement Class along with the Sinclair Law Firm. (ECF No. 152 at ¶ 8.) Miles attests, *inter alia*, to the work performed through Beasley Allen and includes a lodestar chart setting forth the proposed total lodestar award for each Beasley Allen attorney, paralegal, and law clerk who performed work in connection with the case. Miles also attests to out-of-pocket expenses advanced by the firm, breaking them down by category (*e.g.*, experts, photocopies, travel expenses, *etc.*). He explains that the firm took the case on a wholly contingent basis and has received no fee income or expense reimbursement.

The Miles Declaration includes a 40-page spreadsheet titled "Beasley Allen Itemized Time Records" (ECF No. 88-2 at pp. 12–52) setting forth the dates of work performed by each attorney, paralegal, and law clerk, a description of each time entry, and the documented "unit" of time

---

[9] All Beasley Allen counsel of record work out of the firm's offices in Montgomery and Mobile, Alabama.

broken down in the customary 6-minute increment, or 1/10 of an hour, fashion (in which, for example, an entry of .1 indicates 6 minutes, an entry of .5 indicates 30 minutes, an entry of 1 indicates 60 minutes, *etc*.).[10] Miles attests the firm expended 2087.9 hours of work from June 9, 2023[11] through July 15, 2026. (The Motion was filed July 21, 2026.) The Miles Declaration also includes a spreadsheet titled "Beasley Allen Itemized Expense Records" setting forth expenses incurred broken down by date, amount, description, and associated vendor, legal professional or other service/person tied to the expense. (ECF No. 88-2 at pp. 53–77.)

Finally, the Miles Declaration includes a spreadsheet titled "Total Fee and Expense Summary," which breaks down Plaintiffs' total fees award request by firm and professional, as well as each firm's recorded expenses. (ECF No. 88-2 at pp. 78-79.) It indicates that the Motion attributes attorneys' fees of $2,326,970 to Beasley Allen (reflecting 2087.9 hours); $1,328,910.00 to the Sinclair Law Firm (reflecting 915.3 hours)—although this was later modified to $1,315,110.00 in Plaintiffs' reply in support of the Motion (*see* ECF No. 93-2 at ¶¶ 6, 33; *see also* ECF No. 154); $35,250.00 to the Nace Law Group (reflecting 47 hours); and $131,670.00 to the Cuthbert Firm[12] (reflecting 138.6 hours). The Miles Declaration further indicates that the Motion attributes current expenses of $223,690.30 to Beasley Allen; $24,556.61 to the Sinclair Law Firm; and $674.78 to the Nace Law Group—for a total of $248,921.69. (The Motion seeks an additional $4,500.00 in expenses (for a total of $253,421.69) based on "anticipated costs for travel to the Final Fairness Hearing." (ECF No. 88 at p. 2.))

Thus, as modified by ECF No. 93-2 and clarified at ECF No. 154, the Motion seeks a total

[10] Miles attest the spreadsheet was developed from "contemporaneous daily time records." (ECF No. 88-2 ¶ 26.)
[11] At paragraph 19 of the Miles Declaration, Miles asserts the firm began work on June 9, 2026, which the court understands to be a typographical error. The case was initiated in September 2023, and the time records show the first time entry as June 9, 2023. (ECF No. 88-2 at p. 13.)
[12] The Cuthbert Firm is located in Marietta, Georgia.

of $3,809,000.00 in attorneys' fees across all of Plaintiffs' time keepers (attorneys, paralegals and claw clerks);[13] and the total award requested in the Motion is $4,157,921.69—inclusive of all requested attorneys' fees, expenses, and class representative service awards.

In support of the Motion, Plaintiffs also offer Exhibit B, the Declaration of Thomas O'Neal Sinclair of the Sinclair Law Firm located in Birmingham, Alabama. (ECF No. 88-3; the "Sinclair Declaration.") As mentioned above, pursuant to Rule 23(g), the court appointed the Sinclair Law Firm as co-Class Counsel for the Settlement Class along with Beasley Allen. (ECF No. 152 at ¶ 8.) In support of Plaintiffs' request that the court award fees based (in part) on a $1,500 hourly rate for Sinclair and a $300 hourly paralegal rate for Sinclair Law Firm paralegals, and Sinclair Law Firm expenses of $24,556.61, Sinclair attests in great detail to his professional background and relevant subject matter experience, the work he personally performed prior to initiation of this action in case strength evaluation, theory and strategy development, and his role in the settlement negotiations, including the mediation and development of the Settlement Agreement; as well as the importance of his work in the overall outcome reflected in the mediated Settlement Agreement. He further describes in detail the firm's billing judgment (ECF No. 88-3 at p. 19), which is to say the care taken with respect to the firm's services, billing and associated time recordation, and the like, to avoid duplicative, unnecessary, or inefficient work.

Similar to the Miles Declaration, Sinclair attaches a spreadsheet setting forth the dates of work performed by him and firm paralegals, a description of each time entry, and the documented unit of time—totaling $1,317,900.00 in requested attorneys' fees (878.6 hours at $1,500 per hour)

---

[13] As mentioned above and as described in more detail below, Sinclair offers a second declaration in support of Plaintiff's Reply wherein he revises his request on behalf of the Sinclair Law Firm by withdrawing 9.2 hours, thus modifying the Sinclair Law Firm's request to include 869.4 attorney hours (at a requested $1,500 per hour) and 36.7 paralegal hours (at a requested $300 per hour), producing a "revised lodestar of $1,315,110"—"together with the expenses otherwise supported in the record." (ECF No. 93-2 at ¶¶ 6, 33.)

and $11,010.00 in requested paralegal fees (36.7 hours at $300 per hour), (ECF No. 88-3 at pp. 29-68, the "Sinclair Law Itemized Time Entries"); and a second spreadsheet setting forth expenses incurred by category, date, and amount—totaling $24,556.61 in requested expenses, (*id.* at 69, the "Sinclair Law itemized Expenses"). As mentioned above, Plaintiffs' Reply includes a second Sinclair Declaration (ECF No. 93-2; the "Second Sinclair Declaration"), which revises the request on behalf of the Sinclair Law Firm by withdrawing 9.2 hours, thus modifying the Sinclair Law Firm's request to include 869.4 attorney hours (at $1,500 per hour) and 36.7 paralegal hours (at $300 per hour), producing a "revised lodestar of $1,315,110"—"together with the expenses otherwise supported in the record." (ECF No. 93-2 at ¶¶ 6, 33; *see* discussion, *infra.*) Sinclair also attests that the firm took the case on a wholly contingent basis and has received no fee income or expense reimbursement.

In further support of the Motion, Plaintiffs offer Exhibit C, the Declaration of Christopher T. Nace of the Nace Law Group. (ECF No. 88-4; the "Nace Declaration.") Nace served as Plaintiffs' co-counsel of record and local counsel out of Washington, D.C. Nace explains that the firm performed work on a wholly contingent basis and has received no fee income or expense reimbursement. Nace attests that he performed 47 hours of work, documented contemporaneously with services performed, and asserts the proper lodestar for that work is $35,250.00 "based upon current rates." He further attests to firm expenses of $674.78, consisting of the $402.00 court filing fee for the Complaint, $27.19 in postage, and $245.59 for in-house photocopying.

Exhibit D to the Motion is a 265-page "2025 Real Rate Report" published by Wolters Kluwer ELM[14] Solutions. (ECF No. 88-5; the "Real Rate Report.") The Real Rate Report is a compilation of market data and purports to be "[t]he industry's leading analysis of law firm rates,

---

[14] According to the Wolters Kluwer website, ELM stands for Enterprise Legal Management. https://www.wolterskluwer.com/en/solutions/enterprise-legal-management.

trends, and practices." *Id.* at 2. Plaintiffs offer the Real Rate Report to support that their requested lodestar is appropriate for ERISA litigation in the Washington, D.C. market, especially given the risk of non-payment on contingency fee-based work, which, they assert, is unaccounted for in the Real Rate Report. (ECF No. 88-1 at pp. 30–31.)

In support of their response in opposition to the Motion, Defendants offer two exhibits. Exhibit 1 (ECF No. 92-1) is a 75-page series of spreadsheets and tables identifying Defendants' challenges to the Beasley Allen Itemized Time Records (ECF No. 88-2 at pp. 12-52) and Sinclair Law Itemized Time Records (ECF No. 88-3). In total, Defendants' Exhibit 1 identifies challenges to 1,076 Beasley Allen time entries equating to 871.9 service hours and amounting to a challenge to $953,255.00 in requested fees. The eight categories of challenges are as follows: 1(A) Entries Combining Multiple Tasks or Precluding Meaningful Review of Time Allocation (55 entries, 112.9 hours, $78,340.00 in fees); 1(B-1) Same Communication Reviewed by Three or More Timekeepers (638 entries, 179.2 hours, $207,725.00 in fees); 1(B-2) Substantive Review Billed by Three or More Timekeepers (133 entries, 191.1 hours, $238,415.00 in fees); 1(C) Clerical and Ministerial Tasks (120 entries, 19.2 hours, $7,935.00 in fees); 1(D) Non-Working Travel Billed at Full Rate (44 entries, 271.3 hours, $335,005.00 in fees); 1(E) Time Devoted to Counsel's Own Fee Request (27 entries, 53.5 hours, $42,185.00 in fees); 1(F) Referral, Retainer, and Intake Activities (13 entries, 7.1 hours, $3,515.00 in fees); and 1(G) Entries Providing No Meaningful Subject or Purpose (46 entries, 37.6 hours, $40,135.00 in fees).

As for the Sinclair Law Firm, Defendants' Exhibit 1 identifies challenges to 286 time entries equating to 292.2 service hours and amounting to a challenge to $406,260.00 in requested fees. The eight categories of challenges are as follows: 1(H) Passive Receipt or Review of Communications (102 entries, 18.2 hours, $27,300.00 in fees); 1(I) Same Communication Billed

Across Multiple Firms (35 entries, 9.0 hours, $13,500.00 in fees); 1(J) Non-Working Travel (7 entries, 16.6 hours, $24,900.00 in fees); 1(K) Time Devoted to Counsel's Own Fee Request (22 entries, 55.3 hours, $81,270.00 in fees); 1(L) Entries Combining Multiple Tasks or Precluding Meaningful Review of Time Allocation (38 entries, 93.5 hours, $140,250.00 in fees); 1(M) Repeated Review/Mapping of the Same Plan Documents (68 entries, 85.5 hours, $102,330.00 in fees); 1(N) Clerical and Ministerial Tasks (5 entries, 4.3 hours, $2,010.00 in fees); 1(O) Vague or Templated Narratives (9 entries, 9.8 hours, $14,700.00 in fees).

Exhibit 2 to Defendants' opposition is a compilation of the Westlaw published (publicly available) attorney profiles reflecting the law school graduation year of each Plaintiffs' counsel timekeeper. (ECF No. 92-2.) Defendants offer this in support of their position that Plaintiffs' lodestar hourly rate requests are out of line with the Fitzpatrick Matrix, a market-based tool used by this court as a guide in evaluation of fee requests (discussed in greater detail later in this opinion). Local Rule App'x B(3) (D. Md. 2025). Applying the Fitzpatrick Matrix, with a 20% Maryland market reduction, Defendants assert the court should apply the following hourly rates to Plaintiffs' timekeepers: W. D. Miles (1989 graduate) — $746 (not $1,600); Golston (1998) — $724 (not $1,400); Sinclair (1999) — $718 (not $,1500); Nace (2003) — $694 (not $750); Hawthorne (2010) — $636 (not $1,200); Gilliland (2012) — $614 (not $1,150); Hampton (2013) — $603 (not $1,100); L. Miles (2015) — $578 (not $1,000); Minder (2015) — $578 (not $1,000); Evans (2017) — $553 (not $950); paralegals— $204 (not $300); law clerk — $204 (not $250).[15]

[15] Regarding Plaintiffs' counsel of record out of the Cuthbert Firm, the court notes the Motion requests an award of $131,670 attributed to 126 hours of work by Byron Cuthbert and 12.6 hours of work by Vicki Trammel Cuthbert—both at $950 per hour. (ECF No. 88-2 at p. 79.) Defendants assert the court should exclude all fees requested for work asserted to have been performed by the Cuthbert Firm because the Motion offers no declaration from either timekeeper, appends no time records, and provides no description of tasks performed. (ECF No. 92 at p. 30.) As the court understands it, Defendants' Exhibit 2 does not assert an alternative hourly rate the court should consider when evaluating the aspect of the Motion based on Cuthbert Firm services because Defendants contend that no fees should be awarded attributable to the Cuthbert Firm.

In reply, Plaintiffs offer additional declarations of Messrs. Miles and Sinclair. (ECF No. 93-1, the "Second Miles Declaration;" and, as noted above, ECF No. 93-2, the Second Sinclair Declaration, respectively.) The Second Miles Declaration is offered to rebut or answer Defendants' argument that Beasley Allen time records reflect unnecessary duplication of attorney time and to verify Dr. Spica's (Plaintiffs' expert; *see* ECF No. 93-1 at ¶ 11) services and billed time. As set forth earlier, the Second Sinclair Declaration revises the fee request attributable to Sinclair Law Firm to 869.4 attorney hours (at $1,500 per hour) and 36.7 paralegal hours (at $300 per hour), producing a "revised lodestar of $1,315,110"—"together with the expenses otherwise supported in the record." (ECF No. 93-2 at ¶¶ 6, 33.) The Second Sinclair Declaration is also offered to answer Defendants' criticisms of unnecessary/repeated attorney hours, vague billing entries, time billed for clerical tasks, and over-billed travel time. (*See, e.g., id.* ¶ 16, 23-27.)

**2. *Johnson* Factors**

**a. Time and labor required**

As set forth above, the court has before it several declarations of Plaintiffs' counsel and appended exhibits documenting contemporaneously recorded time. The court notes that while this action may appear to the outside observer to have been won on the Complaint alone—*i.e.*, with little work required from Plaintiffs' counsel—the court notes the considerable time and energy counsel invested in legal research and preparation to initiate this action to position their clients in the most advantageous position from the start. And while that may not be unique to this case as a general proposition, the fact that Defendants agreed to proceed to private mediation fairly immediately (a fact which also demonstrates the smart, strategic, and long-range field view of experienced, highly skilled defense counsel) speaks to the value of the time and energy Plaintiffs' counsel spent on launching this case in a very precise, if not surgical, way. As the court expressed

at the fairness hearing last month, Plaintiffs' counsel did not file a scattershot pleading; they took a very narrow, well-chosen path and it yielded significant results for the Settlement Class.

The court also notes, both from the Motions papers as well as the Declaration of Honorable Gerald E. Rosen, retired United States District Judge for the Eastern District of Michigan who served as the mediator for the parties in this case (ECF No. 140), that counsel on both sides engaged in extensive, earnest, negotiations over seven mediation sessions spanning nearly a year. That process involved the effective equivalent of pre-trial discovery, including physician expert engagement and coordination, as well as several mediation position statements and private caucuses with Judge Rosen.

That being said, the court takes a sharp editor's pencil to billing time for multiple partners on tasks like drafting and reviewing status updates filed with the court. Such a nearly perfunctory task, in the court's opinion, does not reasonably call for the eyes and attention of partner level attorneys from cross disciplines. The court, however, does not share Defendants' criticism that Plaintiffs' counsel's time records preclude meaningful review due to block-billed entries. To be sure, many time entries include more than one task, but to the court's eye, the combined tasks are largely (sometimes obviously) related to one another in subject area or purpose, and do not evade meaningful review by the court (or Defendants). (*See, e.g.*, ECF No. 88-2 at pp. 17, 50—4.8-hour time entry of attorney Evans on September 29, 2023, "Drafting complaint, reviewing local rules, ECF manual, and drafting civil cover sheet;" 5.0-hour time entry of paralegal Chandler on May 29, 2026, "Finalizing memo ISO settlement. Preparing other exhibits for memo iso settlement. Email w/ Brandi re: filing today. Coordinating collection of signature pages for settlement agreement;" and *see, e.g.*, ECF No. 88-3 at pp. 35 and 47—2.8-hour time entry of attorney Sinclair on November 19, 2023, "Prepare for meeting with counsel regarding the plans with review of co-

counsel to-do list; review, revise and edit draft memo on plans related benefits; begin researching alternatives for models to remove race norming bias;" 2.4-hour time entry of attorney Sinclair on February 20, 2025, "Finalize presentation to co-counsel on possible plan to settle, prepare Excel chart on numbers, gather all research, prepare to report on findings of how we can resolve in global fashion all the pending claims through the use of an injunctive remedy including the 1981 claims and ERISA claims while expanding the scope of relief that would flow from the injunctions, print and highlight case law from research folder to answer questions and prepare slideshow.")

The court agrees with Defendants that several (sometimes 4 to 6) principal level Plaintiffs' counsel often recorded time for the same task, like reviewing emails from the same source on the same subject. While the court appreciates that this action involved multiple areas of legal discipline, including ERISA and civil rights law, which may have required more than one high-level attorney undertaking similar tasks related to drafting the Complaint, settlement negotiations, the mediation process, *etc*., the court is not persuaded that such cross-discipline principal-level expertise was efficient or reasonable to the extent the time records reflect such a billing practice. In the view of the court, given the extensive number of billing counsel, paralegals, and law clerks working on this action – across four law firms—Plaintiffs' counsel could have (and should have) been more mindful of keeping their time reasonably trim by avoiding this sort of unnecessary doubling (sometimes tripling, quadrupling, or quintupling) up on tasks and matters that simply do not appear to warrant it.

Similarly, Beasley Allen time records include a multitude of entries for clerical tasks, including, for example, several paralegal time entries for booking and canceling travel and lodging plans, seeking price quotes from process servers, making photocopies, downloading documents, and the like. Such tasks should have been assigned to non-billing clerical staff and assistants. (*See*

*generally* ECF Nos. 88-2, 88-3.) The court does not share Defendants' criticism that the Sinclair Law Firm time entries reflect undue or unreasonable repeated review of documents by attorney Sinclair and his paralegal; inappropriately billed clerical or ministerial tasks; or overly vague task descriptions.

On the issue of billing for travel time, Appendix B of the Local Rules of this court provides in relevant part:

> i. Whenever possible time spent in traveling should be devoted to doing substantive work for a client and should be billed (at the usual rate) to that client. If the travel time is devoted to work for a client other than the matter for which fees are sought, then the travel time should not be included in any fee request. If the travel time is devoted to substantive work for the client whose representation is the subject of the fee request, then the time should be billed for the substantive work, not travel time.
>
> ii. Up to two (2) hours of travel time (each way and each day) to and from a court appearance, deposition, witness interview, or similar proceeding that cannot be devoted to substantive work may be charged at the lawyer's hourly rate.
>
> iii. Time spent in long-distance travel above the two (2) hours limit each way, that cannot be devoted to substantive work, may be charged at one-half of the lawyer's hourly rate.

Local Rules, App'x B.2 (D. Md. 2025).

Based on the records before the court, it appears Beasley Allen failed to comply with the Local Rule on billing for travel time and that the Sinclair Law Firm abided the rule much, but not all, of the time. Merely by way of example: on October 17, 2023, attorney Gilliland notes 3 hours for "travel . . . for meeting"; a second time entry for that same date notes 9.1 hours for time spent in a meeting about the case and "[r]eturn travel after meeting." Thus, on one day, approximately 6 hours were logged at the full hourly rate purely for travel, as no time entry indicates substantive work was performed during that time. On December 3, 2023, four Beasley Allen attorneys billed a total of 24.3 hours for travel to Washington, D.C., with a fifth attorney billing another 13 hours

that day for "travel and conference calls" about a meeting with opposing counsel. (ECF No. 88-2 at p. 21.) A few days later, on December 5, 2023, attorney Gilliland logged two separate entries: 3 hours for a meeting with defense counsel and 11.5 hours for "return travel from DC." That same day, an additional four attorneys billed a total of 29 hours for return travel from a meeting with defense counsel with no other time entries indicating any substantive work was performed during travel time. This pattern repeats itself on March 24 and 26, 2024, with four timekeepers recording full rate time for travel to and from meetings with defense counsel, with no additional time entries, totaling 57.2 hours. As another example, on July 10, 2025, attorneys Gilliland, Hampton, and W.D. Miles traveled eight, six, and six hours, respectively, to Washington, D.C., for mediation; their return travel is logged on July 12—again for eight, six, and six hours, respectively. No other time entries are noted for either day. These are mere samples from Beasley Allen time records offered at ECF No. 88-2; the court will not endeavor to set forth an exhaustive illustration of non-compliance with the Local Rules on billing for travel. However, the court notes that Beasley Allen time entries in which travel is the only description of work performed, and which were billed at the timekeeper's full rate, appear to total 271.3 hours, equating to a request of $335,005.00 in fees (at the requested lodestar).

The court also notes that while Plaintiffs' counsel are entitled to seek fees incurred in connection with their Motion, Beasley Allen logged 53.5 hours attributable to the Motion over a two-and-a-half-week period across four timekeepers generating a request of $42,185.00 in fees. The Sinclair Law Firm logged 55.3 hours on the Motion over 14 days for a request of $81,270.00. While $123,000.00 is less than 3% of the total award request and just north of 3% of the total attorneys' fees request, the court finds $123,000.00 objectively excessive, particularly where the Motion fails to acknowledge, no less conform to, several Local Rules of the court as explained

above.

**b. Novelty and difficulty of the questions**

The court finds that this case presented relatively (although not entirely) novel legal theories and agrees with Plaintiffs that the "Settlement demonstrates how § 1981's equality guarantee and ERISA's fiduciary and remedial framework can operate together to correct discrimination embedded in institutional plan administration." (ECF No. 88-1 at p. 22). Similarly, the court agrees with Plaintiffs that race-based demographic norms in neuropsychological testing . . . is a medically specialized practice embedded in clinical literature" and that "[t]ranslating that practice into a cognizable legal claim under ERISA and Section 1981, and developing a judicially administrable rescoring remedy, required significant research and expert consultation." *Id.* at p. 23. The court appreciates that other NFL litigation regarding Plan administration in connection with injured players (including, *e.g.*, *In re National Football League Players' Concussion Injury Litigation*, No. 2:12-md-02323-AB, (E.D. Pa.)) may have some degree of issue overlap with the instant action, but the court finds this action to involve relatively novel legal theories of liability and recovery, and required counsel to develop facility and fluency in a challenging, nuanced scientific area.

**c. Skill requisite to perform the legal service properly**

As reflected above, this action required a confluence of legal expertise and skills including ERISA law, class action law, civil rights law, complex negotiation, and an understanding of aspects of neuropsychological science the average lawyer obviously does not have.

**d. Preclusion of employment by the attorney due to acceptance of the case**

Plaintiffs assert that the "breadth and duration of this engagement, including the demands of seven mediation sessions, expert-coordinated confirmatory discovery, and a 14-year class

period, necessarily limited Class Counsel's capacity to take on other matters." (ECF No. 88-1 at p. 25.) Defendants are correct, however, that Plaintiffs "identify no matter declined, no client turned away, and no specific work foregone [sic] because of this litigation." (ECF No. 92 at p. 19.) To be sure, every case a firm or lawyer takes on comes with at least a theoretical opportunity cost, but nothing before the court suggests that any Plaintiffs' firm or lawyer turned away other work or was unable to pursue other work because of this case. Thus, while the court does not doubt Plaintiffs' counsel invested significant time and other resources into Plaintiffs' case, this case does not appear to have had a preclusive impact on any of the Plaintiffs' firms relevant to this factor.

**e. The customary fee; and**

**f. Whether the fee is fixed or contingent**

As set forth above, Beasley Allen, the Sinclair Law Firm, and the Nace Law Group all performed their work on a wholly contingency fee basis. No information is provided as to the basis of work performed by the Cuthbert Firm.

Preliminarily, the court declines Plaintiffs' request that the court reserve jurisdiction (and judgment) on an enhancement (also referred to as applying a multiplier of the lodestar) "until after the Rescoring Protocol is conducted," (ECF No. 88-1 at p. 25), to reflect the risk of non-payment associated with taking a case on a contingency-based fee arrangement. *See City of Burlington v. Dague*, 505 U.S. 557, 566 (1992) ("Contingency enhancement is a feature inherent in the contingent-fee model (since attorneys factor in the particular risks of a case in negotiating their fee and in deciding whether to accept the case). To engraft this feature onto the lodestar model would be to concoct a hybrid scheme that resorts to the contingent-fee model to increase a fee award but not to reduce it. Contingency enhancement is therefore not consistent with our general rejection of

the contingent-fee model for fee awards, nor is it necessary to the determination of a reasonable fee."). The court agrees with Defendants that the cases cited by Plaintiffs in support of an enhancement for their contingency-based arrangement do not offer adequate support for such relief. *See Rum Creek Coal Sales, Inc. v. Caperton*, 31 F.3d 169, 172 (4th Cir. 1994) (explaining that enhancement may be appropriate in cases of "extraordinary success"); *Ketchum v. Moses*, 17 P.3d 735 (Cal. 2001) (addressing enhancement under California statute); *Goodlaxson v. Mayor & City Council of Baltimore*, 776 F. Supp. 3d 311 (D. Md. 2025) (approving fee request absent fee enhancement for contingency). Further, the court does not find the complexity or duration of the case, or the size of the settlement class, warrants a multiplier. *See, e.g.*, *Berry v. Schulman,* 807 F.3d 600, 617-18 (4th Cir. 2015) (explaining district court's basis for fee award including multiplier).

Relatedly, pursuant to the Settlement Agreement: "The Plans shall administer this Settlement, including identifying Settlement Class Members whose claims are eligible for rescoring . . . , with the exception of any necessary monitoring of the Rescoring Protocol by Class Counsel." (ECF No. 79-3 at § VI.D.2., p. 22.) Section VIII on attorneys' fees provides that that the Motion shall be addressed "contemporaneously with Final Approval." (*Id.* § VIII.A.) Section XI on "Jurisdiction and Enforcement" provides that the court reserves jurisdiction "to enforce the terms of the Settlement Agreement," *id.* § XI.A., in the manner explained in the subsection titled "Dispute Resolution," which provides in pertinent part: "In the event Court intervention is needed, the prevailing party in any enforcement action may seek, and the Court may in its discretion award, appropriate relief including specific performance, injunctive relief, and reasonable attorneys' fees and expenses for enforcing the Settlement Agreement." *Id.* § XI.B. When read as a whole, the court agrees with Defendants that fees incurred in connection with attorney monitoring of the

Rescoring Protocol is carved out of costs to be borne by the Plan in connection with administration of the Settlement Agreement; and the provision pertaining to continued jurisdiction is limited to settling disputes about how the Rescoring Protocol and subsequent benefit administration (if any) is carried out. Moreover, while neither dispositive nor certain, the court is mindful that the Settlement Class may be entitled to notice and an opportunity to be heard on any potential fee petition related to monitoring the Rescoring Protocol. In sum, the court declines to retain jurisdiction as Plaintiffs request.

Regarding the particular hourly rates to be applied to the fee request, as noted above, the Motion requests the court apply the following hourly rates to the time records offered:[16]

| Beasley Allen | Sinclair Law Firm | Nace Law Group |
|---|---|---|
| Miles, Dee $1,600 | Sinclair, Tom $1,500 | Nace, Christopher $750 |
| Golston, Larry $1,400 | Fowler, Claudette $300 | |
| Hawthorne, Ali $1,200 | Hall, Victoria $300 | |
| Gilliland, Rebecca $1,150 | | |
| Hampton, Leon $1,100 | | |
| Miles, Lauren $1,000 | | |
| Minder, Rachel $1,000 | | |
| Evans, Paul $950 | | |
| Chandler, Tristen $300 | | |
| Stapp, Jessica $300 | | |
| Scroggins, Valerie $300 | | |
| Revels, Emma $250 | | |
| Fulmer, Michelle $300 | | |
| Pugh, Ashley $300 | | |
| Leva, Sam $250 | | |
| Stewart, Cole $250 | | |

As aptly explained by Judge Titus of this court:

> The fee applicant bears the burden of establishing the

[16] As mentioned, no time records are offered for the Cuthbert Firm. Similarly, no time records are offered for fees and expenses requested on behalf of the Nace Law Group; however, the Nace Declaration attests generally to attorney time recorded and expenses incurred. (ECF No. 88-4.) As explained below, the court awards no fees attributed to work performed by the Cuthbert Firm ($131,670.00) because the Motion offers no basis for the court to assess the reasonableness of such a request and fails to comport with the Local Rules. Local Rule 109.2.b (D. Md. 2025). The court will not award fees to the Nace Law Group as requested, because nothing is offered consistent with the Local Rules to support the request, *id.*; however, the court personally observed attorney Nace in attendance at court proceedings in his role as local counsel, and will award fees based on that limited observation.

> reasonableness of a requested hourly rate. *Plyler v. Evatt,* 902 F.2d 273, 277 (4th Cir. 1990). "In addition to the attorney's own affidavits, the fee applicant must produce satisfactory specific evidence of the prevailing market rates in the relevant community for the type of work for which he seeks an award." *Id.* (internal quotation marks omitted). Evidence sufficient to verify the prevailing market rate "include affidavits of local lawyers familiar with the type of work involved, the relevant community, and the skills of the fee applicants." *Life Tech. Corp. v. Life Tech., Corp.,* 2012 WL 4748080, at *1 (October 2, 2012). Appendix B of the Local Rules for the District of Maryland sets forth presumptively reasonable rates, but these guidelines are non-binding.

*EEOC v. Freeman*, 126 F. Supp. 3d 560, 574 (D. Md. 2015).

This court's Local Rule 109.b.2 provides:

> Any motion requesting the award of attorneys' fees must be supported by a memorandum setting forth the nature of the case, the claims as to which the party prevailed, the claims as to which the party did not prevail, a detailed description of the work performed broken down by hours or fractions thereof expended on each task, the attorney's customary fee for such like work, the customary fee for like work prevailing in the attorney's community, a listing of any expenditures for which reimbursement is sought, any additional factors which are required by the case law, and any additional factors that the attorney wishes to bring to the Court's attention. If the Rules and Guidelines for Determining Attorneys' Fees in Certain Cases contained in Appendix B to these Rules are applicable, any motion for attorneys' fees also shall be prepared in accordance with such Rules and Guidelines.

Local Rule 109.b.2 (D. Md. 2025).

As mentioned earlier, Appendix B of this court's Local Rules provides in relevant part:

> Reasonable hourly rates should be determined by the Court using declarations, affidavits, stipulations by the parties, or other evidence. A useful guideline for hourly rates may be provided by the Fitzpatrick Matrix as adjusted annually, with a reduction of 5% to 20% (to reflect differences between the legal markets in Washington, D.C. and Maryland). These guideline rates are intended solely to provide practical guidance to lawyers and judges when requesting, challenging, and awarding fees. The factors established by case law govern. These guidelines do not create any presumptions regarding reasonable rates. The Court recognizes that

> a fee award should be determined in accordance with relevant case law.

Local Rules App'x B(3) (D. Md. 2025).

The Motion does not set forth the customary fee of any of Plaintiffs' timekeepers, like standard hourly rates—or any measure of how they customarily generate fee income (*i.e.*, whether by contingency or hourly engagement);[17] nor do Plaintiffs offer attestations of other lawyers or third parties as to rates customarily charged for the nature of services relevant to this action in any market or community. Further, the Motion makes no mention of Appendix B or the Fitzpatrick Matrix, which this court uses as a tool, among other considerations, to assess the reasonableness of attorney rates.

Instead, the Motion asserts:

> Reasonableness of a rate is not restricted solely to the prevailing rate in the community but "where it is reasonable to retain attorneys from other communities" then the rates from that community "may also be considered." *Rum Creek*, 31 F.3d at 175. Evidence of the rate an attorney charges to hourly-paying clients may be preferred,[] "but where an attorney primarily uses contingent fee agreements, a court should consider 'evidence of rates similarly experienced attorneys in the community charge paying clients for similar work and evidence of fee awards the attorney has received in similar cases.'" *Boxell v. Plan for Grp. Ins. of Verizon Commc'ns, Inc.*, No. 1:13-CV-089 JD, 2015 WL 4464147, at *8 (N.D. Ind. July 21, 2015) (quoting *Pickett v. Sheridan Health Care Ctr.*, 664 F.3d 632, 640 (7th Cir.2011).

(ECF No. 88-1 at pp. 28–29) (footnote omitted).

In *Boxell v. Plan for Grp. Ins. of Verizon Commc'ns, Inc.*, relied upon by Plaintiffs, the

[17] A partial exception to this is attorney Nace, who attests by way of his Declaration at Exhibit C to the Motion (ECF No. 88-4) regarding his requested lodestar of $750: "The hourly rates shown below [$750/hour] are the usual and customary lodestar rates charged in Washington, D.C, and the national venues in which the firm typically handles cases for each individual doing the type of work performed in this litigation. . . . Nace Law Group has been retained on hourly matters at these rates, and I have personally been paid retainers based upon these rates." *Id.* ¶ 7. Because the court will not award the requested fees attributed to the Nace Law Group for the reasons explained above, while the court acknowledges that attorney Nace has provided this information, it is not material to the court's overall ruling on the Motion.

Northern District of Indiana explained:

> A reasonable hourly rate "is to be based on the 'market rate' for services rendered." *Spegon v. Catholic Bishop of Chicago,* 175 F.3d 544, 554–55 (7th Cir. 1999). The best evidence of an attorney's market rate is what a client has agreed to pay him, but where an attorney primarily uses contingent fee agreements, a court should consider "evidence of rates similarly experienced attorneys in the community charge paying clients for similar work and evidence of fee awards the attorney has received in similar cases." *Pickett v. Sheridan Health Care Ctr.,* 664 F.3d 632, 640 (7th Cir. 2011). Ms. Boxell's counsel, Robert J. Rosati, seeks a rate of $600 per hour. He does not have any clients who pay by the hour, though, so there is no presumptive hourly rate to use as a starting point, and he has not litigated a fee petition to a decision in many years. However, he has submitted affidavits from four other attorneys attesting to their own rates: Glenn R. Kantor and Joseph A. Creitz, both of California, state that their hourly rates are $650 and $700, respectively; Mark D. DeBofsky, from Chicago, Illinois, states that his hourly rate is $600; and Bridget O'Ryan, from Indianapolis, Indiana, states that her hourly rate is $350. Each of those attorneys specializes in representing plaintiffs in ERISA disability benefits claims."

No. 1:13-CV-089 JD, 2015 WL 4464147, at *8 (N.D. Ind. July 21, 2015). But, as explained, Plaintiffs do not attest to their own rates, they do not provide rates of similarly experienced attorneys in any community,[18] they do not state whether they primarily use contingency fee arrangements, and they ignore the Fitzpatrick Matrix entirely—except to aver that fee matrices can be a useful starting point but do not bind the court. (ECF No. 88-1 at p. 34) (quoting *De Paredes v. Zen Nails Studio LLC*, 134 F.4th 750, 753–54 (4th Cir. 2025)).

A more fulsome recitation of what happened in *De Paredes* is helpful. In *De Paredes*, the Fourth Circuit held that the district court abused its discretion on a fee petition when it determined that it would "not approve hourly rates above those contemplated by the Local Rules" and instead found that "the reasonable hourly rates are those at the high end of the guideline ranges set forth in the Local Rules." 134 F.4th at 754. The Fourth Circuit explained:

[18] The Real Rate Report (ECF No. 88-5) is not adequate to fulfill this task.

> Once a fee dispute is before it, however, a district court "may consider, but is not bound by," any matrix. *Newport News Shipbuilding*, 591 F.3d at 229. Nor may a district court, when discharging its "duty" to "calculat[e] reasonable attorney's fees," treat a fee matrix as "presumptively reasonable" and require special justification to deviate from it—even when that matrix is contained in the district court's local rules. *Vogel v. Harbor Plaza Ctr., LLC*, 893 F.3d 1152, 1159–60 (9th Cir. 2018); *accord* Appendix B, at 127 n.* (stating that "[t]he factors established by case law obviously govern over" the published ranges). Instead, the court must consider all relevant evidence to determine "the prevailing market rates in the relevant community," *Blum v. Stenson*, 465 U.S. 886, 895, 104 S. Ct. 1541, 79 L.Ed.2d 891 (1984), including lawyer affidavits, fee awards in similar cases, general surveys, fee matrices, and even its "own personal knowledge," *Rum Creek Coal Sales*, 31 F.3d at 179; see *McAfee v. Boczar*, 738 F.3d 81, 91 (4th Cir. 2013); *Eastern Assoc. Coal Corp. v. Director, Off. of Workers' Comp. Programs*, 724 F.3d 561, 567 (4th Cir. 2013). The court may not elevate a matrix above all other types of evidence or treat a matrix as establishing a presumptive answer or range of answers.

*Id.* at 753–54.

Accordingly, as explained, this court utilizes the Fitzpatrick Matrix not as a hurdle Plaintiffs must leap or as a baseline standard, but rather as one of many tools in the court's toolbelt to determine a reasonable rate. To be sure, Plaintiffs are correct to rely on *De Paredes*, as is the court; however, Plaintiffs offer little of what the Fourth Circuit and district courts (both within and outside this circuit) expect in the way of sources of information to assess reasonableness.

Instead, on the basis that ERISA is recognized as a specialized, complex field—which it undoubtedly is—Plaintiffs request the court assume the relevant community is nationwide and rely upon the Real Rate Report (ECF No. 88-5, described *supra*) to support their requested lodestar. (ECF No. 88-1 at pp. 30–31.) They explain: "For the ERISA practice area, the Real Rate Report shows a national third quartile partner rate of $1,002 per hour. Thus, twenty-five percent of ERISA partners nationally billed above $1,000 per hour in 2025. In the Washington, D.C. market, an appropriate geographic comparator for complex national ERISA class action work, the

Employment and Labor partner third quartile hourly rate was $1,068, and the mean was $903." *Id*. at 31. Plaintiffs elect not to address the Local Rules' Fitzpatrick Matrix, which identifies "[h]ourly [r]ates . . . for [l]egal [f]ees for [c]omplex [f]ederal [l]itigation in the District of Columbia" based on the data gathered as described in the Explanatory Notes.

Plaintiffs cite several district opinions within the Fourth Circuit in support of application of national market rates in ERISA cases, *id*. at 29–30, which bear varying degrees of favorable comparison to the instant action. *See Ciarciello v. Bioventus Inc*., 760 F. Supp. 3d 377 (M.D.N.C. 2024) (fee petition in SEC class action with percentage of common fund as fee, and based on comparison of attorneys' standard billable hourly rates); *Phillips v. Triad Guar. Inc*., 1:09CV71, 2016 WL 2636289 (M.D.N.C May 9, 2016) (fee petition in SEC class action with percentage of common fund as fee); *Feinberg v. T. Rowe Price Grp., Inc*., 610 F. Supp. 3d 758 (D. Md. 2022) (unopposed fee petition in ERISA class action and applying percent-of-recovery formula); *Sims v. BB&T Corp*., Civ. No. 1:15-732, 2019 WL 1993519, at *2 (M.D.N.C. May 6, 2019) (unopposed fee petition based on common fund settlement); *Kruger v. Novant Health, Inc*., No. 1:14CV208, 2016 WL 6769066 (M.D.N.C. Sept. 29, 2016) (fee petition in ERISA class action involving $32 million monetary recovery for as many as 70,000 class members, and applying percent-of-recovery formula). While not dispositive, Plaintiffs cite no case from within this district awarding fees based on $1,600 hourly rates for ERISA class action litigation.

Notwithstanding the middling comparison of the above-cited cases to the instant action, the court generally agrees with Plaintiffs that broad judicial recognition of the complexity of ERISA law and the relatively small population of lawyers with genuine expertise in the field who are also quality class action litigators entitles Plaintiffs to a rate that reflects these attributes. But other than the Real Rate Report, counsel's assertion of their own competence and experience

(including some reference to outcomes in other matters),[19] the Motion does not offer the court the diverse sources of information described in the very cases they rely on or set forth in the above-mentioned Local Rules—the information necessary to stress-test a fee request, to develop comfort and confidence that what is requested is reasonable.

The court further notes that Plaintiffs do not account for the passage of time in their fee

[19] *See, e.g.*, Miles Declaration, ECF No. 88-2, at ¶¶ 22, 24:

> 22. The hourly rates shown below are the usual and customary lodestar rates charged in the national venues in which the firm typically handles cases for each individual doing the type of work performed in this litigation. The hourly rates set forth in the table above reflect each timekeeper's experience, training, specialization, and role in this litigation, as well as the prevailing market rates for complex ERISA and § 1981 class action work in this district and in the national market for counsel of comparable experience.
>
> . . .
>
> 24. The Lodestar and Expense Charts reflect Class Counsel's expertise in class action litigation, the complexity of the matters involved in this litigation, and the prevailing rate for providing such services. My firm, the attorneys working on this case, and I have been recognized by both federal and state courts across the country as being highly skilled and experienced in complex litigation including successfully leading multiple automotive and consumer fraud class actions;

and Sinclair Declaration, ECF No. 88-3, at ¶¶ 17–18:

> 17. My ERISA work has included individual disability and life-insurance claims, pension claims, plan-document and claims-procedure disputes, breach-of-fiduciary-duty claims, appellate matters, and complex class litigation. I previously served as class counsel for thousands of ERISA plan participants in *Reyes v. Bakery & Confectionery Union & Industry International Pension Fund*, No. 3:14-cv-05596-JST (N.D. Cal.).
>
> 18. I have been invited to teach and present at national programs concerning ERISA claims and litigation. I have presented to practitioners and judges, published articles concerning ERISA benefit claims, and been recognized by members of the bar in my geographic market for plaintiffside ERISA work.
>
> . . .
>
> 116. In *Reyes*, the United States District Court for the Northern District of California approved my requested rate of $625 an hour for work performed nearly a decade ago. *See Reyes v. Bakery & Confectionery Union & Industry International Pension Fund*, 281 F. Supp. 3d 833, 852-53 (N.D. Cal. 2017). Since then, I have accumulated nearly another decade of ERISA, class, appellate, settlement, and strategic experience.

request. The billing records before the court span more than three years: June 9, 2023, through July 15, 2026—yet the Motion seeks 2026 rates for the entirety of the period. That may not make much difference for senior counsel with decades of experience, but three years can (and often do) make a material difference in the skill, expertise, and value of services offered by attorneys with considerably fewer years at the bar. For example, attorney W.D. Miles began practicing in 1990; and attorney Evans in 2017. (ECF No. 92-2.) Respectfully, the court posits that, in 2023, services provided by attorney Evans were not on par with his services offered today from a value perspective; yet Plaintiffs seek a $950 hourly rate for his work beginning with his first time entry of July 7, 2023, when he was not yet six years at the bar. (ECF No. 88-2 at p. 13.)

Turning back to the Fitzpatrick Matrix,[20] applying the matrix to the billing parties absent any market reduction for Maryland in view of the complexity of ERISA law, the suggested rates are as follows as of 2025—the year the current matrix was published—which is to say, not accounting for the 3-year (2023–26) span in billing at issue here:

| Beasley Allen | Sinclair Law Firm | Nace Law Group |
| --- | --- | --- |
| Miles, Dee $933 | Sinclair, Tom $905 | Nace, Christopher $768 |
| Golston, Larry $892 | Fowler, Claudette $255 | |
| Hawthorne, Ali $806 | Hall, Victoria $255 | |
| Gilliland, Rebecca $780 | | |
| Hampton, Leon $768 | | |
| Miles, Lauren $738 | | |
| Minder, Rachel $738 | | |
| Evans, Paul $738 | | |
| Chandler, Tristen $255 | | |
| Stapp, Jessica $255 | | |
| Scroggins, Valerie $250 | | |
| Revels, Emma $255 | | |
| Fulmer, Michelle $255 | | |
| Pugh, Ashley $255 | | |
| Leva, Sam $250 | | |
| Stewart, Cole $250 | | |

[20] As explained, the Fitzpatrick Matrix suggests rates for complex federal litigation in the District of Columbia. Accordingly, the Local Rule suggests a 5-20% market reduction for district of Maryland litigation. Local Rule App'x B.3 (D. Md. 2025). For the reasons explained above, the court does not consider a discounted Fitzpatrick Matrix rate.

Application of the above rates to the fee request set forth in the Motion results in the following adjustments:

| Beasley Allen | Sinclair Law Firm | Nace Law Group |
|---|---|---|
| Miles, Dee $341,104.80 | Sinclair, Tom $786,807.00 | Nace, Chr. $36,096.00 |
| Golston, Larry $3,300.40 | Fowler, Claudette $8,032.50 | |
| Hawthorne, Ali $140,727.60 | Hall, Victoria $1,326.00 | Total: $36,096.00 |
| Gilliland, Rebecca $602,472.00 | | |
| Hampton, Leon $281,011.20 | Total: $796,165.50 | |
| Miles, Lauren $1,476.00 | | |
| Minder, Rachel $9,225.00 | | |
| Evans, Paul $125,091.00 | | |
| Chandler, Tristen $24,480.00 | | |
| Stapp, Jessica $3,162.00 | | |
| Scroggins, Valerie $150.00 | | |
| Revels, Emma $18,513.00 | | |
| Fulmer, Michelle $280.50 | | |
| Pugh, Ashley $535.50 | | |
| Leva, Sam $5,375.00 | | |
| Stewart, Cole $3,850 | | |
| | | |
| Total: $1,560,754.00 | | |

Attorneys' Fees Grand Total Request Adjusted Per the Fitzpatrick Matrix: $2,393,015.50. (The Motion seeks fees totaling $3,809,000.00 per ECF No. 154.)

To be clear, this is presented purely for purposes of drawing a comparison between what Plaintiffs seek in the Motion and what the Fitzpatrick Matrix offers—and not to set forth the court's finding as to lodestar rates or reasonableness of fees, or to imply (incorrectly) that Plaintiffs bear a burden to demonstrate why the court should upwardly deviate from the Fitzpatrick Matrix. *See De Paredes v. Zen Nails Studio LLC*, 134 F.4th 750 (4th Cir. 2025), *supra*.

**g. Time limitations imposed by the client or the circumstances**

Plaintiffs offer no information or assertions as to this factor. Regardless, based on the court's knowledge about this action, nothing about this case would appear to have presented any issues relevant to this factor.

**h. The amount involved and the results obtained**

The damages amount involved is not a factor relevant to this action, as it involved an injunction class under Rule 23(b)(2) and the Complaint sought largely injunctive and declaratory relief. Further, while the Rescoring Protocol may involve provision of retroactive Plan benefits plus 6% annual interest, the dollar amount to be awarded or paid as a result of rescoring is unknown at this time. Regarding the results obtained, the court incorporates herein the above discussion regarding entitlement to a fee award under ERISA and 42 U.S.C. § 1988.

**i. The experience, reputation, and ability of the attorneys**

The court finds that the experience, reputation and ability of Beasley Allen and the Sinclair Law Firm Plaintiffs' counsel of record to be exceptional across the board, and materially relevant to the subject matter of the action, as well as the settlement outcome. This factor is not relevant to counsel at the Cuthbert Firm, as the court declines to award attorneys' fees attributable to these attorneys for the reasons set forth below. As for the Nace Law Firm, the court is not in a position to assess this factor thoroughly, as attorney Nace served as local counsel and the court is largely unaware of his characteristics and qualities necessary to assess this factor; however, the court has considered the Nace Declaration at Exhibit C to the Motion and has no doubt attorney Nace is experienced and competent in complex civil litigation.

**j. The undesirability of the case**

On this factor, Plaintiffs offer:

> Suits challenging the internal administration of major professional sports benefit plans carry inherent institutional resistance. Defendants retained Groom Law Group, a large and highly-qualified firm whose practice is dedicated to representing ERISA plan fiduciaries, and maintained a team of multiple attorneys throughout this process. They had every resource and incentive to contest liability, challenge class certification, and defeat any attempt at retroactive relief. The case was not one where liability was

> obvious, class certification was uncontested, or settlement was inevitable. Other firms, in fact, did turn down this litigation, but Class Counsel took on this matter knowing all of that.

(ECF No. 88-1 at p. 27.)

In the court's view, what Plaintiffs describe is more about the challenges counsel faced to get their clients relief—including contending with Defendants who had both the resolve and resources to hire expert and highly skilled opposing counsel. And if other firms turned the case down—which the court does not doubt—the court declines to speculate why. In sum, from the court's perspective, this case did not place Plaintiffs' counsel in a socially or professionally undesirable position; rather, to the contrary. As Plaintiffs' counsel have repeatedly (and rightly) asserted, they took on a case about ending institutionalized discrimination. If anything, some might say that made the case highly desirable. And to the extent the case was financially risky, as Plaintiffs appear to suggest, evaluating financial risk is the stuff of litigation for any firm whose business model relies on contingent fee income; however, the court appreciates that, to a certain extent, contingency fee-based cases may be less desirable than those offering hourly-based fee income. The court is not persuaded this case was undesirable in any respect.

**k. The nature and length of the professional relationship with the client**

According to the record before the court, Plaintiffs' counsel did not have pre-existing client relationships with named Plaintiffs or members of the Settlement Class.

**l. Awards in similar cases.**

The Motion does not substantively address this factor (although Plaintiffs recognize it is a *Johnson* factor, ECF No. 88-1 at pp. 15, 28).

### 3. Other Considerations

#### a. Cuthbert Firm

The court declines to award fees attributable to the Cuthbert Firm. As set forth above, the Motion requests an award of $131,670 attributed to 126 hours of work by Byron Cuthbert and 12.6 hours of work by Vicki Trammel Cuthbert—both at $950 per hour. (ECF No. 88-2 at p. 79.) The Motion offers no declaration from either timekeeper, appends no time records, and provides no description of tasks performed contrary to Local Rule 109.2.b and Appendix B. Thus, there is no basis for the court to evaluate the reasonableness of the request, and the court will not guess; nor will the court award a percentage of the request absent any basis to do so in contravention of the Local Rules.

#### b. Nace Law Group

As set forth above, in support of the Motion, Plaintiffs offer the Nace Declaration on behalf of the Nace Law Group. (ECF No. 88-4.) Nace attests that he performed 47 hours of work, documented contemporaneously with services performed, and asserts the proper lodestar for that work is $35,250.00 "based upon current rates" (*i.e.*, $750 per hour). He confirms he has been engaged and paid at his requested hourly rate in other matters. He further attests to firm expenses of $674.78, consisting of the $402.00 court filing fee for the Complaint, $27.19 in postage, and $245.59 for in-house photocopying (which the court addresses below). For reasons unclear to the court, the Motion includes no itemized time records or anything of the sort—again, contrary to the Local Rules. The court will award expenses to cover the filing fee, as the Nace Declaration is consistent with the court fee schedule in effect as of the filing date and the court notes Nace served as local counsel. The court will also award fees for court appearances as local counsel (based on

the court's observation, as explained earlier).[21] The court, however, declines to award other fees in the absence of the requisite documentary support per the Local Rules and applicable case law.

**c. Photocopies**

On the subject of photocopies, the Local Rules provide: "Copy work is compensable at the rate established by the Court for taxation of costs." *Id.* at App'x B.4. Beasley Allen expenses spreadsheet entries identify "units" of "printer copies" and include a narrative describing "Print Expense: Total Print Transactions" but it is not clear to the court what the firm charges per page. (*See, e.g.*, ECF No. 88-2 at p. 59, identifying 227 "units" of "printer copies" for a total of $13.27 and described as "Print Expense: Total Print Transactions = 15.") The firm seeks $26.69 for photocopy expenses. Sinclair Law Firm identifies $351.90 in "copies/fax" based on four expense entries, but the court is unable to discern how that request breaks down. (ECF No. 88-3 at p. 69.) Likewise, Nace Law Group seeks a lump sum of $245.59 attributed to "in-house copies," which is meaningless to the court. (ECF No. 88-4 at p. 4.)

**D. The Reasonable Hourly Rate**

Having considered the entirety of the record before the court, the applicable factors, case law, and the Local Rules, the court concludes that the appropriate, reasonable rates to apply to the Motion are as follows:

| Beasley Allen | Sinclair Law Firm | Nace Law Group |
|---|---|---|
| Miles, Dee $1200 | Sinclair, Tom $1100 | Nace, Christopher $750 |
| Golston, Larry $1000 | Fowler, Claudette $275 | |
| Hawthorne, Ali $900 | Hall, Victoria $275 | |
| Gilliland, Rebecca $800 | | |
| Hampton, Leon $775 | | |
| Miles, Lauren $750 | | |
| Minder, Rachel $750 | | |
| Evans, Paul $740 | | |

[21] The court notes that Beasley Allen requests $700 in "Filing Fees," (ECF No. 88-2 at p. 9), which the court concludes relate to reimbursement of the Nace Law Group for *pro hac vice* filing fees, (*id.* at 71, 73, noting "filing fees" expenses of $100 and $600, respectively, for "[r]eimbursement of PHV fees" to "local counsel").

Chandler, Tristen $275
Stapp, Jessica $275
Scroggins, Valerie $250
Revels, Emma $275
Fulmer, Michelle $275
Pugh, Ashley $275
Leva, Sam $250
Stewart, Cole $250

**E. Service Awards for Named Plaintiffs Bailey and Curry**

As set forth in *Berry v. Schulman,*

> Incentive awards are "intended to compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general." *Rodriguez v. W. Publ'g Corp.,* 563 F.3d 948, 958–59 (9th Cir.2009). They are "fairly typical in class action cases." *Id.* at 958 (quoting 4 William B. Rubenstein et al., *Newberg on Class Actions* § 11:38 (4th ed. 2008)).

807 F.3d 600, 613 (4th Cir. 2015).

The court finds Plaintiffs Bailey and Curry are entitled to service awards. Based on the record before the court, there is no dispute (and the court finds) they meaningfully participated in the case, including assisting with information development related to the Complaint; attending mediation in Washington, D.C., repeatedly conferring with co-Class Counsel regarding the litigation as a whole and, importantly, settlement. Further, the court finds it material that serving as class representatives in this action required Messrs. Bailey and Curry to disclose sensitive, highly personal health information; and they risked damage to their public persona and reputations to bring allegations of race-based misconduct against an enormous organization recognized around the world as a symbol of all things Americana. That said, the court finds the requested awards are outsized for this action as compared to others cited by Plaintiffs (and some not cited by

Plaintiffs).[22]

In *Berry*, decided in 2015, the Fourth Circuit found the district did not abuse its discretion in approving service awards of $5,000 each to the six class representatives in a case with a class of 200 million consumers where the outcome produced a "'substantial, nationwide program that addresses the issues raised in the Complaint by the [(b)(2) Class] and will result in a significant shift' in [relevant] industry practices." *Id*. at 615.

In *Siqueiros v. General Motors LLC*, in 2025, the Northern District of California approved $30,000 service awards in a case with a $150 million common-fund settlement where the class representatives participated in the same ways Messrs. Bailey and Curry did here, but also sat for depositions and testified at trial. Case No. 3:16-cv-07244 (N.D. Cal. Oct. 8, 2025), ECF No. 735.[23] In *Galeener v. Source Refrigeration & HVAC, Inc*., also out of the Northern District of California, the court in 2015 approved service awards ranging from $5,000 to $27,000 where the settlement produced a $10 million common-fund settlement. Case No. 3:13-cv-04960-VC, 2015 WL 12977077, at *2 (N.D. Cal. Aug. 21, 2015). In *In re High-Tech Emp. Antitrust Litig*., again out of the Northern District of California, the court in 2015 granted service awards ranging from $80,000 to $120,000 in a "megafund" class recovery of more than $415 million. Case No. 11-cv-02509-LHK, 2015 WL 5158730, at *5-6 (N.D. Cal. Sept. 2, 2015).

In *Feinberg v. T. Rowe Price Group, Inc.*, which Plaintiffs cite in support of their request for a national ERISA-related lodestar, Judge Bredar of this court granted an unopposed motion to approve the settlement of an ERISA class action, including service awards ranging from $10,000 to $15,000 where settlement produced a $7 million common-fund after five years of active

[22] Relatedly, the court will not award expenses incurred for travel and lodging of the spouses of Messrs. Curry and Bailey to and from mediation in Washington, D.C.
[23] No Westlaw citation is available.

litigation and during which class representatives endured depositions conducted by "aggressive defense counsel" and engaged in a multitude of other participation activities like answering interrogatories, and attending court proceedings and settlement conferences. 610 F. Supp. 3d 758, 774 (D. Md. 2022).

In sum, while the court fully supports Messrs. Bailey and Curry's entitlement to awards in recognition of their service to this action and their fellow Settlement Class members, the court cannot abide an award of $50,000.00 per class representative. The court finds service awards of $20,000.00 per class representative is appropriate.

## IV. CONCLUSION

In consideration of the entire record before the court, for the reasons set forth herein—and observing the Supreme Court's apt reminder that "[t]he essential goal in shifting fees (to either party) is to do rough justice, not to achieve auditing perfection," *Fox v. Vice*, 563 U.S. 826, 838 (2011)—the Motion is granted in part as follows and otherwise denied:[24]

| | |
|---|---|
| <u>Basley Allen</u> | |
| Attorneys' Fees: | $1,380,000.00 |
| Expenses: | $200,000.00 |
| Firm Total: | $1,580,000.00 |

| | |
|---|---|
| <u>Sinclair Law Firm</u> | |
| Attorneys' Fees: | $960,000.00 |
| Expenses: | $20,000.00 |
| Firm Total: | $1,000,000.00 |

[24] By filing at ECF No. 134, certain potential members of a putative class action, *Alford v. The NFL Player Disability & Survivor Benefit Plan, et al.*, Civil Case No. 1:23-cv-00358-JRR, filed an objection to the Settlement Agreement, which the court addressed at length at the fairness hearing on October 20, 2026. (ECF No. 134; the "*Alford* Objection.") At the hearing, the court overruled all grounds of the *Alford* Objection save objection grounds directed at Plaintiffs' request for fees, expenses, and service awards set forth in the Motion, as the court had not evaluated the Motion at that time. ECF No. 134. As to the Motion, the *Alford* Objection asserts generally that Plaintiffs ask for too much and "any awards should be markedly less" than those requested. *Id.* at 59. The *Alford* Objection offers no particular detail as to the grounds of the objection to the Motion, explaining "Objectors will not nitpick counsel's ti[m]e records as to the number of hours or the billing rates claimed." *Id.* As set forth above, the court has determined that Plaintiffs are entitled to some, but not all, relief requested in the Motion based, in part, on the particularized grounds raised by Defendants, and, in part, on the court's *sua sponte* observations. Notwithstanding the court's analysis and ruling set forth above, the *Alford* Objection to the Motion, standing alone, fails for lack of specificity and for vagueness; and is therefore overruled.

<u>Nace Law Group</u>

| | |
|---|---|
| Attorneys' Fees: | $6,000.00 |
| Expenses: | $420.00 |
| Firm Total: | $6,420.00 |

<u>Cuthbert Firm</u>

| | |
|---|---|
| Attorneys' Fees: | $0 |
| Expenses: | $0 |
| Firm Total: | $0 |

<u>Service Awards</u>

| | |
|---|---|
| Plaintiff Curry: | $20,000 |
| Plaintiff Bailey: | $20,000 |
| Total: | $40,000.00 |

| | |
|---|---|
| Total Attorneys' Fees Award: | $2,346,000.00 |
| Total Expenses Award: | $220,420.00 |
| Total Service Awards: | $40,000.00 |
| **GRAND TOTAL**: | **$2,606,420.00** |

A separate order follows.

/S/

November 19, 2026

____________________________

Julie R. Rubin
United States District Judge